In re JOINT EASTERN AND SOUTHERN DISTRICT ASBESTOS LITIGATION.

United States Bankruptcy Court Southern District of New York.

In re JOHNS–MANVILLE CORPORATION, et al., Debtors.

Bernadine K. FINDLEY, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, Plaintiffs,

v.

Donald M. BLINKEN, Daniel Fogel, Francis H. Hare, Jr., Christian E. Markey, Jr. and John C. Sawhill, solely in their capacity as Trustees, Defendants.

Bankruptcy Nos. 82 B 11656 (BRL)–82 B 11676 (BRL).
Civ. A. No. 90–3973.

United States District Court, E. and S.D. New York.

June 27, 1991.

716

Elihu Inselbuch, C. Sanders McNew, Caplin & Drysdale, New York City, Frederick M. Baron, Baron & Budd, Dallas, Tex., Ronald L. Motley, Ness, Motley, Loadholt, Richardson & Poole, Charleston, S.C., Christopher M. Placitella, Wilentz, Goldman & Spitzer, Woodbridge, N.J., Robert B. Steinberg, Rose, Klein & Marias, Los Angeles, Cal., Harry F. Wartnick, Cartwright Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc., San Francisco, Cal., for class representatives.

John D. Aldock, William R. Hanlon, Shea & Gardner, Washington, D.C., Andrew T. Berry, McCarter & English, Newark, N.J., Richard C. Binzley, Thompson, Hine & Flony, Cleveland, Ohio, Roger E. Podesta, Anne E. Cohen, Geoffrey Coll, Debevoise & Plimpton, New York City, James J. Higgins, Boyar, Higgins & Hayden, Morristown, N.J., Paul F. Jones, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., James Crawford Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., Earl L. Scott, Wood, Williams, Rafalsky & Harris, New York City, Katherine M. Steele, Seattle, Wash., for Codefendants.

Leslie Gordon Fagen, Clifford Peterson, Beth Friedman Levine, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for future claimants.

James Fite, Paul Safchuck, Reverend James Knight, White Lung Ass'n Baltimore, Md., Myles O'Malley, Mike Saviak, Barbara Zeluck, National Asbestos Victims Legal Action Organizing Committee, Newark, N.J., for individual claimants.

Philip L. Graham, Jr., Edward W. Keane, William E. Willis, Sullivan & Cromwell, New York City, for Manville Corp.

David T. Austern, Manville Personal Injury Settlement Trust, Washington, D.C., Theodore Gewertz, Amy R. Wolf, Wachtell, Lipton, Rosen & Katz, New York City, for Manville Personal Injury Settlement Trust.

Edward T. Dangel, III, Boston, Mass., James Gavin, Gavin & Gavin, Haddonfield, N.J., Richard S. Glasser, Glasser & Glasser, Norfolk, Va., Robert R. Hatten, Patten, Wornom & Watkins, Newport News, Va., Thomas W. Henderson, Theodore Goldberg, Robert L. Jennings, Jr., Tybe Brett, Henderson & Goldberg, Pittsburgh, Pa., Timothy J. Hogan, The Offices of Peter G. Angelos, Baltimore, Md., Robert Jacobs, Jacobs & Crumplar, P.A., Wilmington, Del., Steven Kazan, Kazan, McCallain, Edises & Simon, Oakland, Cal., Hal C. Pitkow, Titusville, N.J., Frederick Schenk, Ca-

sey, Gerry, Casey, Westbrook, Reed & Hughes, San Diego, Cal., Emil Steck, Jr., Pasadena, Cal., for other beneficiaries.

Mark A. Peterson, Rand Corp., Santa Monica, Cal., Margaret A. Berger, Brooklyn Law School, Brooklyn, N.Y., Court–Appointed Experts.

Leon Silverman, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, Special Advisor to the Court.

Sidney Auerbach, M.D., New York City, Gregg J. Borri, Boulanger, Finley & Hicks, New York City, D. Jeffrey Campbell, Porzio, Bromberg & Newman, Morristown, N.J., John H. Faricy, Jr., Pustorino, Pederson, Tilton & Parrington, Minneapolis, Minn., Laurence Gold, AFL–CIO Washington, D.C., Bill Golt, Chemical Workers Ass'n of Dupont, H. Peter Haveles, Jr., Cadwalader, Wichersham & Taft, New York City, James J. Higgins, Boyar, Higgins & Hayden, Morristown, N.J., Shepard Hoffman, Baltimore, Md., Alan Kellman, The Jaques Admiralty National Headquarters Detroit, Mich., Robert Lapowsky, Roberta A. Golden, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for other interested parties.

James W. Whitcomb, Paul F. Jones, General Refractories and Grefco, Inc., Buffalo, N.Y.

BEFORE WEINSTEIN, District Judge, and BURTON R. LIFLAND, Chief Bankruptcy Judge.

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................... 732
II. HISTORY and PROCEDURAL BACKGROUND ......................... 734
 A. Asbestos; Scientific Developments and Knowledge ................... 734
 1. History of Asbestos Use ....................................... 735
 2. Discovery of Health Hazards Associated with Asbestos ............ 737
 3. Current Asbestos Studies and Medical Knowledge ................. 739
 B. Johns–Manville Corporation ........................................ 742
 C. Proof of Industry Knowledge of Health Hazards ..................... 743
 D. Litigation ......................................................... 745
 E. Bankruptcy of Johns–Manville ...................................... 751
 F. Second Amended and Restated Plan of Reorganization .............. 752
 G. Problems with the Trust ........................................... 754
 1. Inaccurate Estimates of Claims and Values ...................... 754
 2. Massive Impleading of Trust Leading to High Transaction Costs, Expensive Settlements and Litigation Costs .................... 758
 3. Operational Problems .......................................... 759
 4. Trust Payment Plan Promulgated on April 6, 1990 ............... 760
 H. Stay of Payments; Stay of Litigation; Orders and Opinions of the Courts 762
 I. Rule 706 Expert to Project Future Claims ........................... 763
 J. Appointment of Hon. Marvin E. Frankel; Limited Fund Hearings ..... 764
 K. Negotiations ....................................................... 766
 L. Stipulation of Settlement; Financing Agreement Between Manville and the Trust ....................................................... 767
 1. Stipulation of Settlement ....................................... 767
 2. Distribution Process ........................................... 768
 3. Master Agreement Between Trust and Manville ................... 770
 M. Appointment of Representative of Future Claimants; Appointment of Laurence Gold ................................................... 771
 1. Factual Setting Necessitating Appointment ...................... 771
 2. Legal Basis of Appointment ..................................... 772
 3. Amicus Curiae Appointment .................................... 773
 N. Courts' Orders of November 23; Notice of Hearings ................. 773
 O. Fairness Hearings ................................................. 775
 P. Order and Partial Judgment ........................................ 776
III. POSITIONS OF THE PARTIES ON THE FAIRNESS OF THE SETTLEMENT ........................................................... 776
 A. Majority Claimants ................................................ 776

| | | |
|---|---|---|
| B. | Minority Claimants........................................................ | 777 |
| | 1. Henderson & Goldberg ............................................ | 777 |
| | 2. Peter G. Angelos ................................................ | 778 |
| C. | Mississippi Claimants .................................................... | 779 |
| D. | Steven Kazan for Asbestos Victims of America ...................... | 779 |
| E. | Organizations Representing Asbestos Victims ....................... | 780 |
| F. | Parties Who Continue to Support FIFO Represented by Hal C. Pitkow and Others ............................................................. | 781 |
| G. | Laurence Gold............................................................ | 782 |
| H. | Leslie Gordon Fagen, Legal Representative of Future Claimants...... | 783 |
| I. | Codefendants ............................................................. | 784 |
| J. | Distributors .............................................................. | 785 |
| | 1. Pacor.............................................................. | 786 |
| | 2. MacArthur......................................................... | 787 |
| | 3. E.J. Bartells ..................................................... | 788 |
| | 4. General Refractory Company ...................................... | 789 |
| K. | Shipowners .............................................................. | 789 |
| L. | The Trust ................................................................ | 790 |
| M. | Manville Corporation .................................................... | 791 |
| N. | *Cimino* Plaintiffs........................................................ | 791 |
| O. | Claimants from Massachusetts Represented by Edward Dangel ....... | 791 |
| P. | Selected Claimants Represented by James Gavin ..................... | 792 |
| IV. | **JURISDICTION** ............................................................ | 792 |
| A. | Subject Matter Jurisdiction ............................................. | 792 |
| | 1. Diversity Jurisdiction ............................................. | 792 |
| | 2. Bankruptcy Jurisdiction; Jurisdiction Retained Under Plan ........ | 794 |
| B. | Personal and In Rem Jurisdiction ...................................... | 795 |
| | 1. In Personam Jurisdiction ......................................... | 795 |
| | 2. In Rem and Quasi in Rem Jurisdiction............................ | 798 |
| C. | Notice.................................................................... | 800 |
| V. | **CLASS ACTIONS** .......................................................... | 802 |
| A. | Class Action and Mass Torts; Aggregation Problems .............. | 803 |
| B. | Asbestos Litigation: A Unique Mass Tort .......................... | 811 |
| C. | Statutory Requirements ................................................. | 816 |
| | 1. Numerosity ....................................................... | 817 |
| | 2. Commonality ...................................................... | 817 |
| | 3. Typicality ........................................................ | 819 |
| | 4. Adequacy of Representation ...................................... | 820 |
| | a. Class Representatives............................................ | 821 |
| | b. Class Counsel ................................................... | 823 |
| D. | Rule 23(b)(1)(B) ........................................................ | 824 |
| | 1. Standards for Certification ....................................... | 824 |
| | 2. Application of Standards to Manville Facts ....................... | 828 |
| | 3. Mandatory Non–Opt–Out Class ................................... | 830 |
| | 4. Binding Future Claimants ........................................ | 834 |
| E. | Participation of Claimants; Voting not required ...................... | 837 |
| F. | Effect of Anti–Injunction Act ......................................... | 839 |
| VI. | **POWER OF BANKRUPTCY COURT AND DISTRICT COURT TO INTERPRET THE PLAN AND REVISE PAYMENTS MADE BY A NEW YORK TRUST CREATED PURSUANT TO A BANKRUPTCY**................. | 840 |
| A. | Bankruptcy Law.......................................................... | 840 |
| | 1. Settlement Does Not Modify Plan ................................. | 840 |
| | 2. Power Under Bankruptcy Code to Issue Injunctions .............. | 842 |
| B. | New York Law Governing Trusts ...................................... | 843 |
| VII. | **FAIRNESS OF SETTLEMENT** ........................................... | 846 |
| A. | Law and Criteria under Rule 23(e) ..................................... | 847 |
| B. | Factual Basis for the Settlement ....................................... | 848 |
| | 1. Arms' Length Negotiations ........................................ | 849 |
| | 2. Good Faith Negotiations Without Collusion ....................... | 850 |
| | 3. Probability of Success on Merits.................................. | 850 |
| | 4. Settlement Prior to Certification of Class ........................ | 851 |

5. Alternatives to Settlement ........................................ 852
6. Class Members' Reaction to Settlement .......................... 854
7. Workability ..................................................... 855
 a. Master Agreement Between Manville and the Trust............. 855
 b. Distribution Process ......................................... 856

C. Response to Objections and Disagreements ......................... 857
1. Distinction Between Level One and Two Claimants ................ 858
2. Prior Settlements with Insurers During .......................... 861
3. Treatment of Settlements and Judgments ......................... 862
4. Attorneys Fees ................................................. 863

D. Conflict of Laws and Interpretation of Section H of the Settlement... 869
1. Should a Single Federal Common Law Govern? .................... 871
 a. Standard.................................................... 872
 b. Application of Standard...................................... 875
2. Choice of Law Generally ....................................... 878
 a. Constitutional Limitations .................................. 878
 b. Modern Choice of Law ...................................... 880
3. New York Conflicts Rules....................................... 883
 a. Choice of Law: Contracts ................................... 885
 b. Choice of Law: Torts ....................................... 886
 i. Joint and Several Liability.................................. 889
 ii. Tort Reform Statutes and Policies Relevant to Settlement ... 891
4. Application of Law to Case; Interpretation of Provision .......... 894
 a. Value of Level One and Level Two Claims .................... 894
 b. Contribution and Set Offs ................................... 895
 i. Codefendants .............................................. 895
 ii. Distributors and Shipowners ............................... 899
 c. Evidence Bar................................................ 902
 d. Impleader Bar.............................................. 904

VIII. NEED TO OPERATE TRUST WITH MINIMAL COSTS IN MANNER
 THAT WILL ENSURE SUCCESS OF RESTRUCTURING .............. 905
IX. RELATION OF SETTLEMENT TO OTHER ASPECTS OF ASBESTOS
 PROBLEM.................................................... 906
 A. Need For Overall Solution ........................................ 906
 B. Flexibility of Plan to Permit Integration; First Step to Integrate Bank-
 ruptcy Facilities and Rule 23(b)(1)(B) Class Action Funds .......... 909
X. CONCLUSION ..................................................... 911
APPENDICES...................................................... 911
 A. Manville Trust's Share of Total Payments by All Defendants......... 912
 B. Feasibility of Projections ......................................... 926
 C. Total Value of Asbestos Claims ................................... 932
 D. Claims Settled with Trust By Law Firm ........................... 956
 D1. Unsettled Claims Pending Against Trust by Law Firms With More Than
 100 Claims ..................................................... 966
 E. Injunction Protecting Trust........................................ 970
 F. Injunction Protecting Manville Corporation ......................... 977

---

AMENDED MEMORANDUM, ORDER
AND FINAL JUDGMENT

## I. INTRODUCTION

This class action seeks approval of a method for the resolution of a large number of present and prospective claims for compensation from the Manville Personal Injury Settlement Trust (the "Trust") for personal injuries resulting from exposure to asbestos dust. The proceedings were precipitated by the virtual failure of the Trust. By May of 1990 the Trust had committed its current assets to only a small portion of the claims it was obligated to pay, leaving it without the capacity to pay anything to the vast majority of injured persons.

A proposed settlement (the "Settlement") of the action has been presented. With some reservations, the relief sought in the complaint is granted and the Settlement is approved. This action effectively removes from case-by-case litigation against the Trust in state and federal courts billions of dollars in claims by hundreds of thousands of people.

A more effective distribution scheme reducing transaction costs substantially and giving much more to claimants could have been devised. Nevertheless, given the institutional and other inhibitions on a wholly new plan created by the courts, what has been proposed must be approved as practicable and fair.

The Bankruptcy Court for the Southern District of New York and the District Courts for the Eastern and Southern Districts of New York (the "courts") are presented with a series of complex factual and legal issues arising from present and prospective claims of those who have or will allege injury ("claimants") from exposure to products manufactured or distributed by Johns–Manville and its affiliates ("Johns–Manville"). By 1982, Johns–Manville had filed for bankruptcy under Chapter 11 and changed its name to the Manville Corporation ("Manville"). In 1988, pursuant to the Second Amended and Restated Plan of Reorganization of Johns–Manville, *et al.* (the "Plan"), the legal obligations of both Johns–Manville and Manville to those injured by their asbestos-containing products were assumed by the Trust.

After appeals, the Trust commenced operations in 1988. It promptly committed all of its current cash and much of its future income for payments to, and settlements with, a relatively small percentage of claimants. Its financial and operational inadequacies lead to the need for intervention by the courts.

Some claimants have obtained, now seek or will seek, compensation for asbestos-related injuries from other companies who manufactured or distributed asbestos-containing products ("codefendants"). As a result of these multiple claims, the code-fendants may have claims against the Trust and the Trust may have claims against codefendants. Litigation between claimants and codefendants and the effect of the Trust's actions on the relationship of these two groups present the most difficult issues in resolving this class action.

Among the questions now posed are the following: (1) does the Plan prevent approval of the Settlement modifying payments from Manville to the Trust and from the Trust to beneficiaries; (2) do the courts have the power to grant the relief sought by the complaint against various parties; (3) is there a limited fund as described by Rule 23(b)(1)(B) and are the other requirements of Rule 23 sufficiently satisfied to warrant certification of the class as requested in the complaint; (4) is the Settlement approved by Manville, the Trust and a majority of present claimants fair, reasonable and adequate under Rule 23(e); (5) do the courts have the power to stay claimants, codefendants and others from proceeding against Manville and the Trust except in accordance with the Settlement; (6) do the courts have the power to approve a Settlement that modifies litigation relationships between claimants and codefendants and others; and (7) can the method of compensating those injured by asbestos be substantially improved while reducing attorneys fees and other transactional costs?

Each of these questions encompasses subissues discussed in the body of this *Amended Memorandum, Order and Final Judgment.* For the reasons stated below, we answer each question in the affirmative with a reservation as to the sixth. The class as defined in the complaint and final judgment is certified. The parties are stayed and enjoined from acting except consistently with the Settlement as interpreted by the courts to avoid unfairness and illegality. The courts request that the parties expedite any appeals so that payments under the Settlement can promptly be made. The courts will retain power to supervise the Trust during appeals.

Citations supporting factual statements in the body of this opinion are kept to a minimum. The courts rely on information

obtained by the district judge in trying to completion more than four score asbestos jury trials and in participation in the settlement negotiations of more than a thousand asbestos cases before and during trial and in participating with state and federal judges across the nation in attempting to resolve legal aspects of the nation's asbestos disaster. The Bankruptcy Judge relies on information obtained during extensive Johns–Manville bankruptcy proceedings. Both judges have held exhaustive independent and joint hearings in this proceeding and are fully familiar with the voluminous record in this and related proceedings.

In the more detailed analysis which follows, we have in Part II described the history of asbestos use and asbestos litigation generally to provide a context for understanding the role of Manville. This is followed by a description of the history of the Trust and events leading to the need for this class action and for more precise projections of future asbestos claims. Part III sets forth the positions of the various parties involved in the litigation. Part IV details the law providing jurisdiction to decide the case. Part V contains an analysis of the law and facts controlling the power of a federal court to certify a national class action which does not permit its members to withdraw and proceed independently when there is insufficient money available to pay all claimants. In Part VI the power of the courts under federal bankruptcy and state trust law to approve a Settlement after a trust has been created in a bankruptcy reorganization is analyzed. Part VII provides the factual and legal underpinnings for declaring the Settlement fair, as interpreted, between plaintiffs and codefendants; it necessarily includes an extensive discussion of federal common law and choice of law decisions since a critical issue is the extent to which federal courts can or should override state tort law. Part VIII emphasizes the need for the Trust to control its costs and operations. In Part IX we touch on some of the implications of the Settlement in connection with the national asbestos compensation crisis. Part X briefly summarizes the conclusions reached in the Memorandum. A number of appendices containing relevant factual analysis and two injunctions follow. We are not relying on any of the Appendices attached to this Memorandum for their accuracy but as illustrative of the difficulties of acquiring the necessary quantitative data and of making appropriate projections.

On May 16, 1991 we issued an earlier version of this Memorandum and Order, inviting those interested to point out any inaccuracies. We are most grateful for the generous additional assistance of those who responded to the invitation. They included: Andrew T. Berry (letter dated May 22, 1991); Elihu Inselbuch (letter dated May 24, 1991); John H. Faricy, Jr. (letter dated May 28, 1991); Leslie Gordon Fagen (letter dated May 29, 1991); David T. Austern (letter dated May 29, 1991); Roger E. Podesta, John D. Aldock, Andrew T. Berry (letter dated May 29, 1991); Roberta A. Golden (letter dated May 29, 1991); Sheila L. Birnbaum (letter dated May 30, 1991); Mark A. Peterson (letter dated June 6, 1991); Paul Safchuck (letter dated June 7, 1991); John Sawhill (letter dated June 6, 1991); Margaret A. Berger (by telephone) and Matthew Gluck (by telephone). Appropriate changes have been made in this Amended Memorandum, Order and Final Judgment.

## II. HISTORY and PROCEDURAL BACKGROUND

### A. Asbestos; Scientific Developments and Knowledge

Asbestos is a general term given to two main varieties of natural, fibrous minerals, amphibole and serpentine, which have been used in a multitude of products for over 4500 years. G. Peters and B. Peters, *Sourcebook in Asbestos Diseases: Medical, Legal and Engineering Aspects* A1 (1980) [hereinafter "*Sourcebook*"]. Chrysotile is the only serpentine mineral that contains asbestos, but more than 90% of the asbestos production in the United States and worldwide utilized this asbestos fiber. G. Peters and B. Peters, *Asbestos Disease Update* 38–39 (1989) [hereinafter "*Update*"]; *Sourcebook, supra,* at A1–A2.

1. *History of Asbestos Use*

Several properties distinguish asbestos from other minerals and explain its widespread use over a long period of time: its tensile strength, its heat and acid resistance and its flexibility. *Sourcebook, supra,* at A1. The seemingly magical qualities of the mineral have inspired awe:

> Asbestos is one of the most marvelous productions of inorganic nature. It is a physical paradox, a mineralogical vegetable, both fibrous and crystalline, elastic and brittle: a floating stone, as capable of being carded, spun, and woven as wool, flax, or silk. Occupying the apparent position of a connecting link between the mineral and vegetable kingdoms, it would appear to possess some of the characteristics of both while being altogether different from either. In appearance, it is as light and feathery as thistle or eiderdown, while, in fact, it is as dense and heavy as the rock which carries it. Ostensibly as perishable as grass, it is actually older than any animal or vegetable life on earth. So little, indeed, is it affected by the dissolving influences of time that the action of unnumbered centuries, by which the hardest rocks are worn away has had no perceptible effect on the asbestos found embedded in them.

Ozonoff, "Failed Warnings: Asbestos–Related Disease and Industrial Medicine," at 143 *in The Health and Safety of Workers: Case Studies in the Politics of Professional Responsibility* (R. Bayer ed. 1988) [hereinafter "Ozonoff"] (quoting R. Jones, *Asbestos and Asbestic: The Properties, Occurrence and Use* 1–2 (1897)).

The earliest uses capitalized on the unique fire resistant qualities of asbestos, as in lamps with incombustible wicks made by the Greeks about 430 B.C. The Romans had asbestos-containing cremation cloths. The writings of Pliny the Elder, Dioscorides, Plutarch, Marco Polo and Charlemagne indicate that asbestos was woven into garments to shield against fire. *Update, supra,* at 6, 38; *Sourcebook, supra,* at A4.

Knowledge of the potential health hazards of asbestos also dates back to ancient times. Pliny the Elder, the Roman historian, and Strabo, the Greek geographer, reported a lung disorder in slaves weaving asbestos. *Update, supra,* at 7. Pliny also referred to the use of transparent bladder skin as a respirator to prevent dust inhalation by slaves. B. Castleman, *Asbestos: Medical and Legal Aspects* 1 (2d ed. 1986) [hereinafter "Castleman"].

Modern industrial use of materials containing asbestos began in the 1860's. *See generally* Ozonoff, *supra,* at 143–210 (provides succinct but comprehensive analysis of manifold social, economic, political and moral aspects of growth of use of asbestos and failures to protect workers and others when knowledge of danger was manifest). The first modern asbestos mine was opened in Lombardy, Italy in 1866 and the first Canadian mine in approximately 1877. Selikoff and Seidman, *Asbestos–Associated Deaths Among Asbestos Insulation Workers,* presented at "The Third Wave of Asbestos Disease Exposure to Asbestos in Place" (conference in New York, June 7–9, 1990) (citing Jones, *Asbestos and Asbestic: With Some Account of the Recent Discovery of the Latter at Danville, in Lower Canada,* 45 J.Soc.Arts 3–15 (1897)). According to some sources, asbestos was used for heat insulation as early as 1866. H. Berger, *Asbestos Fundamentals. Origin, Properties, Mining, Processing, Utilization* (1963).

The rapid expansion in the use of steam power at higher and higher temperatures in the 1870's greatly increased the need for efficient insulation materials. Ozonoff at 143–45. Seeking to take advantage of its fire retardant qualities, Dr. Richard Mattison decided to replace shredded hemp, which deteriorated rapidly, with asbestos fibers in reinforcing insulation materials, molded-pipe coverings, block insulation and magnesium cement. Bettes, *The History of Asbestos in the Textile Industry in the United States,* 52 Asbestos 2–12 (1971). "[T]hus was born '85% magnesia' insulation, destined to become the standard high temperature thermal insulation for many years." *Id.* Thereafter, Mattison along

with Henry G. Keasbey became leading manufacturers of asbestos products.

Sources of asbestos have been plentiful. The multitude of applications, many without competitive substitutes, led to its increasing presence in construction and products. Asbestos lined partitions in schools, office buildings, hospitals and ships. Writing in 1897, one source observed "hundreds of buildings plastered with asbestic." Jones, *supra*, quoted in Selikoff. Other well-known uses of asbestos included: insulation around cold or hot air or liquid conductors or boilers, noise absorption in wall insulation and acoustic tile ceilings, covering of structural steelwork of large buildings to guard against fire and linings for brakes. Its dielectric properties resulted in many electrical equipment uses; it had such applications as ironing board covers, stove linings and table pads. Theatrical audiences were once comforted by the thought that huge asbestos curtains between the audience and stage protected against the spread of fire. Cement products constituted the single largest service for asbestos in the United States; asbestos-containing cement was utilized as filler in resins, plastics, grouts and even cosmetics. Asphalt surfaced roads occasionally contained asbestos fibers as well.

These wide-ranging applications plus ample and accessible supplies of asbestos account for its pervasiveness in many sectors of the American economy during the twentieth century. Federal Judicial Center, *Trends in Asbestos Litigation* 7–8 (1987). In the years between 1934 and 1964, the world's annual use of raw asbestos increased from 500,000 tons to 2,500,000 tons. Selikoff, Churg & Hammond, *Asbestos Exposure and Neoplasis*, 188 J.A.M.A. 22, 142 (1964).

Massive and unrestrained use of asbestos in industrial, commercial and household contexts has exposed millions of people to its insidious dangers. The main groups at risk were those in the plants which shaped and wove asbestos products and those who cut and installed it in the field as insulators, boilermakers or those in other trades laboring in close proximity to asbestos workers. In the naval shipyards, for example, workers of all trades in small compartments breathed the heavy asbestos dust created by insulators and boilermakers and brought it home on their clothing. Carpenters and metal workers who may not have worked directly with asbestos were nonetheless heavily exposed to its hazards. Workers in the oil fields of Texas, the tire factories of the mid-West and the shipyards of our coasts as well as in building construction in all parts of the country were at some degree of risk.

Exposure is not limited to those employed in the mining of asbestos or in the manufacture or use of asbestos products, but it affects those removing in-place asbestos, consumers who used asbestos-containing products such as hair-dryers and persons exposed to a family member's contaminated clothing. *See, e.g.,* Selikoff & Levin, *Radiographic Abnormalities and Asbestos Exposure Among Custodians of the New York City Board of Education* (Dep't of Community Medicine, Mount Sinai School of Medicine, March 1990); Selikoff & Lilis, "Radiological Abnormalities Among Sheet Metal Workers in the Construction Industry in the United States and Canada: Relation to Asbestos Exposure" 11–14 (Dep't of Community Medicine, Mount Sinai School of Medicine 1989). Residents of communities near asbestos mines and manufacturing facilities have an increased chance of illness from exposure to airborne asbestos fibers. *Sourcebook, supra,* at A4–A25. Every resident in New York and other urban areas breathes small amounts each day.

An independent study performed for the Department of Labor estimated that the number of Americans significantly exposed to asbestos is 21 million. *See* Occupational Health Hazards Compensation Act of 1982: Hearings Before Subcomm. on Labor Standards of the House Comm. on Education and Labor, 97th Cong., 2d Sess. 132 (1982) (statement of Harry Martens, Exec. Vice-President, Commercial Union Insurance Companies) (cited in Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,* 36 Vand.L.Rev. 573, 580 n. 13 (1983)).

Because of the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's. *See, e.g.,* Federal Occupational Safety and Health Act of 1970, S.Rep. 91–1282, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5175, 5179; "Asbestos Ban and Phasedown Regulations," 40 C.F.R. 763.160 *et seq.* (promulgated by EPA in July 1989). Yet, as a consequence of the long latency of asbestos diseases, some experts have predicted asbestos-related deaths will peak in the 1990s and early twenty-first century. Insidious asbestos is slowly working in the lungs of millions of workers and others.

Before the crisis subsides, some experts suggest that more than one half million asbestos-exposure deaths will occur. *See* I. Selikoff, *Disability Compensation for Asbestos–Associated Disease in the United States* (1981). Their estimates for morbidity are in the millions, many times that for mortality. Other experts sharply dispute these projections, claiming that the death and disability rates will be far lower. As noted below, because it is necessary to project future claims in assessing the fairness of the Settlement and in executing it, the district courts have authorized a study under Rule 706 of the Federal Rules of Evidence to assess the likelihood of future diseases and claimants. *See* Part II.I, *infra.*

### 2. *Discovery of Health Hazards Associated with Asbestos*

The potential dangers of asbestos exposure have been clearly recognized by the experts and manufacturers—but not by most of the workers—for many years. Beginning in the early part of this century, medical and scientific communities revealed growing persuasive evidence of the health hazards associated with asbestos.

Proof of asbestos risks initially emerged in scattered reports published between 1897 and 1918 in Europe, Canada, and the United States. These case studies discussed the danger of airborne asbestos fibers. *Update, supra,* at 7; Castleman, *supra,* at 2–6; Ozonoff, *supra,* at 155. The first detailed account in the modern era of a worker's death from asbestosis was reported in England by Dr. A.H. Montague Murray, a pioneer in the use of x-rays for medical diagnosis, in 1906. *See* Castleman, *supra,* at 3–4; *Update, supra,* at 7. Prudential Life Insurance performed a study for the United States Bureau of Labor Statistics in 1918 entitled "Mortality from Respiratory Diseases in Dusty Trades (Inorganic Dusts)." This report revealed excess deaths from pulmonary tuberculosis in asbestos workers from twenty-five to forty-five years old. Dr. Hoffman who conducted the study concluded that the industry was a "considerable dust hazard" and noted "the practice of American and Canadian life insurance companies [to generally decline] asbestos workers ... on account of the assumed health injurious conditions of the industry." Ozonoff, *supra,* at 157.

More extensive evidence began to accumulate in the 1920's with reports of asbestosis in widely-circulated medical journals, including the *British Medical Journal* and the *Journal of the American Medical Association* ("JAMA"). Twelve separate British medical publications between 1928 and 1929 contained research on the hazardous effects of asbestos. Castleman at 6–9. A 1930 memorandum by the Market Analysis Section, Sales Promotion Department of the Johns–Manville Corporation entitled "Pulmonary Asbestosis" discussed several papers published in Great Britain between 1927 and 1929, including an analysis of a report by a British clinician, A.C. Haddow, in which he reported four fatal cases of asbestosis. This evidence of knowledge was eventually produced in discovery by Johns–Manville. Castleman, at 9, 510. Because a central controversy in asbestos cases concerns when manufacturers knew or should have known of the health hazards associated with exposure to asbestos dust, the existence of these medical reports significantly undermines contentions of lack of knowledge of Manville and the co-defendants.

Reports concerning the occupational risks of asbestos, including the incidence of

asbestosis and lung cancer among exposed workers, have been substantial in number and publicly available in medical, engineering, legal and general information publications since the early 1930s. *See Sourcebook, supra,* Chronological Bibliography at G1–G162. There is compelling evidence that asbestos manufacturers and distributors who were aware of the growing knowledge of the dangers of asbestos sought to conceal this information from workers and the general public.

The British Parliament commissioned an important study by Dr. E. Merewether, chief inspector of factories in England, in 1930 on the effects of exposure to asbestos dust which included recommendations for its control. The information in the report led to the introduction of safety measures and medical supervision for asbestos workers in England and to the extension of the Workmen's Compensation Act to include asbestosis. Merewether's findings were published in the United States and received some mention in various journals including a 1930 issue of JAMA. *Update, supra,* at 7; Castleman, *supra,* 10–17.

In 1930 the first case of asbestosis in the United States was reported in *Minnesota Medicine* and noted in JAMA. Additional reports on asbestosis were published in the United States by K.M. Nynch and W.A. Smith, in JAMA, and W.B. Soper in 1930. Castleman, *supra,* at 16–22. As of 1930, the symptoms, pathology and disease progression of asbestosis were well understood. Fatalities from the disease had been reported, as well as the high incidence of asbestosis among workers in mines or manufacturing facilities producing asbestos-containing products.

At the same time Dr. Anthony J. Lanza, formerly of the United States Public Health Service, then with Metropolitan Life Insurance Company, began to study asbestos workers in the textile industry at the request of several prominent industry executives. Preliminary results of this study indicated that 43% of those who had worked in the industry for five years had X-ray signs of fibrosis; of those with five to ten years' exposure, 50% showed fibrosis

on X-rays; of those with ten to fifteen years' exposure, 58%; and of those with over fifteen years, an incredible 87% had radiographic evidence of lung disease. Ozonoff, *supra,* at 167; Castleman, *supra,* at 22. The power wielded by the asbestos industry resulted in a four-year delay before the study was published in an allegedly altered form. Ozonoff, *supra,* at 170–72. Writing in 1931 the attorney for Johns–Manville explained the basis for the changes in the report:

[O]ne of our principal defenses in actions against the company on the common law theory of negligence has been that the scientific and medical knowledge have been insufficient until a very recent period to place upon the owners of plants or factories the burden or duty of taking special precautions against the possible onset of the disease in their employees.

*Id.* at 171.

Between 1931 and 1935 additional reports on asbestosis appeared in the medical literature of England, Germany and the United States. Castleman at 22–28. In 1932 an expert committee from the Children's Bureau of the United States Department of Labor recommended the exclusion of minors from certain hazardous activities, including occupations involving exposure to asbestos dust. At a 1933 government hearing attended by many industry executives on asbestos production and use discussion touched upon the health hazards of airborne asbestos fibers. Castleman, *supra,* at 23. Even the allegedly heavily censored 1935 study conducted by the Metropolitan Life Insurance Company, which minimized or ignored significant data, recommended efforts at control of asbestos dust, regular medical examinations of employees and industry studies of known asbestosis cases. Castleman at 29–31.

By 1935 asbestosis was "widely recognized as a mortal threat affecting a large fraction of those who had regularly worked with the material." Castleman at 32; *see generally* Selikoff and Lee, *Asbestos and Disease* 23 (1978). Even some of those who had worked for less than one year with asbestos manifested severe disease.

It was known that the disease process would not become evident for the first few years of exposure.... Moreover, by the time the disease became evident, cessation of exposure would not halt the inexorable progress of the disease caused by the durable fibers already trapped in the lung tissues.

*Id.*

Additional studies concerning asbestosis continued to be published in the United States throughout the 1930's and 1940's. The United States Navy required airline respirators or dust respirators for asbestos jobs in 1943. U.S. Navy, "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," Section 11.1 (U.S. Gov't Printing Office, 1943). These requirements were not enforced in naval shipyards and, in fact, there was official connivance at a coverup of the hazards of asbestos in the shipyards. Transcripts of Brooklyn Navy Yard trials, *New York City Asbestos Litig.*, Civ. No. TS 90–9999 (E. & S.D.N.Y.1990–91) *passim.*

Medical evidence linking cancer with exposure to asbestos fibers developed more slowly. In 1935 a British pathologist, S. Gloyne, reported on the occurrence of lung cancer in association with asbestosis. Further evidence of a connection between cancer and asbestosis surfaced in reports in Great Britain, the United States, Norway, France and Germany during the late 1930's. *Update, supra,* at 7–8; Castleman, *supra,* at 40–45, 55. In response to these reports the federal German government declared "asbestosis in combination with lung cancer" a compensable occupational disease in 1943. Castleman, *supra,* at 44 (citing Fourth Schedule of Extension of Compensation for Industrial Accidents and Diseases, *Reichsgesetzblatt,* Part 1, No. 14 (Jan. 29, 1943)). A report by Dr. Wilhelm C. Hueper in the same year suggested that lung cancer was an occupational disease of great significance to the asbestos industry in the United States and that *"[i]ndustry should make serious attempts to eliminate all potentially cancerigenic agents from further use by the development of*

*suitable substitutes."* Castleman, *supra,* at 45 (emphasis in original).

Correspondence in 1946 from the Saranac Laboratory to J.P. Woodard, a Johns–Manville executive, reveals that Woodard received a copy of Hueper's 1943 article. Castleman, *supra,* at 43–45. Dr. E. Merewether supplied additional evidence of an association between asbestosis and lung cancer in the 1947 and 1948 Annual Reports of the Chief Inspector of Factories in Great Britain. These reports noted that in 13% of known asbestosis fatalities, lung cancer was also present. *Update, supra,* at ˙8; Castleman, *supra,* at 57–58. At about the same time scattered reports of mesothelioma emerged in journals of industrial medicine and hygiene. *Id.* at 108. Important studies by Doll in 1955 and Selikoff in 1964 supplied additional evidence of a causal connection between asbestosis and lung cancer, *Update, supra,* at 8, but the warnings to those who should have been alert had been sounded long before. Lilienfeld, *The Silence: The Asbestos Industry and Early Occupational Cancer Research,* 81 Am.J.Pub.Health 791 (1991) ("When these studies found that asbestos was a carcinogen, this information was suppressed. The ensuing cover-up, effected through industry associations and research compacts, resulted in thousands of deaths."). As Castleman concluded,

[i]t remained for the epidemiologist not to document the cancer risk but quantify its extent in the asbestos industry, to identify the numerous types of cancer caused by asbestos, and further track the danger across property lines into the community (using rare mesothelioma as a marker).

Castleman, *supra,* at 108.

3. *Current Asbestos Studies and Medical Knowledge*

The capacity of asbestos fibers to cause serious injuries is no longer disputed. Injuries vary from fatal malignancies to mild scarring of the lung tissue. There are four disease processes associated with exposure to asbestos fibers: asbestosis, mesothelioma, cancers (including lung, gastrointestinal and others) and pleural plaques.

Asbestosis refers to a pulmonary insufficiency caused by a destruction of air sacs in healthy lung tissue. *See* Selikoff, Churg & Hammond, *Asbestos Exposure and Neoplasia,* 188 J.A.M.A. 22, 25 (1964). This pulmonary disease caused by exposure to asbestos dust is progressive and incurable. Castleman, *supra,* at 302. The disease may dramatically reduce life expectancy and significantly impair lung capacity while the worker is alive. Some evidence suggests that persons with asbestosis may have an increased risk of contracting lung cancer and other malignancies. *See* Selikoff, Lilis and Seidman, *Predictive Significance of Parenchymal and/or Pleural Fibrosis for Subsequent Death of Asbestos–Associated Diseases* (Division of Occupational and Environmental Health, Mount Sinai Medical Center Oct. 1990) (unpublished paper filed and docketed).

Malignant mesothelioma is an uncommon neoplasm arising in the mesothelial cells that make up the pleural, pericardial and peritoneal membranes enclosing the lungs, heart and abdomen respectively. Castleman, *supra,* at 98–99. The occupational association of asbestos as a cause of mesothelioma is well-recognized. Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,* 36 Vand.L.Rev. 573, 579 & n. 11 (1983). Between fifty and eighty percent of diagnosed cases of pleural and peritoneal mesothelioma have a history of asbestos exposure. Llewellyn, *Current Approach to the Diagnosis and Treatment of Mesothelioma,* 11 Int.Med. 50 (Dec. 1990). From the time of first contact with asbestos to the onset of disease may be more than forty years. Once manifested, the illness is usually fatal within two years. *Id.*

Brief but high-intensity and prolonged but low-level asbestos exposure seem equally related to the incidence of mesothelioma, but the risk is said by some to be much greater from the amphiboles (crocidolite and amosite) with long and thin fibers than from the shorter, curly fibers of chrysotile. *Id.* Mesothelioma has been documented among individuals with only casual exposure to asbestos dust, such as family members who cleaned the clothes of workers or visited workers at their jobsite. Castleman, *supra,* at 98–103, 447–49, 457–60.

The incidence of mesothelioma is rising in the United States at a rate estimated by some at approximately thirteen percent per year, most likely as a result of the increased use of asbestos combined with the latency period and delayed recognition of the disease. Malignant mesothelioma causes more than 4,000 deaths annually in the United States. Llewellyn, *Current Approach to the Diagnosis and Treatment of Mesothelioma,* 11 Int.Med. 50 (Dec. 1990).

Among other cancers, pulmonary and bronchogenic malignancies are most commonly associated with asbestos exposure. According to Dr. Selikoff,

far more deaths from cancer of the lung and pleura occurred among the asbestos workers than would have occurred had their death rates from these diseases been the same as for all US white males.

Selikoff, Churg & Hammond, *Asbestos Exposure and Neoplasia,* 188 J.A.M.A. 22, 144 (1964). Combined exposure to asbestos and cigarette smoking results in significantly higher rates of cancer than occur when only one factor is present. Lerman, Selikoff, Lilis, Seidman, Gelb, Clinical Findings Among Asbestos Workers in the U.S.: Influence of Cigarette Smoking, 10 AM. J.Indus.Med. 449 (May 1986); Hammond, Selikoff & Seidman, "Asbestos Exposure, Cigarette Smoking and Death Rates," *Health Hazards of Asbestos Exposure,* 330 Ann.N.Y.Acad.Sci. 473 (1979).

Dr. Selikoff and his colleagues believe that asbestos insulation workers suffer disproportionate death rates from stomach, rectum and colon cancer as well. Selikoff, Churg & Hammond, *Asbestos Exposure and Neoplasia,* 188 J.A.M.A. 22, 26 (1964). Some epidemiological studies have suggested excess risks of cancer of the kidney, larynx, pharynx and mouth among asbestos insulation workers. Selikoff & Seidman, "Asbestos–Associated Deaths Among Insulation Workers" presented at conference "Third Wave of Asbestos Disease:

Exposure to Asbestos in Place. Public Health Control." (New York, N.Y. June 1990); *see* Castleman, *supra*, at 99. Other experts dispute these findings.

Pleural plaques involve a thickening or calcification of the pleural tissue surrounding the lung. Some research has shown that limited radiographic changes often precede lung cancer, mesothelioma and severe asbestosis. *See* Selikoff, Lilis & Nicholson, "Asbestos Disease in United States Shipyards," *Health Hazards of Asbestos Exposure*, 330 Ann.N.Y.Acad.Sci. 295, 304 (1979); Selikoff, Lilis & Seidman, *Predictive Significance of Parenchymal and/or Pleural Fibrosis For Subsequent Death of Asbestos–Associated Diseases* 9–12 (Oct. 1990) (unpublished paper filed and docketed) (study of asbestos insulation workers followed for twenty-seven years found those with parenchymal and pleural fibrosis suffered elevated risk of asbestos-associated cancers and deaths from asbestosis). Some experts question the relationship between pleural plaques and the development of lung cancer and asbestosis. *See, e.g.,* Kiviluoto, Meurman & Hakama, "Pleural Plaques and Neoplasia in Finland," in *Health Hazards of Asbestos Exposure*, 330 Ann.N.Y.Acad.Sci. 31 (1979).

Highly exposed occupational groups were the first to manifest an increased incidence of diseases later associated with asbestos exposure. Appearance of disease correlates with duration and intensity of exposure to asbestos fibers. The greater the exposure, the sooner the disease can be expected to appear; conversely, shorter or less intense exposure translates into a longer latency period. Occupational exposures that occurred in the 1940's, 1950's and 1960's are generally considered excessive with a relatively short latency period of fifteen to thirty years. In contrast, those environmentally exposed and exposed through household contacts may only manifest injury forty or more years later. Age may also affect the latency period with younger exposed workers and family members experiencing longer latency periods. Seidman, Selikoff & Hammond, "Short-term Asbestos Work Exposure and Long-term Observation," in *Health Hazards of*

*Asbestos Exposure*, 330 Ann.N.Y.Acad.Sci. 61 (1979).

The form of asbestos known to pose a risk is "friable asbestos," or asbestos which is capable of releasing fibers into the atmosphere which can be inhaled by humans. *Cf.* 40 C.F.R. § 61.141 (friable asbestos material defined as "any material that contains more than 1% asbestos by weight and that can be crumbled, pulverized, or reduced to powder, when dry, by hand pressure"). Asbestos fibers may become freed and airborne while being processed or used in manufacturing, construction or demolition. Anderson & Selikoff, "Asbestos–Associated Radiographic Changes Among Household Contacts of Amosite Asbestos Workers," in Preger, *Induced Disease: Drug, Irradiation, Occupation* 254 (1979). Individuals working in less dusty areas report a lower incidence of parenchymal fibrosis (asbestosis) than those in more dusty areas of textile mills. Ozonoff, *supra*, at 188; *see* Selikoff, Lilis & Seidman, *Predictive Significance, supra*, at 9–12 (in later years with increased efforts to lower dust level, incidence of disease decreased). As of 1978, the Department of Health Education and Welfare estimated that eight to eleven million Americans workers had been exposed to asbestos since the beginning of World War II. Califano, Statement, Dep't HEW (Washington, D.C. April 26, 1978). Asbestos-associated diseases are progressive. Cessation of exposure will not halt the deterioration in the individual's lung condition. *See* Castleman, *supra*, at 32. While no cures are available for asbestos injuries, preliminary efforts indicate that some treatment may be possible. *See* Letter from Dr. Irving J. Selikoff (Mar. 18, 1991) (filed and docketed) (improved nutrition with supplementary diet improved respiratory muscle function and well-being in individuals with chronic obstructive pulmonary disease). Perhaps continued research efforts will produce advances in medical treatment for the hundreds of thousands of people who possibly have incurred asbestos-related injuries. Based on information presently available the courts must assume

that such advances will not appreciably reduce future claims.

Asbestos pollution was not expected to pose any significant health hazard to the general public. Yet, as early as 1960, mesothelioma was reported in nonoccupational asbestos-exposed individuals. Wagner, Sleggs & Marchand, *Diffuse Pleural Mesothelioma and Asbestos Exposure in N.W. Cape Province*, 17 Br.J.Ind.Med. 260–71 (1960). An additional nine cases of mesothelioma in family contacts of asbestos workers and eleven cases among individuals whose only identified exposure was living within one-half mile of an asbestos factory were reported in 1965. Newhouse & Thompson, *Mesothelioma of the Pleura and Peritoneum Following Exposure of Asbestos in the London Area*, 22 Brit.J.Indus.Med. 261 (1965). Similar reports appeared from nine different countries by the mid–1970's. *See* Anderson, Lilis, Daum, Fischbein & Selikoff, *Household–Contact Asbestos Neoplastic Risk*, 271 Ann. N.Y.Acad.Sci. 311 (1976).

These reports led Doctor Selikoff and his colleagues at Mount Sinai Hospital to undertake a study to assess the risks of nonmalignant and malignant disease associated with household exposure to work-derived asbestos dust. Anderson, Lilis, Daum, Fischbein & Selikoff, *Asbestosis Among Household Contacts of Asbestos Factory Workers*, 330 Ann.N.Y.Acad.Sci. 387 (1979). The study has followed household members who resided with 1,664 asbestos workers at their time of employment in a factory which produced amosite asbestos products from 1941 to 1954. *Id.* While none of the household members had occupational exposure to asbestos, 35% had asbestos-related radiographic abnormalities and five members of the cohort had been diagnosed or died of mesothelioma as of 1979. *Id.* Second to occupational exposure, household contact is the most frequently identified source of asbestos exposure among reported mesothelioma cases. Anderson & Selikoff, "Asbestos–Associated Radiographic Changes Among Household Contacts of Amosite Asbestos Workers," in Preger, *Induced Disease: Drug, Irradiation, Occupation* 254 (1979).

Thus, the extent of injury among those casually exposed to asbestos is the subject of current study, but its dimensions remain unclear. This large group of insulators has now been followed by Doctor Selikoff and his associates for more than thirty-five years, providing some reliable guidance with respect to the incidence of asbestos-related injuries among those casually exposed. Initial analyses of the most recent data indicated increased rates of lung cancer, colon cancer and mesothelioma, but not significant nonmalignant abnormalities nor clinical disability. *See* Letter from Dr. Irving J. Selikoff (Feb. 7, 1991) (filed and docketed) (summarizing study conducted in September 1990 of family members of asbestos workers).

While Johns–Manville and other manufacturers ignored or attempted to conceal this information from the public, proper precautions and the development of alternative products were retarded. The consequence is that millions of people were unknowingly exposed to a dangerous substance. The health, economic and legal reverberations of exposure to asbestos will continue long into the future.

## B. Johns–Manville Corporation

Johns–Manville was founded in 1858 by Henry Ward Johns who patented inventions for roofing and insulation products. According to most sources, from the 1920's until the 1970's Johns–Manville was both the largest manufacturer of asbestos-containing products and the largest supplier of asbestos in the United States. *See* Excerpt from 1970 Johns–Manville Corporation Form 10–K, attached to Affidavit of Anne E. Cohen at Exhibit C (Feb. 5, 1991) ("Cohen Aff."); *see generally* Castleman, *supra*, at 510. The company boasted in an article in *Asbestos* Magazine in 1970, that "Johns–Manville participates in almost every facet of the Asbestos Industry and is the largest producer of asbestos-based products in the United States." *Asbestos* Magazine at 14–15 (Sept. 1970) (Cohen Aff., Exhibit E). *See also In re Johns–Manville Corp.*, 97 B.R. 174, 176 (Bankr. S.D.N.Y.1989) ("[Johns–Manville] was the

world's largest processor, manufacturer and supplier of asbestos materials and products").

This leading corporation manufactured a multitude of products that contained asbestos. During its heyday, Manville marketed more than 500 different lines of products manufactured at the company's 33 plants and mines located throughout the United States and Canada. *Asbestos* Magazine at 50 (Aug. 1959) (Cohen Aff., Exhibit F). In its Product Handbook, Manville projected that its asbestos mill in Quebec, built in the mid-1950's would have "full production capacity ... greater than one-third the free world's supply of asbestos fibre," and that the mine was "the largest mine in the world for the production of asbestos fibre." *Manville Product Handbook* at 2, 3 (1955) (Cohen Aff., Exhibit H). Similarly, Manville proudly announced that it was a "leader in [the asbestos floor tile] industry since it was started on a wide commercial basis." *Asbestos* Magazine at 18 (Nov. 1960) (Cohen Aff., Exhibit J).

Products of Johns–Manville saw widespread commercial, industrial and consumer use. In particular, its "85 percent magnesium" products were used extensively in shipyards in the years leading up to and during World War II. Johns–Manville was allegedly one of the few manufacturers that utilized crocidolite-type asbestos fibre in any significant quantity especially after 1945. *See* Affidavit of Robert D. Brown, ¶ 8 (Feb. 1, 1991); Affidavit of Bruce G. Tucker, ¶ 16 (Feb. 1, 1991). Significant medical data suggests, as already noted, that crocidolite fibers present greater dangers than other forms of asbestos, particularly in connection with the deadly asbestos-induced cancer, mesothelioma.

## C. Proof of Industry Knowledge of Health Hazards

Through persistence, vigorous discovery and creative efforts, plaintiffs' attorneys representing persons suffering from asbestos-related injuries gradually uncovered extensive evidence indicating that manufacturers, including Johns–Manville, knew that asbestos posed potentially life-threatening hazards and choose to keep that information from workers and others who might be exposed. P. Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* 97–131 (1985).

As early as 1932 Johns–Manville, specifically Vandiver Brown and attorney J.C. Hobart, together with Raybestos–Manhattan, suggested to Dr. Anthony Lanza, Associate Director of Metropolitan Life Insurance Company (a provider of group insurance at various times to Manville and Raybestos), that Lanza publish his study on textile workers with material alterations that would minimize the disease process and its seriousness. Castleman, *supra*, at 139–142, 464–65. The study allegedly intentionally omitted mention of the potentially fatal consequences of asbestosis, a fact contested by Metropolitan Life. A sentence which stated "[h]owever, it is possible for uncomplicated asbestosis to result fatally" was allegedly deleted from the published report. *Id.* at 465.

The commonly referenced "Sumner Simpson papers" consist of correspondence to and from Sumner Simpson, a prominent officer of Raybestos–Manhattan from 1929 until his death in 1953. The first letter from A.F. Rossiter of *Asbestos* Magazine to Simpson dated September 25, 1935 refers to previous requests by Simpson to preclude publications in the magazine concerning the hazards posed by asbestos dust. In a second letter, dated October 1, 1935, Simpson told Vandiver Brown, Johns–Manville's attorney, "the less said about asbestos, the better off we are." The letter also mentioned English articles recommending asbestos dust control, noting that *Asbestos* has "been very decent about not reprinting the English articles." In a third letter dated two days later, Brown replied: "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity." Castleman, *supra*, at 143–44. Brown suggested that if they decided not to object to the publication of such an article, it should use American instead of English data on the theory that the asbestos dust in North America was "considerably milder." *Id.* at 142–43.

In 1936 Johns–Manville, and others, appear to have actively censored the information disseminated by the Saranac Laboratories, and they continued to prevent the Saranac scientists from promptly disclosing adverse scientific data. In the 1930's and 1940's, Saranac Laboratories conducted studies on cancer and asbestosis funded by the asbestos industry for the Study of Tuberculosis. Again the corporations manufacturing and distributing asbestos exercised editorial control over the publication of these studies. Castleman, *supra*, at 46–54.

Litigation against Johns–Manville by eleven employees alleging health injuries caused by exposure to asbestos served to place the company on formal notice of the health risks for workers. According to the minutes of a Board of Directors meeting on April 24, 1933, the suits were settled by Johns–Manville on the explicit condition that the plaintiffs' attorneys would not bring similar claims against the company in the future. P. Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* 113–14 (1985).

Correspondence produced by Raybestos–Manhattan in discovery in a South Carolina case included letters concerning the nonpublication of articles in *Asbestos* magazine at the direction of industry executives, the alleged editing of the Metropolitan Life study by Lanza, and the sponsorship of the somewhat suppressed Saranac Labratory research. According to South Carolina Circuit Judge James Price:

> The correspondence very arguably shows a pattern of denial and disease and attempts at suppression of information which is highly probative. [T]he correspondence reveals written evidence that Raybestos–Manhattan and Johns–Manville exercised an editorial prerogative over the publication of the first study of the asbestos industry which they sponsored in 1935.... [It] further reflects a conscious effort by the industry in the 1930s to downplay, or arguably suppress, the dissemination of information to employees and the public for the fear of promotion of lawsuits.

Castleman, *supra,* at 465 (quoting Amended Order, *Barnett v. Owens–Corning Fiberglas Corp, et. al,* (Ct. Common Pleas Aug. 23, 1978)).

Judge Robert Parker who has years of experience trying asbestos cases summarized the knowledge widely accepted in the scientific and medical community with respect to asbestos as follows:

1. There is no safe level of exposure.

2. There is a dose/response relationship that manifests itself in either the type disease that one may contract or the length of latency period between exposure and disease manifestation.

3. Asbestos is a competent producing cause of the diseases of mesothelioma, asbestosis, lung cancer, and pleural disease. Unanimity of opinion is not yet achieved regarding gastrointestinal tract cancers although the evidence has satisfied the Surgeon General.

4. Mesothelioma is an untreatable terminal cancer.

5. Asbestosis is a progressive untreatable disease of the lung.

*Cimino v. Raymark Indus.,* 751 F.Supp. 649, 652 (E.D.Tex.1990).

A recently completed report issued by the Federal Judicial Conference Ad Hoc Committee on Asbestos Litigation condensed the history as follows:

> It is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected.

*Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation* 2 (Federal Judicial Center 1991) [hereinafter "Judicial Conference Asbestos Report"].

The chilling summary contained in David Ozonoff's discussion of the failures to protect workers concludes:

> It was not a lack of moral fibre on the part of scientists and engineers but a

lack of social controls that allowed private interests to meet their own needs at the expense of the health of workers, consumers, and the general public. The task before us is to fashion a set of social controls that is effective, equitable, and without the kind of unintended adverse consequences that often result when a complex system is changed. We can only hope that we are now evolving such a system and the progress will be speedy.

Ozonoff, *supra,* at 209–10. In lieu of such a system the injured were forced to turn to the tort system for private enforcement of rights. That they are doing so at a steadily increasing rate is shown by the following figures supplied by the Administrative Office of the United States Courts. The situation in state courts is many times as grave.

Asbestos Cases Filed, Terminated and Pending in United States District Courts

| | Filed | Terminated | Pending on June 30 |
|------|-------|-----------|--------------------|
| 1984 | 2,788 | 296 | 7,923 |
| 1985 | 4,239 | 968 | 11,194 |
| 1986 | 5,463 | 1,684 | 15,019 |
| 1987 | 7,776 | 3,369 | 19,467 |
| 1988 | 10,715 | 7,901 | 22,358 |
| 1989 | 8,230 | 5,603 | 25,378 |
| 1990 | 13,687 | 5,883 | 33,182 |

All data are for years ended June 30. *See* Judicial Admin. Office, *Civil Cases (Asbestos Only) Commenced, Terminated and Pending During Twelve–Month Period Ending Dec. 31, 1990* Table C 1 (1991).

D. Litigation

Concomitant with the growing use of asbestos products, insulation workers formed a union in the United States and Canada. Initially chartered by the Knights of Labor in New York City in 1884, it was recognized by the American Federation of Labor in 1910 as the International Association of Heat and Frost Insulators and Asbestos Workers. Selikoff, Churg and Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States,* 132 Ann.N.Y.Aca.Sci. 139–55 (1965). The presence of the Union greatly facilitated the transition from individual case studies reporting asbestos-related injuries to the extensive epidemiological data available today. *See* Selikoff, Third Wave, *supra,* at 4–6.

This union and others also provided access for workers suffering from asbestos-injuries to attorneys with special relation-

ships to the unions who became familiar with the litigation. This phenomenon explains in part why asbestos litigation is concentrated in the offices of a relatively few attorneys who can earn enormous aggregate fees while cutting costs through economies of scale.

Typical of mass torts, during the early litigation stages plaintiffs had little success, but as they developed evidence, legal theories and expertise, there was a sudden explosion of asbestos litigation. *See, e.g.,* McGovern, *The Cycle of Mass Tort Litigation,* Yale Law School Program in Civil Litigation, Working Paper No. 122 (1990); McGovern, *Resolving Mature Mass Tort Litigation,* 69 Boston U.L.Rev. 659 (1989); T. Willging, *Trends in Asbestos Litigation* 8–13 (Federal Judicial Center 1987) [hereinafter *Trends in Asbestos Litigation*]; Hensler, Felstiner, Selvin & Ebener, *Asbestos in the Courts: The Challenge of Mass Toxic Torts* (RAND, Inst. of Social Justice 1985) [hereinafter *Asbestos in the Courts*].

The coincidence of prevalent use of asbestos, long latency period of illness and prior knowledge of asbestos hazards by industry executives fueled the litigation.

Angered by evidence that information had been suppressed, juries began to award punitive damages. The evidence reviewed above indicates that the issue of general causation is clear, but causation-in-fact, whether the individual's exposure to a particular defendant's product substantially contributed to the plaintiff's injury, and the nature and extent of the injury, is subject to extensive dispute and in turn continues to encourage litigation.

Asbestos cases differ from typical personal injury cases in significant respects. The injuries caused by asbestos are medically complex. *Asbestos in the Courts, supra,* at 2; *Trends in Asbestos Litigation, supra,* at 11–12. The illnesses may be difficult to detect, diagnoses may be disputed among experts and the injuries may be associated with several causes. *Asbestos in the Courts, supra,* at 2. The injuries are serious, often progressive and life-threatening. The exposure which resulted in injury occurred many years earlier among circumstances which apply to a large group of plaintiffs. *Id.* A number of manufacturers produced the dangerous products. Evidence to demonstrate exposure to a given manufacturer's product at a particular jobsite in the appropriate year may ·be difficult, or overshadowed by evidence of exposure to other products or smoking. *Trends in Asbestos Litigation, supra,* at 11. Despite these confounding factors, by 1985 one study concluded:

> Asbestos cases, however complex they may have been at first, have become relatively routine product liability cases that involve a large number of parties. The major complications that remain relate to (1) disposition of claims against multiple defendants, who frequently have cross-claims against each other, and (2) disputes among defendants and their insurers about coverage.

Willging, *Asbestos Case Management: Pretrial and Trial Procedures* 5 (Federal Judicial Center 1985).

Traditional asbestos claims are primarily brought by workers whose occupations involved direct exposure to or handling of asbestos or asbestos-containing products. A second large category of injured persons consists of those who worked alongside such workers and consequently inhaled asbestos fibers. They include insulation workers, shipyard workers, oil refinery workers and chemical refinery workers. So-called nontraditional claims are brought by persons who are exposed to asbestos already in place such as construction workers, tire workers, merchant seamen, and sheet metal workers. More recently, the incidence of injuries in persons environmentally exposed or household members of workers raises the specter of yet another wave of asbestos litigation.

Escalating jury awards generated incentive for both plaintiffs and attorneys to turn to the tort system for redress and began to create such an extensive docket in some jurisdictions that resolution appeared forever in abeyance. The most current figures estimate that roughly 100,000 asbestos cases are currently pending on federal and state dockets nationwide. Order to Show Cause, Judicial Panel on Multidistrict Litigation, No. 875 (1991). A recent Report issued by the Judicial Conference included the prediction that

> the final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

*Judicial Conference Asbestos Report, supra,* at 2. Many of these projections require further analysis. *See* Appendix B attached.

As a practical matter, for plaintiffs to obtain relief they need a trial date. This in turns presents problems. As one commentator noted,

> the roughly contemporaneous filing of large numbers of asbestos disease cases in selected jurisdictions throughout the United States has created excessive demands for the most scarce resource in the litigation system—judicial trial time.

McGovern, *Resolving Mature Mass Tort Litigation,* 69 B.U.L.Rev. 659, 663 (1989). In part as a result of the known backlog of cases, only a trial date will generate sufficient incentive to compel the parties to

settle or result in a trial verdict that terminates the case. While the disposition of asbestos cases is admittedly calendar-driven, fewer than one percent of all asbestos tort cases are ultimately prosecuted to judgment. *See* Tr. 1/2/91 at 77–78.

The sustained success of plaintiffs in establishing liability for serious and deadly injuries has helped usher in a new stage of asbestos litigation in which the burden of jury awards threatens the viability of many former manufacturers and producers of asbestos products. McGovern, *supra*, 69 B.U.L.Rev. at 665; *Judicial Conference Asbestos Report, supra,* at 13–14; Appendices A, C, attached. At present some dozen former manufacturers of asbestos products have filed for bankruptcy; numerous smaller distributors who have been targeted in the wake of absent manufacturers and have also become insolvent. *See Judicial Conference Asbestos Report, supra,* at 14 & n. 33 (listing eleven of twenty-five major manufacturers in bankruptcy; H.K. Porter filed after completion of the Report); *see, e.g., In re Pacor Inc. and Pacor Material Supply Co.,* Case Nos. 86–03251, 86–03252 (Bankr.E.D.Pa. Dec.1989) (former distributor of asbestos-containing products).

Defendants who have not yet been driven into bankruptcy have developed a defensive posture as a means of survival. *See Cimino v. Raymark Indus.,* 751 F.Supp. 649, 651–52 (E.D.Tex.1990). As Judge Parker explained:

> [Defendants] assert a right to individual trials in each case and assert the right to repeatedly contest in each case every contestable issue involving the same products, the same warnings, and the same conduct.

*Id.* This approach has slowed dispositions, contributing to the clogging of federal and state courts with tens of thousands of complaints.

Not all defendants have successfully adopted this posture of delay. Some defendants have been involved in this mature mass tort litigation for years, have little or no insurance left and continue to barely survive. Some defendants have participated in cooperative efforts among companies and insurers as members of the Wellington group (after Dean Wellington of Yale Law School). The Wellington facility succeeded in fostering a considerable degree of cooperation among defendants that at least reduced litigation transaction costs for its participants. After its dissolution due to conflicting interests among members, a score of smaller defendants formed the Center for Claims Resolution. This group continues to promote the interest of its individual members and to settle the vast majority of claims it faces at reduced transactional costs.

A newer generation of peripheral defendants are becoming ensnarled in the litigation as plaintiffs and defendants. In particular, Owens Corning Fiberglas seeks to spread the burden of asbestos litigation as extensively as possible through third-party actions. This effort and that of plaintiffs seek to uncover new sources of compensation for the hundreds of thousands of present and anticipated plaintiffs. The extent of liability, possible defenses and value of the claims against these new defendants is unknown at this point. For example, in the consolidated cases predicated on exposure to asbestos while engaged in the construction, operation or maintenance of electric generating stations in New York (the "powerhouse cases"), over 200 third-party defendants, many of whom have never previously been involved in asbestos litigation, have been brought into the action by Owens Corning Fiberglass. The third party defendants include Consolidated Edison, Long Island Lighting Company, General Electric, Westinghouse, Bechtel, General Motors and others of the Fortune 500 groups as well as many relatively small companies. Trial of the first fifty of nearly 800 consolidated powerhouse cases from the Eastern and Southern districts of New York began before Judge Charles P. Sifton in the Eastern District of New York at the beginning of April 1991. The new defendants are strenuously resisting being drawn into the asbestos vortex. Settlement of the cases in this group is being attempted by Kenneth E. Feinberg, Esq. as Special Master; he was instrumental in set-

tling much of the Brooklyn Navy Yard docket of the state and federal cases.

Plaintiffs' attorneys have also differed in their approach to handling asbestos cases. They too are seeking to expand the number of those with assets available to pay for asbestos injuries. Some plaintiffs' attorneys have chosen to file only their more serious cases in numbers that can be processed by existing judicial methods. *See* McGovern, *ADR Approaches to Mass Torts* (April 19, 1991) (unpublished paper) (filed and docketed). Others have filed all of their cases without regard to the extent of injury. In conjunction with unions they have arranged through the use of medical trailers and the like to have x-rays taken of thousands of workers without manifestations of disease and then filed complaints for those that had any hint of pleural plaque. Some attorneys will settle their stock of cases for relatively small amounts, making up for fee shortfalls by the large number of cases, while others tend to fight on a case-by-case basis for maximum recovery.

The natural concentration of cases in jurisdictions encompassing areas that witnessed heavy exposure to asbestos products, such as the shipyards, oil fields and tire factories has yielded an uneven distribution of cases. *See* Judicial Admin. office, *Civil Cases (Asbestos Only) Commenced, Terminated and Pending During Twelve Month Period Ending Dec. 31, 1990*, Table C 1 (1991). Thus, the prospect for trial varies considerably from jurisdiction to jurisdiction leaving the plaintiffs' bar with significantly greater leverage in some areas than others.

The courts have adopted diverse postures as well. Some courts have aggressively addressed problems raised by asbestos litigation using a variety of aggregative techniques. *See* Mullenix, *Beyond Consolidation: Postaggregative Procedures in Asbestos Mass Tort Litigations*, 32 William & Mary L.Rev. 475 (1991). For example, many districts have instituted innovative judicial management procedures that have streamlined the discovery and trial phases of litigation considerably. *Judicial Con-*

*ference Asbestos Report, supra,* at 15–16. Some courts have established alternative dispute resolution facilities connected to the court. *Id.* at 24–25. For trial, certain jurisdictions have consolidated as many as sixty-five individual cases for a unified trial of all issues. *See, e.g., New York City Asbestos Litig.,* Civ. No. TS 90–9999 (S. & E.D.N.Y.1990) (Brooklyn Navy Yard cases); *In re Powerhouse Cases,* Civ. No. PH 90–8888 (S. & E.D.N.Y.1991) (consolidation of some 800 powerhouse cases; fifty on trial using reverse bifurcation to try damages before liability); *see also Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492 (11th Cir.1985). A single trial on limited issues of some 9,000 cases is scheduled in state court in Maryland.

New York Supreme Court Justice Helen E. Freedman has been instrumental in encouraging and facilitating unique cooperation among the state and federal courts handling asbestos cases in New York State. Her experience and extensive knowledge of state substantive law has been invaluable to the federal courts. Through her contacts with members of other state judicial systems, the courts have gained a better understanding of how the Manville situation affected state and federal asbestos proceedings throughout the country.

Other courts have utilized class actions in an effort to avoid endless repetition of testimony, documents, experts and argument. *See, e.g., Jenkins v. Raymark Indus.,* 782 F.2d 468 (5th Cir.1986); *Cimino v. Raymark Indus.,* 751 F.Supp. 649 (E.D.Tex.1990).

Another strategy employed in an effort to reduce the burden of asbestos cases is to create an inactive docket of cases with plaintiffs who have few if any objective symptoms. *Judicial Conference Asbestos Report, supra,* at 25–26. Placement of a claim on such a registry acts to toll the statute of limitations holding in abeyance unimpaired plaintiffs whose claims may return to the active docket following the onset of disability. *Id. See, e.g.,* Order To Establish Registry for Certain Asbestos Matters, *In re Asbestos Cases,* (Cook County Circuit Court May 26, 1991) (Trafelet,

J.); Order to Establish Asbestos Deferred Registry, *In re Asbestos II,* No. 86–1739 (N.D.Ill. May 10, 1991).

A number of courts have employed special masters to gather data and encourage settlement. Federal courts in Texas, Ohio, New York and Massachusetts have used this technique as have state courts in Maryland. Some judges have taken an active role in encouraging settlements, while others have not.

Other courts, perhaps feeling a greater burden and urgency from overwhelming criminal and civil dockets have not instituted procedures specifically designed to cope with the asbestos litigation crisis. *Cf.* Judicial Admin. Center, *supra,* (Table indicating numbers of asbestos cases filed, terminated and pending for each district). In such districts the dockets continue to grow with almost no dispositions.

Plaintiffs have extensively exercised their power to choose forums. They have generally chosen to move cases to the high verdict districts where the calendars move. Where the tempo or verdicts vary between state and federal courts, the attorneys file where a faster disposition seems likely. In many instances, they file their cases in both courts to increase their options and leverage on defendants.

At this stage of the litigation cycle, most workers exposed to asbestos recover substantial sums through settlement or jury awards. Nonetheless, the disparities are enormous. In New York City, for example, three large trials of similar plaintiffs and defendants were consolidated. One trial of twenty plaintiffs in the Southern District of New York resulted in twenty defense verdicts. *In re Joint Eastern & Southern Dists. Asbestos Litig.,* 762 F.Supp. 519 (E. & S.D.N.Y.1991) (Patterson, J.). A second of thirty-five plaintiffs in Supreme Court, New York County resulted in a verdict of 65 million dollars plus punitive damages. *In re New York City Asbestos Litig.,* NYAL 4000 (N.Y.Sup.Ct. 1990) (Freedman, J.) A third of sixty-four plaintiffs in the Eastern District of New York resulted in thirteen defense verdicts and fifty-one plaintiffs' verdicts for a total

of 35 million dollars with no punitive damages. *In re Joint Eastern & Southern Dists. Asbestos Litig.,* BNY 90–9999 (E. & S.D.N.Y.1990) (Weinstein, J.). Trials are much like a lottery with substantially higher verdicts in New York City, East Texas and parts of California than other parts of the country.

Settlements are, of course, much more consistent, representing an averaging out of the expectations of all counsel. The ratio of trials to settlement also varies from district to district depending on local substantive law, practice and tradition and the happenstance of counsels' needs and judges' expectations. There are variations by industry as well: tire workers (where exposure is light), on the one hand, and navy shipyard workers or insulators (where exposure is heavy), on the other, have cases which vary widely in the mix of cancer, asbestosis and pleural plaques disease and in which causation is viewed with skepticism or is clear. Much will depend on pressures by the judges to settle, local calendar congestion and the like. In short, while the present phase of the litigation favors plaintiffs, there are enormous variations across the country and even within the same geographic areas or industries.

Some research has attempted to estimate the elements of the cost of asbestos litigation. While difficult to gauge with precision, a 1984 Rand study revealed that for every dollar paid to compensate a plaintiff, $2.59 was spent on litigation and transaction costs. Kakalik, Ebener, Felstiner, Haggstrom, Shanley, *Variation in Asbestos Litigation Compensation and Expenses* 91 (Rand Inst.Civ.Justice 1984) (plaintiffs receive roughly 39 cents for every dollar spent). Based on information now available, including overheads, insurance costs and expenditures for courts, the percentage available to plaintiffs is probably closer to 30 cents for every dollar expended. *See also* Appendix C, attached.

At the time it filed for bankruptcy, the relatively-modest sized Eagle–Picher Industries reported that it had devoted $119.7 million to litigation and settlements associated with asbestos claims in 1989, amount-

ing to an astonishing 2.3 million dollars each week. *Judicial Conference Asbestos Report, supra,* at 13. This was an almost insolvent company heading for bankruptcy that had little remaining insurance coverage.

The extent of litigation costs for companies still defending asbestos claims with the benefit of insurance coverage exceeds the Eagle–Picher figure. The Manville Trust, designed to fairly and expeditiously compensate personal injury claimants was spending approximately one million dollars a week on outside counsel litigation defense costs alone in 1990 in addition to its own staff counsel and overhead costs at a time when it had almost no unrestricted cash. *See* H.Ex. 4, 6. As the *Judicial Conference Asbestos Report,* concluded, "[t]he transaction costs associated with asbestos litigation are an unconscionable burden on the victims of asbestos disease." *Judicial Conference Asbestos Report, supra,* at 13.

A fundamental debate remains about the suitability of the tort system for handling the tens of thousands of asbestos cases that remain on state and federal court dockets. The initial social benefits of tort litigation were impressive. It provided a forum for exposing the greed and indifference of industry and government to the health of American workers. It furnished a means of compensating those injured and deterring future wrongful conduct by creating ample incentives for manufacturers to pay close attention to the potentially harmful side effects of their products. But to continue to process claims in the same fashion as the initial cases were handled despite the extensive body of experience and epidemiological data now accumulated appears intolerable as a matter of national policy. *See* Part IX, *infra.* When actual recovery represents some one-third of the expense of litigation, systemic inefficiencies seem to outweigh benefits derived from traditional one-on-one adjudication. As one Rand study concluded:

> The picture is not a pretty one. Decisions concerning thousands of deaths, millions of injuries, and billions of dollars are entangled in a litigation system

whose strengths have increasingly been overshadowed by its weaknesses.
*Asbestos in the Courts, supra,* at iii (Forward).

The large number of asbestos lawsuits pending throughout the country threatens to overwhelm the courts and deprive all litigants, in asbestos suits as well as other civil cases, of meaningful resolution of their claims. *Judicial Conference Asbestos Report, supra,* at 7 (tide of asbestos litigation "continues to rise unabated and has not begun to crest"). Several commentators have recounted the inefficiencies and inequities of case-by-case adjudication in the context of mass tort disasters. *See, e.g.,* American Law Institute, *Enterprise Responsibility for Personal Injuries: Reporters' Study* (April 15, 1991); American Bar Association, *Revised Final Report and Recommendations of the Commission on Mass Torts* (Nov. 1989); Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 Ind.L.J. 561 (1987); *Trends in Asbestos Litigation* (Federal Judicial Center 1987); Rubin, *Mass Torts and Litigation Disasters,* 20 Ga.L.Rev. 429 (1986); Note; *Class Certification in Mass Accident Cases Under Rule 23(b)(1),* 96 Harv.L.Rev. 1143 (1983); Comment, *Federal Mass Tort Class Actions: A Step Toward Equity and Efficiency,* 47 Alb.L.Rev. 1180 (1983).

The heyday of individual adjudication of asbestos mass tort lawsuits has long passed. *See Judicial Conference Asbestos Report, supra,* at 7 ("one point on which plaintiffs' counsel, defense counsel and the judiciary can agree is that the present way in which we have attempted to resolve asbestos cases has failed"). The reasons are obvious: the complexity of asbestos cases makes them expensive to litigate; costs are exacerbated when each individual has to prove his or her claim *de novo;* high transaction costs reduce the recovery available to successful plaintiffs; and the sheer number of asbestos cases pending nationwide threatens to deny justice and compensation to many deserving claimants if each claim is handled individually. The backlog is eroding a fundamental aspiration of our judi-

cial system—to provide equality of treatment for similarly situated persons. *Cf.* *Asbestos in the Courts, supra,* at 12 (recent wave of asbestos litigation marked by high concentration of claims, dominance of characteristics of individual asbestos cases, behavior of parties, lawyers and the attributes of judges "created a situation in which dispositions are slow, costs are high, and outcomes are variable").

Overhanging this massive failure of the present system is the reality that there is not enough money available from traditional defendants to pay for current and future claims. Even the most conservative estimates of future claims, if realistically estimated on the books of many present defendants, would lead to a declaration of insolvency—as in the case of some dozen manufacturers already in bankruptcy. *Compare* Appendix A, attached *with* Appendix C, attached; *see* Part VII.D.4.a, *infra* and *passim.*

The courts have reached a crossroad in their efforts to resolve the multitude of social and legal issues that asbestos litigation has engendered. *See* discussion of larger context of asbestos litigation at Part IX.A, *infra.* Either the law will adapt to changed circumstances and new pressures or large numbers of persons will be deprived of a practical means by which to redress their injuries. The situation is urgent for many aging victims and widows who have endured years of suffering without relief. This Settlement must be viewed in this larger historical context.

### E. Bankruptcy of Johns–Manville

Manville had been a highly successful producer of asbestos and asbestos products, but by 1982 it was experiencing severe financial stress resulting from the massive number of tort claims filed by persons who had contracted various diseases resulting from exposure to Manville asbestos.

In August of 1982, Johns–Manville Corporation and affiliated entities filed for reorganization under Chapter 11 of the United States Bankruptcy Code. A realistic fear of burgeoning asbestos-related tort claims for compensatory and punitive damages motivated the filing.

Manville already faced a substantial number of asbestos disease claims, including more than 17,000 pending tort suits. By 1982 more than 3,570 claims had either been settled or been tried to verdict at an average disposition cost of $20,000. Manville then estimated another 35,000 claims and projected its total asbestos liability at more than one billion dollars. The corporation sought bankruptcy protection to devise a means to cope with its exploding asbestos liability.

Despite this massive contingent liability, the Chapter 11 filing by Manville, a company with assets valued at $2.25 billion and a net worth of $830 million, shocked both the business world and those involved in asbestos litigation. It inspired extensive academic and other commentary. *See, e.g.,* L. Kallen, *Megabankruptcies of the 1980's and 1990's* chs. 9–11 (1991); P. Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial,* 286 (1985) (committee of asbestos-related litigants filed motion to dismiss petition as effort to use bankruptcy law to impair "the constitutionally protected rights of present and future victims of asbestos-related diseases and their survivors … to obtain full compensation for personal injuries and wrongful death"); *see also id.* at 283, 320; Olick, *Chapter 11—A Dubious Solution to Massive Toxic Tort Liability,* 18 Forum 361 (1983); Harris, *Asbestos Chapter 11 "Solution" to the Tort Litigation System* in *Recent Developments in Tort Law Reform,* 39 Bus. 209 (Johnson ed. Nov. 1983). During the six years of bankruptcy, no asbestos-related claims were paid.

After four years of difficult and intense negotiations among representatives of present claimants, future claimants, codefendants, Manville, equity security holders and other interested parties, Manville proposed its Second Amended and Restated Plan of Reorganization (the "Plan") in August of 1986. It was formally approved and after appeals the Trust became operative on November 28, 1988. As indicated below, serious underestimates of future

claims and their value sowed the seeds of failure. The assumption was that there would be a full payment of all creditors, including asbestos claimants. Plaintiffs' attorneys insisted on a scheme that allowed their earliest clients to be paid in full and permitted the attorneys to collect large fees without reduction for cost savings created by mass settlements. But for what will probably be hundreds of thousands of unpaid asbestos health claimants little was left. When they came, the cupboard was bare.

### F. Second Amended and Restated Plan of Reorganization

The Plan provided for the creation of the Trust which was designed to satisfy fully Manville's asbestos-related liability. *See In re Johns–Manville Corp.*, 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). Specifically, the Trust was formed to assume Manville's liabilities resulting from pending and potential claims, defined as Class 4 Claims, including (1) individuals exposed to asbestos who have manifested asbestos-related diseases or conditions, (2) individuals exposed to asbestos who have not yet manifested asbestos-related diseases or conditions, and (3) third-party asbestos-related health claims against Manville for indemnification or contribution. Plan and Related Documents, § 2.4 at C–24. The Trust was expected to satisfy those claims with assets to be committed to the Trust immediately and over time by Manville and its insurers. It is of some significance in the current class action that all the parties agreed that claimants and codefendants were to be placed in the same class of creditors.

Upon consummation of the Plan on November 28, 1988 (the date the Trust Agreement was executed), the Trust became the exclusive entity from which to seek compensation for existing and future asbestos health claims caused by exposure to Johns–Manville products. An injunction insulated the Manville Corporation from any asbestos-related litigation.

As stated in the Plan, Manville established the Trust to implement the following purposes:

(i) to use the assets in the Trust Estate to deliver fair, adequate and equitable compensation to bona fide Beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims and with settlement to be preferred over arbitration, arbitration to be preferred over resort to the tort system, and fair and efficient resolution of claims to be preferred over all else;

(ii) to enhance and preserve the Trust Estate;

(iii) otherwise to carry out the provisions of this Agreement, the Supplemental Agreement, the [Property Damage] Supplemental Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

Trust Agreement, § 2.02, at C–80.

Under the provisions of the Plan, the Manville Corporation would fund the Trust up to agreed upon payments for at least thirty years. Pursuant to the Plan, the Trust would receive three types of assets in order to satisfy anticipated asbestos claims. *See* Trust Agreement, Schedule I at C–90.

First, the Trust was to receive insurance proceeds, cash and accounts receivable with a total value of $869 million (mostly from insurance). Second, two bonds with an aggregate face value of $1.8 billion and a $50 million installment note were executed by Manville in favor of the Trust, payable in installments commencing August 1991 and extending through November 2014. Third, the Trust was given up to 80 percent of the stock in the reorganized Manville Corporation—24 million shares of common stock (representing fifty percent of Manville common stock outstanding at the time) plus preferred stock convertible under certain circumstances to an additional 72 million common shares (constituting an additional thirty percent interest). The stock was hedged with restrictions that would prevent the Trust from interfering with management's control for some years.

Beyond these assets, beginning in 1992 the reorganized Manville Corporation was to make payments to the Trust of up to twenty percent of its annual profits.

The Plan thus anticipated an extended life for the Trust and closely linked its financing to the health of the reorganized company. The ultimate transfer of a controlling share of Manville stock was designed to give the Trust a long-term interest in the company's operations:

> [T]he Trust, as fiduciary for asbestos health victims will be the single largest stockholder in the reorganized debtor. The effect of this Plan will be to give the "tort victims" the beneficial interest in the ongoing operating corporate entity.

*In re Johns–Manville Corp.*, 68 B.R. 618, 621 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). The bonds were also structured to provide the Trust with funds for a twenty-four year period.

Similarly, the profit-sharing provision sought to ensure a long-term source of income for the Trust. As the Bankruptcy Court recognized,

> the Trust is guaranteed an "evergreen" source of funding by virtue of its 20% call on profits of the operating corporation. This funding of the Trust will continue until the last asbestos victim is found and paid.

*In re Johns–Manville Corp.*, 68 B.R. at 621–22.

The Plan provided that "[e]ach holder of an Allowed Class 4 Claim shall be paid the full amount of such Allowed Claim in accordance with the terms and provisions of the Claims Resolution Facility and Article IV of the Trust Agreement." Plan and Related Documents § 3.4, at C–25. In this context, "Allowed" claims means those timely filed with the Claims Resolution Facility and "liquidated and fixed as to amount in accordance with the terms of the Trust Agreement."

Article X of the Plan expressly retained jurisdiction in the court "to enforce and administer the provisions of the Plan and, to the extent expressly provided therein, the Exhibits thereto and the Annexes to the Exhibits," "to modify any provision of the Plan to the full extent permitted by the Code" and "to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan." Plan and Related Documents § 10.1, at C–36, C–37. This Bankruptcy Court endorsed the efficacy and propriety of the provision retaining jurisdiction. *See In re Johns–Manville Corp.*, 97 B.R. 174, 181 (Bankr.S.D.N.Y.1989) ("The success of these reorganizations will be measured by the ability of the Trust to compensate the future asbestos-health claimants.").

To carry out the Plan post-confirmation, the Trust administers the Claims Resolution Facility ("CRF") described in the Claims Resolution Procedures, Annex B to the Trust Agreement. The stated purpose of the Claims Resolution Procedures embodies the priorities and principles guiding operation of the Trust as envisioned at its creation:

> to provide a simple, economical procedure for obtaining and encouraging the prompt, efficient and equitable resolution of asbestos-related bodily injury claims which are based upon a physician's diagnosis of any and all asbestos-related diseases and conditions while preserving the rights of the parties [sic] access to the tort system, including the right to jury trial in a forum selected by a claimant pursuant to the applicable federal or state laws of the jurisdiction selected, with the only condition precedent to the exercise of the right to trial by jury being the procedures specified in Section II.B.

Trust Agreement Annex B, § 1.A.1 at C–99.

Among other items, the CRF required claims to be processed in the order in which they are originally filed whether in a court or with the CRF whichever is earlier, known as the first-in, first-out ("FIFO") system. Trust Agreement Annex B, § I.A.2 at C–99. The procedures permit certain exceptions to the FIFO system. First, claimants who have previously settled with all other codefendants may pro-

cess their claims with the Trust out of the main FIFO queue. *Id.* Second, to a limited extent the Trust was permitted to negotiate and implement group settlements so long as it would not "in any substantial way" prejudice the FIFO processing. *Id.* Third, extreme hardship claimants could receive a priority in both the processing and payment of their claims. Trust Agreement Annex B, § 11.B.7 at C–101.

For claimants who failed to liquidate claims with the Trust through its procedures, mediation or arbitration and instead pursued a tort action, the claimant had the right to assert against the Trust all claims available under applicable state law for compensatory but not punitive damages. The CRF specifies that claims liquidated by settlement or arbitration must be paid shortly after liquidation. *Id.* §§ II.B.9, III. D.6, III.E.5 at C–101–104. No similar urgency is expressed for payment of claims that have been liquidated through trial. This provision did not, however, in practice represent a significant disincentive to trial.

On December 22, 1986 the Bankruptcy Court entered its order confirming the Plan. Following nearly two years of appeals, the confirmation order became final on October 28, 1988. The Plan was executed and delivered on November 28, 1988.

Upon starting operations it was known to the Trust and others that the Plan was grossly inadequate. Within a year-and-a-half of start-up, the Trust was without liquid assets. Internal memoranda and meetings of the Trust's personnel with selected plaintiffs' counsel made it clear that the shortfall was recognized almost at once. Nevertheless, settlements and payments went on with no allowance made for the looming crisis.

### G. Problems with the Trust

Pursuant to orders of the Bankruptcy Court the Trust was established on an interim basis prior to consummation. An initial staff was hired in January 1987. By May 1988, the Trust began settling but not paying pre-petition claims.

### 1. *Inaccurate Estimates of Claims and Values*

At the time of the Trust's creation, the architects of the Plan expressed the view that the assigned assets and financial resources of the Trust would be sufficient to pay all asbestos health claims as they were liquidated. Relying on its experience to date, counsel to Manville stated at the time of confirmation:

[w]e cannot demonstrate with mathematical certitude that the trust is funded adequately, but with reasonable estimates and by the substantial amounts that the company has committed to pay into the trust, we believe that there is a reasonable probability that the company will be able to meet all of its commitments under the plan and that there will be adequate funding to pay every asbestos claimant.

Confirmation Hearing Tr. at 274.

A critical ingredient in the ability of the Trust to fulfill its obligations was the value of the Trust's common stock at the time of its sale. The Disclosure Statement calculated that value at "various price earnings multiples of between 6 to 12 times the respective year's projected consolidated net earnings available for common stock, subject to a minimum value of 60% of net book value." *Id.* Moreover, Manville explicitly stated:

For the assumed total of 83,000 claims, the estimated amount of Manville Common Stock to be sold by the Trust ranges between approximately 28% and 45% of the total common equity of Manville, depending on the selling price per share ... Under certain assumptions of the 100,000 claims case, the Trust would be required to sell most, if not all of the 80% Manville common equity available in its portfolio in order to pay claims, a large number of which are anticipated to be settled in the early years after consummation.

*Id.*

During the pendency of the bankruptcy proceeding more than 50,000 additional asbestos health claims were asserted. This compelled Manville to revise upward its total claims projections. Contrary to its

early estimation of an ultimate total of 35,000 claims, the rate of filing did not plateau and decrease, but in fact continued to rise. As a result, by the time of the Plan's confirmation, Manville's new projection anticipated that it would face between 83,000 and 100,000 claims. In view of the extent of claims, the Debtors' Disclosure Statement specifically recognized that sufficient funds might not be available to the Trust to pay all asbestos health claims as they were liquidated:

> Although Manville believes that the funding of the Trust will over time be adequate for the payment of 100,000 claims valued at $25,000 per claim in 1986 with per-claim cost increasing by four percent per year thereafter, depending on the timing of the receipt and liquidation of claims, the Trust is likely to experience periods when the payment of claims will be dependent upon the timing of receipt of payments from Manville.

Disclosure Statement IXC(c)(iii) at C–377; *see also id.* Intro D(1) at C–325. Similarly, the Court of Appeals for the Second Circuit, while upholding the bankruptcy court's confirmation of the Plan, conceded that the Trust might not be able to satisfy all claims against it. *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 644–45 (2d Cir. 1988).

Drawing on its prepetition experience, Manville in the Disclosure Statement estimated that on average resolving pending and future claims against the Trust would cost $25,000 per claim in 1986, with the per-claim cost increasing four percent annually thereafter. *See* Disclosure Statement 61 IXC(c)(ii) at C–377.

The Plan thus relied upon assumptions that the number of claims would not exceed 100,000 and that the timing of claims would roughly coincide with the timing of payments from the Corporation to the Trust. Based on available data, the Bankruptcy Court found that the Plan satisfied the criteria set forth in § 1129(a) and that it was "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."

*In re Johns–Manville Corp.,* 68 B.R. 618, 635 ("The evidence submitted by [Manville] ... provides a reasonable estimation, based upon known present claimants and reasonable extrapolations from past experience and epidemiological data, of the number and amount of asbestos-related claims that the AH Trust will be required to satisfy."), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988).

Circumstances quickly outstripped projections concerning the number of claims, the rate at which they were filed and their average value. The confluence of these factors meant that the Trust began incurring liabilities in excess of, and at a far greater rate than, the cash flow to the Trust. Moreover, rather than containing disincentives for trial, in fact the practical effect of certain provisions of the Plan was to encourage costly and wasteful litigation. First, plaintiffs could accelerate the processing of their claim if they obtained a trial date. The Trust would negotiate and settle cases set for trial in an effort to lessen trial exposure and litigation defense costs. Yet this avenue provided a vehicle for late-filing claimants to move ahead of the FIFO queue. Second, the provision permitting codefendants to implead the Trust in any ongoing litigation increased exponentially the number of cases simultaneously docketed for trial. In one fell swoop, the Trust was brought into tens of thousands of cases. This necessitated retaining local counsel in nearly every state, participating in pretrial discovery and preparing tens of thousands of cases for trial rather than merely evaluating them for settlement. Under the weight of constantly increasing claims, the Trust expanded its reliance on expensive outside counsel.

To the extent that cases were settled through the Claims Resolution Facility, plaintiffs' attorneys exercised considerable and effective influence over the Trust's settlement and payout practice. The Trust began settling pre-petition claims in groups organized by plaintiffs' counsel. Spreadsheets were developed to summarize basic information concerning certain selected law firms' pre-petition claims relying on infor-

mation from plaintiffs' counsel, Manville, the Resource Planning Corporation (a fact gathering and data analysis company employed by the Trust at great expense), and information obtained during the claims review process. After spreadsheets were completed, an analysis of the data was undertaken to determine disease mix, total prior settlements or judgments from codefendants and a possible range of Manville's market share based on the occupations of the claimants. Affidavit of Gregory Smith, Western Region Claims Manager of the Trust, ¶ 5A–5C (Oct. 10, 1990) (Cohen Aff., Exhibit M). While millions of dollars was spent for an outside information processing firm to gather and enter data in computers as claims came in, adjusters at the Trust often settled large groups of cases using hand-written file summaries.

Settlement discussions with plaintiffs' counsel varied widely. According to Trust memoranda, group settlements were common and could involve hundreds of claims with an aggregate settlement value ranging in the millions of dollars. Not infrequently these claims were settled relying on varying levels of information supplied by plaintiffs' counsel subject to a random audit after settlement. For example, on June 21 and 22, 1988, Trust personnel met with counsel from one plaintiff firm to discuss settlement of 880 cases. After setting aside certain extraordinary cases the parties proceeded to discuss and settle 835 cases in the course of an afternoon:

> After lunch, discussion continued concerning the 45 special claims. The [representative of the Trust] stated that the plaintiff counsel had [already] received, [from codefendants] on the 835 claims, a total average per claim of $64,414.23. [He] explained that his calculations ... conclud[ed] the accurate amount [was] $53,785,879.
>
> ... [He] offered $20,916,731 for 835 cases to their demand of $70,331,000. [Counsel representing plaintiff-beneficiaries] responded that if one were to take the previous paid amounts and look at them at 40% market share versus 35%, the total would then be approximately $54,000,000. [He] further noted that the

Trust offer should at least be $36,000,-000. [The Trust representative] replied that the actual JM market share is unknown.... [The Plaintiffs' representative] requested that the Trust pay the firm based on joint and several liability. [The Trust representative] commented that the Trust can not afford to compensate on the things that "could have been." Negotiations on both sides continued and [The Trust representative] gave a counter-offer of $25 million. Plaintiff counsel asked for a few minutes to confer.

> Plaintiff counsel responded with a demand of $32,965,538 which was to reflect 38% of the market share liability. [The Trust counsel] said that it would be easy to split the difference, but they wanted to dwell on the concept and not on numbers. [The Trust] gave a counter offer of $28,861,627. [Plaintiffs' counsel insisted that the firm wanted more than 35% market share. [The Trust] offered $31,500,000 ... Plaintiff counsel accepted the offer and settlement of 835 claims was concluded at $31,500,000 (36.9%).

Trust Memorandum (June 27, 1988) (Cohen Aff., Exh. N). The firm involved settled with the Trust for over $50 million. No limit on fees based on the economies of scale was negotiated to reduce the Trust's payment. The share paid by the Trust was arguably greater than present litigation indicates it should have been. Special Master Marvin E. Frankel, appointed to determine whether the Trust constituted a limited fund, *see* Part II.J, *infra*, in the course of his hearings turned his attention to the "perplexing subject" of possible gross overpayment of claims by the Trust. Special Master's Report, *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 661–68 (E. & S.D.N.Y.1990) [hereinafter "Special Master's Report"].

Preliminary discussion between Trust personnel and another prominent plaintiffs' firm centered on fixing the appropriate average value for a group of 326 cases and Manville's share of responsibility. The Memorandum recording the discussion is

illustrative of some of the inherent problems in the Trust's settlement process:

[Plaintiffs' counsel] went on to relate how he and members of his firm had pulled files at random and done a blind evaluation, assigning a total value to each case and then subtracting out what funds had already been received. [He] maintained that the remaining J–M share worked out to be 30%.

[The Trust representative] responded with his "Trust Speech" stressing the Trust's fiduciary responsibility to future claimants as well as its obligation to maintain the viability of the Trust while providing fair and just compensation.

[Plaintiffs' counsel] argued that his cases involved such high value jurisdictions as Texas and Florida and that he was interested in compensating these people fairly and not "gouging the Trust" as evidenced in his assessment of the 13 unsettled cases. [The Trust] reminded him of the 17,200 expected pre-petition cases to be followed by an estimated 150,000 claims over the life of the Trust ...

[The Plaintiffs' counsel] declared that Texas was a good state for getting trials easily and that he was surprised to learn that the average case value was only $130,000 compared to the $150,000 average he had assumed. [The Trust] reminded him that those settlements were docket-driven and then asked him if he had a figure in mind.

. . . .

[The Trust representative] disputed the [percentage calculated by Plaintiffs' attorney] by explaining that considering the cases in bulk masked mitigating factors that individual case evaluations would reveal. Urging [Plaintiffs' attorney] to back away from the courthouse steps logic, [The Trust representative] contended the amount of money already paid on these claims by the [Claims Resolution] Facility was inflated.

. . . .

[The Trust representative] maintained that the Trust could not remain in business if it paid an average of $47,500 a case.

. . . .

[The plaintiff's representative] reiterated his position by stating the Trust was capable of paying his demand on the basis that 25% of the average case award of $85–90,000 was $30,000. $30,000 per 17,200 cases would total $516,000,000, a figure he insisted was below the budget the plaintiff's [sic] committee had determined for the first year....

Trust Memorandum (June 2, 1988) (Cohen Aff., Exh. Q). This firm settled claims with the Trust for some $30 million. One plaintiffs' firm settled claims with the Trust for over $110 million using similar mass negotiation methods. *See* Appendix D.

Trust personnel made little effective effort to apportion available cash among total anticipated assets or to maintain the $25,000 average claim payment level relied upon in devising the Plan. Rather, the Trust was manipulated into paying high tort prices for claims theoretically settled through an alternative dispute resolution process.

When negotiations were successful, a confirmation letter was sent to the attorney indicating that the settlement was contingent upon the receipt of acceptable Proof of Claim forms for all claimants, upon the completion of an audit of all claims paid in excess of $50,000, upon the completion of an audit of a random sampling of 10–20% of the entire settlement group, upon proof that the claims were in fact pre-petition and upon Trust approval of the law firm's allocation among the claimants. Similar but apparently not identical procedures were used in the Western and Eastern Regions in settling pre-petition claims on behalf of the Trust. G. Smith Aff., *supra*, at ¶ 5H.

By March 31, 1989, the Trust had received 60,000 claims and had liquidated and paid in full the majority of its pre-petition claims. The average settlement value of the 15,000 pending claims from before the bankruptcy was $39,000. Payment of pre-petition claims ultimately totalled approxi-

mately $625 million of the Trust's initial available cash of about $837 million. Huge start-up and continuing Trust administrative costs were also paid from this cash on hand. Many of the pre-petition claimants had received roughly full compensation for their injuries from the codefendants during the bankruptcy. Tr. 1/23/91 at 51 (plaintiffs "have gotten full value for cases since 1982" in settlements with and judgments against codefendants). Nevertheless, their attorneys were able to obtain large additional amounts from the Trust consuming almost all of its liquid resources.

During the second year of the Trust's administration the number of claims filed with the Trust nearly doubled; by March 31, 1990 the Trust had received 143,000 claims. Thus, within its first two years of operation the Trust faced almost 50% more claims than the highest projection made at the time of confirmation for the total number of claims to be filed during the entire life of the Trust. By February 5, 1991 the number of claims received by the Trust had soared to over 170,000 and claims continue to flood in. Memorandum of Law of Manville Personal Injury Settlement Trust In Support of Motion to Approve Class Action Settlement, *Findley v. Blinken*, Civ. No. 90–3973 at 10–11 (S. & E.D.N.Y.1991).

Beyond the number of claims asserted for asbestos-related injuries, the average liquidated value of each claim amounted to $42,128. *Id.* This represented nearly a 40% increase over the original projection of $25,000 per claim.

In December of 1989, in an attempt to assist the Trust with its manifest cash shortage, the Manville Corporation prepaid the $50 million Trust Note originally due in equal installments in 1990 and 1991. The payment included $50,000,000 in principal and $8,117,715 in accrued interest.

2. *Massive Impleading of Trust Leading to High Transaction Costs, Expensive Settlements and Litigation Costs*

The drafters of the Plan clearly anticipated that the vast majority of claimants would settle their claims with the Trust without resort to the tort system, even though the Plan preserved the right to a trial by jury. *See* Disclosure Statement VC 2 at C–360–361. Yet no credible disincentives to use of the tort system were built into the system. In fact, by March 1990 thousands of claims were pending against the Trust in state and federal courts across the country. A major precipitating cause of this condition was the right of codefendants to implead the Trust into ongoing litigation 240 days after consummation of the Plan. *See* Trust Agreement Annex F, § IV.B, at C–139. Thus, as of July 28, 1989, the Trust could be made a party in any pending asbestos personal injury case that it had not already settled. Codefendants were anxious to push as much of the cost of asbestos claims—typically filed against many defendants—off on the Trust. Since they had been blocked from this route of sharing costs while the Manville stay was in effect between bankruptcy in 1982 and operation of the Trust in 1988, they were not inclined to show consideration for the Trust once it became vulnerable to suits.

Moreover, claimants could jump the FIFO line by commencing actions. Judgments would be enforceable and early large settlements could be obtained, often with the aid of judges understandably anxious to clear their calendars; one such settlement in one federal district court was for $140 million. *See Cimino v. Raymark Indus.*, 751 F.Supp. 649 (E.D.Tex.1990).

As noted, representatives of the Trust made clear to select plaintiff's counsel almost as soon as the Trust began operations that the Trust's assets were insufficient. As a result, there was an urgency by plaintiffs to assemble huge numbers of claims quickly and push them to early settlement or judgment before the money ran out. The hundreds of millions of dollars in fees received by plaintiffs' attorneys made assembling large stables of claimants hugely profitable. The result was a frenzied offense by plaintiffs' bar to dispose of claims by the hundreds and thousands at a time and collect fees before the Trust went broke.

To avoid the expense of litigation and the risk of a high trial judgment, the Trust sought to settle cases pending on trial dockets. Settlements obtained on the steps of the courthouse invariably cost more than those negotiated without the looming fear of an unpredictable jury verdict. With the constant pressure of massive numbers of cases scheduled for trial, the Trust all but abandoned its efforts to settle cases through the Claims Resolution Procedures. Tr. 1/2/91 at 100–04.

One of the most unacceptable consequences of the Trust's presence in the tort system was the staggering cost of litigation defense. In 1990, the Trust spent roughly $50 million on outside counsel fees. These fees continued to mount despite the Trust's own internal costs of some $25,000,000 a year for its settlement operations. With a rental of a million a year for quarters in Washington, an expensive insurance policy of dubious utility to protect its trustees despite a $30,000,000 protective fund from the Trust's assets, over a hundred employees negotiating settlements and support for outside counsel services in all parts of the country, the Trust quickly spent its assets, present and prospective. Without the intervention of the courts, despite valiant efforts of a dedicated staff, it seemed unable to protect the remaining corpus for the benefit of the hundreds of thousands of present and future unpaid claimants.

As early as January 1989, the Trust publicly warned numerous plaintiffs' counsel that cash shortages might necessitate substantial delay between the time of claim liquidation and payment. *See* H.Ex. 16 at tab 13 (1/3/91). The Trust was aware, as already pointed out, of this certain denouement even before it began first payments. And it seems clear that the leading members of the plaintiffs' bar operated on the assumption that they had to obtain as much cash as possible quickly because there would be only enough for a small number of their present clients and for their fees and probably none for future claimants. The Trust reiterated these concerns to plaintiffs' counsel in May and June of 1989. *See id.* at tabs 15, 16; Tr. 1/3/91

at 344. By August 3, 1989 when Trust officials met with Select Counsel for the Beneficiaries to discuss financial alternatives, including formulating a new payment plan, the Trust was predicting waiting periods of up to twenty-five years between claim filing and complete payment. *See* H.Ex. 16 at tab 20; Tr. 1/3/91 at 306.

The Trust realized that the only hope to survive its cash shortage and at least postpone disaster was to defer payment of liquidated claims in order to draw from the long-term funding generated by profits and bond payments from Manville and the sale of Manville common stock. *See* Tr. 1/3/91 at 314. The payment scheme presented in December 1989 anticipated liquidating all claims filed in 1982 and paying a fixed percentage ninety days after the close of the year of settlement with the balance due in five years without interest. Thereafter, the Trust planned to settle one-half of the 1983 claims in 1991 and the other half in 1992; to settle one-third of the 1984 claims in 1993, and continue at much the same pace. In each case the Trust planned to make partial payments as described above. *See* Tr. 1/2/91 at 101.

If the Trust could defer payment, then it could settle far more cases, control the timing of the sale of its Manville shares and retain Manville's bonds and the right to the profit-sharing payments for their full long-term payout values. *See* Tr. 1/3/91 at 289; H.Ex. 16 at tab 23. These principles formed the basis of the payment plan announced on April 6, 1990. *See* Tr. 1/3/91 at 314; discussion of New Plan *infra*.

### 3. *Operational Problems*

The fiduciary responsibility to compensate those injured by exposure to asbestos dust yet to pay only bona fide claims without overcompensating or undercompensating claimants alone creates a formidable challenge. Efficiencies of scale through fixed payment schedules and reduced transactional costs had been blocked by plaintiffs' counsel who insisted on the FIFO system based on an individual-by-individual tort compensation plan as embodied in the bankruptcy Plan. *See* Peter-

son, *Giving Away Money*, 54 Law & Contem.Probs. 1201, 1207–08 (Winter 1991).

The Plan's success depended on the Trust settling 98% to 99% of the claims at fair, but relatively low values. With little cash, the Trust suddenly found itself scheduled for trial in thousands of cases without the money to enter effectively into settlement negotiations with the promise of prompt payment. The "seeming paradox" of simultaneously owing a fiduciary duty to beneficiaries and vigorously defending the Trust in litigation against plaintiff-beneficiaries or in faithfully preserving adequate assets to provide fair and equitable treatment to all claimants known and unknown appeared to present irreconcilable conflicts. Special Master's Report, 120 B.R. 648, 665 (E. & S.D.N.Y.1990).

Even with litigation costs devouring much of the Trust's limited resources, most of the cases addressed by the staff of the Trust or scheduled for trial ultimately settled. Since consummation of the Plan, the Trust has resolved over 27,000 asbestos health claims, including more than 10,000 cases on active trial dockets. According to the General Counsel of the Trust, only 164 of the total number of claims resolved were the subject of trial verdicts; the remaining claimants all settled with the Trust. Affidavit of David T. Austern, ¶ 11 (Jan. 2, 1991).

The transaction costs that resulted from the Trust's presence in the tort system clearly exacerbated the situation. Plaintiffs who otherwise accepted the premise that the best method for resolving cases was through consensual agreements were no longer willing to liquidate and release the Trust from responsibility without any firm indication of when claimants would receive payment. The benefits of increased efficiency and reduced litigation and transaction expenses that typically attend even hybrid administrative claims facilities were not being achieved. *Cf.* McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U.L.Rev. 659, 694–5 (1989) (routine processing of cases in hybrid litigation-administrative format easily reduces transaction costs).

Some effort was made to devise alternatives to the calendar-driven tort system. The Trust informed the Select Counsel for the Beneficiaries, the three attorneys elected by the Asbestos Litigation Group comprising attorneys who specialize in the representation of asbestos victims, that the Trust's financial condition threatened its ability to pay claims fully as they were liquidated according to the specified terms of the Plan. The Trust and Manville met with Select Counsel for the Beneficiaries in 1989 and 1990 in an effort to find ways to eliminate or minimize the Trust's soaring transaction costs. Tr. 1/2/91 at 19. No consensus on how to address the Trust's fiscal problems emerged from these discussions. The select counsel, being themselves key players with large stocks of cases, continued to look after their own claimants. They can hardly be accused of using insider information since the Trust's situation was well known—except possibly to the claimants.

By January 1, 1990 the Trust had increased its efforts to safeguard what cash it possessed. At that time, the Trust issued a statement that indicated that all 1982–84 claims would be paid in full over the course of five years. While aware of the tensions and inadequacies from the outset, the Trust continued to guide its efforts to resolve the Trust's formidable and unanticipated difficulties by adherence to select provisions of the Plan.

### 4. *Trust Payment Plan Promulgated on April 6, 1990*

On April 6, 1990 in the face of dire cash shortages extending beyond the immediate future, the Trust announced a revised payment plan for settling the nearly 130,000 claims pending against it as of March 31, 1990. Under the new plan, all claims (with the exception of those denominated as Hardship, Exigent Health or "Manville Only" claims) would receive 40% of the agreed upon settlement or judgment amount within 90 days of the end of the year in which the claim would be eligible for payment in the Trust's "FIFO queue." The remaining 60% of the amount due

would be paid five years after the initial payment. It has already been pointed out that the Plan's Claims Resolutions Procedures permit the Trust to negotiate with claimants out of FIFO order if the claimant has settled with all other defendants.

With the proposed new payment plan ("New Plan") the Trust established its contemplated payment schedule for all claims filed as of March 31, 1990. According to the schedule, claimants who filed in 1982 would receive 40% of their payment at the end of the first quarter of 1991, and would receive the remaining 60% in 1996. Claimants who filed in 1990 were scheduled to receive their first 40% in 2015 with the remainder due in 2020. Persons who filed claims that were placed in the FIFO queue in 1988 could expect 40% between 2004 and 2007; the remainder would be paid between 2009 and 2012. Those in the FIFO year 1989 would receive their first payment between 2007 and 2015; the remaining 60% to be paid between 2012 and 2020.

The New Plan applied to both settlements and judgments. In contrast with earlier practice, the Trust intended not to pay out of FIFO order trial docketed cases that either were prosecuted to judgment or were settled by all co-defendants. This proposed change in Trust practice was designed to deal with the pressure by attorneys to get cases on trial dockets and expedite trial schedules in order to obtain immediately enforceable judgments. The result was to put greater docket pressure on the courts for accelerated trial dates in many parts of the country. Codefendants became concerned because the increased rates of judgments and court pressured settlements accelerated their own cash outflow problems, driving more and more of them toward bankruptcy as their insurance coverage was exhausted. And, of course, ever more efficient disposition by the courts resulted in no diminution of pending cases, since the asbestos bonanza led to an increased search for more clients through unions and independent solicitation and increased filings.

Hardship Claims under the New Plan were defined as claims in which the Trust in its discretion has determined that there is a causal connection between the claimant's financial condition and an asbestos-related disease and that the claimant needs financial assistance on an immediate basis. They would receive full or partial payment with a portion deferred depending on the financial circumstances of the claimant.

Exigent Health claimants, defined by the New Plan as claimants with clear and convincing evidence that they suffer from asbestos-related injuries where a physician has submitted a declaration or affidavit attesting that there is substantial medical doubt that the claimant will survive beyond six months, would be paid 40% within twenty business days of the Trust receiving a release. The balance would be paid in accordance with the preexisting Guidelines for Exigent Health Program. It provided that to the extent possible the balance due would be paid during the year that the claim was settled. If that was not possible the claims would be paid on a pro rata basis according to the relative size of each deferred payment amount.

In addition, the Trust would endeavor to settle twenty percent of so-called Manville Only claims, those in which the Trust in its discretion determines that Manville is the only party that could be named as a defendant (including claims by workers in Manville plants and those in which exposure was predominantly to Manville asbestos containing products). Those claimants could not expect to recover from codefendants—as most claimants can. They would receive 40% of the liquidated value of their claim within ninety days of the end of the year in which the Trust receives a release with the balance to be paid within five years.

The Trust began negotiating under the New Plan's terms immediately. Tr. 1/3/91 at 314. In view of the uncertainties concerning the financial condition of the Trust even over the course of the immediate future, the terms described above provided additional disincentive for plaintiffs to settle with the Trust on such precarious terms with payment extending well into the twenty-first century. Tr. 1/2/91 at 17–18.

Since plaintiffs' counsel and some courts took the position that a judgment was enforceable by its terms in full at once, the New Plan's deferral provisions further accelerated the rush to the courthouse and judgments. Liens and seizure of the Trust's assets by those holding judgments were threatened. Codefendants' attempts to slow the process proved less and less effective.

The sociology of the courts, long urged and habituated to dispose promptly of pending cases, increased disposition rates. Moreover, the courts themselves had developed efficient methods of discovery, docket control, multiple trials, use of special masters and the like that provided great potential for compounding the crisis. In this Alice in Wonderland world, they were running faster and faster yet moving backward, while codefendants were being carried along, toward bankruptcy. As a result of escalating litigation and court pressures, the Trust's rapidly dwindling assets were increasingly consumed by transaction costs.

### H. Stay of Payments; Stay of Litigation; Orders and Opinions of the Courts

The deteriorating situation came to the attention of the district courts sitting in the Eastern and Southern Districts of New York in the Spring of 1990 when a number of its judges discovered the plight of the parties as they began to speed dispositions of asbestos cases under the direction of Judge Charles P. Sifton of the Eastern District of New York acting for the Eastern and Southern Districts. He had undertaken to control discovery and calendars for asbestos cases on behalf of both districts.

Pursuant to the Bankruptcy Code, any referral of a bankruptcy case or proceeding may be withdrawn in whole or in part by the district court. *See* 28 U.S.C. § 157(d); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). On July 20, 1990 the undersigned district court judge was granted supervisory responsibility over the Plan, (consolidated cases) 82 B 11656(BRL) through 82 B 11676(BRL). *See* July 20, 1990 Designation Order of James L. Oakes, Chief Judge, Second Circuit; July 20, 1990 Assignment Order by Charles L. Brieant, Chief Judge, United States District Court, Southern District of New York. In effect, a section 157(d) partial removal occurred by that date permitting the district court to protect the Trust against destruction and the Plan against frustration. The need for these steps had been revealed earlier in the Brooklyn Navy Yard cases then being prepared for settlement and trial by the district judge granted supervisory responsibility over the Plan.

In May 1990, through proceedings in the consolidated Brooklyn Navy Yard cases, the New York State Supreme Court and federal district courts for the Eastern and Southern districts sitting jointly requested that the Trust furnish information on the assets it began with, its current assets, its projected liabilities and its operations. The courts were prompted by the Trust's apparent inability to enter into meaningful settlement negotiations with the plaintiffs in the Navy Yard cases. The Trust's response indicated that it had insufficient cash to meet its obligations over the next twelve months. Thus, a mere one year and nine months after it became operational, the Trust was effectively out of funds. Based on the report from the Trust, the district courts for the Eastern and Southern districts entered a temporary stay of payments and a stay on the enforceability of judgments and settlements against the Trust pending revision of the Trust's operations. Memorandum and Order, *In re Joint Eastern and Southern Dists. Asbestos Litig.*, NYAL/BNY Index No. 4000 (E. & S.D.N.Y. July 9, 1990) (available on WESTLAW as 1990 WL 115761).

Leon Silverman of Fried, Frank, Harris, Shriver & Jacobson, Special Advisor to the Bankruptcy Court during the Manville Chapter 11 proceedings and a respected national leader of the litigating bar was appointed by the Bankruptcy Judge. He was assisted by his able partner Matthew Gluck. Mark Peterson, a consultant of the

RAND Corporation and an expert analyst in mass torts and alternative dispute resolution matters, was appointed as advisor by the district courts. *Id.*

The Trust, with the assistance of Mr. Silverman, Mr. Peterson, Select Counsel for the Beneficiaries and other interested parties, was directed to consider (1) developing new eligibility criteria and a restructuring of the payment schedule and (2) refinancing of the Trust so that it would have sufficient funds now and in the future to meet its obligations and make reasonably timely payments. *Id.*

## I. Rule 706 Expert to Project Future Claims

It was apparent that more reliable information was required on the nature and extent of future claims so that any revisions and payment plans could be more realistic. The district court appointed Professor Margaret A. Berger, a noted evidence scholar and consultant to the Carnegie Commission Project on Science, Technology and Government, pursuant to Rule 706 of the Federal Rules of Evidence to consider the creation of a panel of experts which would evaluate and predict the volume and type of future claimants. Order, *Findley v. Blinken,* 122 B.R. 6 (E. & S.D.N.Y.1990). She was specifically charged with reporting to the courts "upon the feasibility of providing accurate estimates of future claims upon the Trust," and "empowered to aid the court in selecting an appropriate panel of knowledgeable and neutral experts pursuant to Rule 706 of the Federal Rules of Evidence." *Id.*

An evaluation of the probable success of the proposed Settlement hinges on its projections about the incidence of future diseases and deaths due to asbestos exposure and about the volume and nature of claims that will be asserted against the Trust in the future. The courts sought expert assistance to explore the feasibility of developing a statistical model that would ensure more reliable projections. A panel of experts in the fields of epidemiology, medicine, statistics and actuarial sciences might supply more reliable and accurate predictions upon which to calculate equitable distribution of Trust assets.

The district courts' authority to appoint a neutral expert is well established although not extensively utilized in practice. *See McCormick on Evidence* § 17 at 42–45 (E.Cleary 3d ed. 1984) (common law power to call experts dates back at least to fourteenth century). In the context of a complex reorganization plagued by a history of inaccurate estimates of future claimants and conflicting epidemiologic projections, the assistance of an independent expert may offer the courts an impartial reservoir of data from which to gauge the fairness of the settlement. *See Students of California School for the Blind v. Honig,* 736 F.2d 538, 548–49 (9th Cir.1984), *vacated as moot,* 471 U.S. 148, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985) (after much conflicting expert testimony, well within court's discretion to appoint neutral expert).

In the hearings before Special Master Marvin E. Frankel, the Trust projected 47,000 future claimants. A number of plaintiffs' counsel considered this a gross underestimate. Codefendants viewed the Trust's estimate of its future liability as exaggerated, criticizing the model it used to project future claims. At the fairness hearings several individual claimants and representatives of white lung associations indicated their belief that the ultimate number would greatly exceed the Trust's estimate of 47,000.

The projections in Mark Peterson's estimates contained in Appendices A and C, attached, range up to a total of 366,000 present and future claims. *See* Part VII. D.4.a, *infra.* An examination by the court of the early 1980 studies referred to in Professor Margaret A. Berger's report, Appendix B, attached, suggests that a wide range of estimates rather than a single estimate is all that can be expected. Nevertheless, a disinterested attempt by neutrals to obtain a spread of estimates would provide more assurance of the future than has been available.

Commentators familiar with mass tort litigation and claims resolution facilities have emphasized the efficiency that

attends effective and comprehensive data collection. *See, e.g.,* McGovern, *Resolving Mature Mass Tort Litigation,* 69 B.U.L.Rev. 659, 692–93 (1989) ("A facility can then gauge the adequacy of available funds, evaluate effective settlement strategies, and be more confident in devising case resolution processes."). In this proceeding, the courts must consider divergent and contingent interests of those who may seek compensation from the Trust estimated to range in the hundreds of thousands. This fundamental concern warrants independent expert review of opinions upon which the success of the Settlement rests.

As Dean Berger testified at the Fairness Hearing on January 22, 1991, projecting the number of future claimants with any degree of confidence is a difficult, complex task because of numerous unknowns that surround the incidence of disease and the incidence of claims. Tr. 1/22/91 at 3–16. Her initial report to the court concluded that such projections are feasible. It then considered the desirability of having court-appointed experts undertake the task of making projections and concluded that such a project directed by court-appointed experts is in the best interests of the Trust, of present and future claimants and of the courts. Finally, it proposed a work schedule consisting of several stages, and recommended that the first stage be implemented immediately. *See* Appendix B, attached.

The history of the Johns–Manville bankruptcy demonstrates the need for projections made by persons who are not associated with the litigants. An independent study is not susceptible to attack on the basis of bias, a charge leveled against some of the projections previously made. Evidence obtained almost immediately following confirmation of the Plan that the estimates for future claimants made on behalf of the Johns–Manville Corporation were much too low have fueled these charges of bias. The Johns–Manville litigation also demonstrates that not all projections undertaken by parties see the light of day at the time when they would be most useful. A study made at the direction of the courts will become part of the public record. Its assumptions and conclusions will be public-

ly aired and subject to peer review by the scientific community. The consequence of asbestos use is an issue about which the public and our policy-makers need to be informed; the Trust is a quasi-public entity.

At first both the courts and Dean Berger thought that the principal expert and advisory panel should be appointed at the same time. Accordingly, Dean Berger spent considerable time searching for well-respected, neutrally-perceived experts in the following fields: epidemiology, biostatistics, environmental medicine, pulmonary medicine and economics. Suggestions were also made that a pathologist and an expert on fibers might be useful. While she has identified candidates for the panel in many of these fields, she soon realized that selecting an epidemiologist who was truly knowledgeable about asbestos but who would not be perceived as plaintiff or defendant oriented was a task that would take some time. There was considerable opposition expressed by the plaintiffs' bar and reluctance to cooperate with any Rule 706 panel.

Dean Berger was directed by the district court to proceed promptly without deferring work on the projections until the panel was in place. The district courts approved all of Dean Berger's recommendations after conferring with interested parties and holding a public hearing on her report. The orders approving the necessary Rule 706 appointments were signed by the district court. *See* Fed.R.Evid. 706; *see also* Fed.R.Evid. 101, 1101(a).

### J. Appointment of Hon. Marvin E. Frankel; Limited Fund Hearings

On September 18, 1990, the Trust moved for a determination that its assets constituted a limited fund within the meaning of Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. Shortly thereafter, the district court appointed the Honorable Marvin E. Frankel to hold hearings and report on the following questions and any related issues:

(1) Whether the financial assets of the Trust are so limited that there exists

substantial risk that payment for the present and prospective asbestos-related personal injury and wrongful death claims brought against the Trust will be placed in jeopardy.

(2) Whether "there is a substantial probability—that is less than a preponderance but more than a mere possibility—that if damages are awarded, the claims of earlier litigants would exhaust" the defendant's available and projected assets, including any pertinent insurance proceeds. *In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718, 726 (E.D.N.Y.1983), *mandamus denied sub nom. In re Diamond Shamrock Chemical Co.*, 725 F.2d 858 (2d Cir.), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

Memorandum and Order, *In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville)*, NYAL 4000 (E. & S.D.N.Y. Sept. 18, 1990).

The Trust provided notice, including a copy of the pleadings and order of the court, to all individuals and institutions whose names appeared on their exhaustive mailing lists. This included 1,452 notices sent to attorneys who represent asbestos health claimants who have filed proof of claim forms with the Trust, 1,746 notices addressed to claimants who have filed proof of claims forms with the Trust on behalf of themselves or as personal representatives but without an attorney, and 635 notices addressed to individuals and institutions who appear on the service lists used during the Manville Bankruptcy.

All who expressed an interest in participating in the limited fund hearings before the Special Master were afforded an opportunity to be heard. Representatives for both plaintiffs and codefendants appeared and participated in Special Master Frankel's hearings. All document and discovery requests were accommodated by agreement of counsel and a substantial volume of documents were freely produced by the Trust. Special Master's Report, 120 B.R. 648, 662 (E. & S.D.N.Y.1990). In addition to preliminary informal meetings with counsel, the Special Master held four days of hearings.

Acting with great skill and dispatch, the Special Master furnished a Report indicating that no meaningful disagreement existed on the referred questions. All parties conceded that they should be answered in the affirmative. Special Master's Report, 120 B.R. at 661. The parties did differ in their valuation of the Trust's assets, the valuation of the assets it will liquidate in the future and the extent of its present and future liabilities. *Id.*

Notwithstanding these variations, the Special Master made the following findings and conclusions based upon "evidence that is clear and convincing to the point of being undisputed and beyond dispute in all essential respects":

1. Without pretending to certainties beyond what the nature of facts allows, it is reasonable to say, and it is found, that the Trust's assets have a value in the range of $2.1 to $2.7 billion.

2. On a similar basis, the Trust's liabilities for asbestos claims already pending and unliquidated, together with an estimated 47,000 further claims to be received in the future, come to a total of $6.5 billion. In addition, the Trust owes $448.5 million for claims that have been liquidated by settlement or judgments.

3. If it could fulfill its obligations in the interests of the claimant beneficiaries, the Trust would pay promptly the $448.5 million owed for liquidated claims. The Trust lacks the cash, however, to pay more than an inconsequential portion of this amount.

4. However insolvency is defined, the Trust is deeply insolvent.

5. The Trust's assets and expectations of future receipts are and will be so limited that there is a substantial risk that payments for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy.

6. There is a substantial probability that the award of damages to earlier litigants will exhaust the Trust's available and projected assets.

Special Master's Report, 120 B.R. at 667–68.

The report made it clear that revisions were necessary. All interested parties gave their attention to the form the changes should take.

### K. Negotiations

By all standards, the negotiations that led to the Settlement were arduous and extensive. They occurred over several months. Plaintiffs' counsel met at national assemblages and conducted almost continuous face-to-face and telephone conferences. To facilitate the process, the court-appointed advisors participated in almost all discussions.

One of the realities of the structure of the Plan is that the ability of the Trust to pay victims over time hinges on the fiscal success of the reorganized Manville Corporation. To the extent that tort claimants seek to strip Manville of cash or assets now, they would reduce the Corporation's ability to compete and prosper in the future. This in turn diminishes the monies that would be available for compensation of asbestos victims whose claims are pending but not yet liquidated and for those who have not yet filed claims primarily because their injuries are latent. In particular, any refinancing which has the effect of reducing the value of Manville stock in the future would redound to the detriment of claimants at the time they monetize their controlling share of Manville stock, their single most valuable asset. Furthermore, any settlement that reduced the productivity of Manville would decrease the profits, a percentage of which the Trust is due to begin receiving in 1992.

In response to the district courts' July 9, 1990 order, the Select Counsel for the Beneficiaries, a three lawyer liaison group created under the terms of the Plan, see Plan, Ex. A at C–57, convened a large meeting of members of the asbestos plaintiffs' bar in Dallas on August 13, 1990. Tr. 1/2/91 at 21. The Select Counsel for the Beneficiaries are elected by the Board of Directors of the Asbestos Litigation Group, a voluntary association of plaintiffs' attorneys who specialize in the representation of persons suffering from asbestos-related injuries. The Select Counsel serve as representatives of the larger group of plaintiffs' counsel. Notice of the meeting was sent to all plaintiffs' attorneys as well as to pro se claimants throughout the country.

More than seventy attorneys attended the meeting and participated in the debate about how to respond to the Trust's fiscal crisis. Tr. 1/2/91 at 21. The group ultimately elected a seven person committee to negotiate with the Trust and report back on its progress. The committee consisted of Peter G. Angelos, Frederick M. Baron, Thomas W. Henderson, Ronald L. Motley, Christopher M. Placitella, Robert B. Steinberg and Harry F. Wartnick, each of whom represents large numbers of clients with differing mixes of asbestos diseases, differing geographical bases and differing histories in asbestos litigation.

Its members sought information through meetings with Drs. Selikoff and Nicholson of Mt. Sinai Hospital, with investment bankers, with Mr. Silverman, with Mr. Peterson and with others familiar with the situation. Tr. 1/2/91 at 22–23. The group first addressed the question whether in fact the Trust's assets presently and over time constituted a limited fund within the meaning of Rule 23(b)(1)(B).

The committee met with members of the plaintiffs' bar in New Orleans on September 13, 1990. The committee took the opportunity to outline priorities it felt ought to be embodied in any revisions of the Trust's operations. These included eliminating the Trust's huge transaction costs that attend its presence in the tort system; reducing plaintiffs' legal costs; treating all beneficiaries equally, yet paying those suffering with more serious illnesses on an accelerated basis so that they might receive compensation during their lifetime; segregating adequate funds so that future claimants would also receive compensation from the Trust; and removing the Trust from the tort system in a manner that preserved the litigation postures of the beneficiaries. The constituency endorsed the basic principles presented and authorized the commit-

tee to devise a concrete scheme for review. Tr. 1/2/91 at 24.

Simultaneously with these meetings, Mr. Silverman was conducting negotiations between the Trust and Manville to explore mechanisms by which to infuse desperately needed cash into the Trust in the short term. *Id.* These discussions led to a new financing arrangement between the Trust and Manville. On September 7, 1990 the Trust and the Manville Corporation announced an agreement in principle to provide additional funding from the Manville Corporation to the Trust up to a maximum of $520 million over the next seven years, contingent on the Trust revising its payment procedures.

During this time period Mr. Peterson was in contact with representatives of codefendant beneficiaries and communicated their views regarding settlement discussions to the negotiating committee. Tr. 1/2/91 at 187–88. Similarly, Mr. Silverman and Mr. Austern received a written submission from the codefendants outlining their position on a restructuring. Tr. 1/23/91 at 32.

The plaintiff negotiating committee again reported on the progress of negotiations to its constituency on October 29, 1990. The committee reported that the evidence presented in the limited fund hearings before Special Master Frankel demonstrated beyond cavil that there was a limited fund. An intense debate ensued concerning several of the cornerstone provisions of the proposal. Great effort was expended to respond as much as possible to articulated concerns. Although there was no unanimous position, a consensus emerged from the meeting. Tr. 1/2/91 at 25. A mandate to approach the Trust once again culminated in an agreement. Tr. 1/2/91 at 25–26.

This intense responsible effort by a diverse national plaintiffs' bar represented a commendable and almost unique effort on behalf of hundreds of thousands of prospective and present claimants. The strengthened institutional structures may well be useful in devising more global solutions to the asbestos problems presented by the codefendants.

### L. Stipulation of Settlement; Financing Agreement Between Manville and the Trust

Plaintiffs filed a class action complaint on November 19, 1990 against the trustees of the Trust in their capacity as such seeking a revision of the obligations and payment procedures of the Trust to promote the equitable compensation of all Trust beneficiaries. The complaint seeks to enjoin any action inconsistent with the requested relief.

On the same day, representative counsel submitted the proposed Settlement in the form of a Stipulation of Settlement and attachments as follows: Exhibit A entitled "Trust Distribution Process", Exhibit B entitled "Master Agreement dated as of November 15, 1990 between Manville Corporation and Manville Personal Injury Settlement Trust" and Exhibit C, a proposed Order and Final Judgment. Copies of the Stipulation of Settlement, the Trust Distribution Process and certain Memoranda and Orders of the courts appear in *In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648 (E. & S.D.N.Y.1990). This court document was printed in a booklet and widely distributed to anyone interested during the fairness hearings described below. The salient features of the Settlement are described in the next section.

#### 1. *Stipulation of Settlement*

The Stipulation provides for discontinuance of the class action with prejudice upon court approval pursuant to Rule 23(e) of the Settlement and entry of final judgment. The Stipulation recites that

WHEREAS, unless the Trust is restructured, it is likely that

(i) its assets will be dissipated at substantially less than their fair value;

(ii) enormous sums of money will be spent on defense costs which could and should otherwise be allocated to the payment of Beneficiaries;

(iii) certain Beneficiaries will receive a disproportionately large payment on their claims in comparison to other Beneficiaries while some Beneficiaries will receive far less than is equitable or nothing at all....

Stipulation of Settlement, *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 668 (E. & S.D.N.Y.1990) [hereinafter "Stipulation"]. In order to maximize the value of the assets of the Trust it is necessary, the Stipulation conceded, that the Manville Corporation function and prosper as a going business without the present uncertainty engendered by fiscal difficulties of the Trust.

The Stipulation is binding on each member of the class defined as follows:

The Class consists of all Beneficiaries of the Trust, including, but not limited to, all persons who presently have or may in the future have (a) any unliquidated claim for death or personal injury arising from exposure to asbestos and arising or allegedly arising, directly or indirectly from acts or omissions of the Manville Corporation or any of its predecessors, subsidiaries or affiliates; (b) any warranty, guarantee, indemnification or contribution claims against the Trust arising directly or indirectly from exposure to asbestos by any member of the Class; and (c) settlements or judgments arising from any of the foregoing claims previously asserted against the Trust.

Stipulation, ¶ 2, 120 B.R. at 669. The Stipulation is expressly conditioned upon court approval of the class action and the Settlement upon terms satisfactory to the class representatives and the Trustees, and upon court authorization for the execution, delivery and performance by the Trustees and Trust of the terms of the Settlement. Stipulation, ¶ 6–7, 120 B.R. at 669. The Stipulation is also predicated upon a reaffirmation of the injunction barring asbestos-related suits against Manville.

The Stipulation releases the Trustees, officers, employees and agents of the Trust from liability to any beneficiary as a result of any action or inaction of the Trust if the decision or judgment was based on a good faith belief that it was authorized by the terms of the Stipulation. Stipulation, ¶ 5, 120 B.R. at 669.

Holders of claims which as of November 19, 1990 were the subject of a final order or judgment or a valid and binding contract (unless the claimant elects to receive payment in accordance with the Trust Distribution Process) will be paid according to their terms except that any amounts immediately due and owing as of the date of a final judgment in the class action shall be paid within ten days of the payment of the first dividend without interest. Stipulation, ¶ 9, 120 B.R. at 669. In effect, prior judgments and settlements will be paid according to their terms following final approval of the Settlement and exhaustion of appeals. Any judgments and settlements dated after November 19, 1990 will be treated as Level One or Level Two claims with no priority in payment to any post-November 19, 1990 judgment. This provision and other safeguards in the Settlement provide what should be effective safeguards against litigating Manville claims in the courts. In effect, Manville claims are removed from the court system, both federal and state.

### 2. *Distribution Process*

The rights and duties of class members and the rights and duties of Trustees with respect to beneficiaries are governed by the Trust Distribution Process. Stipulation, ¶ 8, 120 B.R. at 669. Class members will receive payments from the Trust only in compliance with the terms of the Trust Distribution Process. *Id.* The ultimate objective is to pay each claimant, present and future, an equal percentage of their claim's value over time.

All available funds of the Trust will be distributed annually as the Trust settles with claimants, unless some funds must be set aside for future claimants. In years in which the Trust monetizes its assets, a portion of the proceeds will be set aside for future claimants. Trust Distribution Process, §§ E & L, *In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 674 (E. & S.D.N.Y.1990) [hereinafter "Trust Distribu-

tion Process"]. The allocation of funds between two accounts, one utilized to make payments to current claimants and one held for the benefit of future claimants, will ensure some protection for those who will suffer from asbestos injuries in the future. At the same time the Distribution Process has left open the possibility that additional information may warrant changes in its allocations and payment procedures. Trust Distribution Process, § L, 120 B.R. at 679.

Priority in terms of scheduling the timing of payment will be given to those most seriously injured. Cancer victims, wrongful death cases and those with serious asbestosis, categorized as Level One claimants, will begin receiving payments in the first two years of the plan. Those with less serious injuries, Level Two claimants, will receive funds that are available starting in the third year of the plan. Once claimants receive forty-five percent of the value of their claim, they will stop receiving payments from the Trust until all other claimants have similarly received forty-five percent of the total value of their claims. Thereafter, as funds allow, payments will be made on a pro rata basis to all claimants until they have been paid the full liquidated value of their claim. Contribution and indemnification claims will be categorized according to the injury suffered by the underlying tort claimant.

The Distribution Process provides guidelines for settlements of each category of asbestos illness with both midpoints and maximum values. Trust Distribution Process, §§ B & D, 120 B.R. at 672–73; Trust Distribution Process, Attachment A, 120 B.R. at 680 (initial projected maximum and average midpoint payment amounts by disease). Except in extraordinary cases, the liquidated value of a claim will not exceed the maximum set for the disease category. Claims will be evaluated in light of the following criteria: the individual's age, the jurisdictional history, Manville's relevant market share, whether the individual was living or dead when the claim was filed, disability, dependency, special damages and pain and suffering. Trust Distribution Process, § B, 120 B.R. at 672.

The Trust will analyze and attempt to liquidate two-thirds of the Level One malignancy claims currently pending prior to thirty days before payment of the first dividend, roughly two years after the distribution process begins operating. *Id.* at § F. Level One claims filed after the initial two years will be processed by the Trust and if liquidated will receive a payment from the Trust within two years of their filing date. Such claims filed after the first two years will receive an equal portion of the liquidated value of their claim as if they had entered the pool during the first year. Trust Distribution Process, § F(a), 120 B.R. at 675. The procedures that govern the valuation of a claim are improved to simplify and accelerate the settlement of claims and reduce litigation expenses. *See, e.g.,* Trust Distribution Process, § D, 120 B.R. at 673.

Notwithstanding any other provision, the Trust may continue to liquidate and pay Level One extreme hardship and exigent health claims to the extent that Trust funds permit. Beginning with the third payment cycle, the Trust must liquidate and pay Level Two extreme hardship claims as well. Trust Distribution Process, § A, 120 B.R. at 670. These exceptional payments must be kept to an absolute minimum to prevent a drain on already severely depleted Trust funds. An end-run around the Settlement limitations by substantial numbers of claimants must not be permitted by the Trust.

The Trust may choose to offer Level Two claimants an option to receive faster, limited payments not to exceed $2,000 to avoid waiting until his or her claim is liquidated. Such deferral payments will be funded with savings in litigation expenses, but are limited to a total of $75 million during the first four years. In addition, a Level Two claimant who has received payment from the Trust may reassert a further claim if he or she develops a Level One illness. This option also applies to Level One claimants who settle on the basis of serious asbestosis and subsequently contract asbestos-related cancer.

In most instances, beneficiaries may not sue the Trust in the tort system. Instead they must follow the procedures set forth in the Distribution Process. Where a beneficiary disagrees with the value that the Trust assigns to a claim, he or she may seek binding or non-binding arbitration with the Trust.

There are substantial disincentives to suits. If non-binding arbitration fails to resolve the dispute, the beneficiary then retains the right to seek a jury trial as to damages. Trust Distribution Process, § D, 120 B.R. at 673–74. The Trust will not contest its liability. The Process establishes maximum values for each asbestos-related disease. Any verdict that a plaintiff receives in excess of that maximum will be paid from a separate Trust account, Pool B, that will be funded only after all other Trust beneficiaries have been paid in full. Trust Distribution Process, § E, 120 B.R. at 674.

To conserve assets and avoid wasteful transaction costs, all pending tort suits against the Trust will be dismissed without prejudice and all beneficiaries will be enjoined from litigating against the Trust except as provided in the Distribution Process. The injunction extends to the prosecution of a claim against the Trust aimed at establishing the Trust's status as a joint tortfeasor, its relative share of fault or its liability for contribution or indemnification. Where a defendant has paid a judgment for which it claims the Trust has responsibility in whole or in part, that defendant may file and liquidate the claim as if it were the injured claimant. If the Trust has already liquidated that person's claim, a defendant who is subject to a judgment is entitled to a credit against the judgment in the amount that the plaintiff has received from the Trust, and then may succeed to any remaining entitlement of the plaintiff from the Trust. Trust Distribution Process, § H, 120 B.R. at 676–77.

Attorneys' fees payable in connection with claims liquidated and paid pursuant to the Settlement will be the lower of the fee provided in a contract between claimant and counsel or twenty-five percent where calculated as a percentage of recovery. Such legal fees will be paid over time as clients receive payments from the Trust.

Plaintiffs' attorneys must play an active role in the distribution process by electing whether to file the proof of claim as a Level One or Level Two claim and by supplying certain medical and other information before the claim will be processed. Trust Distribution Process A, § B, 120 B.R. at 672. This requirement of counsel responsibility is designed to reduce the administrative burdens of the Trust. It is also expected that attorneys will keep their individual clients fully informed, providing the usual services of lawyers representing individual clients on a one-to-one basis.

The courts expect the Trust to insist that counsel promptly supply all necessary information. In the past the Trust has apparently accepted incomplete data, increasing the costs of its own internal administration.

### 3. *Master Agreement Between Trust and Manville*

In order to effectuate the provisions of the Stipulation, the Trust and Manville entered into the Master Agreement, annexed as Exhibit B to the Settlement. This agreement seeks to make cash available in the near future so that the Trust can enter into meaningful settlement negotiations with claimants suffering from debilitating and often fatal asbestos-related illnesses. Pursuant to the Distribution Process, Level One claims should begin to be liquidated immediately upon approval of the Settlement.

According to the terms of the Master Agreement, Manville will pay special dividends resulting in an additional $100 million in cash available to the Trust in each of the first two years that the restructuring takes place. During the third and fourth years, Manville will pay special dividends that will supply an additional $40 million each year. In the fourth through seventh years the Corporation will pay special dividends up to a total of $300 million based on Manville's performance, $240 million of which constitute the Trust's share. All but

the first dividend payments are subject to financing.

In addition, the Trust will exchange its current $1.8 billion bonds for a new bond with identical payment obligations. The new bond may be exchanged for marketable debentures of equal value, but with more standard payment terms that will permit the Trust to sell them. Manville's obligation to make annual bond payments begin in 1991.

The refinancing of the Trust leaves in place the monies the Trust was due to receive from the Corporation under the terms of the Plan of Reorganization including the right to twenty percent of Manville's annual net profits beginning in 1992 and continuing as long as necessary. The additional financing is contingent on the restructuring of the distribution of Trust assets in conformity with the Trust Distribution Process.

M. Appointment of Representative of Future Claimants; Appointment of Laurence Gold

1. *Factual Setting Necessitating Appointment*

The long latency period for disease resulting from exposure to asbestos, which can take twenty to forty years after the victim's exposure to manifest itself, necessitated the appointment of a legal representative for those who will contract asbestos-related injuries and consequently seek compensation from the Trust in the future ("future claimants"). The number of future claimants is impossible to predict with certainty. Special Master Frankel adopted the Trust's best current estimate that it will receive roughly 47,000 additional claims. Special Master's Report, 120 B.R. 648, 667 (E. & S.D.N.Y.1990). This projection seems very low based upon past claims, current filings, known exposures to asbestos and latency periods. *See* H.Ex. # 106 (Memorandum from Mark Peterson to Les Fagen dated Dec. 11, 1990); Appendices A & B, attached. It is significant that even the highest estimates made in the early and mid–1980's in the course of the bankruptcy were lower than claims actual-

ly filed to date. *See* Estimates on file with Margaret A. Berger.

As of November 30, 1990 approximately 130,000 asbestos health victims and code-fendants had unresolved claims pending with the Trust, consisting of roughly 128,-500 claims filed by about 1,300 attorneys and over 1,500 claims filed pro se by claimants or their personal representatives. As of April 1, 1991 there are approximately 136,000 pending unsettled claims and this number continues to increase. An additional 11,300 claims were settled but unpaid as of that date. More than 15,500 claimants have executed and delivered releases in favor of the Trust and have been paid in full. The total filed claims to April 1, 1991 are approximately 163,000.

Based on current flows of cases and projections, an estimate of more than double the number of claims received to date, approximately 170,000 future claims, is the courts' present best upper level working estimate. It must be emphasized that this number provides a working hypothesis made in the absence of objective reliable data supplied to date by the parties. This number of future claims would leave a total of somewhat under 320,000 claims to be paid as of April 1, 1990. (136,000 unsettled claims plus 11,300 unpaid but settled claims plus 170,000 future claims = 317,-300 unpaid claims, past and future). *See* Appendix A, attached. More precise ranges of estimates may be possible utilizing pending work under the direction of Dean Berger. *See* Appendix B, attached. Based on current estimates, their knowledge of present settlement practices and considerations of fairness, the courts have recommended present best estimate allowances for the Trust's share of future payments under the Settlement. *See* Part VII. D.4.a, *infra;* Part II.I, *supra;* Part III.I & J, *supra.*

The class action attempts to restructure the financing and payment procedures of the Trust in a manner that will ensure that the Trust's assets are distributed equitably to all beneficiaries over time. The Settlement, if approved, binds all present and future beneficiaries to its proposed distri-

bution and financing procedures and enjoins any action inconsistent with its provisions. The importance of developing adequate safeguards to protect the interests of future beneficiaries in accomplishing this ambitious goal cannot be overestimated.

Although the provisions of the Settlement affect the interests of present and future beneficiaries, each plaintiff is a present claimant. A central issue in the reformulation of the Trust's procedures is how to allocate the Trust's limited assets between present and future claimants. As to that basic question, the interests of present and future claimants are in conflict. Hence no present claimant can serve as an adequate representative of future claimants. The Trust owes a fiduciary duty to all beneficiaries; it cannot appropriately further the interests of some at the expense of others.

### 2. Legal Basis of Appointment

The Supreme Court recently stated that in general unless "a person, although not a party, has his interests adequately represented by someone with the same interests who is a party," the nonparty cannot be bound by the judgment. *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 2184 & n. 2, 104 L.Ed.2d 835 (1989). Thus the class' attempt to bind future beneficiaries and accomplish a final conclusive judgment would be significantly hampered by the absence of counsel representing the interests of future claimants.

Ample precedent exists in bankruptcy law, trust law and other analytically similar contexts to appoint a representative for future claimants. The inherent equitable powers of the courts pursuant to Section 105(a) of the Bankruptcy Code and the All Writs Act, 28 U.S.C. § 1651, exercised in furtherance of the courts' jurisdiction over this proceeding and the assets of the Trust authorize the appointment of a legal representative for parties with a substantial stake in the litigation.

When faced with a modification of a trust, courts have appointed legal representatives for unborn or unascertained trust beneficiaries. In *Hatch v. Riggs*

*Nat'l Bank*, 361 F.2d 559, 565–66 (D.C.Cir. 1966), the court explained,

> [t]he use of *guardians ad litem* to represent interests of unborn and/or otherwise unascertainable beneficiaries of the trust seems to us wholly appropriate. Though the persons whose interests the *guardian ad litem* represents would be unascertainable as individuals, they are identifiable as a class and their interest, as such, recognizable.

*Id.* at 566, *on remand*, 284 F.Supp. 396, 399 (D.D.C.1968) ("[N]ot only does [the court] have the authority to appoint a guardian *ad litem* without statutory authority but the majority of jurisdictions and commentators agree and approve of such action.").

This equitable power has been invoked by other courts in class actions where members of the plaintiff class were unknown, unborn or incompetent. *See, e.g., Meyer v. Citizens & S. Nat'l Bank*, 677 F.Supp. 1196, 1200 (M.D.Ga.1988) (appointing guardian ad litem prior to approving settlement of class action brought by trust beneficiaries against trustee); *see generally* III A. Scott & W. Fletcher, *The Law of Trusts* § 214 at 319 (4th ed. 1988) ("The interests of beneficiaries who are under a disability or unborn or unascertained may be protected by the appointment by the court of a guardian ad litem."); Begleiter, *The Guardian Ad Litem in Estate Proceedings*, 20 Willamette L.Rev. 643, 647–55 (1984) (discussion of power of courts to appoint); Note, *Trusts: Modifications of Irrevocable Trusts Through Appointment of a Guardian For Unborn Heirs—Repudiation of Worthier Title Doctrine*, 66 Colum.L.Rev. 1552 (1966).

New York has codified an express provision governing trust proceedings that mandates such appointments. "[I]f it appears that there is no person in being or ascertained, having the same interest" as persons not in being or unascertained, "the court shall appoint a guardian *ad litem* to represent or protect the person who eventually may become entitled to the interest." N.Y.Surr.Ct.Proc. Act § 315(2)(a)(iii) (Supp.

1990). While the courts are not bound by this arguably state procedural rule under the holding of *Erie R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it reflects a strong policy that should be respected as a matter of comity in adjudicating the right of beneficiaries of a New York trust.

The Federal Rules of Civil Procedure have no comparable provision except in instances of infants or incompetents. *See* Fed.R.Civ.P. 17(c). Rule 17(c), however, indicates a recognition of the value of independent representation on behalf of persons not in a position to protect their own interests. *See* 6A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1570, at 504 (2d ed. 1990) ("The district court's power to appoint a guardian ad litem under Rule 17(c) has been broadly interpreted and has not been limited by a narrow construction of the 'infant' or 'incompetent.' ").

In several bankruptcy proceedings involving former manufacturers or producers of asbestos products subject to tort claims, courts have appointed independent legal representatives to advocate on behalf of those who in the future will manifest asbestos-related illnesses. The Johns–Manville case persuasively demonstrated both the importance of a separate legal representative and carefully traced the ample precedent that supports such an appointment. *See In re Johns–Manville Corp.,* 36 B.R. 743, 749–59 (Bankr.S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y.1985). The Second Circuit explicitly affirmed the bankruptcy court's appointment of a representative of future claimants. *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 644 (2d Cir. 1988). The Third Circuit subsequently reversed the decision of a bankruptcy court refusing to appoint such a representative in the case of a debtor who formerly produced asbestos products. *In re Amatex Corp.,* 755 F.2d 1034, 1043 (3d Cir.1985) ("because of the adverse interests of other parties, it would appear that future claimants require their own representative"); *see also In re UNR Indus., Inc.,* 46 B.R. 671 (Bankr. N.D.Ill.1985) (finding future claimants

"parties in interest" entitled to participate and have separate representation).

In view of the indisputable findings of the Special Master that without some fundamental change in the Trust's operations the payment of present claims will jeopardize payment to future claimants, the courts concluded that future claimants were entitled to a legal representative to independently and impartially evaluate and pursue their interests in this litigation. Consistent with this finding, the courts appointed Leslie Gordon Fagen of Paul, Weiss, Rifkind, Wharton & Garrison as Legal Representative of Future Claimants on November 23, 1990 to review and report on the fairness of the proposed Settlement of the class action. Order, *Findley v. Blinken,* Civ. No. 90–3973 (E. & S.D.N.Y. Nov. 23, 1990). The question of whether representation should be continued after court approval of the Settlement is discussed at part III.H, *infra.*

*3. Amicus Curiae Appointment*

In addition, the district court appointed Laurence Gold, General Counsel of the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae* to assist in evaluating the fairness of the Settlement. Order, *In re Eastern and Southern Dists. Asbestos Litig. (Johns–Manville),* NYAL 4000 (E. & S.D.N.Y. Nov. 20, 1990). Assistance of this prominent labor representative was sought because "[i]t would be useful to have the plan independently reviewed by an individual who understands the plight of the American worker with respect to the problems associated with asbestos and asbestos litigation." *Id.* The ultimate goal of the courts is to ensure that the plan treats workers and their families equitably. "It is highly desirable that labor have direct input into the process." *Id.*

N. Courts' Orders of November 23; Notice of Hearings

On November 23, 1990, the courts heard argument in response to orders to show cause on the following issues: why a class should not be certified pursuant to Rule 23;

why representative counsel should not be appointed on behalf of future claimants; why all proceedings and litigation against the Trust should not be enjoined; why the proposed form of notice informing interested persons of the hearings on the fairness of the proposed settlement and propriety of class certification should not be sent; why all payments from the Trust should not be enjoined during the pendency of the class action proceedings; and any other matter any interested person sought to bring to the courts' attention. Notice of the hearing on the orders to show cause was served by overnight mail upon counsel for plaintiffs, counsel for individual Trust beneficiaries known to the Trust, codefendants known to the Trust and the Property Damage Trust. The Trust served notice upon Trust beneficiaries who are not represented by counsel by first class mail.

After hearing from all who wished to be heard, the courts entered several orders. They conditionally certified the class as defined in the complaint. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 681 (E. & S.D.N.Y.1990) (Order Conditionally Certifying Class and Appointing Representative Counsel and Others). The courts appointed the named plaintiffs to serve as class representatives and five prominent members of the plaintiffs' bar selected by the plaintiffs' bar, Frederick M. Baron, Ronald L. Motley, Christopher M. Placitella, Robert B. Steinberg and Harry F. Wartnick, to act as representative counsel on behalf of the class. *Id.* At the request of counsel for the codefendants, separate representation selected by counsel for codefendants, Roger E. Podesta, John D. Aldoch and Andrew T. Berry, was approved to speak for the codefendant beneficiaries of the Trust. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 691 (E. & S.D.N.Y.1990) (Order Appointing Defendants' Representatives).

Simultaneously the courts enjoined all litigation against the Trust in aid of their jurisdiction over the class action and to halt the dissipation of assets and resources of the Trust during the pendency of the action and consideration of the proposed restructuring. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 688 (E. & S.D.N.Y.1990) (Order Staying Proceedings). At that time defense litigation costs for outside counsel alone were consuming roughly one million dollars per week from the Trust's severely limited funds. *Id.* The courts granted certain exemptions from the stay of all proceedings. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 689 (E. & S.D.N.Y.1990) (Order Making Exceptions to Stay of Proceedings). The courts also restrained the execution or enforcement of judgments or settlements against the Trust or its assets except in instances of Exigent Health Claims or Hardship Claims. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 687 (E. & S.D.N.Y.1990) (Order Staying Payments).

Also approved was a form of notice that indicated the nature of the class proceedings, the basic elements of the proposed Settlement and the time and place of public hearings at which time the courts would consider whether the class should be unconditionally certified, whether named plaintiffs should serve as class representatives, class counsel should serve as representative counsel, and the Settlement approved as fair, reasonable and adequate in accordance with Rule 23(e). *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 683 (E. & S.D.N.Y.1990) (Order Setting Hearings And Approving Form of Notice).

A copy of each of the courts' orders described in the preceding two paragraphs were served by overnight mail to each known claimant's counsel and codefendant counsel and to approximately 1,500 pro se claimants. All federal and state courts in which the Trust was a party in litigation also were served by hand, fax or overnight mail copies of the Order Staying Proceedings and sent copies of the remaining orders by first class mail. Judges who participate in state or federal asbestos coordinating committees were served with copies of the documents. Codefendant counsel,

parties to the Brooklyn Navy Yard litigation, those on Manville's service list from its bankruptcy proceeding, the Property Damage Trust, court-appointed counsel and experts and the Manville Corporation were also served by overnight mail. In sum, all persons known to have a potential interest in the class action were served with the relevant papers.

Notice was published in the following periodicals on November 30, 1990:

The New York Law Journal
The New York Times
The Washington Post
The Times–Picayune
San Francisco Chronicle
The Dallas Morning News
The Atlanta Journal and the Atlanta Constitution
USA Today
Chicago Tribune
Los Angeles Times
The Baltimore Sun

In addition, between December 29, 1990 and continuing through January 9, 1991 abbreviated copies of the Notice were published in periodicals in those cities in which the fairness hearings in the class action were to take place.

O. Fairness Hearings

Hearings were scheduled for January 2 & 3, 1991 in the Eastern District of New York; January 4, 1991 in Washington, D.C.; January 9, 1991 in the Eastern District of Louisiana; and January 11, 1991 in the Northern District of California. Additional hearings were held at the request of objectors to the Settlement who needed more time to develop their alternative proposal and present expert and other testimony in its support on January 22nd in the Southern District of New York and January 23rd in the Eastern District of New York. Subsequently a schedule of briefs and extensive oral argument was provided. An additional hearing on Dean Berger's proposed studies and Mark Peterson's projections of future payments and codefendants shares as well as on related matters was held on April 18, 1991 in the Eastern District of New York.

A magistrate judge was appointed to assist the parties in obtaining discovery. During the fairness hearings the courts directed the parties to exchange further documents and compile relevant information. Requests for information or discovery were granted. *See In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) (abuse of discretion to deny plaintiff objectors discovery requests to show that negotiations were irregular and settlement prejudiced interests of class members).

■ It is within a court's discretion to control discovery and the presentation of evidence in determining whether the settlement is fair. *Mars Steel Corp. v. Continental Illinois Bank & Trust Co.*, 834 F.2d 677 (7th Cir.1987); *Glicken v. Bradford*, 35 F.R.D. 144, 148 (S.D.N.Y.1964). In view of the comprehensive record developed by the proponents and opponents of the Settlement at the fairness and limited fund hearings as supplemented by affidavits, no additional materials was required to assist the courts. *See* H. Newberg, *Newberg on Class Actions* § 11.56, at 477 (2d ed. 1985). In any event, Objectors were given the opportunity to fully develop and present expert testimony and evidence in support of an alternative settlement. *See* Tr. 1/22/91; Tr. 1/23/91.

At each hearing, any interested persons were afforded an opportunity to address the courts on any subject relevant to the proceedings. Attorneys were permitted to introduce evidence and cross-examine witnesses called by other parties. Written submissions were accepted until February 12, 1991. On the following day, the courts heard oral argument from any counsel who indicated a desire to be heard on the legal issues raised by the proceedings.

The record thus developed is extensive. In the course of eight days of hearings, thirty-seven witnesses and attorneys addressed the courts, eighty-seven exhibits and detailed reports of Dean Berger and Mark Peterson were introduced and some 1,200 pages of transcript were recorded.

In addition, the courts had before them the extensive record created before Special Master Frankel.

## P. Order and Partial Judgment

At the conclusion of oral argument on February 13, 1991, the courts entered an order and partial judgment that certified a non-opt-out class pursuant to Rule 23(b)(1)(B) consisting of all beneficiaries each of whom has or will have a claim either for death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of a death or personal injury claim. Pending entry of final judgment and completion of appeals the Trust was enjoined from making any payments on asbestos claims with the exception of Exigent Health Claims and Hardship Claims and from settling or proceeding with litigation in asbestos cases except appeals.

## III. POSITIONS OF THE PARTIES ON THE FAIRNESS OF THE SETTLEMENT

The Settlement appears, under the circumstances, to be the most efficacious one that might be devised. The courts would have preferred more protection for future claimants. Present claimants are fully protected by their counsel. Essentially the Settlement depends upon the trustees to protect future claimants by being conservative about making future assets available for known as opposed to unknown claimants. The Settlement drafters' expectation that tensions between trustees and attorneys for plaintiffs will suffice to protect future claimants must be viewed with some skepticism in view of the past inability of the trustees to adequately serve that role.

Transactional costs are still far too large with a case-by-case individual settlement tort-driven process instead of an administrative-insurance scheme that would arrange for scheduled payments by disease with limited variations. Such an administrative system could save hundreds of millions of dollars for claimants in projected costs, in Trust expenses and in fees to plaintiffs' attorneys. It is the system reportedly to be used in administering the UNR Industries bankruptcy asbestos trust, a trust which was modeled upon the Manville Trust concept.

There is also unfairness in paying in full settlements and judgments of some $450 million achieved before the Settlement date. Many of them were obtained in a rush by plaintiffs' attorneys when it was already clear that the roof was about to collapse on the Trust. Allowing such windfalls to a relatively small group and to attorneys who have received or will receive hundreds of millions of dollars in fees as a result of bulk settlements and payments already made is also disturbing. *See* Appendix D and D–1, attached. Many of these attorneys had to know that these recoveries would result in detriment to their other clients and to future claimants.

Despite these and other reservations discussed below, the courts recognize that they are reviewing the fairness and viability of a Settlement, not devising the best available system for compensation. Inhibited by past decisions in the litigation, the Trust's history and the courts' limited powers, we turn to the positions of the parties.

## A. Majority Claimants

Having worked diligently and responsibly to refinance the Trust and restructure its payment procedures, the majority claimants through the appointed representative plaintiffs and their counsel staunchly support the Settlement. They readily admit it is not the only possible solution to the Trust's problems, but assert that it is a sensible and workable compromise. They maintain that it was the product of difficult negotiations and represents a fair, adequate and reasonable settlement of the class members' claims. The attorneys have met their professional responsibilities to devise a viable and fair solution to a complex and vexing problem.

The majority claimants contend that the Settlement accomplishes the most significant progress that can be made in the circumstances of the Trust's limited funds.

First, the Settlement has the effect of removing the Trust from the tort system, eliminating the dissipation of Trust assets on transaction costs while leaving tort litigants in much the same posture *inter se* as they were before the class action.

One of the primary objectives of the Settlement is to attempt to assure that over time each claimant, present and future, will receive an equal percentage of the liquidated value of his or her claim. To accomplish this result, the Distribution Process provides that claimants will receive an annual pro rata share of their claims liquidated according to the Settlement process with somewhat uniform payment guidelines.

The Trust is effectively removed from the tort system saving hundreds of millions of dollars in future transaction costs which will then be available to injured claimants. The Trust is no longer obligated to follow the FIFO processing and payment system nor to pay claimants 100% of the liquidated value of their claim upon settlement or judgment. Instead, the Distribution Process requires the Trust to allocate and reserve funds to meet its future obligations to claimants.

Plaintiffs' attorneys have agreed to limit their fees to a maximum of 25% of the amounts received by their client payable in installments as payments are made by the Trust. This will save several hundreds of millions of dollars, leaving higher net awards to the claimants.

Majority claimants assert that these provisions in conjunction with the flexibility of the Process will ensure that the ultimate goal of equitable compensation to all claimants over time can be achieved. With the benefit of additional cash during the early years, the Trust will promptly pay some of the most seriously injured claimants who otherwise would have received little if any compensation from the Trust while they were alive.

### B. Minority Claimants

#### 1. *Henderson & Goldberg*

The firm of Henderson & Goldberg is one of a small group of plaintiffs' counsel with extensive national experience in representing persons suffering from asbestos-related injuries. Thomas W. Henderson played a significant role in unearthing incriminating evidence that Johns–Manville, among other asbestos manufacturers and producers, was aware of and choose to suppress and conceal from its employees and others the dangers caused by exposure to asbestos fibers. *See* P. Brodeur, *Outrageous Misconduct, supra,* 97–106 (1985).

As a member of the Select Counsel for the Beneficiaries during the period when the Settlement was negotiated, Mr. Henderson not only knew of the need to refinance and restructure the Trust's distribution system, but actively participated in formulating some of its critical components. He concedes that the Trust is on the brink of bankruptcy, but differs about how the troubles that plague the Trust should be handled. In fact, Mr. Henderson supports certain aspects of the new Trust Distribution Process and incorporates by reference those provisions into his own proposal.

Notwithstanding the portions he seeks to maintain, Mr. Henderson makes a number of procedural and substantive objections to the class certification and Settlement. His firm developed an alternative scheme that in his view cures the infirmities of the Settlement. He summarizes his procedural objections as follows:

—Orders to restructure the Trust were entered in a procedural vacuum out of context of a concrete dispute.

—Limited fund hearings were held before filing of a class action complaint.

—Orders were entered on November 23, 1990 without obtaining personal jurisdiction over the parties sought to be bound or otherwise protecting absent class members' rights to due process.

—The class was conditionally certified without providing class members notice, opportunity to be heard, opportunity to opt out and adequate representation.

—The class was conditionally certified despite the district court's lack of subject

matter jurisdiction over claims of class members.

—The class was conditionally certified despite absence of commonality, typicality and adequate representation.

—The class was conditionally certified and proceedings against the Trust were stayed in violation of the Anti–Injunction Act.

—Hearings were held on class certification issues without adequate notice, opportunity to be heard, opportunity to opt out and adequate representation.

—Notice of the hearings was misleading.

—The class counsel with inherent conflicts of interest were appointed.

—The confirmed and substantially consummated Plan of Reorganization was modified without disclosure to and voting by classes of creditors.

—Parties are attempting to amend a trust without obtaining written consent of all beneficiaries.

Brief of Objecting Asbestos Disease Claimants (Henderson & Goldberg) at 2–3.

On a substantive level, Mr. Henderson contests the fairness of the Plan primarily because it gives those beneficiaries suffering from more serious illnesses a temporal preference in the payment of their claims over those claimants with less debilitating injuries, allegedly in violation of the Bankruptcy Code and applicable law governing trusts in New York. He contends that there is a strong possibility that Level One claimants will receive a higher percentage of the total value of their claims than Level Two claimants. In addition, he argues that the courts prejudged the fairness of the Settlement by suggesting that more seriously disabled claimants be paid first; that the Settlement alters vested rights; and that it modifies the Plan but fails to comply with the requirements of the Bankruptcy Code providing for good faith, same treatment for class members, absence of discrimination, fair and equal treatment among class members, voting by claimants and feasibility. Finally, Henderson & Goldberg assert that the financing agreement between the Trust and Manville will diminish the value of the Trust's assets in Manville as a consequence of the heavy debt Manville must assume to pay its promised dividends in the next several years. The law firm prefers to postpone payment to all claimants for a period of approximately five years at which time all the assets of the Trust can be liquidated and distributed.

Henderson & Goldberg have proposed an alternative plan on behalf of a minority of the plaintiffs. The proposal responds to certain of the substantive provisions they argue render the Settlement untenable and contrary to applicable law. The minority proposal would delay payments much longer than the majority's Settlement. In the interim, the minority proposal provides for the payment of a substantial group of "hardship cases." All other claimants would then be paid simultaneously, eliminating the two levels of the majority's plan.

### 2. *Peter G. Angelos*

Peter Angelos represents many thousands of unpaid claimants. *See* Appendix D1, attached. He supports the minority proposal preferred by Henderson & Goldberg. He appeared at the fairness hearings and objected to the class certification and Settlement on the grounds that the courts lack subject matter jurisdiction. He argues that the courts cannot exercise jurisdiction except pursuant to section 1127(b) of Title 11 of the United States Code because the compromise modifies a confirmed and consummated reorganization plan. He contends that the district court lacks diversity jurisdiction because many absent members of the class will settle their claims with the Trust for substantially less than the jurisdictional minimum of $50,000.

On a substantive level, Peter Angelos raises many of the same objections pressed by Henderson & Goldberg. In particular, he contends that the proposed Settlement does not comply with bankruptcy law in that it fails to treat all class members equitably. By prioritizing payments to Level One claimants there is created, he suggests, a disparity in percentage of recovery taking into account both the time

value of money and the greater risk of non-payment or lesser percentage of payment to Level Two claimants.

Peter Angelos challenges the fairness of the provision for the payment of preexisting settlements between the Trust and claimants, amounting to approximately $450 million, that were settled but unpaid at the time the class action was filed. *See* Appendix D, attached. This full payment amounts to a windfall, he argues, for one group of claimants who won the race to settlement or judgment. A large portion of the money, $200 million, covers two mass court action settlements, the *Cimino* litigation in East Texas and the *Norfolk* litigation in Virginia. According to Mr. Angelos there is no principled basis upon which to distinguish this group of claimants from those subject to the terms of the class action Settlement. Regardless of the severity of their injuries, those parties will receive full compensation from the Trust for the value of their claims.

Mr. Angelos also suggests that the Settlement should not be approved because adequate inquiry has not been made into the cause of the Trust's insolvency. In particular, he alleges that the officers and directors of the Trust violated their fiduciary duties in the evaluation and payment of claims. Specifically, he claims that the Trust liquidated claims without complete information. He relies for this contention on the testimony of Mark Lederer, Chief Financial Officer of the Trust. Tr. 1/3/91 at 318–22. As a result, Mr. Angelos suggests that claims against the Trustee's insurance policies, with a face value of $100 million, might be appropriate.

While differing somewhat on detail, during the course of the fairness hearings Peter Angelos appears finally to have embraced the modified plan proposed by Henderson & Goldberg. He has simultaneously sought dismissal of the class action, rejection of the Settlement, and appointment of a receiver to examine all past and future functions of the Trust and to investigate funds due the Trust from third parties.

## C. Mississippi Claimants

This group consists of the few lawyers for claimants who have cases pending in Jackson County, Mississippi. The majority of the Mississippi claimants were exposed to asbestos while working at Ingalls Shipyard in Pascagoula, Mississippi from the 1940s through roughly 1976. Some of the cases have been pending since 1978. In 1988, all asbestos cases that had been removed to the district court were remanded back to the state court creating a total of over 6,000 pending cases. A consolidated trial of approximately 75 cases was scheduled to begin in April 1990. Four days before it was scheduled to begin, the trial was stayed by the Mississippi Supreme Court pending resolution of an interlocutory appeal to determine when the Mississippi statute of limitations should begin to run in latent injury cases. On December 12, 1990, the Mississippi Supreme Court held that Mississippi law embraced a "discovery" rule, and lifted its stay. Shortly thereafter, Circuit Judge Darwin M. Maples issued an order consolidating all pending cases for a trial similar to that conducted by Judge Parker and upheld by the Fifth Circuit in *Jenkins v. Raymark Indus.*, 782 F.2d 468 (5th Cir.1986).

These claimants primarily object to the stay of state court proceedings issued on November 23, 1990. They claim that the stay violates principles of federalism and comity and the Anti–Injunction Act, 28 U.S.C. § 2383. In addition they assert that the court lacks personal jurisdiction over absent state court plaintiffs. The Mississippi claimants also contend that the Settlement modifies the confirmed Plan of Reorganization without meeting the requirements of 11 U.S.C. § 1127(b). They challenge the courts' jurisdiction to adjudicate the class action and in particular to enforce a nationwide mandatory class action.

## D. Steven Kazan for Asbestos Victims of America

Speaking on behalf of Asbestos Victims of America, Mr. Kazan took an opposite position to that of Henderson and Angelos when he expressed the view that those

described as Level One claimants deserve to be compensated first and fully before any other asbestos victim receives any compensation from the Trust. Tr. 1/11/91 at 161–62. In addition the Asbestos Victims of America favor paying so-called Exigent Health Claimants in full within twenty to thirty days from the date of a negotiated settlement.

Mr. Kazan suggests that each plaintiff's counsel submit a survey of its cases in order to ascertain the extent of existing Level One claimants. After the Level One claimants receive full compensation, Asbestos Victims of America would recommend that the Trust compensate impaired asbestosis and impaired pleural claimants who are elderly and not likely to be around long enough to develop a Level One degree of illness. Mr. Kazan asserted that no unimpaired pleural claimants should receive money from the Trust until all impaired victims are paid in full. Tr. 1/11/91 at 164. According to his testimony, the organization he represents conducted an informal survey of its members including persons with all levels of disease, impairment, potential future claimants and those without impairment. It found that even those without impairment favored not seeking compensation from the Trust at this time in favor of those who are disabled, dying and dead. They would rather wait and liquidate their claim against the Trust if and when they became impaired. Hopefully, their deferral of any right to present compensation would help ensure that funds would be available in the future as needed. Tr. 1/11/91 at 165. This victim organization does not view such a scheme as discriminating between different classes of victims, but rather as a means of treating all persons exposed to asbestos equally. To the extent that it makes distinctions based on diseases, it submits that this does not constitute discrimination in the sense prohibited by the bankruptcy code.

Mr. Kazan also urged that the Trust adopt a statute of limitations that would not require presentation of a claim unless there is impairment of the ability to perform one's usual occupation. For people who retire before becoming impaired, in effect no statute of limitations would apply or bar a claim if he or she later suffers impairment. This model, based on the system apparently adopted in California, would deter the filing of claims of those without a right to compensation under his proposal.

E. Organizations Representing Asbestos Victims

The National Asbestos Victims Legal Action Organizing Committee, an umbrella organization, comprises roughly five asbestos victim groups including White Lung Associations from various states with a total membership of approximately thirteen thousand workers and several trade unions. The trade unions claim membership of approximately twenty thousand persons.

During the course of the fairness hearings, nearly a dozen present claimants or potential future claimants testified. In addition the courts received approximately twenty form letters from members of various White Lung Associations. Throughout the proceedings exposed individuals expressed views with respect to the reasons why the Trust ran out of money so quickly, the stay on sometimes long-awaited payments, the stay on litigation against the Trust, the class action and provisions of the Settlement. These letters emphasize the unfairness to those suffering from asbestos illness of bearing the brunt of the insolvency of the Trust. They implored the courts to "[m]ake the industries responsible for the destruction of the peoples' healths and lives with the products they produce."

Roughly a dozen individual members of National Asbestos Victims Legal Action Organizing Committee sent copies of a form letter which stated "we strongly encourage you to set up a mechanism by which asbestos victims can be fully apprised of the ramifications of the proposed plan and vote agreement or disagreement with it." Despite extensive notice through individual mailings to claimants, their representatives or their attorneys, publication of notice, and notice through the various trade publications and through White Lung

Associations and other asbestos victims' organizations, few claimants appeared during the course of the Fairness Hearings. Myles O'Malley, a leader in this organization, stated that his organization sent individual notice to four thousand asbestos victims informing them of the hearings and their right to appear and be heard. Tr. 1/9/91 at 85. In all, about thirty members came to the initial New York hearing, ten people to Washington, D.C., and five to New Orleans, Louisiana.

Mr. O'Malley in testimony and written submissions expressed his belief that many more than the 47,000 future victims will surface seeking compensation from the Trust. In particular, he points to the recent increase in claims by family members of workers who developed asbestos-related injuries from their contact with the worker. Another group ignored or underestimated according to Mr. O'Malley consists of those who currently have pleural disease or asbestosis and who may have a substantially increased risk of contracting asbestos-related cancers. Additionally, those who participate in asbestos abatement programs also face risk of injuries resulting from exposure during removal, although significantly greater precautions have supposedly attended abatements than were utilized prior to the 1970's in production and installation.

In terms of concrete alternative proposals, the National Asbestos Victims Legal Action Organizing Committee favored reopening the Manville bankruptcy, voiding the settlement between Manville and its insurers, and if necessary liquidating the corporation in order to meet its obligation to pay claimants. The letter submitted by several members of the organization requests that the court

> appoint special counsel to examine the feasibility of maximizing the Manville Trust's assets by re-opening the original bankruptcy reorganization plan. The information, provided by Manville Corporation, upon which that plan was based, especially the settlement between Manville Corporation and its Insurers, was misleading and self-serving.

## F. Parties Who Continue to Support FIFO Represented by Hal C. Pitkow and Others

A number of claimants beneficiaries represented by Hal C. Pitkow object to the Settlement because it modifies the principles of the reorganization Plan which they contend formed the basis for the claimants' votes for its adoption. They object to a restructuring of the payment procedures to protect future beneficiaries, who were represented by counsel during the reorganization, to the detriment of present beneficiaries. They argue that the Plan was confirmed and approved on appeal with their interests in mind. Other plaintiffs' counsel have asserted the same position.

The claimants allege that the fiscal crisis facing the Trust results from its payment of excessive settlements, primarily pre-petition cases, without proper and complete evaluation; from its group settlements which ignored adherence to the FIFO order in violation of the Plan and from the practice of certain courts in consolidating hundreds and in some instances thousands of cases for trial with the result that the Trust was pressured to settle such cases without appropriate and full evaluation.

Pre-petition claimants represented by Hal C. Pitkow seek equal treatment to that of other pre-petition claimants. They claim that they will not receive the equal treatment mandated by the bankruptcy code under the proposed Settlement. These pre-petition claimants have settled with other codefendants and released all claims against them having excluded the portion of their injury that they attributed to Manville. Under the Settlement they will only receive a portion of the value of their claims against Manville; the remaining portion will be uncompensated. Similarly, post-petition claimants have also settled and released codefendants with a similar understanding that they would be able to obtain the full value of their claim from the Trust. Claimants represented by Mr. Pitkow therefore object to the Settlement because it will deny full compensation for injuries.

### G. Laurence Gold

Laurence Gold, General Counsel of AFL-CIO, speaking on behalf of organized labor, offered the judgment that the Settlement is in general fair and deserves court approval. Three factors in particular informed Mr. Gold's opinion. First, the additional funding available through the Settlement appeared to be reasonable, recognizing the ongoing needs of the Corporation and the interests of current employees of the Manville as well as those of claimants suffering from asbestos-related injuries. Second, as a result of years of hard work and successful litigation, it is possible to place proper values on asbestos cases as determined by the tort system. Third, in view of the funding available to the Trust and the extent and value of the claims against it, there is little doubt that the Trust cannot afford to pay 100 cents on the dollar. Even more significantly, the Trust cannot afford to continue to participate in litigation which constitutes the most expensive method by which to value claims and pay compensation.

With respect to the Settlement, Mr. Gold praised its system of providing compensation over time with provisions for modifying and adjusting payments to take account of claims experience and income flow. The history of the Trust under the reorganization Plan demonstrates the paramount importance of flexibility. Proper concern for the uncertainties that attend the future will hopefully ensure fair treatment of claimants over time. These components were critical to Mr. Gold's overall support of the Settlement. In addition, the limited fund warrants more substantial payments to those who are most sick, preserving the claims of Level Two claimants to conserve cash.

Mr. Gold raised two special concerns with respect to the Settlement. One involved persons who had predominantly been exposed to only Manville asbestos products, such as Manville employees. Such individuals only have the Trust to look to for compensation. Nothing in the Settlement give them priority in recognition of that fact. For example, he suggested treating such persons as having Level One claims to accelerate their payment. According to the Trust, roughly 4500 of 157,000 pending claims would fall into the Manville Only category. Approximately 1500 of these 4500 claims have been settled.

Second, the role of the Special Advisor to the Trust appeared too limited especially after the experience of the Trust thus far. He recommended elevating the status of the Special Advisor to that of the Select Counsel for the Beneficiaries. Without that protection, in his view some provision should be permitted for outside input from either the representative for the future claimants or someone else responsible for overseeing and sharing administrative authority under the Settlement.

He also pointed out that the transaction costs associated with administering the Trust appeared to be in excess of what is appropriate under the circumstances. For what should essentially be a compensation program, this percentage could be and should be reduced, possibly eliminating the extensive involvement of plaintiffs' counsel. Moreover, Mr. Gold noted that the system retains a great deal of sensitivity and discretion in payment levels, increasing the value of having claimant representation and unnecessarily hindering simpler administration and processing of claims.

Mr. Gold also offered comments with respect to how this Settlement fits within the larger areas of concern to organized labor in the context of the asbestos problem. In his view those injured would be better served by a single comprehensive fund which covered the major defendants and the federal government which bears some responsibility for the injuries that occurred as a result of its procurement needs.

Finally, Mr. Gold expressed some concern about the lack of investment in monitoring, prevention and education. In particular, substantial progress in informing workers of the consequences of smoking might improve their quality of life and minimize the severity of their latent disease. Despite the above suggestions, Mr. Gold concluded that the Settlement is the prod-

uct of fair negotiations and represents a qualitative improvement over the present situation.

### H. Leslie Gordon Fagen, Legal Representative of Future Claimants

After careful consideration and active participation in the fairness hearings, the Legal Representative for Future Claimants has urged the courts to approve the Settlement. Cognizant of the uncertainties that attend all predictions of the number of future claimants the Trust will face, the Legal Representative did not demand a guarantee of equal payment of all future claimants. Instead he found that the Settlement represents an effective attempt to accommodate the rights of future claimants to equal pro rata treatment in view of the limited resources of the Trust.

He noted that the current distribution procedures of the Trust require complete payment of settlements and judgments as they are liquidated on a first in, first out basis leaving little hope that the Trust would have resources with which to compensate future claimants fairly, if at all. Against the present backdrop, the Settlement offers future claimants significantly greater protection. In particular, the Settlement would remove the Trust from the tort system thus eliminating the inherent inequity to future claimants in the existing race to the courthouse to secure recoveries from diminishing Trust assets. Simultaneously, the Trust would save the multimillion dollar annual costs of litigation that it can ill afford to pay.

The Settlement would permit the Trust to liquidate claims, but only to pay a pro rata portion of the value of the claim each year up to a maximum of forty-five percent of the total funds in order to safeguard enough assets to pay future claimants on an equitable pro rata basis. Finally, the Trust would be required to evaluate statistical, epidemiological and medical data to develop over time a clearer understanding of the nature and extent of future claimants. The availability of this data will compel the Trust to plan ahead to a much greater extent than previously.

The Legal Representative for Future Claimants concluded, "these provisions alone represent an enormous advance for the interests of future claimants under the current circumstances and justify our support for the Settlement." Memorandum of Legal Representative of Future Claimants at 2–3. Mr. Fagen found that Henderson & Goldberg's alternative proposal, while not before the courts for consideration as a settlement within the meaning of Rule 23(e), in fact did not afford adequate protection of the interests of future claimants.

Mr. Fagen objected that the 25% fee allowance to plaintiffs' counsel was too high in view of the limited work they had to do under the Settlement, the efficiencies of scale they could expect and the substantial fees they will receive even if the maximum fee was reduced far below the 25%.

Mr. Fagen found no reason to continue his appointment beyond approval of the Settlement since future claimants could expect adequate protection from the trustees and Select Counsel for the Beneficiaries, whom Mr. Fagen understood to have a fiduciary duty to all beneficiaries. In addition to the cost savings that would result to the trust from the termination of his appointment, his firm substantially reduced its usual fees as part of a pro bono contribution to the Settlement.

This position that future claimants required no special representative following approval of the Settlement was modified by Mr. Fagen's letter of April 26, 1991. In the interim he had received a letter dated March 1, 1991 from Elihu Inselbuch writing as counsel to the Selected Counsel for the Beneficiaries. In it Mr. Inselbuch stated, "we disagree with the suggestion that the Selected Counsel for the Beneficiaries act as fiduciaries for future claimants ..." It was his position that, in instances where the interests of present and future beneficiaries conflict, they had an obligation only to "all present beneficiaries."

Mr. Fagen then stated, "I now believe that the Trust's February 5, 1991 proposal for the appointment of a Permanent Legal Representative of Future Claimants should be adopted." Letter of April 26, at 2. The

letter outlined the following role for the Legal Representative:

I propose that the Court, using its inherent powers over the Trust, appoint a Permanent Legal Representative with the following rights and powers:

1. To receive notice regarding:

(a) any determination as to proposed major Trust asset sales and the timing or amount of proposed allocations between present and future claimants upon the sale of major Trust assets under the terms of the Settlement, and

(b) any material proposed changes in the administration of the Settlement such as the setting or resetting of a percentage cap on claims payments.

2. To obtain full disclosure regarding the matters described in ¶ 1 above including reasonable access to all Trust personnel, to experts retained by the Trust or appointed by the Court pursuant to Rule 706, and to all relevant documentary information.

3. To receive any periodic or other reports produced by or for the Trust, the Special Advisor, the [Select Counsel for the Beneficiaries], or experts appointed by the Court pursuant to Rule 706.

4. To observe any dispute resolution procedure which may be held pursuant to Section J of the Distribution Plan of the Settlement.

5. To have standing to invoke the Court's continuing equitable jurisdiction over the administration of the Trust and to bring legitimate grievances to the attention of the Court.

*Id.* at 6–7 (footnote omitted). This position is consistent with that of Mr. Gold, Part III.G, *supra,* and of the Trust.

Authority for the continuing appointment was found by Mr. Fagen to rest on general equitable powers over a trust's assets. *See, e.g.,* Surrogate Court Practice Act §§ 315(2)(a)(iii), 403 (power to appoint guardian); *Guaranty Trust Co. v. York,* 326 U.S. 99, 106, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945) ("a federal court may afford an equitable remedy for a substan-

tive right recognized by a State even though a state court cannot give it"); *Perfect Fit Indus. v. Acme Quilting Co.,* 646 F.2d 800, 806 (2d Cir.1981), *cert denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

He pointed out that nearly fifty years ago the Supreme Court, referring to "the requirements of equity practice with a background of several hundred years of history," said:

The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

By letter dated May 7, 1991, Elihu Inselbuch, on behalf of plaintiffs' counsel, objected to appointment of any representative for future claimants. He declared that it would be contrary to the terms of the Settlement.

■ The courts are persuaded by Mr. Fagen's arguments and proposal. Their powers to appoint a representative of future claimants lie outside those embodied in the Settlement. A court of equity has power and responsibility to ensure that trust funds are available for those they are designed to benefit, but who are as yet unknown. Mr. Fagen is appointed as Representative of Future Claimants with the authority recommended by him. The courts retain power to replace him or terminate his appointment.

### I. Codefendants

The codefendants have unanimously opposed the Settlement as fundamentally unfair. They object to both the process by which the Settlement was negotiated and the substantive provisions of the agreement. They estimate that the effect of the Settlement will be to shift hundreds of

millions of dollars of asbestos liabilities that would otherwise have been borne by Manville to the codefendants and rid them of protections recently enacted by many states that limit such shifting of joint liabilities.

The codefendants contend that the class should not have been certified because the requirements of Rule 23(a)(3) and (a)(4) are not met. All named plaintiffs in the class action are plaintiff-beneficiaries rather than codefendant-beneficiaries. Similarly, class counsel who filed the complaint and negotiated the Settlement exclusively represented the interests of personal injury plaintiffs to the detriment of the codefendants. Therefore, codefendants assert, such counsel cannot adequately represent the interests of the entire class including the codefendants. Instead, codefendants argue that in view of their historic, bitter and protracted conflicts with the plaintiff beneficiaries the class must be divided into subclasses. Simply stated, the divergence of interests reduces to the fact that the plaintiffs seek to maximize the compensation they can obtain from the Trust while preserving their rights to recovery in the tort system against the codefendants. In contrast, the codefendants seek the maximum set off or credit for payments that the Trust makes to plaintiffs and to retain the benefits of tort reforms that modify joint and several liability in many states.

Codefendants contend that the conflict of interests between the two groups of beneficiaries clearly manifests itself in the unfairness of the terms of the Settlement. Section H precludes the introduction of any Manville-related evidence in any proceedings between beneficiaries. According to the codefendants, this undermines their ability to demonstrate that it was Manville's products that caused a plaintiff's injuries, or at least that Manville bears a much greater responsibility for the injuries than the defendants who might be present at trial. In addition, without the presence of Manville on verdict forms, codefendants allegedly lose the ability to benefit from independent state law rights that modify joint and several liability and thereby limit a defendant's responsibility to that portion

of the harm a jury finds it substantially caused. The consequence of these provisions for the codefendants is supposedly to shift to them the entire burden of the difference between the perceived full value of plaintiffs' claims against Manville and any lesser amounts actually paid by the Trust. Many of the rights the codefendants contend are sacrificed by the Settlement arise independently under state law, such as the right to introduce evidence relevant to proximate causation in litigation in which neither the Trust nor Manville is a party. Such tort cases involve the competing interests of plaintiffs and codefendants.

Finally, codefendants argue that the Settlement eliminates rights that they bargained for in the bankruptcy proceeding without any benefit in exchange. They claim that the Settlement constitutes a material modification of the Plan because it eliminates their right to implead the Trust in pending asbestos litigation. Thus, the Settlement violates Section 1127(b) which prohibits material modifications of the rights of a party under a confirmed Plan after it has been "substantially consummated." *See* 11 U.S.C. §§ 1127(b), 1101(2).

The codefendants argue that their principal objections may be corrected without interfering with the accelerated funding available through the Master Agreement between Manville and the Trust and without interfering with the establishment of the new claims resolution procedures contemplated by the Settlement. They propose deleting the provision that prohibits the introduction of evidence concerning Manville and permitting the codefendants to continue to implead the Trust but treating the Trust as a settling party to prevent the unnecessary expenditure of limited Trust funds. The Trust would therefore not have to appear. In states that have modified joint and several liability, the codefendants will then be able to present evidence and argument with respect to fault and apportionment unhindered by the absence of the Trust from the litigation.

### J. Distributors

Distributor-codefendants, who never produced asbestos but merely sold asbestos-

containing products manufactured by Manville and other manufacturers, join the codefendants' objections outlined above. They do not, however, uniformly accept the proposed solution endorsed by the codefendants who were themselves producers of asbestos products. Distributors at least in some states have claims for indemnity rather than contribution from the Trust and are only secondarily liable if the party primarily liable cannot be sued. In addition, certain distributors of Manville products have negotiated agreements with the Trust that they seek to protect and enforce.

### 1. *Pacor*

The Pacor Settlement Trust, created by a chapter 11 reorganization plan, objects to the proposed Settlement if it modifies the Stipulation of Settlement between the Pacor and the Manville Trusts approved by the bankruptcy courts presiding over the Pacor and Manville reorganizations. Pursuant to the Pacor plan, all asbestos health claims against Pacor, a former distributor of Manville asbestos-containing products, are channeled to the Pacor Trust. The debtor in turn assigned to the Pacor Trust its interest in the Stipulation which provides for a pass-through to the Manville Trust of claims against Pacor arising from the distribution of Manville products and the assumption by the Manville Trust of liability for certain claims against Pacor unrelated to Manville products. These claims are treated as though the claimants filed proof of claim forms directly with the Manville Trust. Pacor/Manville Stipulation § 2(b)(i).

If the Trust accepts liability for passthrough claims, when the Trust processes, defends and resolves the claim in accordance with its claims resolution procedures, it then obtains releases for Pacor, the Pacor Trust and the Manville Trust. Pacor/Manville Stipulation § 2(b)(iii), (iv). If the Manville Trust rejects the claim, it returns it to the Pacor Trust for processing, defense and resolution subject to Pacor's right to seek contribution or indemnification and have that issue submitted to binding arbitration. Pacor/Manville Stipulation § 2(b)(vi)(a). The Pacor plan was con-

firmed on November 30, 1989. *In re Pacor, Inc. and Pacor Material Supply Co.,* Nos. 86–03251 and 86–03252 (Bankr. E.D.Pa.1989). If the proposed Settlement does not alter the rights of the Pacor Trust, it has no objection to the class action and its compromise.

If the Settlement alters rights emanating from their Pacor/Manville Stipulation, the Pacor Trust contends that principles of res judicata, collateral estoppel and comity preclude its modification. In addition, it argues that the Settlement then would constitute a modification of Pacor's substantially consummated plan of reorganization and trigger creditors rights under Sections 1127(b) and 1101(2) of the Bankruptcy Code.

Pacor joins the objections asserted by the codefendants, but not their proposed solutions which in fact the Pacor Trust asserts further prejudices its rights. The nominal joinder of Manville as a party in tort litigation and introduction of evidence to prove Manville's tortious conduct would serve to increase the share of liability attributable to distributors in states with derivative liability. In effect, judgments would be entered against Pacor as the distributor in Manville's stead, leaving the Pacor Trust with the additional burden of defending Manville to minimize the allocable share which the plaintiff can collect from the distributor. This contrasts sharply with the primary benefit derived from the Pacor/Manville Stipulation, the elimination of its obligation to process and defend claims.

Beyond increasing the burdens imposed on distributors, the codefendants' suggested modification of the Settlement, Pacor argues, eliminates its indemnification rights. Instead, indemnification and contribution rights would be determined in the underlying action and the defendant would pay only its proportionate share of the judgment. The personal injury claimant could then proceed against the Pacor Trust to recover an amount commensurate with the percentage of fault allocated to Manville. Lack of a simultaneous judgment against Manville prejudices a distributor

who pays that share but loses the right to proceed against the Trust.

Finally, the Pacor Trust seeks to opt out of the class action if the Settlement is approved. Pursuant to Rule 23(c)(1) it claims the court has the power to alter or amend its certification order if and when it becomes apparent that diverse interests cannot be represented by the defined class. *Cf. Rios v. Marshall*, 100 F.R.D. 395, 408 n. 14 (S.D.N.Y.1983); *Brady v. LAC, Inc.*, 72 F.R.D. 22, 29 (S.D.N.Y.1976). It argues that the courts should exercise their discretionary power to permit the Pacor Trust's exclusion from the class. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1420–21 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990).

### 2. *MacArthur*

MacArthur Company, Western MacArthur Company and Milwaukee Insulation ("MacArthur") similarly object to the proposed Settlement. MacArthur is a long-time distributor of Manville products. Following the bankruptcy filing of Manville and its protection from litigation pursuant to the automatic stay provisions under chapter 11 § 362(a), MacArthur was transformed from a minor peripheral party in the asbestos litigation to a primary target potentially liable for Manville's share of responsibility in Manville's absence. *See, e.g., Kaminski v. Western MacArthur Co.*, 175 Cal.App.3d 445, 220 Cal.Rptr. 895 (1985) (distributor of Manville's defective products jointly and severally liable for all harm caused by such products). MacArthur's protection against jeopardy was to obtain indemnity from Manville as the responsible manufacturer. *Kaminski*, 175 Cal.App.3d at 457, 220 Cal.Rptr. at 901.

MacArthur argues that its circumstances are unique and require separate consideration. It claims that Manville's insurance policies were subject to "vendor endorsements" which allegedly provided direct insurance coverage to vendors and distributors of Manville products as "additional insureds." MacArthur vigorously objected to the settlement reached between Manville and its insurers without success. *See Mac-*

*Arthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 94 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988).

After months of difficult negotiations, MacArthur and Manville negotiated a settlement approved by other parties in the bankruptcy in August 1989. In compromise of its twenty-six million dollar indemnity claim, MacArthur received a lump sum of eight million dollars. The settlement also contained specific mechanisms by which MacArthur can assert indemnity and contribution claims against the Trust. In essence, MacArthur may submit codefendant proofs of claim if the underlying asbestos health claim is liquidated by settlement or judgment. If MacArthur and the Trust do not settle the claim within 180 days, MacArthur has the right to bring an action for ·contribution or indemnification in any court of competent jurisdiction. The claims can be processed according to the codefendants' procedures notwithstanding their contingency and the fact that MacArthur did not make a Contribution Claim Election. If a plaintiff could have utilized priority processing under the Claims Resolution Procedures but did not do so, MacArthur could immediately commence a third-party action. MacArthur/Trust Stipulation ¶¶ 10–13.

As with the Pacor Trust, MacArthur presumably would withdraw its opposition if in fact the Settlement left in place the agreement it negotiated with the Trust. If that settlement is affected by the current proceedings, it objects to any abrogation of rights it secured through a court-approved agreement. MacArthur interprets the Settlement as radically impairing its rights under the codefendant procedures which they claim virtually eliminates its right to indemnity for derivative distributor liability. Relying on accepted principles of contract law and res judicata, MacArthur claims that no circumstances warrant either rescinding the agreement with the Trust or setting it aside. MacArthur also maintains that the Trust's posture, if in fact it intends to ignore its agreement with MacArthur, serves to aggravate the low confidence level of Manville's present and future business partners which it has sought to bolster.

In sum, MacArthur seeks to prevent plaintiffs from recovering against the Trust and then suing it as a distributor for the same harm caused by the same products. If plaintiffs were required to release their claims against MacArthur for any and all derivative liability attributable to the distribution of Manville's asbestos-containing products, and MacArthur preserved its ability to obtain indemnification and contribution from the Trust, it would endorse the Settlement.

3. *E.J. Bartells (joined by Allied Signal; Ford Motor Company; General Motors Company; Phelps Dodge Corporation and Thorpe Insulation Company).*

Bartells, a Washington-state corporation, is a distributor of insulation and refractory products in a number of states including Washington and Oregon. For approximately 50 years, Bartells distributed insulation and refractory products manufactured by Johns–Manville, its affiliates and successors including some of its asbestos-containing products, as well as products of other manufacturers some of which also contained asbestos.

■ Bartells seeks exception from the Settlement on the ground that it abrogates the company's rights under California law to (1) obtain comparative or equitable indemnity against the Trust in cases in which Bartells has been sued solely or in part because of its alleged activities as a distributor of Manville's asbestos-containing products, and (2) obtain an apportionment of damages against the Trust based on the respective liability of the parties. *Cf. Safeway Stores v. Nest–Kart*, 21 Cal.3d 322, 579 P.2d 441, 146 Cal.Rptr. 550 (1978); *American Motorcycle Ass'n v. Superior Court*, 20 Cal.3d 578, 578 P.2d 899, 146 Cal.Rptr. 182 (1978). Under the principle of comparative indemnity, ordinarily a manufacturer is primarily liable and obliged to totally or partially indemnify a distributor or retailer where the liability is derivative or vicarious rather than based on an independent duty to the plaintiff. *See Angelus Assocs. Corp. v. Neonex Leisure Prods.,*

167 Cal.App.3d 532, 213 Cal.Rptr. 403 (1985).

■ Bartells, as a distributor of many companies' insulation products, has contribution rather than indemnification claims against the Trust as well as other manufacturers. Not all of its liability can be shifted to the Trust. In states where the distributor's liability is secondary, the absence of the Trust from the litigation will serve to shift a substantial burden toward those companies otherwise not directly liable. Section H leaves ambiguous whether a distributor would be entitled to assert a set-off for amounts received or to be received by a plaintiff as a result of his or her claim against the Trust.

It also objects to the absence of procedural guidelines for the processing of indemnification and contribution claims. Whereas plaintiffs are instructed to present evidence of asbestos-related injury resulting from exposure to Manville products that would sustain a cause of action at common law, codefendants should not be hostage to the plaintiffs' presentation of adequate medical proof or be forced to substantiate plaintiffs' claims. In addition, Bartells objects to a requirement that it must have a judgment against it prior to asserting a claim against the Trust.

These parties claim that the proposed Settlement violates the fifth, tenth and fourteenth amendments to the Constitution as well as the Anti–Injunction Act, 28 U.S.C. § 2283. They allege that they were not permitted to participate in the negotiations between plaintiffs attorneys and the Trust that resulted in the Settlement which substantially impairs legal rights and financial interests of their clients. They assert that their clients contribution and indemnification rights were traded off for higher payments to plaintiffs and their attorneys. They argue that the effort to clear the asbestos dockets constitutes a taking of property without due process of law in violation of the fifth and fourteenth amendments.

Because their clients allegedly had no notice of these proceedings, they claim that the Settlement violates their clients' due

process and equal protection rights. They claim that the Settlement cannot make evidentiary determinations barring the introduction of Manville-related evidence in trials yet to occur in various state and federal courts throughout the country. These companies contend that this provision violates the tenth amendment. The summary allegations made have not been substantiated with legal authority.

Thorpe Insulation Company, another Manville distributor further claims that preservation of the debtor's distributors in business should be as much an object of the Settlement agreement as preservation of Manville. Without companies to sell and install Manville products, they argue, Manville will not earn the funds necessary to remain in business and support the Trust. In addition, under California law Thorpe's liability as a distributor is said to be derivative and coextensive with that of Manville. Plaintiffs need not show negligence on the part of the distributor to support liability. Thorpe therefore requests that the release of liability against Manville incorporate a release of those whose liability is solely derivative of Manville's. It also seeks a provision enjoining litigation against Manville's distributors, a provision which prevents a claimant who settles with the Trust from pursuing a claim against a distributor and that any judgment against a distributor presently obtained by a Trust beneficiary automatically be credited with any amount ultimately received from the Trust.

### 4. *General Refractory Company*

General Refractory Company also has contribution and indemnification claims against the Trust. This company joins the objections made by the codefendants, particularly to the adoption of a national rule limiting the set off or reduction in liability to the amount that the Trust agrees to pay a plaintiff-beneficiary. Many of the cases against this company are pending in Maryland and Pennsylvania, states in which non-settling defendants allegedly are entitled to pro rata reductions on account of a settlement. *See* Md.Code Art. 50 § 20; 42 Pa. Cons.Stat.Ann. §§ 8326, 8327. In order to obtain this reduction in liability, there must be proof that the settling defendant is a joint tortfeasor. This evidence they claim is barred by Section H of the Settlement.

### K. Shipowners

Various shipowners submitted objections to the class action certification and proposed Settlement. They claim that notice and the opportunity for objection to the Settlement were inadequate even though they participated in the public fairness hearings and submitted written memoranda expressing their position. They contend that the provisions of the Settlement deprive shipowners of rights previously conferred in the Plan and under existing applicable law in violation of due process.

The shipowners are domestic shipping companies that have been sued by plaintiffs including longshoremen and seamen-employees for injuries allegedly caused by exposure to asbestos-containing products. The defective products were manufactured by Johns–Manville and other companies and installed or carried on board these shipowners' vessels. Plaintiffs base liability upon the contention that the vessels were in an unseaworthy condition as a result of the presence of asbestos-containing products on board. Under well-established principles of maritime law, the shipowners may seek indemnification from Manville or the other manufacturers. *See Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (shipowner may recover for stevedoring contractor's breach of implied warranty of workmanlike performance); *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974) (right to seek contribution); *Nye v. A/S D/S Svendborg,* 501 F.2d 376 (2d Cir.1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975) (right to seek implied indemnity). Shipowners also claim the right to recover from the manufacturer for settlements they enter into with plaintiffs if reasonable and the cost of expenses associated with the satisfaction of plaintiffs' claims.

One court recently held,

a Shipowner's duty to maintain its vessel in a seaworthy condition is non-delegable and may be breached regardless of the Shipowner's own fault [and] where the condition of unseaworthiness has been caused by a third party it is that [third] party who should be made to bear the ultimate responsibility for any damage or injury caused by the vessel's unseaworthiness.

*Vaughn v. Marine Transp. Lines, Inc.*, 723 F.Supp. 1126 (D.Md.1989). This standard requires the shipowner to demonstrate that the ultimate responsibility lies with Manville. To establish such a claim, shipowners claim that they must introduce evidence barred by their interpretation of section H of the Settlement. Thus, the Settlement imposes on shipowners the burden of litigating the underlying claims, fully satisfying liabilities ultimately attributable to the Trust and effectively re-litigating the claim against the Trust.

The shipowners also object to the reduced value they will receive on their indemnification claims. While a court or jury establishes the value of the plaintiff's claim, when the shipowner turns to the Trust to satisfy its indemnity obligation, the value of the claim is, under the Settlement, re-liquidated and depreciated in accordance with the Distribution Process. Absent the new Plan it is claimed that the Trust would pay the liability in full once responsibility was established.

L. The Trust

The Trust favors the mandatory class action and Settlement. While its view of the past may differ from that of the plaintiffs and codefendants, the Trust cannot ignore the financial plight it faces. It believes that the Settlement has several distinct and significant advantages over both the present Claims Resolution Procedures and the Henderson & Goldberg alternative proposal.

The Trust outlines the reasons for its support as follows: First, the Settlement provides a more fair and equitable distribution of the Trust's limited funds to presently known claimants while still recognizing the special needs of a small number of extraordinarily situated claimants through exceptions for hardship and exigent health cases. Second, the Distribution Process creates a mechanism by which the Trust will set aside funds to protect the interests of future claimants to whom the Trust has a responsibility but little means to treat equitably under the Plan. Third, it permits the Trust in consultation with the Special Advisor to the Trust and with the concurrence of Select Counsel for the Beneficiaries to control the timing and manner of disposition of its assets and thereby maximize their value for the benefit of all claimants. Fourth, the Settlement provides flexibility to alter any aspect of the process to achieve the agreed-upon purpose of the Settlement, in particular the distribution pattern between present and future claimants. Given the uncertainties regarding the assets and liabilities of the Trust and the practical problems of implementing the Settlement this aspect is particularly important. Finally, the Master Agreement between the Trust and Manville will furnish severely needed cash to enable swifter compensation of those beneficiaries with the most serious injuries.

The Trust opposes the Minority Claimants' proposal because it prohibits any distributions to Trust beneficiaries for a period up to six years with the exception of limited payments to hardship claimants. The Trust considers this delay particularly unfair in light of the substantial number of years many claimants have already waited to receive payments both as a consequence of the bankruptcy and of the Trust's inadequate cash flow. The Settlement pays the neediest claimants at least some money relatively quickly, a result the Trust believes is critical.

Moreover, the Minority Proposal appears to reject the Master Agreement between Manville and the Trust. Among other obligations, this agreement provides for more than $500 million which the company would not otherwise be obligated to pay pursuant to the existing Plan. In view of the assurances of both Manville's and the Trust's investment bankers that Manville should be

able to perform its responsibilities under the Master Agreement without suffering undue harm to its business and overall financial condition, Tr. 1/23/91 at 255–56, 260–61; there seems to be no basis, the Trust argues, upon which to reject these substantial and valuable payments.

The Trust has had the benefit of outstanding representation by its General Counsel, David T. Austern. His excellent services have greatly assisted the parties and the courts throughout this complex litigation.

### M. Manville Corporation

The Manville Corporation favors the proposed Settlement in all respects. It has agreed to provide additional funding pursuant to the terms of the Master Agreement to help the Trust enhance its present and future ability to compensate asbestos health victims. The Corporation's experts have indicated that they believe the new payment obligations can be met and will not unduly hamper Manville's business prospects in the future. In exchange for the new funding, Manville seeks an order reaffirming the injunction instituted as part of the bankruptcy reorganization. The Corporation wants additional protection against any attempt to sue it rather than the Trust now or in the future.

### N. *Cimino* Plaintiffs

The *Cimino* plaintiffs consist of 2298 plaintiffs who participated in the class action proceeding before Judge Robert M. Parker and hold a final judgment obtained by consent against the Trust. *Cf. Cimino v. Raymark Indus.*, 751 F.Supp. 649 (E.D.Tex.1990). The underlying agreement between the Trust and the *Cimino* plaintiffs provides that the Trust is to pay $140,564,000 to the *Cimino* clients and their attorneys over a six year period beginning in 1991.

Counsel for the *Cimino* plaintiffs object to any construction of Paragraph 9 of the Stipulation of Settlement that alters in any manner the terms of payment on their judgment. Paragraph 9 states that the Trust will pay Liquidated Claims, defined as final judgments and valid and binding agreements entered prior to November 19, 1990 in accordance with the terms of those judgments or agreements. These claimants contend that unless they elect to follow the procedures of the Distribution Process, the provisions of their agreement govern the obligations of the Trust with respect to their claims. They strenuously object to an interpretation of Paragraph 9 which infers that only the first payment, which will be "immediately due and owing" as of the date of a Final Order, must be paid according to its terms, and the remaining payments can be made under the Trust Distribution Process. While some claimants may have signed releases which state that payments are subject to the availability of funding, the *Cimino* judgment contains no such exception. They assert that their right to enforce their judgment according to its terms is not and cannot be altered by the Settlement.

### O. Claimants from Massachusetts Represented by Edward Dangel

Edward Dangel in testimony during the Fairness Hearings objected to the portion of the Settlement that considers "jurisdictional history" in the valuation of claims. Tr. 1/4/91 at 101. He argued that in the context of a national class action that seeks to pay victims based on the asbestos disease they have contracted, the history of jury awards is not relevant. To permit the Trust to liquidate claims at different prices based on this factor would only create regional friction and increase the administrative difficulties for the Trust. Moreover, Mr. Dangel argues that in a national class action, national values and averages should prevail over the uncertainties and vagaries of the tort system. In particular, consideration of this factor undermines efforts to establish a rational and uniform process for all claims against the Trust and carries an air of unfairness into a compensation-type scheme. Mr. Dangel also recommended that the courts retain jurisdiction during the early years under the Settlement to ensure that the parties have an accessible

avenue for redress if that appears necessary.

Mr. David L. Meade of West Virginia, who represents over a thousand claimants seeking compensation from the Trust, submitted a letter echoing Mr. Dangel's objection to inclusion of traditional jurisdictional value as relevant in liquidating claims. He explained his position as follows: "[I]f certain attorneys are permitted to say that their mesothelioma death case is worth ten (10) times more than a mesothelioma case in another state, that will permit that attorney to deprive nine (9) other individuals who have claims with the fund from being paid." He further cautioned:

> We have already seen the results of the greed of a few attorneys in plundering the fund and leaving little money for remaining beneficiaries. Simply because my clients live in the State of West Virginia, which is a poor state and in which the juries are not out of control and know the value of money, should not lessen the value of their claim with the Trust.

Letter from David L. Meade (dated Oct. 31, 1990) (filed and docketed).

### P. Selected Claimants Represented by James Gavin

James Gavin objects to the Settlement on behalf of claimants he represents because it allegedly impermissibly modifies the Plan and claims resolution procedures adopted in the reorganization proceeding. First, he argues that pre-petition claimants who have not yet settled with the Trust suffer disproportionately and unfairly from a reordering of claims that abandons the Plan's obligation to follow the FIFO queue. While the majority of pre-petition cases have settled and been paid in full, those that are still pending do not receive temporal priority under the Settlement and will be paid over several years rather than receiving full payment within twenty business days as required under the Plan. Second, Mr. Gavin contends that the Settlement, which sets forth average values for asbestos-related injuries, violates the provision of the original claims procedures which directed the Trust to set values based upon the individual factors of the particular claimant. Lastly, he objects to certification of a class pursuant to Rule 23(b)(1)(B) consisting of individuals suffering from different injuries as a consequence of particular work and exposure histories, as inconsistent with the requirements of Rule 23.

## IV. JURISDICTION

### A. Subject Matter Jurisdiction

■ As a threshold matter, the courts must determine whether they have subject matter jurisdiction to resolve the present controversy. The complaint alleges two bases of jurisdiction, diversity of citizenship, 28 U.S.C. § 1332 (1988 & Supp. II 1990), and bankruptcy jurisdiction, 28 U.S.C. § 1334 (1988).

Undoubtedly the jurisdiction of federal courts to resolve mega-mass tort litigations would be clarified and the ability to rationally deal with procedural and substantive issues improved were Congress to address the problems directly. *See, e.g.,* Mullenix, *Complex Litigation Reform and Article III Jurisdiction,* 59 Ford.L.Rev. 169 (1990); *cf.* Multiparty, Multiforum Jurisdiction Act of 1990, H.R. 3406, 101st Cong., 2d Sess., 136 Cong. Rec. H3116–19 (daily ed. June 5, 1990) (proposing grant of district court original jurisdiction in wrongful death or personal injury cases involving harm to at least twenty-five persons in which residence of defendant and place of injury differ, two defendants live in different states or significant events occurred in more than one state) (initial draft). In the absence of such legislation, traditional jurisdictional bases must be revisited. As indicated below, there is ample basis for exercising jurisdiction in this case.

#### 1. *Diversity Jurisdiction*

■ In the class action context, to satisfy the prerequisites of diversity each named class representative must reside in a different state from each defendant. *See Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969) ("if one member of a class is of diverse citizen-

ship from the class' opponent, and no non-diverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant"); *Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *see also* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.-95, at 23–546 (2d ed. 1987); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3606, at 424 (2d ed. 1986) ("the courts look only to the citizenship of the representative parties in a class action"). Most courts have accepted the principle that for federal class action purposes complete diversity between each member of the plaintiff class and each defendant is not required. *In re School Asbestos Litig.*, 921 F.2d 1310, 1317 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 162 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). In reviewing a jurisdictional challenge on the basis of lack of complete diversity in a class action the Second Circuit stated:

> It is hornbook law, based on 66 years of Supreme Court precedent, that complete diversity is required only between the named plaintiffs and the named defendants in a federal class action.

*Agent Orange*, 818 F.2d at 162.

■ In ascertaining the residency of a trust, the court will look to the state citizenship of the trustees and deem the trust to reside in each state where its trustees reside. *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 464, 100 S.Ct. 1779, 1783–84, 64 L.Ed.2d 425 (1980). According to the complaint, each of the trustees reside in a different state from each of the class representatives, hence this component of diversity jurisdiction is met. *Cf. Freeport–McMoRan, Inc. v. K N Energy, Inc.*, —— U.S. ——, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (per curiam) (diversity jurisdiction, once established, is not defeated by the addition of a nondiverse party to the action).

■ Federal diversity jurisdiction also requires that "the matter in controversy" exceed "the sum or value of $50,000, exclusive of interest and costs ..." 28 U.S.C. § 1332 (1988 & Supp. II 1990); *cf.* Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, 102 Stat. 4642 (1988) (partly codified as amended at 28 U.S.C. § 1332) (increasing amount in controversy requirement from $10,000 to $50,000). For a class action to proceed, each member of the class must meet the jurisdictional minimum; the claims of the individual members cannot be aggregated to satisfy the requisite amount in controversy. *See Zahn v. International Paper Co.*, 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988).

■ In determining if all class members satisfy the amount in controversy,

> the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (footnotes omitted). The court need not dismiss an entire class action for lack of subject matter jurisdiction of certain individual class members. *In re School Asbestos Litig.*, 921 F.2d 1310, 1315 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). Rather the court would be required only to dismiss those members who appeared "to a legal certainty" to have claims for less than jurisdictional amount. *Id.*

■ The injuries suffered by persons exposed to asbestos are serious and substantial. According to the complaint, each personal injury claimant seeks compensatory damages well in excess of $50,000. While any plaintiff is free to settle a claim for less than the amount sought in the complaint, the amount that controls for jurisdictional purposes is what the claimant in good faith pleads. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988) (court

has no affirmative obligation to question amount pled by plaintiffs absent some reason to make further inquiry).

■■ The district court charged with the instant case tried to conclusion scores of plaintiffs' claims and has also assisted in many hundreds of settlements of asbestos cases. In addition, we have studied settlements and judgments in other courts, many of which are published, and have had available appropriate records of the Trust including settlements of tens of thousands of claimants. The courts take judicial notice of the fact that the value of every claim in the complaint can in good faith be said to exceed $50,000 for the purposes of pleading.

The courts cannot find, to a legal certainty, that any of the claims of the class members are worth less than the statutory minimum. *See In re A.H. Robins Co.*, 880 F.2d 709, 723 (4th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Payton v. Abbott Labs*, 83 F.R.D. 382, 395 (D.Mass.1979) (unliquidated claims subject to jury evaluation cannot be found, to a legal certainty, to be less than jurisdictional amount), *vacated on other grounds,* 100 F.R.D. 336 (D.Mass.1983). Plaintiffs satisfy the prerequisites of diversity jurisdiction pursuant to 28 U.S.C. § 1332.

### 2. Bankruptcy Jurisdiction; Jurisdiction Retained Under Plan

■■ A post-confirmation bankruptcy court retains jurisdiction over matters concerning the implementation or execution of a confirmed plan. 11 U.S.C. § 1142 (1988); *see Goodman v. Phillip R. Curtis Enterprises, Inc.*, 809 F.2d 228, 232 (4th Cir. 1987) (court retains authority to implement confirmed plan); *In re Pittsburgh Terminal Coal Corp.*, 183 F.2d 520, 522 (3d Cir.), *cert. denied,* 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950) (court retains power to protect its decree and prevent interference with execution of plan). *See also In re Johns–Manville Corp.*, 97 B.R. 174, 180 (Bankr.S.D.N.Y.1989) (jurisdiction of bankruptcy court "continues post-confirmation as to fundamental questions of interpretation and administration of a plan"). Sec-

tion 1142 invokes the district court's bankruptcy jurisdiction under the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1334 (1988); *see also* 28 U.S.C. § 157(d) (1988) (withdrawal of reference of case to bankruptcy court).

In this case the Plan itself in Article X explicitly reserves the courts' jurisdiction. *See* Plan § 10.1 at C–36, C–37; *In re Johns–Manville Corp.*, 97 B.R. at 180. Several of the stated purposes appropriate for the invocation of jurisdiction pursuant to Article X apply to this equitable action, most significantly ensuring the feasibility and survival of the Plan itself. *See, e.g.,* Plan § 10.1.L at C–37 ("To enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan."); Plan § 10.1.K, at C–37 ("To enforce all orders, judgments, injunctions and rulings entered in connection with the Cases").

■■ In contrast with other judicial proceedings which end with the entry of a final judgment, a bankruptcy case does not clearly end at the point a plan of reorganization is confirmed. As the court in *In re A.J. Mackay*, 50 B.R. 756 (D.Utah 1985) stated:

> A bankruptcy proceeding where a chapter 11 reorganization plan is confirmed differs markedly from a typical civil case in federal district court. Once a judgment is rendered in a typical case, the case is over. The court rendering the judgment generally has jurisdiction over only a few ancillary administrative matters.... In a bankruptcy case, however, the confirming of a plan of reorganization is in some ways only the beginning of a case. The bankruptcy court generally retains broad jurisdiction over a case even after a plan has been confirmed.

*Id.* at 759. *Cf. United States v. Novak*, 86 B.R. 625, 629 (D.S.D.1988) ("Congress has long recognized that the process of reorganization is involved and complex....").

■■ Pursuant to section 1142, the courts have the authority to direct the debtor and others to perform acts necessary for execution of a plan. 11 U.S.C. § 1142

(1988); *see generally* Lander & Warfield, *A Review and Analysis of Selected Post–Confirmation Activities in Chapter 11 Reorganizations,* 62 Am.Bankr.L.J. 205–08 (1988). The court in *In re Terracor,* 86 B.R. 671 (D.Utah 1988), found that Section 1142 expresses a "clear intent ... to assure that the terms of the confirmed Chapter 11 plan are carried out until the plan is completed and a final decree is entered closing the case." *Id.* at 676.

The courts have already stated with respect to their role in the Trust's reorganization proceedings that they retained jurisdiction to oversee the reorganization process even after the Plan was confirmed. *See In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville),* 120 B.R. 648, 657 (E. & S.D.N.Y.1990). The Second Circuit has rejected the "contention that adoption of the reorganization plan ousted the court of jurisdiction...." *In re Dilbert's Quality Supermarkets, Inc.,* 368 F.2d 922, 924 (2d Cir.1966); *cf. United States v. Energy Resources Co.,* — U.S. ——, 110 S.Ct. 2139, 2141–43, 109 L.Ed.2d 580 (1990) (section 105 permitted court to order IRS to apply post-confirmation payments in manner that ensured success of reorganization plan).

The Fourth Circuit Court of Appeals in affirming the Dalkon Shield reorganization plan explicitly approved the district court's retention of continuing jurisdiction over the personal injury trust fund created to process claims of parties injured by debtor's products as long as the actions taken by the court did not interfere with the power and duties of the Trustees and were necessary to ensure that the plan was feasible. *In re A.H. Robins Co.,* 880 F.2d 769, 776–77 (4th Cir.1989). The Fourth Circuit stated:

> Matters relating to the control and supervision of trusts are within the equity jurisdiction of the court, and the power of the court of equity is usually invoked to require a trustee to perform a duty under a Trust.

*Id.* at 776 (interpreting Virginia law [New York law is not to contrary]).

Even without a specific provision in a plan reserving jurisdiction, the bankruptcy court continues to have the power post-confirmation to resolve fundamental questions of interpretation and effectuation of a plan. *In re Johns–Manville Corp.,* 97 B.R. 174, 180 (Bankr. S.D.N.Y.1989). The need to settle disputes concerning the administration of the reorganization necessitates maintaining jurisdiction. *See In re A.J. MacKay Co.,* 50 B.R. 756, 759 (D.Utah 1985). *See generally In re A.H. Robins,* 88 B.R. 742, 752 (E.D.Va.1988) ("Sections 105, 1129(a)(4) and 1142 of the Bankruptcy Code and Sections 157 and 1334 of Title 28 of the United States Code as well as principles of equity empower and require the Court to maintain a continuing supervision in the manner aforesaid."), *aff'd,* 880 F.2d 694 (4th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).

The courts rely upon bankruptcy jurisdiction in addition to jurisdiction over the proceeding pursuant to authority to resolve diversity cases.

### B. Personal and In Rem Jurisdiction

#### 1. *In Personam Jurisdiction*

The court must also have personal jurisdiction over the parties to the litigation. To compel the defendant to appear and defend in a particular forum, it must be "reasonable and just, according to our traditional conception of fair play and substantial justice." *See International Shoe Co. v. Washington,* 326 U.S. 310, 319–20, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945); *see World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–94, 100 S.Ct. 559, 564–66, 62 L.Ed.2d 490 (1980) (due process does not permit state to bind person with whom state has no contacts, ties, or relations); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (applying "fair play and substantial justice" standard to in rem actions).

There can be little dispute that the defendant has substantially more than the necessary minimum contacts with the forum to satisfy due process. The Trust was created pursuant to a Chapter 11 reorgani-

zation Plan filed in New York. *See In re Johns–Manville*, 68 B.R. 618, 621–22 (Bankr.S.D.N.Y.1986) (order approving reorganization and simultaneous creation of Trust to pay personal injury claimants), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). Furthermore, a provision of the final reorganization Plan explicitly provided for the continuing jurisdiction of the bankruptcy court, and by extension the district court, for overseeing effectuation of the Plan. *See* Plan, § 10.1 at C–36.

■ A slightly more difficult question involves the court's jurisdiction over nonresident class members who may have little or no connection with this forum. Since New York had no prelitigation contact with many of the plaintiff class members or their claims against the Trust, the issue turns on whether each member of the class must satisfy the "minimum contacts" standard typically applied to out-of-state defendants in individual suits. *E.g., International Shoe Co. v. Washington*, 326 U.S. 310, 319–20, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980).

The extent of due process protection afforded out-of-state defendants stems in part from the hardship imposed by being haled into an inconvenient forum to defend or suffer the consequences of a default judgment. *Woodson*, 444 U.S. at 291–92, 100 S.Ct. at 564–65. While an adverse determination will have res judicata effect on an absent plaintiff's cause of action, "[t]he burdens placed by a State upon an absent class-action plaintiff are not of the same order or magnitude as those it places upon an absent defendant." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808, 105 S.Ct. 2965, 2972, 86 L.Ed.2d 628 (1985). Out-of-state defendants must hire counsel, travel—perhaps on many occasions—to the forum state, participate in discovery and court proceedings, and comply with whatever judgment the court may impose, including one for money damages. By con-

trast, the plaintiff class member enjoys the benefits of representative litigation.

■ A proceeding may only go forward as a class action after a court has determined that the named plaintiffs and absent plaintiffs share common claims, that the representatives will adequately protect the interests of absent class members, and that absent members have received notice of the pendency of the action and been afforded an opportunity to be heard. Fed. R.Civ.Pro. 23; *see* discussion of requirements of Rule 23 *infra*. Moreover, the court has continuing responsibilities to absent class members including review of any settlement or dismissal of class claims. Fed.R.Civ.P. 23(e). Absent plaintiffs may hire counsel, intervene, and participate in the proceedings, or they may rely upon the court-approved representatives to protect their interests. *See Larionoff v. United States*, 533 F.2d 1167, 1186 n. 44 (D.C.Cir. 1976) ("in suits under subdivisions (b)(1) or (b)(2), once the court determines that the members are adequately represented as required by Rule 23(a)(4), it is reasonably certain that the named representatives will protect the absent members and give them the functional equivalent of a day in court"), *aff'd*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). In fact, absent plaintiffs are not affirmatively required to act in any way in order to protect their rights and will not have to pay money damages if an adverse judgment is entered against the class. *Shutts*, 472 U.S. at 810, 105 S.Ct. at 2973–74.

In *Shutts*, the Supreme Court addressed the question whether a Kansas state court had the power to bind absent plaintiff class members in an opt-out class action, implicitly holding that the court had jurisdiction over those absent parties. The Court concluded

a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant. If the forum state wishes to bind an absent plaintiff concerning a claim for money dam-

ages or similar relief at law, it must provide minimal procedural due process protection.

*Shutts*, 472 U.S. at 811–12, 105 S.Ct. at 2974 (footnotes omitted); *see also Robertson v. National Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir.1977) ("While the due process clause imposes definite limitations on Rule 23, those limitations concern adequacy of representation, notice, and opportunity to participate and be heard....").

There is no reason to demand greater due process protection for out-of-state plaintiffs in a federal non-opt-out class than that afforded in state common question class actions. As a practical matter, to restrict the court's power to bind absent class members would effectively eviscerate Rule 23(b)(1)(B) class actions. 1 H. Newberg, *Newberg on Class Actions* § 1.15, at 12 (Supp.1990) ("it is probable that individual procedural due process rights involving minimum contacts with the forum will not be imposed on these more cohesive [23(b)(1) and (2)] class actions, when they were not required in more discretionary common question [23(b)(3)] class actions").

■■■ Without adjudicating the rights of all claimants to a limited fund, the court cannot ensure that the interests of parties to the litigation are not impaired or exterminated. For the hundreds of thousands of injured victims who risk losing the opportunity to recover as a result of the backlog of asbestos cases and the ongoing race to the courthouse to obtain a portion of the coveted limited funds from the remaining solvent manufacturers and distributors of asbestos-containing products, due process mandates a unified disposition that includes all claimants. *See* Miller & Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1, 52 (1986). The courts may properly exercise personal jurisdiction over absent plaintiffs in this class action.

■■■ What is true generally of limited fund class actions is a fortiori true in the present case. Under the Court's analysis in *Shutts*, the filing of a proof of claim seeking compensation from the Trust can be construed as implied consent to the court's jurisdiction. If the mere failure to fill out and return an "opt out" card constitutes implied consent, *see Shutts* 472 U.S. at 812–14, 105 S.Ct. at 2974–76, then the more active decision to file a claim with a Trust created in New York, with its funds in New York and governed by New York law similarly implies consent. Without the filing of a proof of claim form, there can be no recovery from the Trust. This was decided when the Court of Appeals approved the Plan incorporating that requirement. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 650 (2d Cir.1988) (affirming confirmation of Plan).

In addition, four other factors relevant to exercise of jurisdiction under the Court's standard of fair play and substantial justice favor a finding that the courts have personal jurisdiction over absent class members. *See Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (these factors "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required"); *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (listing factors). They include:

1) The forum state's interest in adjudicating the dispute. In the instant case this factor is significant because the Trust's funds are administered under New York trust law pursuant to a Plan approved by a bankruptcy court in New York. The continued viability of the New York Trust and hence reorganization itself is at stake in this class action proceeding.

2) The plaintiffs' interest in obtaining convenient and effective relief is a major factor. In the case at bar limited funds mean that tens of thousands of claimants require a class action to protect the corpus of the Trust.

3) The national judicial system's interest—including that of both state and feder-

al courts—in obtaining the most efficient resolution of controversies is important. Here only a settlement by class action can efficiently dispose of related disputes arising in every state in the country in a manner that is equitable for all Trust beneficiaries. Moreover, the original exposures to asbestos resulted from a national technology, manufacture of asbestos products in many states and use of the product in every state in combination with equipment and products probably manufactured in every state. Asbestos related disputes involve the viability of national codefendant corporations doing business in every state with hundreds of thousands of workers. If ever there was a dispute implicating national issues and interstate commerce it is this one.

4) The shared interest of the several states in furthering fundamental social policies is significant. Each state has a similar interest in ensuring that injured persons are compensated effectively. Some differences among the states exist as to such aspects of compensation as rights to punitive damages, limits on liability and the like. But no punitive damages are permitted against the Trust under the Plan and in no case will damages exceed those permitted in any state because there are such limited assets. The special problem of codefendants is discussed below.

The ultimate result of a jurisdictional inquiry must be reconcilable with these four factors. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1073, at 452 (2d ed. 1987); *see also Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 743 F.2d 947, 951 (1st Cir.1984) (part of fairness inquiry is whether state has legitimate interest in bringing in out-of-state defendant). Protection of New York claimants as well as claimants from all other state jurisdictions and survival of the Plan itself requires that the rights of all claimants be adjudicated in this Rule 23(b)(1)(B) class action.

2. *In Rem and Quasi in Rem Jurisdiction*

■ While the vast majority of federal cases are actions in personam, there is no constitutional or statutory limitation on the power of a federal court to entertain actions in rem or, under certain circumstances, actions quasi in rem. *See* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3631, at 3 (2d ed. 1985).

Jurisdiction predicated on the presence of property or assets within the court's geographical domain has a long history. *See Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878). In rem and quasi in rem jurisdiction arising from a court's territorial power over the property is typically invoked when persons with claims to the property are nonresidents and securing personal jurisdiction is difficult or impossible. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1070, at 417 (2d ed. 1987).

■ In *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court held that securing personal jurisdiction over a nonresident defendant through the seizure of property located within the state but unrelated to the action violated due process. *Id.* at 207, 97 S.Ct. at 2581. The plaintiff had seized defendant's shares in a Delaware corporation to obtain jurisdiction to resolve a dispute unrelated to any acts within the state. *Id.* Without additional contacts, the Court found that jurisdiction offended traditional notions of fair play and substantial justice. *Id.* Thus, for quasi in rem actions, due process requires the court to look beyond the mere physical existence of the property within the forum. *See Estate of Portnoy v. Cessna Aircraft Co.*, 603 F.Supp. 285 (S.D.Miss.1985).

■ Essentially the same principles of minimum contacts that govern personal jurisdiction are relevant in determining the propriety of asserting quasi in rem jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 207, 97 S.Ct. 2569, 2581, 53 L.Ed.2d 683 (1977). The location of the property remains a significant factor, however, as it "may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation." *Id.*

The *Shaffer* decision has inspired considerable commentary on its applications and limitations in various factual settings. *See generally* Silberman, *Shaffer v. Heitner: The End of an Era,* 53 N.Y.U.L.Rev. 33 (1978); Kalo, *Jurisdiction as an Evolutionary Process: The Development of Quasi in Rem and In Personam Principles,* 1978 Duke L.J. 1147; Farrell, *Forward: Symposium on Shaffer v. Heitner,* 45 Brooklyn L.Rev. 493 (1979) (describing articles in symposium). Much debate still surrounds the use of quasi in rem jurisdiction, clouded in part by varying definitions of two jurisdictional concepts. Technically, in rem jurisdiction relates to the determination of title to, or the status of, property located within the court's territorial limits. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1070, at 422 (2d ed. 1987). A court's authority stems directly from adjudicating the ownership or other rights with respect to the property and the judgment is effective against all persons with an interest in the property. *See, e.g.,* 28 U.S.C. § 1655 (1988) (granting federal court jurisdiction to hear cases involving title, liens, claims or encumbrances as to real or personal property).

Typically, a quasi in rem action does not directly relate to the property, although the property often represents the asset that will be used to satisfy a subsequent judgment if the plaintiff prevails. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1070, at 422 (2d ed. 1987). Most courts and commentators support continued reliance on in rem and quasi in rem jurisdictional bases in instances where the property is the subject matter of the litigation or at least a significant ingredient in it, but seriously question its use in absence of minimum contacts. *See Cargill, Inc. v. Sabine Trading & Shipping Co.,* 756 F.2d 224, 227–28 & n. 2 (2d Cir.1985); *Spungin v. Chinetti Int'l Motors,* 515 F.Supp. 31 (E.D.N.Y.1981); *Drexel Burnham Lambert Inc. v. D'Angelo,* 453 F.Supp. 1294, 1296–97 (S.D.N.Y.1978); *see generally* Silberman, *Shaffer v. Heitner: The End of an Era,* 53 N.Y.U.L.Rev. 33 (1978).

One distinction between in rem and quasi in rem jurisdiction relates to the preclusive effect of a judgment in the action. The question whether a court exercising quasi in rem jurisdiction can bind the parties on matters unrelated to the property is open. According to the Second Restatement of Judgments, a judgment rendered in a quasi in rem action "is conclusive between the parties, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action." *Restatement (Second) of Judgments* § 32(3) (1982).

The courts have an adequate basis to exercise both in rem and quasi in rem jurisdiction in this class action proceeding. The assets of the Trust constitute the res and are located within the territorial limits of the courts. The subject matter of the action relates directly to the res and in fact affects the financing and distribution of funds from the res. Each absent class member has some contact with the jurisdiction since each seeks to recover monies from the res and hence expects to benefit from this forum's laws protecting the Trust's assets. Absent class members, in contrast with out-of-state defendants, have other due process protections safeguarding their interests in the litigation that permit a lower quantum of contacts with the forum to satisfy due process. *See* Part IV.B.1, *supra.*

Additional connection between the res, the forum and absent class members stems from the fact that the Trust was created pursuant to a bankruptcy proceeding in this jurisdiction. New York law governs disputes that arise concerning the Trust, supplying a further nexus with this jurisdiction and in fact rendering it the most convenient, efficient and logical location for the class action. *See* 4 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1070, at 441 (2d ed. 1987). This forum also has an interest in protecting the value and marketability of property within its borders; these interests are served by providing a peaceful procedure for the resolution of disputes concerning the Trust's property. *See Shaffer v. Heitner,* 433 U.S. 186, 208 n. 30, 97 S.Ct. 2569, 2582 n. 30, 53 L.Ed.2d 683 (1977).

Mr. Henderson argues that in rem jurisdiction is not available "because a court's in rem or interpleader jurisdiction extends only to the property or funds deposited in the court," relying upon *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967). While this requirement applies to statutory interpleader actions, it does not govern all in rem proceedings. *See* Note, *The Requirement of Seizure in the Exercise of Quasi in Rem Jurisdiction: Pennoyer v. Neff Re-examined*, 63 Harv.L.Rev. 657 (1950). For example, an action concerning the foreclosure of a mortgage on property within the jurisdiction invokes a traditional use of in rem power to bring in all parties who may have an interest in the property before the court without prior proceedings to take possession of the property.

In this instance, the courts have constructive possession of the Trust and the presence of its assets suffices to warrant the exercise of jurisdiction. *See Farmers' Loan & Trust Co. v. Lake Street Elevated R. Co.*, 177 U.S. 51, 61–62, 20 S.Ct. 564, 568, 44 L.Ed. 667 (1900) (constructive possession adequate); *Palmer v. of Texas*, 212 U.S. 118, 129, 29 S.Ct. 230, 233–34, 53 L.Ed. 435 (1909) (same). Courts have held that enjoining the transfer of the res eliminates the need for actual possession and amounts to seizure of the property. In *Pennington v. Fourth Nat'l Bank*, 243 U.S. 269, 272, 37 S.Ct. 282, 283, 61 L.Ed. 713 (1917), the Supreme Court stated:

> The objection that this proceeding was void, because there was no seizure of the *res* at the commencement of the suit, is also unfounded. The injunction which issued against the bank was as effective a seizure as the customary garnishment or taking on trustee process.

*Id.*

Unlike the more typical circumstances where plaintiffs fear that the property will be disposed of prior to judgment and render any subsequent judgment unenforceable, the facts of this case do not raise such concerns. Thus, actual judicial possession of the corpus of the Trust is unnecessary for the purpose of jurisdiction. The injunction precluding any payments from the Trust amounted to constructive possession by the courts of the res and will sustain the courts' exercise of in rem jurisdiction.

C. Notice

A final jurisdictional element required to maintain this class action is affording persons who may be bound by any judgment or settlement adequate notice. Such notice must comport with due process as well as Rule 23.

In *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the Supreme Court set out the fundamental tenets of notice that will satisfy due process in class actions. *Hansberry* predicated binding of passive class members to a judgment rendered on proof that such members were "in fact, adequately represented by parties who are present. . . ." *Id.* at 43, 61 S.Ct. at 118. While Rule 23(a)(4) similarly requires that representative parties "fairly and adequately protect the interest of the class," due process may implicate a particularly stringent scrutiny of adequate representation in mandatory class actions.

The extent of notice required for binding adjudications is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). This pragmatic approach to notice recognizes that while "[p]ersonal service of written notice is always adequate," publication notice is also constitutionally adequate where it is not reasonably possible or practicable to give more adequate warning. *Id.* at 313, 317, 70 S.Ct. at 657, 658. This is particularly true in actions where some of the class members are unknown. *Id.* The Supreme Court recognized that there is also a strong public interest in settling disputes, thus a "construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified." *Id.* at 313–14, 70 S.Ct. at 657.

Timely notice necessarily means that class members learn of the proceedings when meaningful participation is still available to them. *See id.* at 314, 70 S.Ct. at 657 ("This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."). Moreover, the content of the notice must clearly describe the nature of the proceeding; how it will affect any rights the recipients of the notice may have; and when, where, and how such persons may express their objections. One circuit court has held that absent class members who would be bound by a judgment in a Rule 23(b)(1)(B) class action must have an opportunity to participate in pre-certification hearings to challenge the propriety of certification and contest the adequacy of the representation in order to satisfy the dictates of due process. *See In Re Temple,* 851 F.2d 1269, 1272 (11th Cir.1988).

The interplay of due process and the federal rules notice requirements varies depending on the nature of the class action. Rule 23(c)(2) specifies mandatory individual notice to class members of an action brought pursuant to Rule 23(b)(3), *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), but articulates no precise form of notice for 23(b)(1) actions. Notice provided in 23(b)(1) class actions is governed by the more flexible provision of Rule 23(d)(2) which leaves greater discretion with the district judge, subject only to constitutional due process limitations expressed in *Hansberry* and *Mullane.*

Because of the mandatory nature of a 23(b)(1)(B) class action, pre-certification notice to all potential class members must be designed to inform absent members of the action to the extent reasonably possible consistent not only with *Hansberry* and *Mullane,* but with the more rigorous criteria outlined in *Eisen.* Applying these standards to the notice afforded in the instant class action, both with respect to the limited fund hearings and the fairness hearings, the notice satisfied the dictates of Rule 23 and due process.

The form of the notice given here was essentially that approved by the Court of Appeals in *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); *see County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990) (similar form of notice approved). Notice in the instant case was much more effective than it was in *Agent Orange* because every pro se claimant received notice and each other claimant was represented by counsel who obtained actual notice. In addition, the various White Lung Associations received notice and informed their thousands of members of the hearings. The unions also had notice through their counsel and Mr. Gold. The most widely circulated periodicals that follow and report on asbestos litigation developments publicized the Settlement and hearings as well. So, too, did the public press.

Individual notice to all claimants, representatives of injured persons, and attorneys who have filed proof of claim forms with the Trust are likely to have reached almost all of those persons directly interested in the class action. Notice to those who participated in the Manville bankruptcy proceedings will further inform those who previously indicated an interest in proceedings relating to Manville. Moreover, communication through such associations as the AFL–CIO, local unions, asbestos publications and asbestos victims organizations will serve to advise some workers who may have been exposed but who have not yet manifested an asbestos-related illness that they have an interest in these proceedings and an opportunity to participate.

The courts find that the notice given was adequate to apprise potential class members, including out-of-state claimants and possible future claimants, to the extent reasonably possible, of the pendency of the action. They were afforded an opportunity to present their objections at the pre-certification hearings. *See In re Temple,* 851

F.2d 1269, 1272 (11th Cir.1988). Presence of counsel for future claimants also helped ensure that their rights would be adequately protected.

## V. CLASS ACTIONS

Recognizing the tremendous burden imposed by repetitive asbestos litigation, class proponents believe that resolution of that aspect of the national asbestos tragedy impinging on the Trust is appropriate for class action disposition. A class action fosters judicial economy and efficiency by adjudicating in a unified proceeding, to the extent possible, issues that affect many similarly situated persons. *See Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979). Courts have emphasized the flexibility of the class action as a tool for meeting substantive and procedural barriers to a just decision. *See Curley, Karanfilian & Roberts v. Brignoli, Curley & Roberts Associates*, 915 F.2d 81, 87 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991).

Traditionally courts of equity have considered the surrounding factual circumstances and balanced affected interests in devising equitable remedies. In the asbestos mass tort context these include: (1) fairly and expeditiously compensating numerous injured persons, (2) deterring wrongful conduct, while, where possible, preventing over-deterrence that will shut down industry or remove needed products from the market, (3) keeping the courts from becoming paralyzed by tens or even hundreds of thousands of repetitive personal injury cases, and (4) reducing transaction costs so that those injured can obtain the most compensation possible with the least damage to industry and its current workers.

Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation. *Cf. General Tel. Co. v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) ("the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion"). This is especially true when class certification is contemplated in the context of a proposed Settlement and distribution plan for class-wide relief. Adjudication on a classwide basis enables the court to reduce transaction costs, particularly attorneys' fees, thereby maximizing available resources to compensate injured claimants. Where liability is determined on a class-wide basis, or resolved according to the terms of a settlement, scarce financial and judicial resources are conserved. In addition, for some claimants class settlement will accelerate the receipt of compensation for injuries they suffered years ago, enhancing the monetary value of the settlement.

Much of the objection to class treatment of personal injuries cases rests on the loss of individual control of the litigation. This concern is exaggerated in the context of the asbestos personal injury litigation against the Trust. There is no substantial loss of individuals' rights to control the claim and obtain a day in court. In practice, since dockets are inundated with asbestos litigation, most claimants cannot expect a court trial during their lifetime. The goal of individual tort compensation has been obscured by excessive delay and litigation. Individual litigants in these cases have been hostage to mass settlement techniques necessarily devised by their attorneys with the encouragement of the courts and defendants. There is in fact little or no individual client consultation and no judicial oversight of a hidden process of wheeling and dealing to maximize overall recovery and fees for hundreds and thousands of massed cases. Moreover, the value of a day in court is largely illusory unless the claimant wins the race to the courthouse door before funds constantly depleted by transaction costs run out.

The traditional role of equity is that of "adjusting legal rules that do not work well, providing a moral force, and shaping new substantive law." Subrin, *David Dudley Field and the Field Code: A Historical Analysis of an Earlier Pro-*

*cedural Vision,* 6 L. & Hist.Rev. 311, 345 (1988). It is this principle of fashioning remedies where none exist at law that underlies Rule 23 and justifies its application to this complex of asbestos cases. Rule 23 is a child of equity.

### A. Class Action and Mass Torts; Aggregation Problems

Litigation arising from large-scale disasters is an inevitable consequence of the mass character of contemporary society and the complexity of ever-advancing technology. The national implications of mass distribution and use of products which subsequently cause serious and fatal illnesses have presented the courts with circumstances that necessitated a reassessment of traditional approaches to tort litigation. Common law models of litigation that envision one plaintiff sparring with one defendant were not designed to and cannot cope with harm experienced by huge numbers of geographically dispersed people. No mass tort epitomizes this phenomenon more dramatically than asbestos.

Historically, the class action has served as a procedural device to enable courts of equity to render comprehensive decrees in litigation involving numerous individuals. C. Bacon and F. Morse, *The Reasonableness of the Law: The Adaptability of Legal Sanctions to the Needs of Society* 187, 204–05 (1924). Several practical needs spurred the development of representative litigation including to protect defendants from inconsistent obligations, to protect the interests of parties not before the court, to provide a convenient and economical means for disposing of similar lawsuits and to spread the costs among numerous litigants with similar claims. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 402–03, 100 S.Ct. 1202, 1211–12, 63 L.Ed.2d 479 (1980). Although the class action in its present form is a relatively modern development, representative lawsuits date back to medieval England. Group litigation in the medieval period existed in a different social and political context, but certain common threads emerge from a brief look backward that continue to guide modern courts in their search to effectuate their equitable responsibilities.

In medieval England, life was characterized by social relations defined according to group status, arising from membership in organizations such as villages, guilds, parishes and manors. A person's status as a group member gave rise to known duties and obligations common to all group members. These responsibilities were enforced on a collective basis by law and religious authorities. Chosen representatives spoke for the particular groups in administrative matters and in manorial, royal, and ecclesiastical courts when litigation became necessary to settle disputes. Representative litigation was an inevitable and natural outcome of the collective social and political organization of medieval society. *See generally* S. Yeazell, *From Medieval Group Litigation to the Modern Class Action* 38–99 (1987); Yeazell, *Group Litigation and the Social Context: Toward a History of the Class Action,* 77 Colum.L.Rev. 866, 866–96 (1977).

Between 1400 and 1700, the modern European state emerged, along with significant social, economic and legal changes. Most important to the evolution of group litigation was the development of the legally-sanctioned corporate form, such as the chartered borough and the quasi-corporate status of the parish. Incorporation and substantive charter rights became the basis for a group's right to approach the royal court; lack of corporate status made it difficult for a court of law to recognize a suit brought by an unincorporated association. S. Yeazell, *From Medieval Group Litigation to the Modern Class Action, supra,* at 100–31.

Though manor and parish group litigation theoretically continued into the eighteenth century, by the latter part of the seventeenth century these suits were heard exclusively in the equity Courts of Chancery. *Id.* at 125, 155. To avoid multiple proceedings and to render a complete decree, the Chancery courts imposed a compulsory joinder rule. Realizing the administrative problems inherent in bringing all interested parties before the court, Chan-

cery developed the Bill of Peace, a class or representative action by which one person could sue on behalf of others similarly situated. A subsequent decree would be binding on the entire class. *See* 1 J. Pomeroy, *Equity Jurisprudence*, §§ 252, 253 (1918); Chafee, *Bills of Peace with Multiple Parties*, 45 Harv.L.Rev. 1297 (1932); *see also* 1 H. Newberg, *Newberg on Class Actions*, §§ 1.10, 3.03 (2d ed. 1985). Thus, equity courts retained the capability of adjudicating and concluding litigation affecting numerous persons.

With the transformation of feudal society, village-based group litigation ended around the start of the eighteenth century. At that time, new, more loosely-bound groups emerged with shared interests. The equity courts responded with greater flexibility than the common law courts did to the needs of these new associations of capital and labor. Joint stock companies and "friendly societies" (voluntary trade affiliations that insured their members against illness and death) whose constituents were associated not through social bonds, but by membership for limited purposes, required a new rationale for aggregation of parties and issues in the courts. The justification for group litigation became one of representation, based on actual consent of the members or on an identity of interests among the members. Eventually, legislation recognizing these associations as legal entities entitled to sue and subject to suit was passed and group litigation via equity fell into disuse in England. S. Yeazell, *From Medieval Group Litigation to the Modern Class Action* 160–96 (1987).

As in England, the class action in the United States evolved from the court's equitable jurisdiction over bills of peace and in response to the equitable rule of compulsory joinder. Trial courts relied on their equitable powers to avoid multiple suits where numerous individuals sued a defendant for a single legal grievance. J. Story, *Equity Pleadings* § 97 (3d Ed.1944); Note, *Action Under the Codes Against Representative Defendants*, 36 Harv.L.Rev. 89 (1922). In 1842, the Supreme Court promulgated Equity Rule 48. This rule official-

ly recognized representative suits where the parties were too numerous to be conveniently brought before the court, but refused to bind absent parties to any resulting judgments. The Supreme Court described the class action in a court of equity as a device of convenience, which could "prevent a failure of justice ... [and insure] that the interest of all will be properly protected and maintained." *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 302–03, 14 L.Ed. 942 (1854).

In 1912, Rule 48 of the Federal Equity Rules was rewritten as Rule 38. The new rule allowed representative suits where the parties were too numerous for joinder. In contrast with the prior rule, absent parties could be bound by subsequent judgments pursuant to this provision. One of the best examples of a limited fund case from this time period is *Hartford Life Ins. Co. v. Ibs*, 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915). The case involved an insurer's contingency fund created through contributions from policyholders. The Supreme Court found that the policy was properly treated as a unit and that the adjudication of rights to it had to be determined in a single suit in which all policyholders were joined. The Court explained that

> [t]he Fund was single.... It would have been destructive of [policyholders'] mutual rights ... to use the Mortuary Fund in one way ... in one State and to use it another way ... in a different State.

*Id.* at 670–71, 35 S.Ct. at 695. *See also Sovereign Camp of the Woodmen of the World v. Bolin*, 305 U.S. 66, 78–79, 59 S.Ct. 35, 39–40, 83 L.Ed. 45 (1938) (group challenge to reorganization of fraternal benefit association necessitated compulsory joinder).

After 1938, with the theoretical merger of law and equity in the Federal Rules of Civil Procedure, class actions became increasingly common. They retained their roots in equity with consequent flexibility to meet new needs. The former Rule 23 divided class actions into three categories: (1) spurious, (2) true, and (3) hybrid actions. The antecedents of the current limited fund-type proceeding are found in the hy-

brid class action in which the class claimed a "right in a common fund or in common property." *Pennsylvania Co. for Ins. on Lives and Granting Annuities v. Deckert,* 123 F.2d 979, 983 (3d Cir.1941); 2 Barron & Holzoff, *Federal Practice and Procedure* § 562.2, at 272 (1961); *see Van Gemert v. Boeing Co.,* 259 F.Supp. 125, 129 (S.D.N.Y.1966). In 1966, Rule 23 was amended and augmented to its present form, providing greater reach to grow and change in response to changing social and legal needs.

■ Concerns about equity, fairness and judicial efficiency clearly implicate the use of the class action in the mass tort situation. Yet, since the 1966 revision of Rule 23, some courts have been reluctant to certify such class actions. Many district courts that have certified mass tort classes encountered resistance and obstacles from the courts of appeals. Much of this caution stems from comments of the Advisory Committee:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Fed.R.Civ.P. 23 advisory committee notes 39 F.R.D. 69, 103 (1966).

These comments of the Advisory Committee reflect the traditional wisdom that the nature of a personal injury suit with its concomitant private implications militated against the desirability of class treatment in mass tort cases. *See, e.g., Hobbs v. Northeast Airlines Inc.,* 50 F.R.D. 76, 78 (E.D.Pa.1970); *Causey v. Pan American World Airways,* 66 F.R.D. 392 (E.D.Va. 1975); *see also Yandle v. PPG Indus.,* 65 F.R.D. 566 (E.D.Tex.1974) (noting "general feeling that when personal injuries are involved each person should have the right to prosecute his own claim and be represented by the lawyer of his choice"). The comments also generated concern in some courts that class treatment of mass accidents encouraged unethical solicitation. *See, e.g., Hobbs,* 50 F.R.D. at 78 ("use of the class action device in personal injury litigation seems to contain at least the suggestion of improper claim solicitation"); *Hernandez v. Motor Vessel Skyward,* 61 F.R.D. 558, 559 (S.D.Fla.1973) ("aware of potential for abuse that exists whenever a class action arises"), *aff'd mem.,* 507 F.2d 1278 (5th Cir.1975). Finally, the complexity and choice of law problems that arise in multistate class actions deterred some courts from employing the device in mass tort cases. *See, e.g., Causey,* 66 F.R.D. at 398 (only two putative class members had sufficient contacts with forum state); *cf. Bentkowski v. Marfuerza Compania Maritima, SA,* 70 F.R.D. 401, 405 (E.D.Pa. 1976) (distinguished food poisoning case from airplane crash disaster case).

Despite these difficulties, the years immediately following passage of amended Rule 23 witnessed some successful efforts to obtain the benefits of class actions in mass disasters. Early certifications under 23(b)(1) demonstrated the possible efficiency, speed and broad relief that can be afforded through class treatment. *See American Trading and Prod. Corp. v. Fischbach & Moore, Inc.,* 47 F.R.D. 155, 148 (N.D.Ill.1969) (1200 tort claims for fire at McCormick Place convention center); *Hernandez,* 61 F.R.D. at 560–62 (655 personal injury claims of passengers due to contaminated water on board ship); *Hall v. Union Oil Co.,* No. 69–889–ALS (C.D.Cal. 1969) (3000 victims of Santa Barbara, California oil spill); *Coburn v. 4–R Corp.,* 77 F.R.D. 43, 46 (E.D.Ky.1977) (164 deaths or injuries resulting from fire in nightclub); *Bentkowski,* 70 F.R.D. at 405 (food poisoning of 200 passengers); *Ouellette v. Int'l Paper,* 86 F.R.D. 476 (D.Vt.1980) (400 pollution victims), *aff'd,* 776 F.2d 55 (2d Cir. 1985), *aff'd in part, rev'd in part,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). *See also Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 563 (2d Cir.1968) (Rule 23 should be given "liberal rather than a restrictive interpretation"), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

In certifying a class action under Rule 23(b)(1)(A), (B) and (b)(2) in a case arising out of a plane crash, one court, subsequently reversed on appeal, stated unequivocally

> that, notwithstanding ... the notes of the advisory committee ... the plain language of F.R.Civ.P. 23 was devised for just such a situation as this. If that rule was not intended to cover Tort actions or death actions in crash cases, or any kind of a mass Tort, it would have been simple enough to say so in the text of the rule. But the rule is very broad in its language so as to permit the courts to eliminate repetitive and burdensome litigation.

*In re Gabel*, 350 F.Supp. 624, 627 (C.D.Cal. 1972), *vacated sub nom. McDonnell Douglas Corp. v. United States Dist. Court*, 523 F.2d 1083 (9th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

There is some doubt about the intended scope of the Advisory committee comment. It specifically addressed common question Rule 23(b)(3) class actions. Moreover, the secondary source relied upon was obviously out-of-date and myopic. *See* Notes of 1966 revisors to Subdivision (b)(3) referring to 9 Buffalo L.Rev. at 469. The (b)(3) provision offers litigants the option of pursuing their claims in a unified proceeding merely because their claims share legal and factual allegations. *See* Fed.R.Civ.P. 23(b)(3). To satisfy 23(b)(3), the movant must not only demonstrate that the common questions predominate, but also that the class device will provide a superior method for fair and efficient adjudication of the controversy. *See* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv.L.Rev. 356, 389–90 (1967). Considerations pertinent to the latter finding include the class members' interest in individual control over the litigation, the extent and nature of litigation already commenced, the desirability of concentrating litigation in a particular forum, and the difficulties to be encountered in managing the class action. *Id.; see Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 567 (2d Cir.1968), *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

These factors are enumerated in an effort to ascertain the ultimate benefit of proceeding as a class in common question actions. Similar considerations do not govern certification of a class action pursuant to Rule 23(b)(1)(B). When the proceeding is predicated upon the existence of a limited finite fund, individual litigants face potential prejudice to their rights and ability to recover if the claims proceed separately. *See generally* 7B C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1783 (2d ed. 1986); Miller and Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1, 44 n. 307 (1986). As a result there is greater coherence and nexus among claimants in (b)(1) class actions. This distinction has led commentators to suggest that the Advisory Committee Notes recommending against class treatment for mass disasters might not apply with equal force to such cases. *Id.; see also* 3B J. Moore, *Federal Practice* § 23.45[2], at 23–324, 23–325 (2d ed. 1980) (certification appropriate, despite notes of Advisory Committee, if claimants brought together "more by mutual interest in the settlement of common questions than it is divided by the individual members' interest in matters peculiar to them"). Certification is appropriate if class members are "seeking to remedy a common legal grievance." *Id.* at 23–332.

Although the comments suggest that a mass accident is ordinarily inappropriate for a class action, courts heeding this advice have failed to distinguish between mass accidents and mass product liability torts. *See* Williams, *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323, 324 n. 1 (1983). Use of the phrase "mass accident" indicates that in evaluating the propriety of class actions, the Advisory Committee focused on events such as airplane crashes. Though tragic, such one-time occurrences generally affect a finite number of people. In contrast, product liability and mass toxic torts typically involve injuries to significantly greater

numbers of people—sometimes numbering in the hundreds of thousands. *See In re A.H. Robins Co.*, 880 F.2d 709, 725 (4th Cir.) (product defects generate more cases than single-incident accidents), *cert. denied*, — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). Rather than causing injury as a result of a single event, mass torts often inflict harm over a period of time through multiple events experienced by geographically dispersed persons.

The specialized bar has enabled the mass accident cases, such as airplane crashes, to be handled on a de facto consolidated basis with the aid of the Multidistrict Panel at relatively low transaction costs. *See J. Kakalick & E. King, Costs and Compensation Paid in Aviation Accident Litigation* (Inst.Civ.Justice, Rand Corp.1988) (of total expenditures per death case, plaintiffs took home 71% in net compensation and 29% went toward transaction costs). Ensuing litigation, while burdensome, does not threaten to bankrupt the judicial system in the same fashion as megamass toxic tort and product liability disasters. *See id.* In noting the general inapplicability of class actions, the Advisory Committee could not have anticipated the mass tort litigation that has proliferated in recent years. *See* Mullenix, *Class Resolution of the Mass Tort Case: A Proposed Federal Procedure Act*, 64 Tex.L.Rev. 1039, 1062–63 (1986).

Despite the potentially narrow implications of the Advisory Committee's Note, some courts have applied it broadly and reflexively refusing to certify a class in any mass tort litigation. *See, e.g., In re Federal Skywalk Cases*, 680 F.2d 1175, 1189 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); *In re Northern Dist. of California Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 852–53 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *Mertens v. Abbott Laboratories*, 99 F.R.D. 38, 41–42 (D.N.H.1983); *In re Three Mile Island Litig.*, 87 F.R.D. 433, 442 (M.D.Pa.1980); *Vincent v. Hughes Air West*, 557 F.2d 759, 767 (9th Cir.1977); *Yandle v. PPG Indus.*, 65 F.R.D. 566, 570 (E.D.Tex.1974); *Boring v. Medusa Port-*

*land Cement Co.*, 63 F.R.D. 78, 83–84 (M.D.Pa.1974).

While the initial trend appeared to preclude the use of class actions in mass torts, the overwhelming burden of these cases in the twenty years since the Advisory Notes were published has revived efforts to utilize the device to fashion equitable and efficient remedies. As one class action authority explained:

Historically, classes in the mass tort field have largely been denied, based on assumptions made in early decisions which were never adequately challenged. Mass torts in modern-day jurisprudence are taking a fresh look at the value of Rule 23 class actions. The economies of time, effort, and expense of the class device cut across categorical tort lines and ought not to be obscured by the narrow application of circumstances or by undue emphasis on traditional interests in one-to-one litigation.

3 H. Newberg, *Newberg on Class Actions* § 17.06, at 373 (2d ed. 1985). *See also Manual for Complex Litigation, Second* § 33.24 (1985). Professor Wright forcefully explained the need to reevaluate the emphasis on traditional values preserved by individual adjudication:

I was an ex officio member of the Advisory Committee on Civil Rules when Rule 23 was amended, which came out with an Advisory Committee Note saying that mass torts are inappropriate for class certification. I thought then that was true. I am profoundly convinced now that is untrue. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of the mass repetitive wrong that we see in this case and so many others that have been mentioned this morning and afternoon.

Prof. C. Wright, *In re: School Asbestos Litig.*, Master File 83–0268, Class Action Argument, Tr. 106 (E.D.Pa. July 30, 1984).

Many leading commentators have agreed that the purpose underlying Rule 23 can be achieved in mass torts situations. According to Professor Moore's treatise:

Mass accidents appear peculiarly appropriate for class treatment. Indeed, the question of liability to all those injured in a plane or train crash is more likely to be uniform than that of liability for manipulation of the price of securities; with the introduction of such large scale public transportation facilities as the 'jumbo jets,' the ability to determine liability for an accident in one proceeding will be even more desirable.

3B J. Moore, *Moore's Federal Practice* ¶ 23.45, at 23–353 to 23–354 n. 40 (2d ed. 1982). *See also* 7B C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1783, at 71–76 (2d ed. 1986) (argument for class action treatment particularly strong in cases arising out of mass disasters such as airplane crashes where there is little chance of individual defenses). *But see* Trangsrud, *Joinder Alternatives in Mass Tort Litigation,* 70 Corn.L.Rev. 779 (1985) (opposing use of class actions for mass torts).

Courts have recently been more receptive to the use of class action in mass tort litigation. *See, e.g., In re A.H. Robins Co.,* 880 F.2d 709, 740–49 (4th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *In re School Asbestos Litig.,* 789 F.2d 996, 1009 (3d Cir.) ("the trend has been for courts to be more receptive to use of the class action in mass tort litigation"), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); *Jenkins v. Raymark Indus.,* 782 F.2d 468, 473 (5th Cir.1986); *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 149 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). In *Jenkins,* the Fifth Circuit succinctly explained

Judge Parker's [class action] plan is clearly superior to the alternative of repeating, hundreds of times over, the litigation of state of the art issues with ... days of the same witnesses, exhibits and issues from trial to trial.

*Jenkins,* 782 F.2d at 473. With respect to the Advisory Committee Note, the Third Circuit declared:

Although the statement continues to be repeated in case law ... there is growing acceptance of the notion that some mass accident situations may be good candidates for class action treatment.

*In re School Asbestos Litig.,* 789 F.2d 996, 1008 (3d Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). In one recent case, *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988), the court approved certification of a class action against a chemical manufacturer for personal injuries and property damage to residents who lived near the corporation's chemical waste burial site. While each plaintiff suffered different damages, the evidence to establish causation, level and duration of contamination, liability and types of injuries were common to the class, warranting certification. *Id.* at 1197. In *A.H. Robins,* the Fourth Circuit, after an extensive discussion tracing the evolution in judicial and academic perception of the wisdom of certifying classes in mass tort cases concluded that a single integrated legal proceeding was necessary for efficient disposition. *In re A.H. Robins Co.,* 880 F.2d 709, 740 (4th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989).

The voluminous literature which the subject has inspired reflects the urgency in developing a more satisfactory and expeditious means for resolving mass tort claims. *See, e.g.,* Nielson, *Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation,* 25 Harv.J.Legis. 461 (1988); Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 Ind.L.J. 561 (1987); Wright & Colussi, *The Successful Use of the Class Action Device in the Management of the Skywalk Tort Litigation,* 52 U.M.K.C.L.Rev. 141 (1984); Williams, *Mass Tort Class Actions: Going, Going, Gone?,* 98 F.R.D. 323 (1983); 7B C. Wright & A. Miller, *Federal Practice and Procedure* § 1783 (2d ed. 1986); Note, *Class Certification in Mass Accident Cases Under Rule 23(b)(1),* 96 Harv.L.Rev. 114 (1983). Some of the unassailable findings illuminated in these writings bear repetition here.

Professor Arthur Miller teaches us:

It is important in understanding the class action debate to realize that the "big case" phenomenon transcends the class action. The "big case" is an inevitable by-product of the mass character of contemporary American society and the complexity of today's substantive regulations. It is a problem that would confront us whether or not rule 23 existed. Indeed, it is becoming increasingly obvious that the notion of civil litigation as merely bilateral private dispute resolution is outmoded. Since our conception of the roles of judges and advocates is based on this traditional view, the ferocious attack on the class action may reflect anxiety over the growing challenge to the model's immutability.

Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem"*, 92 Harv.L.Rev. 664, 668 (1977). Mr. Newberg has explained the evolution in thinking as follows:

Two benchmarks herald the arrival of mass tort class actions. First, the emerging judicial acceptance of class suits involving mass torts is undoubtedly the result of cumulative effects of mass production, with its attendant imperfections, in the context of a growing population and a court system with finite growth dimensions. The other arises from a single event—the Johns–Manville bankruptcy proceedings....

Many courts are now abandoning their historic reluctance to certify mass tort class actions in light of what is often an overwhelming need to create an orderly, efficient means for adjudicating hundreds or thousands of related claims.

Newberg, "Mass Tort Class Actions," *Trial* 53 (Feb.1986).

Due to the procedural complexities of class actions, they are processed in a highly varied and individualistic fashion. "Every rule 23 decision, therefore, must be viewed through the prism of its particular facts, some of which may not even appear in the court's opinion." Miller, *Of Frankenstein Monsters and Shining Knights*, 92 Harv. L.Rev. 664, 668, 677 (1977). The American

Law Institute Complex Litigation Project prepared a paper on class actions for discussion which stated:

Despite Rule 23's ambitious goals, multiparty, multiforum cases often are not certified for class treatment because its requirements have been read quite restrictively by some federal courts. Large scale tort actions involving personal injuries rarely are certified. In the past, this may be due primarily to the federal courts' reliance on the statement in the 1966 Advisory Committee Note.... Although this reasoning may be criticized as shortsighted, it nonetheless has been influential. In addition, concern about how to handle individual issues and large numbers of claimants have served to restrict class certification in nationwide products liability cases, as well as in consumer, securities, and antitrust actions. Recent years, however, have seen some weakening in the resistance to the certification of mass tort class actions ... Nonetheless, the full procedural advantages of class actions have not been realized.... Several commentators have decried the courts' narrow approach to the Rule, arguing it should be interpreted more broadly to achieve unitary adjudication.

American Law Institute, *Complex Litigation Project Tent. Draft No. 1*, at 36–37 (1989).

Many equitable goals are served by class treatment of mass tort claims. First, separate litigation of numerous similar claims entails enormous transaction costs. Joint litigation eliminates duplicative effort on behalf of plaintiffs, conserves scarce judicial resources and minimizes the difficulty of defending in several forums simultaneously. For example, discovery is broader for plaintiffs in class suits, but if the procedures are coordinated defendants will only have to respond to one cumulative production request. *See Manual for Complex Litigation, Second* § 1.94 (1985). In turn, unified discovery can lead to more efficient and economical pretrial proceedings. *See* 3 H. Newberg, *Newberg on Class Actions* § 17.03, at 367 (2d ed. 1985). The reduction in costs almost certainly will

lead to a higher percentage of net compensation for the injured plaintiffs.

Second, distribution of the total recovery among those injured will be more equitable if accomplished as a class action. Individual adjudication encourages the race to sue so prevalent in asbestos litigation. This produces inconsistencies among similarly situated claimants both in amount of compensation received based on disease suffered and in timing of recovery. The unprincipled and inequitable allocation of punitive damages, in some instances at the expense of other deserving claimants receiving compensatory damages, also warrants class treatment in some situations.

Third, class treatment helps to equalize the bargaining power of plaintiffs and defendants. This in turn may enhance possibilities for settlement of the case, accomplishing an expeditious and just result with great savings. *See In re A.H. Robins Co.*, 880 F.2d 709, 738–40 (4th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (" 'proper' in determining certification to consider whether such certification will foster settlement of the case with advantage to the parties and with great savings in judicial time and services"). Some courts have approved classes explicitly for the purposes of pursuing possible settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 72–73 (2d Cir.1982). Judge Friendly explained:

> The hallmark of Rule 23 is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies. Temporary settlement classes have proved quite useful in resolving major class action disputes. While their use may still be controversial, most Courts have recognized their utility and have authorized the parties to seek to compromise their differences, including class action issues through this means.

*Id.* This court has emphasized that it "may not ignore the real world of dispute resolution.... [A] classwide finding of causation may serve to resolve the claims of individual members ... by en-

hancing the possibility of settlement among the parties...."

*In re Agent Orange Prod. Liab. Litig.*, 100 F.R.D. 718, 723 (E.D.N.Y.1983), *aff'd*, 818 F.2d 145, 166–67 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). The Third Circuit similarly declared:

> [M]ost mass tort cases settle, and the preliminary maneuvering in litigation today are designed as much, if not more, for settlement purposes than for trial. Settlements of class actions often result in savings for all concerned.

*In re School Asbestos Litig.*, 789 F.2d 996, 1009 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). *See also In re First Commodity Corp.*, 119 F.R.D. 301, 306–08 (D.Mass.1987); *In re Mid–Atlantic Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1388–90 (D.Md.1983). *But see In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305 (6th Cir.1984).

After the Eighth Circuit vacated a mandatory certification in the *Skywalk* litigation, two voluntary class actions were certified and settled in the federal and state courts. *See In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). As a persuasive article explained,

> certification and settlement of those two voluntary class actions performed the same management function and permitted the claims of all litigants to be resolved in the same equitable and efficient manner that would have resulted if the mandatory class action had not been vacated.

Wright & Colussi, *The Successful Use of the Class Action Device in the Management of the Skywalk Mass Tort Litigation*, 52 U.M.K.C.L.Rev. 141, 141–43 (1984).

Fourth, class treatment enables the court to exercise greater control over the transaction costs associated with massive complex tort litigation, particularly attorneys' fees. In the absence of a class action—where appointed representative counsel is paid a reasonable hourly rate out of the total recovery or settlement fund—attorneys who represent multiple victims in a

mass disaster charge multiple contingencies without regard to the amount of time spent on each case. *See In re Federal Skywalk Cases*, 98 F.R.D. 462, 463 (W.D.Mo.1983) ("attorneys who represent some victims [not part of class action] are receiving multiple contingency fees, the sum of which greatly exceeds any reasonably justifiable fee for the amount of time actually spent earning the fee"). In contrast, a district court through a one-time award for all work performed on behalf of the entire class preserves assets for compensation. *Id.; see also Jenkins v. Raymark Indus.*, 782 F.2d 468, 473 (5th Cir. 1986) (attorneys fees for all parties greatly reduced by class treatment both by elimination of trial time and control of fees collected from all members of plaintiffs class by judge). For example, in *Jenkins*, Judge Parker limited plaintiffs' class counsel to a twenty percent contingency fee which, while substantial in amount, represented a tremendous savings from the traditional fee collected in asbestos cases. *See id.* at 473. Attorneys' fees and other litigation expenses devour approximately two-thirds of the total expenditures in asbestos cases. *See* D. Hensler, W. Felstiner, M. Selvin & P. Ebener, *Asbestos in the Courts: The Challenge of Mass Toxic Torts* (Inst.Civ.Justice, Rand Corp.1985). The experience of the courts is that, when direct and indirect transactional costs are taken into account, these costs amount to some 70% of money available for compensation.

Fifth, class treatment better serves tort goals of uniformity and deterrence. As one commentator noted:

Two goals of tort law should be predictability and uniformity.... But if various factfinders reach inconsistent conclusions about the *same* set of facts, the defendant (and others in similar circumstances) is left without any guidance concerning the legality of its conduct, which may serve important legitimate aims.... But defendants and plaintiffs alike have interests in consistent liability determinations, interests that can and should be addressed.

Note, *Class Certification in Mass Accident Cases Under Rule 23(b)(1)*, 96 Harv. L.Rev. 1143, 1154–55 (1983) (emphasis in original). In fact, each of the Circuit Courts that have reversed mandatory certifications in mass tort cases have explicitly limited the holding to the facts of the particular case and reserved the possibility that future classes might be appropriate. *See, e.g., In re Temple*, 851 F.2d 1269, 1273 n. 7 (11th Cir.1988) (expressly disclaiming any holding that "a products liability or mass accident suit could *never* be the subject of a class action") (emphasis added); *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305–07 (6th Cir.1984) (alluding to precedent for certification pursuant to Rule 23(b)(1)(B) but absence of findings of limited fund erroneous as matter of law; limited holding to "situation presented by this case"); *In re Northern Dist. of California Dalkon Shield IUD Litig.*, 693 F.2d 847, 853 (9th Cir.1982) (noting that mass torts caused by a single transaction, *i.e.*, a plane crash, might be proper subject of a class action), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

Under the traditional framework of case-by-case adjudication, there is a real danger that victims suffering severe or fatal injuries may not receive substantial compensation from the Trust while others with less serious injuries absorb disproportionate shares of scarce funds. In such situations, those injured face potential prejudice to their claims if they proceed by individual lawsuits. The circumstances of this unique mass tort asbestos case enhance the desirability of certification. *See In re Joint Eastern and Southern Dists. Asbestos Litig. (Eagle–Picher)*, 134 F.R.D. 32 (E. & S.D.N.Y.1990); *In re Joint Eastern and Southern Dists. Asbestos Litig. (Eagle–Picher)*, 133 F.R.D. 425 (E. & S.D.N.Y.1990); *In re Joint Eastern and Southern Dists. Asbestos Litig. (Eagle–Picher)*, 132 F.R.D. 332 (E. & S.D.N.Y.1990).

**B. Asbestos Litigation: A Unique Mass Tort**

Litigation arising from exposure to asbestos transcends prior experience and redefines the phenomenon of mass torts.

The nature of asbestos cases account for much of their unique posture in our legal system including the latency of disease, the clear causation of injury, the number of exposed individuals during an extended and intense period of use, and the prior knowledge of danger on the part of manufacturers.

In the Dalkon Shield litigation numerous claimants processed claims in response to notice of the bankruptcy proceedings of A.H. Robins. The injuries, while serious, were generally not life-threatening and progressive.

With Agent Orange, the extent of injury actually caused by exposure to the herbicides was doubtful. In contrast, asbestos has propelled tens of thousands of persons, many suffering from fatal diseases, to turn to the tort system.

The extent of individual tort litigation arising from asbestos exposure is unparalleled in American tort law. *See Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *Racich v. Celotex Corp.*, 887 F.2d 393, 394 (2d Cir.1989); *In re School Asbestos Litig.*, 789 F.2d 996, 1000 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). As early as 1981, the Fifth Circuit emphasized "there is an urgent need for new approaches to the national tragedy of asbestos-related disease." *Migues v. Fibreboard Corp.*, 662 F.2d 1182, 1189 (5th Cir. 1981). In 1986, the Fifth Circuit noted that "because asbestos-related diseases will continue to manifest themselves for the next fifteen years, filings will continue at a steady rate until the year 2000." *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir.1986). *Jenkins* underestimated the cutoff date; it will surely extend well into the 21st century.

An extensive body of literature has documented the dimensions of asbestos litigation, its costs and the resulting fiscal problems faced by plaintiffs and defendants. *See, e.g.*, T. Willging, *Trends in Asbestos Litigation* (Federal Judicial Center 1987); D. Hensler, W. Felstiner, M. Selvin & P. Ebener, *Asbestos in the Courts: The Challenge of Mass Toxic Torts* (Inst. Civ. Justice, Rand Corp.1985); T. Willging, *Asbestos Case Management: Pretrial and Trial Procedures* (Federal Judicial Center 1985); J. Kakalik, P. Ebener, W. Felstiner, G. Haggstrom & M. Shanley, *Costs of Asbestos Litigation* (Inst. Civ. Justice, Rand Corp.1984); Kakalik, Ebener, Felstiner, Haggstrom & Shanley, *Variation in Asbestos Litigation, Compensation and Expenses* (Inst. Civ. Justice, Rand Corp.1984); Harris, *Asbestos Chapter 11 "Solution" to the Tort Litigation System* in *Recent Developments in Tort Law Reform*, 39 The Business Lawyer 209 (Johnson ed.1983); Locks, *Asbestos–Related Disease Litigation: Can the Beast Be Tamed?*, 28 Vill. L.Rev. 1184 (1983); Phillips, *Asbestos Litigation: The Test of the Tort System*, 36 Ark.L.Rev. 343 (1983); Special Project, *An Analysis of the Legal, Social and Political Issues Raised by the Asbestos Litigation*, 36 Vand.L.Rev. 573 (1983).

The situation continues to deteriorate. We return to this problem of a need for an overall solution in the context of the settlement at Part IX.A, *infra*. Despite an overall decrease in civil filings, there was a dramatic increase in the number of asbestos personal injury product liability filings in 1990. The new number of asbestos cases soared from 8,230 in 1989 to 13,687 in 1990 (a 66 percent increase). Judicial Admin. Office, *Asbestos Cases Filed, Terminated and Pending in United States District Courts* (June 30, 1990). A total of 33,182 cases were pending in the federal courts alone as of June 30, 1990. Moreover, over 7,000 asbestos cases have been pending for two to three years. *Court Administration Bulletin* 2 (Oct.1990) (publication of Administrative Office of the United States Courts). Despite the large number of cases terminated in the last two years and extensive efforts to increase efficiency and devote substantial resources to asbestos cases, the number of unresolved cases continues to escalate.

The extraordinary proportions of the asbestos problem led the Chief Justice of the United States on September 27, 1990 to appoint a committee to address "the mas-

sive and complex issues involved with asbestos litigation" and suggest possible solutions. News Release, "Committee To Study Asbestos Litigation Formed" (Sept. 27, 1990). *See* discussion on need for an overall solution in Part IX.A, *infra.*

The Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation took the highly unusual step of endorsing, albeit in principle, specific legislative proposals to alleviate the burden on the courts or enact provisions that would empower the courts to handle the thousands of cases in an expeditious and more equitable manner than the present state-by-state crazyquilt approach. Judicial Conference Asbestos Report at 27, 36 (1991).

The national dimensions of the asbestos problem has generated multiple calls for congressional action. Extensive and thoughtful commentary has advocated federal legislation to overcome some of the objections to current methods for handling mass tort litigation, particularly asbestos cases. *See, e.g.,* American Law Institute, *Compensation and Liability for Product and Process Injuries* Final Report, Prelim. Draft No. 3, (Aug. 1990); Note, *Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 To Allow More Frequent Use of Class Actions in Mass Tort Litigation,* 25 Harv.J.Legis. 461 (1988); Mullenix, *Class Resolution of the Mass Tort Cases: A Proposed Federal Procedure Act,* 64 Tex.L.Rev. 1039 (1986); Williams, *Mass Tort Class Actions: Going, Going, Gone?,* 98 F.R.D. 323 (1983). *See also* Feinberg, *No: Courts are on Course,* ABA Journal 413 (May 1991); Feinberg, *Do Mass Torts Belong in the Courtroom,* 74 Judicature 237 (Feb. 1991) (in absence of congressional action courts must grapple with problems raised by mass torts).

Although the subject has attracted the attention of individual representatives and senators, no legislation has garnered requisite support for enactment. Congress has considered several proposals to address the widespread problems resulting from the massive exposure to asbestos. *See, e.g.,* Occupational Disease Compensation Act of 1985, H.R. 3090, 99th Cong., 1st Sess.

(1985); Asbestos Workers Recovery Act of 1985, H.R. 1626, 99th Cong., 1st Sess. (1985) (identical companion bill S. 1265); Asbestos Workers Recovery Act of 1984, S. 2708, 98th Cong., 2d Sess. (1984); Product Liability Act, S. 44, 98th Cong., 1st Sess. (1983); Occupational Disease Compensation Act of 1983, H.R. 3175, 98th Cong., 1st Sess. (1983).

While none of these proposal were enacted into law, Congress did amend the Longshoremen's and Harbor Workers' Compensation Act with respect to claims related to occupational diseases, including claims arising out of exposure to asbestos. *See* Longshore and Harbor Workers' Compensation Act of 1984, Pub.L. No. 98–426, 98 Stat. 1639. A bill providing federal district courts with original jurisdiction in mass tort cases in which at least twenty-five persons sustained injuries resulting in damages in excess of $50,000 each recently passed the House of Representatives. Multiparty, Multiforum Jurisdiction Act, H.R. 3406, 101st Cong., 1st Sess. (1989). As already noted, the Judicial Conference of the United States has drafted a fourteen-point Plan for handling the problem of cost and delay in civil litigation. *See Judicial Conference Approves Plan to Improve Civil Case Management,* 22 The Third Branch 1 (May 1990); *see also* Judicial Improvement Act of 1990, S. 2648, 102nd Cong., 1st Sess. (1990) (attempting to address problems of case management in complex litigation).

The Federal Courts Study Committee chartered by Congress, including members appointed by the Chief Justice, recently issued a report that recommended that Congress amend the multidistrict litigation legislation to permit consolidation for trial as well as—its current provisions—for pretrial proceedings. Other changes would enable related state and federal cases to be consolidated in the federal courts. *Report of the Federal Courts Study Committee* 44 (Apr. 2, 1990).

As yet another indication of the condition faced by the courts, despite five prior refusals to consolidate asbestos personal injury cases pursuant to section 1407, the Judi-

cial Panel on Multidistrict Litigation has decided to revisit the question. The panel issued an Order to Show Cause on January 17, 1991. It ordered all parties in asbestos cases pending in federal courts to show cause why the actions should not be transferred to a single district for coordinated or consolidated pretrial proceedings. *See In re Asbestos Prod. Liab. Litig.*, MDL–875, 2 (J.P.M.L., Jan. 17, 1991). The Panel explained its actions as follows:

> Our goals here are to utilize Section 1407 in order to streamline the common questions in this litigation to the greatest extent possible; to eliminate duplication and overlap; to encourage a uniform case management plan; to allow for division of responsibility among the assigned judges; to provide a mechanism for the transferee judges to fully explore the uniform use of dispositive techniques (such as (a) classes and subclasses under Fed.R.Civ.P. Rule 23, (b) pleural registries, (c) separately consolidated pretrial or trial on any common issues or claims; and (d) separated or reverse trials on various issues); to focus the circuit appellate process regarding centralized rulings; to provide a method whereby repetition in newly filed actions is eliminated; to provide a focal point to facilitate coordination with the mammoth number of asbestos actions pending in state courts; and, most importantly, to better implement Rule 1's edict to secure the just, speedy and inexpensive determination of federal litigation.

*Id.* A full day hearing was conducted by the Panel on May 30, 1991.

In addition to these efforts, committees of federal judges and state judges handling large numbers of asbestos cases have met and begun to structure means for coordinated efforts. In particular, these judges seek to share information and innovative management tools devised and utilized with some success by various judges. This level of inter- and intra-judicial cooperation on a statewide and national level is also almost unprecedented.

Slowly, a broad consensus has evolved in favor of new initiatives to cope with mass tort cases generally, and asbestos cases in particular. Continuous efforts by judges and lawyers have been underway to devise mechanisms which will avoid the repetitious, inefficient and time-consuming retrial of the same issues again and again in hundreds of courtrooms nationwide. *See, e.g.,* Special Master's Report, *Cimino v. Raymark Indus.*, No. 86–0456 (E.D.Tex. Sept. 20, 1990) (it is "self-evident that the use of individual one-by-one trials is not an option in the asbestos cases").

Some current individual efforts serve as examples of the varied approaches courts have devised in attempts to cope with asbestos litigation. In Jackson, Mississippi, Circuit Judge Darwin Maples recently entered an order consolidating roughly 10,000 cases filed in state and federal courts in Mississippi for discovery and trial of common issues including product defect, negligence, knowledge of asbestos health effects, disease categories, defenses, compensatory damages for each disease category and punitive damages as a multiplier against compensatory damages. Memorandum and Order, *Abrams v. GAF Corp.*, No. 88–5422(1) (Cir.Ct.Miss. Dec. 20, 1990) (Cohen Aff., Exhibit T). Prior to the Order, only one Mississippi asbestos case had been tried, in 1982, and relatively few cases had settled. This led Judge Maples to declare,

> the number of cases filed has far exceeded the Courts' abilities to resolve them by conventional means.... The number of individual asbestos cases presents Mississippi jurisprudence with unprecedented difficulties. There are no rules of procedure or other judicial devices that specifically lend themselves to resolving such numbers.

*Id.* at 2–3. In elaborating on the troublesome situation, the court explained:

> Mindful of the similarities and characteristics of the cases on its own docket as well as the techniques used by other courts in attempting to solve the unique problems presented by this litigation, this Court is convinced of two things: Conventional, one-by-one trials lasting several weeks, endlessly trying and retrying the same issues for each plaintiffs, are

not an option. There are wholly inadequate judicial resources, and the time required to try the cases would exceed the life spans of even the younger plaintiffs. Such an approach would be an abdication of judicial responsibility and deprive most of the plaintiffs of their rights to due process of law. Conversely, as the defendants have argued, there may be enough individual issues to make it unfair to the defendants to bind them on every issue in a single class action style trial.

*Id.* at 4.

A similar trial will commence shortly in Maryland involving some 9000 cases under Judge Marshall A. Levin of the Baltimore City Circuit Court. Judge Levin has been a leader in coordinating the work of state and federal judges.

Chief Judge Robert E. Parker of the Eastern District of Texas has espoused class actions. He has also suggested a unique sampling technique, applying individual damage awards on a statistical extrapolated basis to a large class of cases. *See Cimino v. Raymark Indus.,* 751 F.Supp. 649 (E.D.Tex.1990).

The United States District Courts for the Eastern and Southern Districts of New York in conjunction with the New York Supreme Court has consolidated over 600 federal and state cases emanating from exposure to asbestos in the Brooklyn Navy Yard. *See* Case Management Order Amendment No. 7, *In re Joint Eastern and Southern Dists. Asbestos Litig. & In re New York City Asbestos Litigation* No. 4000 (E. & S.D.N.Y. Jan. 10, 1990); Order Setting Down Joint Trials, *In re Joint Eastern and Southern Dists. Asbestos Litig. & In re New York City Asbestos Litig.,* No. 4000 (E. & S.D.N.Y. June 1, 1990). Although initially scheduled for a joint state-federal trial, last minute settlements with many defendants obviated the need for trial consolidation. Nevertheless multiple mass trials of as many as 64 plaintiffs against many defendants were utilized together with settlement-master techniques under Special Master Kenneth R. Feinberg to clear the federal calendar and much of the state docket of these Navy Yard cases which had their genesis in World War II.

700 powerhouse cases pending in the Eastern and Southern District Courts of New York have been consolidated by Judge Charles P. Sifton of the Eastern District of New York for trial and for settlement with the aid of Special Master Kenneth R. Feinberg. 48 of these cases are on trial using reverse bifurcation techniques. Some 350 private shipyard and construction cases in the Eastern and Southern Districts of New York are being transferred for trial and settlement before Judge Robert W. Sweet of the Southern District of New York. As a result of these and the Brooklyn Navy Yard consolidations, statewide settlements, including all four districts in New York against a number of defendants have been arranged.

State and federal judges in New York are now consulting on a statewide basis with leaders of the plaintiffs' and defendants' bars on methods of avoiding individual trials. Stipulations on issues, plus alternative dispute resolution techniques for fixing damages are being discussed. A serious problem is the defendants' need to control the tempo of dispositions so that the drain on their funds is spread over time. Chief Judge Michael A. Telesca of Western District of N.Y. is developing a district-wide approach along these lines.

As the Fifth Circuit has noted,
> the juggernaut of modern technology has repeatedly given life to new concepts in our torts jurisprudence and procedure ... Old citadels of jurisprudence have [been] demolished, modified, and refined to meet the needs of a rapidly changing industrial society; one which confers on its members both benefits and burdens previously unimaginable....

*Migues v. Fibreboard Corp.,* 662 F.2d 1182, 1189 (5th Cir.1981).

The time has arrived to attempt to grapple with the problem, cognizant of its scope and the limitations of the federal courts to single-handedly accomplish a just resolution on a case-by-case basis. Creative efforts for a fair, efficient and economical adjudication of asbestos cases must be pur-

sued by the courts in the absence of legislative assistance. To deprive the courts of the aid of the class action, where appropriate, would be to require them to approach this Herculean task with one hand shackled. Rule 23(b)(1)(B) offers a major tool for dealing with the many defendants whose assets and number of cases bring them well within the category of a limited fund. *Cf.* Appendix C, attached.

In the context of the Manville Trust, the goal is delicately to balance the Trust's need for cash with its long-term interests in the viability of Manville and simultaneously to establish an equitable distribution plan. Any such scheme must maximize existing and expected funds, shorten the amount of time asbestos victims must wait to receive compensation, and curtail the amount of funds devoured by transaction costs. Unlike individual litigants and their counsel who are bound to pursue selfish aims, the courts must weigh the collective interests of all present and prospective parties and adopt the approach which seems to safeguard best equality of treatment for all litigants. Many of the objections to class treatment and the Settlement emanate at least in part from a overly-narrow view not only of the realities of continuing to proceed as the Trust has since its creation, but also of the multiple interests that must influence the courts' decision.

Settlement of the Manville Trust difficulties will provide the basis for an integrated administration of funds of the various trusts set up or to be established in the many asbestos bankruptcies across the country. Consolidated administration will result in very large savings as well as more effective attention to the needs of the injured. The Trust under the Settlement is free to join in such cooperative ventures.

### C. Statutory Requirements

 In keeping with the spirit of Rule 23, the courts must adopt a pragmatic approach in their review of the facts presented in any proposed class certification issues. As already noted, the class action was designed to foster judicial economy and efficiency by adjudicating in a unified proceeding, to the extent possible, issues that affect many similarly situated persons. *See Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979). A district court is therefore afforded broad discretion in determining whether an action should be certified under Rule 23. *City of New York v. Int'l Pipe & Ceramics Corp.,* 410 F.2d 295, 298 (2d Cir.1969); 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1759, at 111 (2d ed.1986). Where class litigation seeks to establish procedures that will extend into the future, the class definition must be equally broad. The boundaries of the class are necessitated by the relief sought. *Handschu v. Special Servs. Div.,* 605 F.Supp. 1384, 1389 (S.D.N.Y.1985) ("where class litigation seeks to safeguard broad constitutional rights *in futuro,* the class must be equally broad in scope and time"), *aff'd,* 787 F.2d 828 (2d Cir.1986). As the Fourth Circuit has recently indicated, these principles of flexibility and discretion apply with particular force in the mass tort context. *In re A.H. Robins Co.,* 880 F.2d 709, 744 (4th Cir.), *cert. denied,* ── U.S. ──, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989).

Whether the parties have agreed to a settlement influences the courts' determination of the propriety of class certification. "The requirements under Rule 23 are more easily satisfied in the settlement context than in the more complex litigation context." *In re A.H. Robins Co.,* 85 B.R. 373, 378 (E.D.Va.1988). Certification should be granted where "the need is compelling, and the benefits are substantial." *In re Agent Orange Prod. Liab. Litig.,* 506 F.Supp. 762, 787 (E.D.N.Y.1980). Class treatment in the instant case will achieve economies of time, effort and expense, will promote uniform results among similarly-situated individuals and will protect procedural fairness and substantive rights.

 Regardless of the category of class action pursued under Rule 23(b), it is necessary to decide whether the requirements of 23(a) are satisfied. This subdivision delineates four prerequisites to prosecution of

any class action often summarized as: numerosity, commonality, typicality and adequacy of representation. Fed.R.Civ.P. 23(a). The party seeking certification has the burden of demonstrating that these criteria are satisfied. *See East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 399–405, 97 S.Ct. 1891, 1894–98, 52 L.Ed.2d 453 (1977).

### 1. *Numerosity*

 The Rule provides that the class must be "so numerous that joinder of all members" would be "impracticable." Fed.R.Civ.P. 23(a)(1). The practicability of joining all parties must be evaluated in light of the circumstances of the particular litigation. *General Telegraph Co. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980). The feasibility of joinder is inherently affected by the numerical size of the proposed class, but the party seeking certification need not allege the exact number or identity of every class member to satisfy the numerosity requirement. *See Evan v. United States Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983); 1 H. Newberg, *Newberg on Class Actions*, § 3.06, at 139 (2d ed. 1985). Joinder need not be impossible; a strong showing of hardship and inconvenience is sufficient.

 Joinder is inappropriate as a method of consolidation if the number of litigants would place an untenable burden and cost on the plaintiffs and drain the court's time and resources. *Northwestern Nat'l Bank v. Fox & Co.*, 102 F.R.D. 507, 510 (S.D.N.Y.1984).

What is considered "impractical" is, of course, a subjective determination although the indicia of the number of parties involved, the expediency of joinder and the inconvenience of trying individual suits provide guidance.

*Peil v. National Semiconductor Corp.*, 86 F.R.D. 357, 365 (E.D.Pa.1980). Other relevant factors are whether the class is so large that individual control over the pleading, discovery and litigation strategy is effectively eliminated. *Alexander Grant &*

*Co. v. McAlister*, 116 F.R.D. 583, 586 (S.D.Ohio 1987).

 The class contemplated by the instant proceedings not only encompasses a number of persons too large to join as parties in a single proceeding, but includes a category of exposed persons as yet unknown and not capable of joinder for that reason. The best available estimates indicate that the number of individuals who have already filed claims, or have been exposed to asbestos-containing products and might be expected to assert claims in the foreseeable future ranges in the hundreds of thousands. *See* Appendices A and B, attached. Not only is the full dimension of the class unknown, identifiable members are widely dispersed throughout the country. Joinder would thus cause insurmountable administrative as well as practical difficulties.

Tort claims emanating from exposure to asbestos manufactured or produced by Manville place great burdens on federal and state courts across the country and consolidation of such claims in a single proceeding could only be accomplished in a representative capacity through a class action. *See Cimino v. Raymark Indus.*, 751 F.Supp. 649 (E.D.Tex.1990) (it would take six and one-half years to try asbestos cases pending in Eastern District of Texas if 30 cases were disposed of each month and still leave over 5,000 untouched cases). Injured plaintiffs rarely exert significant control over the pleading, discovery, and litigation strategy in mature mass tort cases such as asbestos. *See* T. Willging, *Trends in Asbestos Litigation* (Federal Judicial Center 1987); *see also In re A.H. Robins Co.*, 880 F.2d 709, 745 (4th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); Williams, *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323, 330 (1983).

The allegations in the class action complaint easily satisfy the joinder prerequisite, and comport with the practical realities of asbestos litigation.

### 2. *Commonality*

 To satisfy 23(a)(2) there must be "questions of law or fact common to the

class." Fed.R.Civ.P. 23(a)(2). Commonality focuses on whether certification will offer a more economical approach to resolving the underlying disputes than would individual litigation. *General Telephone Co. v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) ("the class device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion"). The commonality requirement does not mandate that all class members raise identical claims, only that common issues exist among all the class members. *Port Authority Police Benevolent Ass'n v. Port Authority*, 698 F.2d 150, 153–54 (2d Cir. 1983).

Courts have liberally construed this requirement to mandate a minimum of one common issue among all class members. *See Jenkins v. Raymark Indus.*, 109 F.R.D. 269, 271 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir.1986). *But see In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir.1990) (over 3,000 asbestos cases administered as a unit involved many disparities among various plaintiffs). One authority has explained,

> [w]hen the party opposing class certification has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more elements of that cause of action will be common to all of the persons affected.

1 H. Newberg, *Newberg on Class Actions,* § 3.10, at 154–55 & n. 141 (2d ed.1985); *see Ashe v. Board of Elections*, 124 F.R.D. 45, 48 (E.D.N.Y.1989) (plaintiffs "need only demonstrate common questions of fact or law"). The courts are guided by the observation that the "threshold of commonality is not high." *Jenkins*, 782 F.2d at 472.

■ Class members, each of whom seeks compensation from the Trust resulting from its assumption of Manville's asbestos-related obligations, share a multitude of common issues of fact and law that make certification appropriate. The most fundamental question is whether the procedures by which assets are paid into and distributed from the Trust must be changed to provide equitable compensation to all beneficiaries in light of the inability of the Trust to pay each beneficiary an appropriate share of his or her claim as it becomes due. This overarching issue encompasses subsidiary issues of fact and law including whether New York trust law or the Bankruptcy Code permits the modifications sought in the Trust's distribution process. The factual evidence and legal arguments relevant to these questions envelop the entire class.

In this case, class members' underlying tort allegations relate to a common nucleus of operative facts concerning the defendant's conduct and the nature of harm caused by its asbestos-containing products. Manville claimants assert similar if not identical theories of liability. Personal injury and wrongful death claimants seek to prove that the defendant's asbestos-containing materials were defective under the state of the art in which they were produced. Due to the failure to warn of the health hazards associated with inhalation of asbestos fibers, the question is whether production or distribution of such products was tantamount to negligence and whether Manville fraudulently intended to conceal known risks to end-product users.

Plaintiffs' claims rely upon a common factual predicate including the characteristics of the defendant's products, medical understanding of the effects of asbestos exposure, when and what the defendant knew or should have known of those dangers, the failure to warn or test, and the defendant's concert of action or conspiracy in the formation and adherence to industry practices. Proof on these matters would not vary widely among class members. The district court has tried enough of these cases to be certain that at this stage of the litigation, the common issues have been and will be tried using canned depositions, witnesses, exhibits and briefs. Tedium through repetition is a hallmark of these cases. At the very least, the determination with respect to general causation is common to all class members. *See In re School Asbestos Litig.*, 789 F.2d 996, 1009

(3d Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).

In addition to sharing common factual issues and theories of liability, the plaintiffs' ability to prevail typically turns on resolution of the state of the art defense, a defense asserted against most if not all plaintiffs. Proof to support the state of the art defense involves evidence showing when Manville learned or should have learned, as a manufacturer held to the level of knowledge of an expert, of health risks associated with the use of asbestos products; what steps if any it took to ameliorate the risks; and whether or not its actions in minimizing the risks or failing to do so warrant the imposition of damages. *See George v. Celotex,* 914 F.2d 26 (2d Cir.1990). The centrality of this defense to Manville's liability for injury resulting from asbestos exposure alone satisfies the prerequisite of commonality. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987) (government contractor defense common to class), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988).

The existence of a proposed Settlement, as a practical matter, greatly minimizes the significance of any noncommon issues since they disappear if the court concludes that the compromise is fair, adequate and reasonable. Under such circumstances, individual questions of causation and extent of injuries will be resolved outside of court pursuant to the Settlement and its Trust Distribution Process upon proof of exposure to Manville asbestos-containing products and appropriate medical documentation.

Most significantly, the universe of persons with present and future claims against the Manville Trust share an interest in a unitary disposition that equitably apportions a limited fund among similarly-situated claimants. As a result of the interdependency of the class members' claims against the Trust, "limited fund" classes readily satisfy the commonality requirement. *See* 1 H. Newberg, *Newberg on Class Actions,* § 1.15, at 13 (Supp.1990) (Rule 23(b)(1) actions are more cohesive than common question 23(b)(3) class actions).

3. *Typicality*

Under this subdivision, the claims of representative parties must be typical of those of remaining class members. Fed.R.Civ.P. 23(a)(3). Stated differently, the class representative's causes of action and allegations must resemble those of other members of the class. 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1764 (2d ed. 1986); 3B J. Moore, *Moore's Federal Practice* ¶ 23.06–2 (2d ed. 1987). As one court explained:

> Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981). The actual injury suffered by the class representative may differ in degree from that suffered by other members. *Jenkins v. Raymark Indus.,* 109 F.R.D. 269, 272 (E.D.Tex.1985), *aff'd,* 782 F.2d 468 (5th Cir. 1986); *McQuilken v. A & R Development Corp.,* 576 F.Supp. 1023 (E.D.Pa.1983) (varying damages to landowners' properties caused by construction); *In re Asbestos School Litig.,* 789 F.2d 996 (3d Cir.) (certifying national class action despite differing degrees of damages to school property caused by asbestos abatement), *cert. denied,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). Similarly, the claims of the representatives need not present a precise equivalency of the types of diseases suffered by other class members. *Jenkins,* 109 F.R.D. at 285; *see also Ouellette v. Int'l Paper,* 86 F.R.D. 476, 480 (D.Vt. 1980) ("differences in . . . the ability to prove damages do not vitiate the typicality of a representative's claim"). This aspect of Rule 23(a) looks to the essence of the

representatives' claims and seeks to ensure that absent class members receive adequate protection of their interests. As long as there are no adverse interests between the named plaintiffs and the remaining class members with respect to the subject matter of this litigation, the requirement will be met. *Cf. In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y.1982); *see* 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1764, at 231–33 (2d ed. 1986).

■ In this case, the class representatives allege causes of action and harm that typify the class members' claims. All members of the class are beneficiaries of the Trust each of whom seeks payment from the Trust for harm caused by Manville asbestos, either directly as an injured person or indirectly as a third-party claimant with contribution or indemnification rights. Class representatives, as well as all class members, face the serious—if not certain—risk that without a restructuring of the Trust, they will not receive equitable payments from the Trust commensurate with the extent of their injuries relative to others seeking compensation from the Trust.

The codefendants contend that their interests are in fact inimical to those of plaintiff beneficiaries. In particular, they assert that because these two categories of beneficiaries are engaged in extensive, protracted litigation nationwide, one group's claims cannot typify those of the other group. Because each class representative is a plaintiff beneficiary, codefendants argue that Rule 23(a)(3) criteria are not satisfied.

With respect to this class action, however, in fact all beneficiaries stand in the same position with respect to the Trust. To the extent that codefendants have contribution or indemnification claims against the Trust, they are treated under the Settlement as if the underlying injured plaintiff was seeking recovery for their injuries. Thus, claims by codefendants closely resemble claims by injured plaintiffs. In addition, the equitable relief sought in this action is designed to ensure that all beneficiaries receive roughly the same percentage of the value of their claims against the Trust. While theoretically each claimant must compete with all other beneficiaries in order to obtain the greatest compensation possible, the current restructuring attempts to rationalize a process marked by its previous capricious results.

That the rights of the codefendants and plaintiffs are inextricably intertwined was recognized in the bankruptcy proceeding itself. All beneficiaries with asbestos-related tort claims against the Trust including plaintiffs and codefendants were in the same class of creditors during the bankruptcy proceeding. Plan § 2.4, at C–24; *id.* at C–46 (Glossary definition of terms used to describe Class Four Claims).

In addition, the representative cases embody a cross-section of the claims filed against the Manville Trust nationwide. Their cases arise out of the same underlying course of conduct and are based on the same legal theories as those of the class generally. The particular manifestation of disease may differ between the representatives and the members of the class according to the extent of exposure, the effects of the asbestos disease process and the nature of the disease contracted by the individual. Nevertheless, the liability claims of the representatives sufficiently typify those of the class to satisfy Rule 23(a)(3). The class members and their representatives possess an identity of interest and appear to lack any critical inimical interests for purposes of Rule 23 certification.

### 4. *Adequacy of Representation*

The final prerequisite for maintaining a class action is that class representatives be capable of fairly and adequately protecting the interests of the class. This requirement has two components. First, the named plaintiffs can not have " 'interests antagonistic to those of the remainder of the class....' " *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1413 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990) (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir.1968), *vacated on other grounds*, 417

U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Second, the attorney for the plaintiffs must be "qualified, experienced, and generally able to conduct the proposed litigation." *Id.; see also* 1 H. Newberg, *Newberg on Class Actions,* § 3.22 (2d ed. 1985). Satisfaction of these requirements ensures that the claims of class members will be vigorously prosecuted through their representatives. *See In re First Commodity Corp. Customer Accounts Litig.,* 119 F.R.D. 301, 310 (D.Mass.1987) ("The adequacy of representation goes directly to the integrity of the process by which the proposed settlement was developed.").

The codefendants contend that representation of the class has been inadequate. They maintain that the Trust beneficiaries consist of two major groups—asbestos health claimants and codefendant manufacturers and distributors—who have sharply antagonistic interests. Rule 23(a)(4) has not been satisfied, they argue, because the class representatives are all asbestos plaintiffs whose interests are contrary to those of the codefendants. In addition, class counsel are members of the plaintiffs' bar and are *per se* unsuited to represent the interests of their long-standing adversaries, the codefendants. None of these arguments provides a sufficient basis for denying class certification.

### a. Class Representatives

The class is comprised of all Trust beneficiaries who are or will be seeking payment from the Trust on account of asbestos-related claims. The five named plaintiffs are all beneficiaries of the Trust.

The subject matter of this class litigation relates to distribution of funds from the Trust to beneficiaries and to the Trust from Manville. The plaintiffs and codefendants both have an interest in restructuring the Trust to ensure an equitable allocation of the Trust's limited assets. Without the revisions proposed by the Settlement, the great majority of beneficiaries, both asbestos plaintiffs and codefendants, will receive nothing at all.

■ The fact that the asbestos plaintiffs and codefendants are adversaries in other civil actions is not an impediment to class certification. *See Uniondale Beer Co. v. Anheuser-Busch, Inc.,* 117 F.R.D. 340, 343 (E.D.N.Y.1987); *see also Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173 (9th Cir.1977). In this action, all the beneficiaries share a common interest in maximizing the value of the Trust. While their interests are not aligned in all respects, they " 'share common objectives and legal or factual positions' " sufficient to satisfy Rule 23(a)(4). *In re Tetracycline Cases,* 107 F.R.D. 719, 730 (W.D.Mo.1985) (quoting *Edmondson v. Simon,* 86 F.R.D. 375, 381 (N.D.Ill.1980)).

■ Under Rule 23, absent class members do not automatically have the right to participate in settlement negotiations. They should, however, have the opportunity at some point during the proceedings to express their position.

The codefendants have had a vocal role in the proceedings concerning the Trust since their inception. During the course of the limited fund hearings before Special Master Frankel, codefendants' counsel presented evidence, cross-examined witnesses and submitted extensive written materials. Special Master's Report, 120 B.R. 648, 661–62 (E. & S.D.N.Y.1990). They received formal notice of the Special Master's Report filed with the courts on November 3, 1990. They were well-aware from the time of the hearings that active negotiations were occurring in an effort to cope with the Trust's insolvency. While formal negotiations may not have begun until Tuesday November 6th, in fact discussions among the groups of parties and with Leon Silverman were well underway. All concerned realized by the time of the courts' first stay that negotiations for more money and different methods of distribution were essential. The codefendants prepared a written explication of their position which was submitted to the court-appointed advisors during settlement discussions. *See* Tr. 11/23/90 at 32. Yet, the codefendants never sought formal intervention from the courts.

Having expressed their views exhaustively both prior to the Settlement and through

able counsel since presentation of the Settlement to the courts, their lack of presence during part of the face-to-face negotiations does not render the class representation inadequate. The courts have carefully considered and responded at great length to the objections of the codefendants. *See* Part VII.D.4.b, *infra.* Another district court faced with somewhat analogous circumstances concluded:

> Assuming such exclusion is unusual in multiparty, complex litigation, the court fails to see how such absence, in and of itself, constitutes collusion or fraud to render a proposed agreement unfair or unreasonable. In this case, moreover, the negotiating process was not initiated or, for the most part, concluded by the parties alone. The court appointed a nonparty Special Master "to explore the possibility of settlement." This diligent and competent Special Master was assisted in his efforts by a court-appointed Amicus, representing the public interest. The presence of these persons throughout the major part of the negotiating process renders any suggestion of possible collusion or fraud less tenable than in other settlement situations.

*Liddell v. Board of Education,* 567 F.Supp. 1037, 1046 (E.D.Mo.1983), *aff'd,* 731 F.2d 1294 (8th Cir.), *cert. denied,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). Here, too, the presence of neutral court-appointed advisors throughout the negotiating process has ensured that all members of the class have received adequate and fair representation.

Defining the class to include all of the Trust's beneficiaries is also consistent, as already noted, with the treatment of claims in the Manville bankruptcy proceedings. The asbestos health plaintiffs and codefendants were both Class IV claimants. During the critical stage of negotiations, the class was represented by a single creditors' committee in their dealings with Manville. These attorneys were primarily from the plaintiffs' bar and almost assuredly had asbestos suits against the codefendants. Subsequently, in April 1984 an official committee of co-defendants was appointed by the U.S. Trustee. They participated fully in negotiations and their counsel was paid for these services out of the bankruptcy estate. While the role of counsel in a class action and in a bankruptcy proceeding is somewhat different, there was no sustainable objection during those proceedings that the creditors' committee was acting improperly in representing the interests of all beneficiaries including the codefendants during early, critical negotiations.

Under the confirmed reorganization Plan, the plaintiff beneficiaries and codefendant beneficiaries stand in essentially the same position with respect to the Trust. The Plan created the Select Counsel for the Beneficiaries, a three-member panel, as the only continuing voice of beneficiaries in their dealings with the Trust. Only plaintiffs' counsel serve as Select Counsel.

The codefendants' reliance on *National Super Spuds v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981) and *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir.1982) as grounds for a finding of inadequate representation is misplaced. In *National Super Spuds,* the class consisted of all persons with commodities contracts liquidated during a certain time period. The notice sent to class members referred only to liquidated contracts and at no point did the class representatives, who held liquidated contracts, seek to represent unliquidated contracts. *See National Super Spuds,* 660 F.2d at 15. The inadequacy of the representation was highlighted by the settlement agreement which released both liquidated and unliquidated claims against defendants, yet it only paid the liquidated claims. *Plummer,* where only the class representatives received compensation at the expense of the remaining class members, is an even more egregious example of inadequate representation.

Here, under the settlement agreement, the plaintiffs and codefendants are treated identically with respect to their rights against the Trust. This is not an instance in which one category receives money from the Trust and the other category within the class does not. Every beneficiary must process his or her proof of claim form in the same manner regardless of status as a

plaintiff or codefendant. Hence, representation of the codefendants through the class representatives was adequate and, combined with extensive notice, satisfies due process. *See Hansberry v. Lee,* 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940). The remainder of the codefendants objections are more properly characterized as challenges to the fairness of the settlement and will be discussed below.

### b. Class Counsel

■ There is little doubt that class counsel are capable of vigorously prosecuting the action against the Trust on behalf of the entire class. These five attorneys are prominent members of the plaintiffs' bar and have significant experience in asbestos litigation and complex class action suits. They also represent a majority of plaintiffs with claims pending against the Trust.

Elihu Inselbuch of Caplin and Drysdale has served as counsel to Select Counsel for the beneficiaries and class counsel. His skilled services, extensive experience in asbestos litigation, inexhaustible patience and equanimity were instrumental in negotiating the class Settlement.

Ronald L. Motley of Ness, Motley, Loadholt, Richardson & Poole in South Carolina has been representing asbestos plaintiffs since the mid–1970s. He was an original member of the Manville Asbestos Health Claimants Creditors Committee and was elected to the four person Negotiating Committee. He was also elected to the Select Counsel for the Beneficiaries and has served in that capacity continuously. Chief Judge Robert Parker in the Eastern District of Texas appointed him to the Plaintiffs' Steering Committee in the proposed national class action pending in that district. He and other members of the committee have strong financial motives for remaining vigilant. *See* Appendices D and D1, attached.

Harry F. Wartnick of Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc. in San Francisco has had significant experience in complex asbestos litigation and other consolidated trials. He has served as lead counsel in four major civil actions in California. He is also a member of two advisory committees on complex asbestos litigation in the San Francisco area.

Robert B. Steinberg of Rose, Kline and Marias is a former President of the California Trial Lawyers Association. He has been involved with asbestos litigation since 1975 when he filed the first asbestos-related personal injury claim in Southern California.

Christopher M. Placitella of Wilentz, Goldman & Spitzer in New Jersey has been involved in asbestos litigation since 1981. He was a member of the Negotiating Committee in the Manville bankruptcy proceeding. He is currently serving as one of the liaison counsel for the cases involving the New York Navy Yard and powerhouse cases before Justice Helen Freedman.

Frederick M. Baron of Baron & Budd in Texas has had significant experience with the bankruptcy proceedings of major asbestos manufacturers. He has been the chairman of two creditors' committees and a member of two others including Manville. He has successfully represented thousands of asbestos plaintiffs.

No one can dispute that these attorneys have the requisite experience, qualifications, resources and competency to conduct this litigation. *See Ashe v. Board of Elections,* 124 F.R.D. 45, 50 (E.D.N.Y.1989); *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 80 (E.D.Pa.1987). Counsels' legal abilities and dedication guarantee that class members will have the benefit of some of the best legal talent in the field.

Independent counsel was also appointed to represent the codefendant beneficiaries and the future beneficiaries of the Trust. Roger E. Podesta of Debevoise & Plimpton, John D. Aldock of Shea & Gardner and Andrew T. Berry of McCarter & English were self-selected to represent the codefendant beneficiaries. Together they represent some of the largest defendant-manufacturers with claims against the Trust.

These attorneys and attorneys for other codefendants have been active, skilled and well-compensated participants since the in-

ception of the action to restructure the Trust. The court has observed these able defense counsel in trials and extensive settlement negotiations. They have exercised great ability on their clients' behalf. They have also expressed their interests and concerns to the other beneficiaries, court-appointed expert Mark Peterson and Special Advisor Leon Silverman, the Trust and directly to the courts throughout these proceedings.

The courts also appointed Leslie Gordon Fagen of Paul, Weiss, Rifkind, Wharton & Garrison to represent the interest of the Trust's future beneficiaries. Mr. Fagen has significant experience in both prosecuting and defending major product liability actions. He also has represented a number of parties in class actions and shareholder derivative actions. This appointment further insured that the interests of the future claimants would not be sacrificed to present claimants.

### D. Rule 23(b)(1)(B)

#### 1. *Standards for Certification*

■ If criteria of Rule 23(a) are met, then the proponent of class certification must demonstrate that the facts and circumstances of the cases warrant class treatment under a subdivision of Rule 23(b). Here class representatives seek certification under Rule 23(b)(1)(B) which states in pertinent part:

[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of ...

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]

Fed.R.Civ.P. 23(b).

■ Certification under Rule 23(b)(1) is appropriate when a unitary decision is essential. *See, e.g., Robertson v. National*

*Basketball Ass'n,* 556 F.2d 682, 685 (2d Cir.1977) (attack on proposed merger of two professional athletic leagues that would reduce the number of player positions). Suits pursuant to this subdivision typically involve parties who either act or refuse to act in a manner that affects the interests of others in absence of whom complete and equitable adjudication cannot be accomplished. *Larionoff v. United States,* 365 F.Supp. 140 (D.D.C.1973) (group challenge to statutory provision regarding Navy re-enlistment bonuses), *aff'd and remanded on other grounds,* 533 F.2d 1167 (D.C.Cir.1976) (certification proper), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Ames v. Mengel Co.,* 190 F.2d 344 (2d Cir.1951) (shareholder suit to enjoin sale of unissued stock); *see also Mungin v. Florida East Coast R.,* 318 F.Supp. 720, 730 (M.D.Fla.1970), *aff'd,* 441 F.2d 728 (5th Cir.), *cert. denied,* 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175 (1971); *Walker v. City of Houston,* 341 F.Supp. 1124, 1131–32 (S.D.Tex.1971). As one commentary pointed out "[i]t is impossible to reorganize a single fraternal benefit organization in inconsistent ways, or to keep two basketball leagues both merged and separate, or to distribute uniform bonuses according to conflicting plans, or simultaneously to pay and withhold a dividend." Miller and Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts,* 96 Yale L.J. 1, 41 (1986).

The mere possibility that an action will have either precedential or stare decisis effect on subsequent cases has been considered insufficient to satisfy Rule 23(b)(1)(B). *Larionoff,* 533 F.2d at 1181; *La Mar v. H. & B. Novelty & Loan Co.,* 489 F.2d 461, 467 (9th Cir.1973); 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 1774, at 439 (2d ed.1986). As Professor Moore explained, a majority of courts have retained faith with the past by holding that mere stare decisis effect of an individual adjudication is not ordinarily enough as a practical matter to be dispositive of other members' interest, and that a dispositive impact more in the nature of a legal

necessity traceable to a joint or common right, such as a disposition of a property interest which could not subsequently be recaptured, or one of the other recognized impacts is what is required.

3B Moore's, *Moore's Federal Practice* ¶ 23.35[2], at 23–254 (1987).

One court explained that when, at worst, individual actions would leave the unnamed members of the class, next of kin of passengers who died in an airplane crash, in the same posture as if no prior actions had been brought, class certification was inappropriate. Prior individual actions would not then diminish subsequent plaintiffs' recovery. In such instances, "the complexity and expense of the class litigation and the burdens on the United States and the aircraft manufacturer of multiple trials did not warrant the maintenance of a class action under 23(b)(1)(B)." *McDonnell Douglas Corp. v. United States Dist. Court*, 523 F.2d 1083, 1086 (9th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

Subsection (b)(1)(B) was designed to apply "when claims are made by numerous persons against a fund insufficient to satisfy all claims." Fed.R.Civ.P. 23(b)(1)(B) advisory committee's note, 39 F.R.D. 69, 101 (1966). In the limited fund situation, the Advisory Committee stated that it "is plainly the case" that

an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit.

*Id.*

Creation of such a class action seeks "to preserve the limited fund for the entire class against the individual claims of class members" which might otherwise exhaust the limited fund and thus leave subsequent parties with no remedy. *Waldron v. Raymark Indus.*, 124 F.R.D. 235, 238 n. 1 (N.D.Ga.1989). As Professor Miller put it:

[t]he paradigm Rule 23(b)(1)(B) case is one in which there are multiple claimants to a limited fund.... There is a risk, if litigants are allowed to proceed on an individual basis, that those who sue first will deplete the fund and leave nothing for latecomers.

Miller, *An Overview of Federal Class Actions: Past, Present, and Future*, 4 Just. Sys.J. 198, 211 (1978).

The propriety of certification under various subsections of 23(b)(1) is "not well defined." *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1544 (11th Cir.1987). Different circuit courts have adopted a spectrum of tests to ascertain whether the existence of a limited fund has been established and what level of certainty must accompany the determination. Whatever the specific standard, the movant must demonstrate that a finite source of funds exist to satisfy liability that exceeds the value of the fund. This entails proof with respect to the total assets and funds available to pay all potential claims, as well as evidence of the likely value of potential claims against the fund. *See* 3 H. Newberg, *Newberg on Class Actions* § 17.14, at 381 (2d ed. 1985).

Many decisions, while recognizing the applicability of Rule 23(b)(1)(B) certification in limited fund mass tort cases, have denied certification where there was an insufficient showing that a limited fund existed. *See, e.g., In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 306 (6th Cir.1984); *In re Northern Dist. of California Dalkon Shield Prods. Liab. Litig.*, 693 F.2d 847, 852 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *Payton v. Abbott Labs*, 83 F.R.D. 382, 389 (D.Mass. 1979), *vacated*, 100 F.R.D. 336 (D.Mass. 1983). *See also In re Federal Skywalk Cases*, 680 F.2d 1175, 1182 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335 (9th Cir. 1976); *In re Jackson Lockdown/MCO Cases*, 107 F.R.D. 703, 711–12 (E.D.Mich. 1985) (noting that courts that have vacated certifications in mass torts have relied upon "inability of proponent of the certifi-

cation to establish the existence of a 'limited fund' ").

■ In all cases there must be a fact-finding inquiry, on notice to those who have an interest in the fund, to examine the evidence that supports a Rule 23(b)(1)(B) certification. Opponents of certification must be able to present evidence that a limited fund does not exist. *See In re Temple,* 851 F.2d 1269, 1272 (11th Cir.1988) (failure to notify class members of limited fund determination violates due process). The Eleventh Circuit explained,

> without a finding as to the net worth of the defendant, it is difficult to see how the fact of a limited fund could have been established given that all of Raymark's assets are potentially available to suitors. Had Raymark's motion been contested, such a salient fact would almost certainly have been adduced.

*Id.; see In re Bendectin Prods. Liab. Litig.,* 749 F.2d at 306.

Many early litigations permitted cases to proceed as class actions pursuant to Rule 23(b)(1)(B) with little analysis of the applicable standard, merely reciting the language of the rule. *See, e.g., Stanford v. Gas Service Co.,* 346 F.Supp. 717, 722 (D.Kan.1972). For example, in *Bradford Trust v. Wright,* 70 F.R.D. 323, 326 (E.D.N.Y.1976), the court found that certification pursuant to Rule 23(b)(1)(B) was proper since there was "a limited fund to be distributed and to meet all claims." *Id.* at 326. The court therefore concluded that individual adjudication of claims would impede the ability of other class members to protect their interests. *Id.* Some courts continue to certify classes without clearly delineating the standard applicable to determine whether a limited fund exists. *See D'Arrigo Bros. Co. v. Freshville Produce Distrs., Inc.,* 1990 U.S. Dist. LEXIS 4230 (S.D.N.Y.1990) (holds Rule 23(b)(1)(B) certification in part warranted because there is possibility common fund will be insufficient to cover all claims).

In one of the earliest decisions addressing the proper test for Rule 23(b)(1)(B), the Ninth Circuit focused upon

the effect of an action on behalf of an individual on the interests of those who have rights similar to those of the individual bringing suit ... If the individual action inescapably will alter the substance of the rights of others having similar claims ... the action falls within Rule 23(b)(1)(B).

*La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466–67 (9th Cir.1973); *see McDonnell Douglas Corp. v. United States Dist. Court.,* 523 F.2d 1083 (9th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). According to that court, certification is proper "where the claims of all plaintiffs exceeded the assets of the defendant and hence to allow any group of individuals to be fully compensated would impair the rights of those not in court." *Green v. Occidental Petroleum Co.,* 541 F.2d 1335, 1340 n. 9 (9th Cir.1976).

In the context of litigation arising out of the use of the Dalkon Shield IUD, the Ninth Circuit further defined and restricted certification pursuant to Rule 23(b)(1)(B). The court stated that certification is proper only when separate damage awards *"necessarily* will affect later claims." *In re Northern Dist. of Cal. Dalkon Shield Prods. Liab. Litig.,* 693 F.2d 847, 852 (9th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983) (emphasis added). The movant for certification must "inescapably" prove that the fund is inadequate to satisfy all claims. *Id.* at 851. Despite adopting the most stringent test for proof of a limited fund, the Ninth Circuit did not preclude the possibility of certifying a Rule 23(b)(1)(B) class in a mass disaster litigation under appropriate circumstances. *See, e.g., id.* at 853 ("mass torts caused by a single transaction, *i.e.,* a plane crash might be proper subject of class action"); *see Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 n. 9 (9th Cir.1976).

This district court has previously articulated the applicable test as a "substantial probability" standard meaning "less than preponderance but more than a mere possibility." *In re Agent Orange Prod. Liab. Litig.,* 100 F.R.D. 718, 726 (E.D.N.Y.1983),

*aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). The evidence in that case did not support a finding that the amount of compensatory damages, if allowed, would exceed defendants' assets. A mandatory class was certified, however, on the issue of punitive damages.

> [T]here is a substantial probability that limited punitive damages may be allowed. If they are, it would be equitable to share this portion of the possible award among all plaintiffs who ultimately recover compensatory damages. Yet, if no class is certified under Rule (b)(1)(B), non-class members who opt out under Rule 23(b)(3) would conceivably receive all of the punitive damages or, if their cases are not completed first, none at all.
>
> . . . . .
>
> There is, therefore, a substantial probability that "adjudication with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the adjudication."

*Id.* at 728. More recently in *Suffolk County v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1418 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990), the district court found that "[b]ecause it is unlikely that the defendant can pay the judgments which may result from this suit, making allocations among members of the prospective class necessary, this is an appropriate case for certification pursuant to Rule 23(b)(1)(B)."

Other courts have similarly disputed the Ninth Circuit's interpretation of the proper standard for class certification under Rule 23(b)(1)(B). For example, in *In re Alexander Grant & Co. Litig.*, 110 F.R.D. 528, 538 (S.D.Fla.1986), the court stated that it

> does not agree with the highly restrictive gloss applied to Rule 23(b)(1)(B).... Separate adjudications conceivably would exhaust coverage leaving subsequently tried partners to pay legal fees from their own pocket and leave them with only personal assets from which to compensate plaintiffs.

*Id.* The court felt compelled to consider the interests of all partners while keeping an eye on the conservation of both the partnership and individual assets of its members.

In a related case in another district, the court certified a "limited fund" class action after finding

> [t]he presence of an inadequate fund to fully protect all those who may ultimately be held liable, and the possible additional liability of some members of the class, is sufficient to permit the class to be held to be a Rule 23(b)(1)(B) type class.

*Alexander Grant & Co. v. McAlister*, 116 F.R.D. 583, 590 (S.D.Ohio 1987).

The Eighth Circuit in the *In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982), concluded that certification under Rule 23(b)(1)(B) would have the effect of enjoining pending state proceedings and therefore violated the Anti–Injunction Act, 28 U.S.C. § 2283 (1988). *Id.* at 1182. The court stated that "the class has an uncertain claim for punitive damages against defendants who have not conceded liability. The claim does not qualify as a limited fund ..." *Id.* In dissent, Judge Heaney agreed with the analysis set forth in *Agent Orange. Id.* at 1190 (Heaney, J., dissenting). An award of such damages, if limited, appropriately should inure to the benefit of all injured by the tortious conduct.

The Sixth Circuit in the *Bendectin Products Liability Litigation*, 749 F.2d 300, 306 (6th Cir.1984), found that a certification that merely states without support that "there is a risk that a limited fund may exist from which judgments may be satisfied" was clearly erroneous as a matter of law. *Id.* at 306. The court found that such a conclusion must be supported by findings of fact which the parties have had an opportunity to contest.

▮ Rule 23(b)(1)(B) by its terms does not require that individual adjudications be legally binding on the absentees to justify certification. The Rule clearly states that

where separate actions "as a practical matter" could affect the absent parties without giving them the protection of representation, certification is appropriate. 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1774 (2d ed. 1986). The Second Circuit has similarly read the rule to permit certification when "individual actions would 'as a practical matter' impair or impede the rights of class members not before the court." *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir.1977).

In the *In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986), despite seeking certification pursuant to Rule 23(b)(1)(B), the plaintiffs presented no evidence to demonstrate that the defendants' assets would be insufficient to pay all claims. *Id.* at 1003. The proponents of the mandatory class asserted that at some point there would be a very real possibility that late-coming plaintiffs would not receive punitive damages because such damages would constitute overkill in light of the number and extent of previous awards. Based on this argument, the district court certified a (b)(1)(B) class, finding a "substantial possibility that early awards of punitive damages ... will impair or impede the ability of future claimants to obtain punitive damages." *In re Asbestos School Litig.*, 104 F.R.D. 422, 437 (E.D.Pa. 1984), *aff'd in part, rev'd in part*, 789 F.2d 996 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). The district court, however, made no findings concerning the potential amount and scope of punitive damages to support its conclusion.

The Third Circuit candidly acknowledged that necessarily there were "inherent limitations on any factual inquiry undertaken at such an early stage of the litigation, and we recognize that any record that could be developed would be inevitably predictive." 789 F.2d at 1005. Still, the court found that mandatory certification in absence of factual inquiry was an abuse of discretion. A fatal flaw in the district court's certification, according to the appellate court, centered on the under-inclusiveness of the class which did not encompass all property

damage claimants. To be successful, the Third Circuit found, the court must have control over all those affected in order to carry out the basic premise justifying the class action—parity for all victims and reduction of litigation expenses for all parties.

In *Coburn v. 4-R Corp.*, the court certified a class under Rule 23(b)(1)(B) after finding that "[t]here is good reason to believe that total judgments might substantially exceed the ability of defendants to respond." 77 F.R.D. 43, 45 (E.D.Ky.1977), *mandamus denied sub nom. Union, Light, Heat & Power v. United States Dist. Ct.*, 588 F.2d 543 (6th Cir.1978). Conceding that it could not "state with assurance" whether or not judgments, if obtained, would be satisfied, the court concluded, "[i]n no event should this litigation become an unseemly race to the courtroom door with monetary prizes for a few winners and worthless judgments for the rest." *Coburn*, 77 F.R.D. at 45; *see In re Joint Eastern & Southern Dists. Asbestos Litig. (Eagle–Picher)*, 132 F.R.D. 332 (E. & S.D.N.Y.1990).

### 2. *Application of Standards to Manville Facts*

Following the Trust's motion seeking a determination that it constituted a limited fund within the meaning of Rule 23(b)(1)(B), the district court appointed Special Master Marvin E. Frankel to assist in making factual determinations relevant to certification. After extensive discovery, four days of hearings, written briefs and extensive oral discussions with counsel for the Trust, the plaintiff beneficiaries and the codefendant beneficiaries, on notice to all ascertainable potentially interested parties, the Special Master submitted a report containing extensive explication and findings of fact. Any party seeking to participate in the hearings was afforded an opportunity to do so.

The Trust satisfied multiple discovery requests; it produced voluminous documentary evidence in support of its motion. In addition, an independent banking consultant testified in support of the Trust's posi-

tion. Witnesses who testified were cross-examined. OCF representing the codefendants vigorously contested the Trust's evidence, particularly its method of auditing aggregate claims. They asserted that the Trust underestimated its assets and overestimated its liabilities. Despite these objections, the codefendants agreed that the Trust constituted a limited fund and only challenged the extent of the limit. The plaintiffs proposed a more conservative estimate of the Trust's asset's and liabilities, but also did not dispute that the Trust is a limited fund.

The Special Master concluded on the basis of evidence that is "clear and convincing to the point of being undisputed and beyond dispute in all essential respects" that (1) the assets of the Trust range from approximately $2.1 billion to $2.7 billion; (2) its liabilities for pending unliquidated claims and a conservative estimate of 47,-000 future claims totals roughly $6.5 billion plus an additional $448.5 million in liquidated but unpaid claims past due; (3) the Trust could not then pay even a small percentage of $448.5 in liquidated claims; and (4) by any definition, the Trust is deeply insolvent. Special Master's Report, 120 B.R. 648, 667–68 (E. & S.D.N.Y.1990). Emergency measures are required to safeguard its insufficient assets.

■ The district court held additional hearings to solicit objections to the Special Master's Report. Receiving none, after careful independent analysis, the district court adopted the findings made by the Special Master. The evidence reveals beyond any possible doubt that the Trust constitutes a limited fund within the meaning of Rule 23(b)(1)(B). The Trust qualifies as a limited fund.

■ The Trust was created as part of Manville's reorganization proceedings. To file a petition pursuant to Chapter 11, the debtor must demonstrate a need to reorganize, either because of insolvency or inability to pay debts as they become due. The bankruptcy code defines insolvency as a

> financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation exclusive of:
>
> (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and
>
> (ii) property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C. § 101(31)(A) (1988). To maintain a petition for reorganization, Manville had to produce evidence to support a more rigorous standard than that necessary for Rule 23(b)(1)(B). The primary support adduced in support of its bankruptcy filing related to its asbestos tort liability. *See In re Johns–Manville Corp.*, 36 B.R. 743, 745 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985); *cf. In re A.H. Robins Co.*, 880 F.2d 709, 720 n. 13 (4th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (contingent claims are liquidated according to estimation provision, 11 U.S.C. § 502(c), which calculates aggregate liabilities); *see also* Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 Harv.L.Rev. 1121 (1983); 3 Collier, *Collier on Bankruptcy* ¶ 502.03, at 502.71 to .75 (15th ed. 1979). In his discussion of Rule 23(b)(1)(B), Professor Newberg explained, "[i]n the mass tort field, there are at least two statutory interpleader situations where personal injury claimants are required to look to a finite fund created by a statutory limit on liability," the second of which is a fund within the court's control, as illustrated by the Johns–Manville bankruptcy proceedings. 3 H. Newberg, *Newberg on Class Actions* § 17.14, at 381 (2d ed. 1985).

At the time the Plan was confirmed its proponents optimistically assumed that the Trust could satisfy Manville's entire asbestos liability, but even a modestly skeptical view then could discern the imbalance between mounting liabilities and fixed assets. The situation has sharply deteriorated. Against the background of Manville's chapter 11 proceedings, with the evidence and proof necessarily generated to prove its insolvency, the courts have great confidence that now, in the face of liability of epic proportions, the Trust has finite and

severely limited funds. For the reasons indicated above, certification pursuant to Rule 23(b)(1)(B) is appropriate.

### 3. *Mandatory Non–Opt–Out Class*

Harry Wartnick has made a motion on behalf of Deanne Allen to opt out of the class. Relying on the courts' discretion pursuant to Rule 23(d), he argues that her claim is atypical since it is a pre-petition cancer case and that at the time of her death she had minor children. He asserts that the cost to the Trust of permitting this particular claimant to opt out will be minimal. Counsel relies upon the court's holding in *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1420–21 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990), in which Suffolk County was permitted to opt out of the class of rate payers because it was a "highly atypical and unrepresentative plaintiff." *Id.* Conceding that members do not have an automatic right to opt out of Rule 23(b)(1) classes, he urges that because monetary relief is a component of recovery, exclusion rights must be afforded to satisfy due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810, 105 S.Ct. 2965, 2973–74, 86 L.Ed.2d 628 (1985); *cf. Holmes v. Continental Can*, 706 F.2d 1144, 1153 (11th Cir. 1983).

Several distributors have also sought exclusion from the class. Certain companies submitted language to the courts specifically preserving their rights without modification by the Settlement. In some instances these codefendants seek an expansion of rights they otherwise might have under state law and the original Plan.

The debate about whether class members have the right to opt out of a Rule 23(b)(1)(B) action has generated divergent views by the courts and academic community. Traditionally, limited fund or previously denominated "hybrid" class actions did not afford class members exclusionary rights. *See* Kennedy, *Class Actions: The Right to Opt Out*, 25 Ariz.L.Rev. 3, 14–15 (1983); *see generally* 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1752 (2d ed. 1986) (distinction between class based on binding effect of judgment on class members). If a class might satisfy the criteria under more than one subdivision of Rule 23(b), it is preferable to certify under (b)(1) or (b)(2) precisely because "the judgment will have *res judicata* effect as to all the class (since no member has the right to opt out in a (b)(1) or (b)(2) suit) thereby furthering the policy underlying [those class] suits." 3B J. Moore, *Moore's Federal Practice* ¶ 23.-31[3], at 236–37 (2d ed. 1987). The Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, is said by some to have thrown that well-established view into doubt.

Construction of the reach of the Supreme Court's holding in *Shutts* has generated multiple interpretations. Many authorities construe the following language as barring mandatory class actions:

> If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, either in person or through counsel.... Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court.

*Shutts*, 472 U.S. at 811–12, 105 S.Ct. at 2974 (footnote omitted).

*See, e.g.*, Note, *Phillips Petroleum Company v. Shutts: Procedural Due Process and Absent Class Members: Minimum Contacts Is Out—Is Individual Notice In?*, 13 Hastings Const.L.Q. 817, 821 (1986); Note, *Phillips Petroleum Company v. Shutts: Multistate Plaintiff Class Actions: A Definite Forum, But Is It Proper?*, 19 John Marshall L.Rev. 483, 485 (1986).

Careful and thoughtful analyses of *Shutts* have reached a different conclusion. *See, e.g.*, Miller and Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v.*

*Shutts*, 96 Yale L.J. 1 (1986) [hereinafter Miller and Crump, *Multistate Class Actions* ]; 1 H. Newberg, *Newberg on Class Actions* § 1.14, at 8–15 (Supp.1990). Professors Miller and Crump argue that certain situations justify continued use of mandatory class actions without offending due process. "By definition, it is impossible to resolve separately individual claims involving common rights or limited funds." Miller and Crump, *Multistate Class Actions, supra,* 96 Yale L.J. at 40.

In the absence of explicit discussion of non-opt-out classes in *Shutts,* Miller and Crump propose an analysis that would determine the propriety of mandatory class certification by balancing four factors: efficiency, equity, distant forum abuse and individual control of litigation. *Id.* at 55. They suggest that *Shutts* was intended to prevent distant forum abuse and preserve the plaintiff's right to individual control over litigation. They reason that in *Shutts,* the opt-out provision was "essential to the Court's validation of jurisdiction over members who have no affiliation with a distant forum." *Id.* at 52. But where there are minimum contacts between claimants and the forum, the forum can force them to litigate in the action just as it could join them involuntarily as defendants. *Id.*

Thus, where there are minimum contacts between claimants and forum, mandatory class certification is permissible; where contacts are insufficient, opt out must be permitted. *Id.*

> For example, a case concerning a limited fund located in a particular state can be brought as a mandatory action, because the nexus between the fund, the claimants and the action supports the exercise of jurisdiction over claimants even against their will.

*Id.* If the traditional concerns of judicial efficiency and equity weigh heavily in favor of class certification and the additional requirement of sufficient contacts with the forum is met, then the court is justified in overriding a party's right to individual control of his or her own litigation by certifying the class. *Id.* at 55.

Adopting a different analysis of the salient policy goals served by affording opt-out rights to class members, Professor Moore's treatise calls for balancing private rights against the interests of judicial efficiency, noting that:

> [C]ourts ... have been more willing to allow the practical need for a unified class remedy to override the individual rights of members to pursue their own actions. Thus clause (B) has been used both to validate the class action and to exclude the opt out right under b(3) in situations where, even though the dispositive impact of an individual action will not as a matter of legal analysis necessarily dispose of other claims, in the practical world of legal remedies it will.

3B J. Moore, *Moore's Federal Practice* ¶ 23.35[2], at 23–255. Another analysis has posited:

> [T]he only way in which the binding Rule 23(b)(2) class action might not be seen to be a violation of due process is if one follows *Mathews v. Eldridge* and weighs the harm to the interests of absentees with the cost of the alternative safeguard of notice and the right to opt out.

Weber, *Preclusion and Procedural Due Process in Rule 23(b)(2) Class Actions,* 21 U.Mich.J.Law Reform 347, 394 (1988).

The Circuits have differed in their interpretation of *Shutts. Compare In re A.H. Robins Co.,* 880 F.2d 709, 744–46 (4th Cir.), *cert. denied,* ── U.S. ──, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) *with In re Temple,* 851 F.2d 1269, 1272–73 & n. 5 (11th Cir. 1988). The Fourth Circuit upheld a mandatory class certification. The court found that public policy and the right to try one's case to a jury if the claimant cannot settle with the Dalkon Shield trust satisfied due process and *Shutts. In re A.H. Robins Co.,* 880 F.2d at 745–46. The Fourth Circuit's analysis of the relevant public policy considerations bears directly on fundamental interests at stake in the present case:

> Class certification cannot be defeated simply because a few claimants—actually, their attorneys—feel that they would fare better by pressing as quickly as they could their individual suits than

they would if the suit were to be prosecuted for the benefit of all claimants. Certainly, in the mass tort situation, there is a substantial societal interest. The burden placed on the judicial system resulting from every products liability litigation entails great public and private expense, encumbers the court calendars, and prejudices other litigants by unusual delays in their litigation. As we have already said, judges in such cases are required to try case after case where the same documentary evidence is produced, where the same expert witnesses and their tests are exhaustively developed, where there is extended direct and cross-examination, and required, as by rote, to repeat the same instructions to a jury. To permit a small number of claimants who are seeking actually to promote their own interests largely at the expense of the other claimants to frustrate a class certification in such a case is unthinkable.

*Id.* at 746.

In *Temple*, the Eleventh Circuit granted a mandamus petition and vacated a mandatory Rule 23(b)(1)(B) class certification. In dicta the court stated that a literal reading of *Shutts* would preclude mandatory certification in class actions predominantly for money damages. *In re Temple*, 851 F.2d 1269, 1272 n. 5 (11th Cir.1988) (plaintiffs might "have the right to opt out of even a mandatory class action"). Because the court vacated the certification of the Rule 23(b)(1)(B) class on other grounds and because "no federal appellate court has yet so held," the court did not decide the issue. *Id.*

On remand, the district court refused to grant mandatory certification on jurisdictional grounds even if the plaintiffs were willing to attempt to satisfy the articulated basis for the reversal of certification—that there were inadequate findings to support the limited fund holding. *Waldron v. Raymark Indus.*, 124 F.R.D. 235, 237 (N.D.Ga. 1989). The district court lamented: "the restrictions placed upon [Rule 23(b)(1)(B)'s] application by the federal appellate courts make it appear that availability of a Rule

23(b)(1)(B) class action to protect plaintiffs is purely illusory." *Id.*

That district court shared the pragmatic and legally sound view that unless limited fund class actions are mandatory "large numbers of plaintiffs could opt out and continue to exhaust the limited fund through the filing of their own lawsuits." *Id.* Thus, the Circuit Court's reference to opting out of a mandatory class "besides being oxymoronic, is contrary to the very purpose for which a Rule 23(b)(1)(B) class is meant to serve." *Id.* at 238 n. 1. Bound by its interpretation of *Temple* and *Shutts*, the *Waldron* court concluded that to maintain the mandatory class action, "[a]ny attempt to exercise jurisdiction over such nonconsenting plaintiffs would undoubtedly violate those plaintiffs' constitutional due process rights." *Id.* at 238.

Restrictive interpretations of *Shutts*, even if correct, apply only to claims which are legal rather than equitable in nature. By its language and holding, *Shutts* only addressed the right to due process and opt out in class actions predominantly for money damages. The primary relief sought in the present class action is equitable. As one expert on class actions stated,

[c]lasses for interpleader suits or actions to allocate pro rata an available fund that is insufficient to pay all claims are equitable in nature, although they involve money claims individually; this type of suit historically has proceeded without permitting an opt out right. It is unlikely that *Shutts* will be construed to change the highly focused nature of the equitable relief addressed in these actions by requiring opt-out rights which might serve to frustrate the equitable ends of these suits.

1 H. Newberg, *Newberg on Class Actions* § 1.14, at 9 (Supp.1990). Confirming this view, recently the New York Court of Appeals found that where a class seeks predominantly equitable relief there is no due process right to opt out. *Woodrow v. Colt Indus.*, 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991); *see also In re Jackson Lockdown/MCO Cases*, 107

F.R.D. 703, 712 (E.D.Mich.1985) ("where a limited fund exists in a particular litigation and the projected number of claims would exceed the amount of that fund, it is both equitable and reasonable that the mere fortuitousness of one party filing before another should not be the deciding factor in determining the availability of recompense").

Further support for the conclusion that mandatory classes survive *Shutts* is drawn from the Second Circuit's recent decision in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1303 (2d Cir.1990). In reviewing the district court's decision to permit Suffolk County to opt out of the class, the Court of Appeals explained that Rule 23(b)(1)(B) does not typically permit parties to opt out. *Id.* at 1303 (right to opt out "may not be exercised *solely* at the instance of the party seeking to opt out") (emphasis in original). The Second Circuit reviewed case law and commentary explicating the rationale behind the non-opt-out rule. The court summarized present law noting that "a district court judge *usually* should not allow a Rule 23(b)(1)(B) class member to opt out . . ." *Id.* at 1304 (emphasis in original). Since the purpose of a limited fund class certification is to afford equitable distribution of limited resources to all claimants, it would defeat the purpose of the rule to allow a class member to opt out and collect his or her full judgment while other class members receive only their proportionate shares. *Id.* The Second Circuit affirmed the district court's decision to allow Suffolk County to opt out under the unusual circumstances of that case, but found the question a close one. *Id.* at 1302. It held that the district court had acted within its discretion because the opt out did not substantially impair "the class's ability to recover its settlement amount" and facilitated "the fair and efficient conduct of the action." *Id.* at 1305.

The instant complex class action raises numerous claims, many of first impression, but the single unifying cause of action that subsumes all other aspects of the litigation emanates from the Trust's status as a limited fund. The relief sought may have extraordinary features to it, yet it is a modern version, crafted to address the era of mass tort problems, of an ancient equitable suit. At base the suit seeks injunctive relief; it determines the means by which the Trust will be funded and by which the Trust will resolve claims on the Trust's res. It does not liquidate an individual's claim nor award a monetary judgment.

Additional support for refusing to permit any claimants to opt out of this class is that, as in *A.H. Robins*, a tort claimant reserves the theoretical right to an individual trial by jury after complying with the procedures of the Distribution Process. While mandatory negotiation will delay when a beneficiary might have his or her day in court, the ultimate right to process an independent claim has been found to eliminate any due process objections. *See In re A.H. Robins Co.*, 880 F.2d 709, 745–46 (4th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). In *A.H. Robins*, the Fourth Circuit concluded that if an opt-out right is required to satisfy due process, then the mandatory negotiation with the claims facility followed by the opportunity to present individual causation and damages arguments in a jury trial constituted the equivalent of that right of exclusion. *Id.* at 745.

In the instant case, if a beneficiary in fact ends up seeking a jury trial, the Trust will not contest its liability. Thus, in exchange for the delay the claimant will in fact save the money it would spend to prosecute a contested case and eliminate the risk of a defense verdict that would leave him or her with no recovery from the Trust. Finally, the payment on a judgment that exceeds the maximum value that the Trust pays other beneficiaries for similar injuries will be paid only after all other Trust beneficiaries have received the full value of their settlements. In the absence of the Settlement, it is doubtful whether any significant monies would be available to the claimants who insist upon individual claims processing. The greater interest in preserving the corpus of the Trust to pay all claimants equitably over time more than justifies the restrictions imposed on claim-

ants who ultimately take the Trust to court.

#### 4. *Binding Future Claimants*

Some claimants allege that the courts lack the authority to bind future claimants to this Settlement because those who have not yet manifested an asbestos-related illness do not have claims against the Trust at this point. They argue that disposition of their rights against the Trust does not present a case or controversy within the meaning of Article III. As outlined above, the presence of asbestos fibers in a person's lung causes perceptible changes on radiographic and other diagnostic tools before symptomatic manifestation of injury occurs. Since asbestos-related illnesses progress over time, the injury can be presumed to have occurred though the victim may not yet be aware of it.

 It is doubtful that persons with present claims have standing to argue on behalf of future claimants. There is a clear conflict—the more present claimants get, the less will be available for future claimants. The law does not depend upon charitable impulses of litigants. They do not provide sufficient foundation for standing. *Cf., e.g.,* C. Wright, *Law of Federal Courts* 59–74 (4th ed. 1983).

 On its face, the objection is without merit. The question of whether compensable injury has occurred is not subject to doubt by any court. Some states, such as New York until recently, defined the period within which to file a claim for statute of limitations purposes as a certain number of years from the date of exposure to the injurious substance. *See generally Wilson v. Johns–Manville Sales Corp.*, 684 F.2d 111, 115–6 (D.C.Cir.1982) (noting differing formulations of limitations periods used by various states); *Pauley v. Combustion Engineering Inc.*, 528 F.Supp. 759, 764 (S.D.W.Va.1981) (same). If the constitution failed to recognize latent injuries suffered by persons exposed to asbestos, their right to compensation in those states would be forever precluded. *See, e.g., Steinhardt v. Johns–Manville Corp.*, 54

N.Y.2d 1008, 1010–12, 446 N.Y.S.2d 244, 245–46, 430 N.E.2d 1297, 1298–99 (1981) (period of limitations ran from date of last employment-related asbestos exposure), *cert. denied and appeal dismissed*, 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982); *id.* at 1012–13, 446 N.Y.S.2d 244, 430 N.E.2d 1297 (Fuchberg, J., dissenting) ("it would be unreasonable and perhaps unconstitutional to hold that his time to sue expired before it was possible for him to learn of the wrong") (citation omitted).

To uphold such a limitations period implicitly acknowledges that a claim recognizable under Article III exists at the time of last exposure to the harmful substance even if its full deleterious effects only become manifest years later. *See, e.g., Thornton v. Roosevelt Hosp.*, 47 N.Y.2d 780, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979) ("the cause of action accrued at the time of the invasion of the decedent's body, and not at the time" that condition became apparent); *see also Braswell v. Flintkote Mines Ltd.*, 723 F.2d 527 (7th Cir.1983), *cert. denied*, 467 U.S. 1231, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984) (construing Indiana law to hold that limitations period runs from date of exposure). These holdings imply that those claims, if they had been filed while the injuries were latent, satisfied the minimal Article III requirements.

Even where the statute of limitations permits a litigant to await manifestation of latent illnesses, courts have recognized claims for medical monitoring that accrue at the time of exposure. *Gerardi v. Nuclear Util. Serv.*, 149 Misc.2d 657, 566 N.Y.S.2d 1002, 1004 (1991) (court denied motion to dismiss cause of action for medical monitoring). In *Gerardi*, the plaintiffs employed by Consolidated Edison in the course of a maintenance project were enveloped in a cloud of dust which contained asbestos. Plaintiffs asserted that they probably ingested or inhaled asbestos fibers. The plaintiffs conceded that they did not then suffer from an asbestos-related illness, but asserted that they have an increased risk of developing such disease as a result of their exposure. *Id.* The plaintiffs contended they then needed a lifetime

of medical monitoring and had suffered emotional distress.

The court noted that "[w]hile it is true that damages resulting from the enhanced risk of disease and the threat of future harm not yet realized are not compensable in a tort action, a defendant may be liable for 'reasonably anticipated' consequential damages to include future medical expenses...." *Id.* 566 N.Y.S.2d at 1004 (citations omitted). The court adhered to the Appellate Division's holding in *Askey v. Occidental Chemical Corp.*, 102 A.D.2d 130, 477 N.Y.S.2d 242 (4th Dep't 1984), which permitted recovery for medical monitoring. That decision recognized that such a cause of action " 'would permit early detection and treatment of maladies and that as a matter of public policy the tortfeasor should bear its cost.' " *Gerardi*, 566 N.Y.S.2d at 1004 (quoting *Askey v. Occidental Chemical Corp.*, 102 A.D.2d 130, 135, 477 N.Y.S.2d 242 (4th Dep't 1984)); *see also* "Jury Awards Damages for Medical Monitoring, Fear," 6 *Mealey's Litigation Reports: Asbestos* 33 (March 15, 1991) (jury in Camden County, New Jersey awarded $20,000 for medical monitoring expenses to person with pleural thickening).

A person exposed to asbestos dust has also been recognized as a "party in interest" for the purpose of bankruptcy proceedings. *See, e.g., In re Amatex Corp.*, 755 F.2d 1034, 1043 (3d Cir.1985); *In re UNR Indus.*, 46 B.R. 671 (Bankr.N.D.Ill. 1985); *In re Johns–Manville*, 36 B.R. 743, 747–49 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). Such claimants were deemed to have a cognizable interest in the Johns–Manville bankruptcy reorganization. This bankruptcy court stated,

> [a]ny plan not dealing with [future claimants'] interests precludes a meaningful and effective reorganization and thus inures to the detriment of the reorganization body politic.... If they are denied standing as parties in interest, they will be denied all opportunity either to help design the ship that sails away from these reorganization proceedings with their cargo on board or to assert their interests during a pre-launching distribution.

*Id.* at 749.

Some courts have held that the time of exposure to asbestos triggers insurance coverage. *See Insurance Co. of North America v. Forty Eight Insulations, Inc.*, 657 F.2d 814, 816 (6th Cir.) (trigger for insurance coverage exposure because 'bodily injury' occurs when asbestos victims first starts breathing asbestos fibers), *cert denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *see also Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1047 (D.C.Cir.1981) (term "bodily injury" in comprehensive liability policies means "any part of the single injurious process that asbestos-related disease entails"), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (same). *But see W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865, 876 (5th Cir. 1990) (reversing district court after analysis of Texas and New York law revealed conflict on issue of injury-in-fact versus continuous trigger for insurance coverage; court concluded that New York courts would apply injury-in-fact standard for insurance coverage); *Abex Corp v. Maryland Casualty Co.*, 790 F.2d 119, 124–25 (D.C.Cir.1986) (interpreting policy which provides coverage for occurrence that "results, during the policy period, in bodily injury"); *Eagle–Picher Indus. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982) (manifestation triggers insurance coverage), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 1280, 75 L.Ed.2d 500 (1983).

If persons exposed to asbestos fibers have a sufficient injury to warrant insurance coverage, they must have suffered a quantum of harm adequate to satisfy the constitutional case or controversy minimum of injury-in-fact. *See generally In re Johns–Manville Corp.*, 36 B.R. 743, 750 (Bankr.S.D.N.Y.1984) (discussion of insurance cases), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). As the Seventh Circuit explained:

Even in a "discovery" state the cause of action may "exist" before it "accrues"—that is before the statute of limitations on bringing it begins to run.... These states postpone the date of accrual of the cause of action not in order to prevent the early filing of claims but in order to lift the bar of a statute of limitations to later filings.

*In re UNR Indus.*, 725 F.2d 1111, 1119 (7th Cir.1984); *see also Insurance Co. of North America*, 657 F.2d at 816; *Keene*, 667 F.2d at 1047) (court decided both exposure and manifestation trigger coverage under comprehensive general liability policies). In *Commercial Union Insurance Co. v. Pittsburgh Corning Corp.*, 553 F.Supp. 425, 433 (E.D.Pa.1981), the district court explained its holding that exposure triggered insurance coverage:

I hold in favor of an exposure theory based on either of two simple, uncontroverted, and indisputable facts: (1) asbestos disease is cumulative; and (2) some microscopic damage occurs before manifestation of the injury ... By the former, I mean that asbestos diseases are caused by an accumulation over time of asbestos particles in the body. Particles accumulated during exposure, but before manifestation of an asbestos disease, are a cause-in-fact of the disease. The second fact statement is self-explanatory.

*Id.* at 433; *cf. Maryland Casualty Co. v. W.R. Grace Co.*, 1991 WL 34181, at 5–9, 1991 U.S.Dist. LEXIS 2509, at 17–28 (S.D.N.Y.1991) (where injury-in-fact triggers insurance coverage must make case-by-case determination of onset of asbestos injury).

■ The policy reasons behind statute of limitations periods do not govern whether a party has a case or controversy within Article III. As the Supreme Court has stated:

Statutes of limitations ... represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and the right to be free of state claims in time comes to prevail over the right to prosecute them ... These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired....

*United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979).

When and whether to file a claim seeking compensation for asbestos-related injury involves many considerations particular to each individual and each state's public policy. While perhaps it may be undesirable to institute claims prior to full appreciation of the extent of injury, the fact that such claims could be pressed in many jurisdictions is indisputable.

Early status for Article III standing to be heard is particularly necessary in mass-tort-latent-disease cases. Often settlements and alternate dispute resolution techniques will be instituted even before litigation is threatened to provide protection against a looming storm cloud of future controversies. The courts need to be in a position to intervene as necessary.

■ Even if persons exposed but without current impairment did not have a cause of action at the time that the Settlement was reached, such claimants could be bound to the courts' final judgment. The Supreme Court recently recognized certain limited exceptions to the general rule that a person must be a party to the litigation to be bound in personam by its judgment. *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 2184 n. 2, 104 L.Ed.2d 835 (1989). Despite the "deep-rooted historic tradition that everyone should have his own day in court" under certain limited circumstances when

a person, although not a party, has his interests adequately represented by someone with the same interests who is a party. *See Hansberry v. Lee*, 311 U.S. 32, 41–42 [61 S.Ct. 115, 117–18, 85 L.Ed. 22] (1940) ("class" or "representative" suits) ... Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonliti-

gants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 529–30, & n. 10 [104 S.Ct. 1188, 1198, & n. 10, 79 L.Ed.2d 482] (1984) ("proof of claim must be presented to Bankruptcy Court ... or be lost"); *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. [478], 108 S.Ct. 1340 [99 L.Ed.2d 565] (1988) (nonclaim statute terminating unsubmitted claims against the estate).

*Id.* 109 S.Ct. at 2184 n. 2 (citations omitted).

This present class litigation emanates out of a remedial scheme created by a bankruptcy reorganization. If the proceedings have comported with due process procedural protections, future claimants who are members of the class of beneficiaries of the Trust will be bound in practical effect by the revisions effectuated in the Settlement. The presence of untold thousands of future claimants necessitates a class action. It must proceed as a mandatory, non-opt-out class action in which no individual has the opportunity to deplete disproportionately the Trust's funds by withdrawing and prosecuting a separate case.

### E. Participation of Claimants; Voting not required

 The suggestion by several objectors to the Settlement that a vote of claimants should occur prior to approval is appealing. In an effort to solicit the views of claimants, the courts ordered that detailed notice be mailed directly to claimants who had filed proof of claim forms with the Trust and to attorneys who represented claimants so that they could inform interested clients of the pendency of the proceedings and the date and times of the hearings both before Special Master Frankel and the courts. Moreover, notice was published in numerous national newspapers shortly after the proposed Settlement was submitted to the courts and again just before the fairness hearings. The courts held public hearings in five separate districts (Southern District of New York, Eastern District of New York, Washington,

D.C., Southern District of Louisiana and Northern District of California) to encourage participation by injured and exposed individuals, and make such participation more convenient.

Various representatives of White Lung Associations availed themselves of the opportunity to be heard and suggested alternatives to the proposed Settlement. *See* Part III.D, *supra.* Beyond the presence of members representing the White Lung Associations, few independent claimants came forward to participate.

Despite the desirability of having democratic participation in the resolution of the difficult questions posed by the proposed Settlement, none of the counsel who favor claimant voting has offered a feasible and fair method for conducting a vote. The courts invited those in support of such a procedure to submit recommendations, but none were received. The difficulties in designing an equitable vote appear to the courts, and presumably to the parties in view of the lack of concrete proposals, formidable if not insuperable under current circumstances.

The first difficulty involves how to calculate and weigh votes to account for differing illnesses and hence differing claim values and codefendants' claims. With respect to a bankruptcy plan, the Code defines acceptance of a plan of reorganization when "such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." 11 U.S.C. § 1126(c) (1988). For the purpose of allowance, a bankruptcy court must estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1) (1988). A bankruptcy court has further authority to estimate the value of claims under certain circumstances. *See* Bankruptcy Rule 3018(a) (after objections, notice and hearing bankruptcy court can allow claim "in an amount which the court deems proper for the purpose of accepting or rejecting a plan").

By the time the Manville Plan was before the bankruptcy court for confirmation after the notice campaign, approximately 53,440 proofs of claim had been submitted by asbestos health claimants. As Judge Miner noted in his concurrence affirming the confirmation of the Plan,

[i]t was apparent at that juncture in the proceedings that the administration of the case would be delayed unduly if each of those unliquidated claims were to be considered separately for allowance purposes.... [T]he very purpose of the reorganization would be defeated if each claim were to be considered separately for purposes of allowance and voting. Indeed the delay entailed by such an approach would not only be fatal to the entire plan but might very well be fatal to any recovery for the claimants.

*Kane v. Johns–Manville Corp.*, 843 F.2d 636, 651 (2d Cir.1988) (Miner, J., concurring). The Second Circuit affirmed the authority of the Chief Bankruptcy Judge to estimate the value of each claim at $1.00 to eliminate this problem. *Id.* at 646–47.

Faced with similar obstacles in the *A.H. Robins* bankruptcy confirmation, the judge explained

[a]ny attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well.

88 B.R. 742, 747 (E.D.Va.1988), *aff'd*, 880 F.2d 694 (4th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). Instead, the court placed a nominal value on each of the claims for voting purposes.

A second factor inhibiting the courts inclination to obtain a vote is the practice of permitting attorneys to vote on behalf of their clients. This does not seem appropriate in the context of asbestos litigation, particularly with respect to the Trust. The fee and solicitation positions of attorneys in this specialized and concentrated litigation amount to vested interests quite distinct in some circumstances from those of injured claimants. Moreover, conflicts among the masses of clients each major attorney represents arise because of vast differences in exposures, kinds of diseases, ages and needs of clients and the like. Any position taken by an attorney is bound to place him or her or one of the clients at a relative disadvantage or advantage. This has been true for the last decade in asbestos litigation.

Treating this mass litigation as if each claimant had an individual voice and an individual attorney devoted only to that client's interest is, in the case of most claimants, a romantic notion based on dreams of the law's past, having no relationship to the reality of asbestos lawyering as a business in the present. As the bankruptcy court in the Celotex/Carey Canada proceedings recently concluded:

Considering the actual participants of the Official Asbestos Personal Injury Creditors Committee, the actual driving force behind the piercing of the corporate veil litigation and the hiring of committee legal representation, the activities appear to be lawyer driven. Notwithstanding that driving force, it does not appear these two groups, whether they be characterized as asbestos personal injury claimants or lawyers representing asbestos personal injury claimants, have the same interest, legal agenda or fiduciary duty as regards the committee. A creditors committee has a fiduciary duty to the individual members that committee represents. Counsel for the committee has a fiduciary duty to the committee and its constituency. The fiduciary duties cannot be misdirected by the relationship of the committee's counsel with other entities that have other considerations than the committee or its constituency.

*In re Celotex Corp.*, 123 B.R. 917, 920 (Bankr.M.D.Fla.1991). The bankruptcy court in *Celotex* characterized the group of plaintiffs' attorneys as "the face of the creditors committee but not its members." *Id.* at 921.

In the course of the class action, the courts have reiterated their concern that serious conflicts exist between plaintiffs' counsel and their various categories of clients each of whom would be affected differently by the alternative scenarios before the court. The existence of divergent interests with respect to the Settlement with its limit on attorneys fees, undermines the validity of a vote in which counsel participate on behalf of their clients.

The third and most vexing problem concerns the appropriate treatment of future claimants in any voting process on the fairness of the Settlement. In view of the difficulty in determining who will in fact manifest asbestos-related injuries from among those exposed, any calculation will suffer from assumptions and uncertainties that will greatly diminish its usefulness. A vote by proxy through the court-appointed Legal Representative would be possible, but again necessarily speculative. How such a vote would be weighed poses perhaps the most insurmountable obstacle. *See* Tr. 1/23/91 at 238. Shall Mr. Fagen, representing future claimants, be authorized to cast one weighted vote on behalf of perhaps hundreds of thousands of injured persons whose injuries are not yet manifest?

The significance of future claimants was not overlooked during the bankruptcy proceedings. Future claimants were classified as "parties in interest" and assigned an independent representative. *See* 11 U.S.C. § 1109 (1988); *In re Johns–Manville Corp.*, 36 B.R. 743, 749–57 (Bankr. S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). The question whether they constitute creditors who· hold claims within the meaning of section 101(4) was not resolved. *See In re Johns–Manville Corp.*, 68 B.R. 618, 628 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988); *accord In re UNR Indus.*, 71 B.R. 467, ·472 (Bankr.N.D.Ill.1987). If future claimants are not creditors, a question the courts do not now decide, they would not be entitled to vote under the bankruptcy code. *See In re UNR Indus.*, 71 B.R.

467, 472 (Bankr.N.D.Ill.1987). Yet, to eliminate that category of claimants in a vote on the Settlement would vitiate the utility of claimant participation. As under the original Plan, attorneys for their current clients might exercise their voting power to strip the Trust of assets needed for future claimants.

A vote that excluded future claimants— the group that stands to suffer the most from defeat of the Settlement—would inherently skew the results. The Settlement in· effect requires present claimants to accept only a partial payment of their claim in order to preserve some funds for those who have yet to manifest asbestos-related injuries (as well as for those who stand farther back in the existing FIFO queue). Outside bankruptcy, class action settlements are not typically subject to a vote of class members. *See League of Martin v. Milwaukee*, 588 F.Supp. 1004, 1023 (E.D.Wis.1984) (no right to vote on class action settlement; objections of class members not dispositive). The equivalent of a vote is provided by notice and public fairness hearings. The court acts as a neutral fiduciary to protect the silent majority.

A final possibility would be to submit the Settlement to the state and federal judges currently handling asbestos cases across the country. Their proxy vote on behalf of claimants would not suffer from the self-interest that might infect a vote by attorneys on behalf of the beneficiaries they represent. It is an intriguing thought without any practical means of implementation absent new and radical legislation.

As to present claimants, they are almost all fully represented by able counsel. The court must assume that these counsel consulted with their clients in an appropriate manner before those representing a majority of the claimants decided to support the Settlement. In effect they have voted for the Settlement.

**F. Effect of Anti–Injunction Act**

▉▉▉▉▉ Certification of a mandatory class action has the effect of enjoining all pending asbestos cases against the Trust,

including those filed in state courts. Consideration must be given to the applicability of the Anti–Injunction Act, 28 U.S.C. § 2283 (1988). This statute bars a federal court from staying pending proceedings in state court "except as expressly authorized by Act of Congress, or when necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1988).

This question has been exhaustively addressed in a previous opinion in the *Manville* proceedings. *In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville)*, 120 B.R. 648, 654–59 (E. & S.D.N.Y.1990); *see In re Eastern and Southern Dists. Asbestos Litig. (Eagle–Picher)*, 134 F.R.D. 32 (E. & S.D.N.Y.1990). Existence of a final class certification and partial judgment strengthens the court's authority to protect its jurisdiction through an injunction. *See In re Baldwin–United*, 770 F.2d 328, 335 (2d Cir.1985). The courts rely upon their previous discussions of this issue. There is no reason to depart from that analysis. The Anti–Injunction Act does not inhibit certification of the class.

## VI. POWER OF BANKRUPTCY COURT AND DISTRICT COURT TO INTERPRET THE PLAN AND REVISE PAYMENTS MADE BY A NEW YORK TRUST CREATED PURSUANT TO A BANKRUPTCY

### A. Bankruptcy Law

#### 1. *Settlement Does Not Modify Plan*

No one disputes that the courts have the authority to implement or execute a confirmed plan of reorganization. *See* Part IV.A.2, *supra*. Under the Plan, the courts, where appropriate, have the power to modify provisions of the Plan or to order any changes necessary to ensure the proper effectuation of the Plan. *See* Part II.F, *supra*.

■■ Despite this broad grant of authority, several objectors to the Settlement contend that the Settlement constitutes a modification of a confirmed plan of reorganization and hence must satisfy the criteria set forth in section 1127(b), which governs modifications of such a plan. Section 1127(b) provides:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b) (1988). This argument has little merit. The Settlement is not, and does not purport to be, a modification of the Plan.

The Plan provided for the establishment of the Trust to pay all claims of the Class IV creditors, and Manville was discharged from the debts created by those claims. *See* 11 U.S.C. § 1141(d); *In re Johns–Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d. 636 (2d Cir.1988); Plan § 4.3 at C–29; Trust Agreement § 2.04, at C–80. The class action, while related to a reorganization under Chapter 11, involves a consensual variation of the Trust's methods for meeting its obligations to its beneficiaries and the rights of those beneficiaries among each other.

The Settlement will not alter, in any manner, Manville's obligations to its other creditors; Manville will simply provide additional financing to the Trust. The Trust Agreement, which is the only document affected by the Settlement, is not a plan of reorganization, but a "plan-related document." We have found no case that has applied section 1127(b) to bar variations in a plan-related document. Rather, the terms of the plan and the plan-related documents themselves govern the question of the availability of modification.

Mr. Angelos argues that because certain documents submitted with the Plan explicitly state "[t]his document did not form part of the Plan of Reorganization", *see*

Plan at C–71 (By–Laws of Manville Corporation), C–94 (By–Laws of Manville Personal Injury Settlement Trust), that all other materials bound with the reorganization Plan constitute a unified package all of which are subsumed as part of the Plan. The courts look to the provisions of the Plan to ascertain what formed the Plan itself and what falls within the category of "Related Documents."

The Second Circuit has recently addressed the question of variations concerning plan-related documents with respect to the Manville Property Damage Trust (the "PD Trust"). *See In re Johns–Manville Corp.*, 920 F.2d 121, 129 (2d Cir.1990). It considered whether a "temporary" thirty year suspension of the operations of the property damage claims resolution facility constituted an impermissible modification of the reorganization plan. Noting that section 1127(b) does not define the term modification, the court turned to the Plan itself for guidance.

The Plan defined modification by referring to the terms of the PD Trust. The Court of Appeals found that the PD Trust specifically permitted the temporary suspension of operations because it was a procedural rather than a substantive change in the Plan and not a modification within the meaning of section 1127. It agreed with the district court's assessment that

> [i]t is clear that when the plan was adopted the parties were embarking into unknown territory and that the operation of the Manville claims facility might require adjustments and changes as additional knowledge and experience were gained. Thus, we find that the [bankruptcy court's] order is entirely consistent and pursuant to the provisions of the reorganization plan and that there was no error of law by the bankruptcy court in approval of that order.

*In re Johns–Manville Corp.*, 920 F.2d 121, 129 (2d Cir.1990). The court concluded that the suspension "is more properly deemed, as suggested in the district court, to be 'a variation ... with respect to the timing and intensity of claim processing.'" *Id.* at 128–29 (quoting district court decision).

Similar provisions dictate the result in the present case. Article XI of the Plan explicitly provides for amendment of plan-related documents:

> *Amendments.* The authority of the Company, the Trustees, the PD Trustees and holders of Claims to agree to modifications, supplements or amendments of or to the agreements and instruments attached as Exhibits hereto or as Annexes to any such Exhibit shall be as provided in such agreements and instruments.

Plan § 11.6, at C–37. The Trust Agreement, Exhibit C to the Plan, states in Article VII, section 6.03(a) that the Company and Trustees may, after consultation with Select Counsel for the Beneficiaries, modify or amend the Trust Agreement so long as it is in writing. Section 6.03(a) contains certain exceptions which are not implicated in the Settlement.

The plain language of the Plan and Trust Agreement indicate that the drafters contemplated that unforeseen circumstances might arise which would require variations of aspects of the Trust. The Plan undertook to resolve a complex reorganization in a novel and creative fashion. Such efforts should be encouraged under the flexibility of the bankruptcy laws without excessively hindering the reorganized entities from responding to substantially changed circumstances.

The Settlement is well-within the flexible approach authorized by Section 11.6 of the Plan. The changes are "entirely consistent with and pursuant to the provisions of the reorganization plan." *In re Johns–Manville Corp.*, 920 F.2d 121, 129 (2d Cir.1990). If a thirty year suspension of operations constitutes a procedural modification in the PD Trust, *a fortiori*, altering the payment procedures of the Trust should be characterized in the same way.

 The objectors also argue that the Settlement modifies the Plan because it impermissibly impairs the rights of one class of creditors and treats creditors within the same class differently in contravention of both the Plan and the Bankruptcy Code. Article III of the Plan provides:

Treatment of Classes of Claims and Interests. The treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to Article III of the Plan shall be in full settlement, release and discharge of their respective Allowed Claims or Interests.

. . . .

3.4 *Class Four Claims are impaired.* Each holder of an Allowed Class Four Claim shall be paid the full amount of such Allowed Claim in accordance with the terms and provisions of the Claims Resolution Facility and Article IV of the Trust Agreement.

Plan § 3.4, at C–25. This Article indicates that payments will be made according to the provisions of the Trust Agreement and the Claims Resolution Facility. Reference to those documents does not bind the Trust to maintain the procedures in place at the time the Plan was confirmed, especially when the Trust Agreement itself contemplates amendment, but instead mandates that the claims will be processed in compliance with such procedures adopted by the Trust in accordance with the Trust Agreement.

The codefendants further argue that the Codefendant Procedures, unlike the Trust Agreement, does not include a modification provision and hence are not subject to revision even if the other instruments are. *See* Annex F to Trust Agreement. In fact, the Codefendant Procedures merely amplify aspects of the Claims Resolution Procedures that relate exclusively to claims for indemnification and contribution. They largely refer to, and incorporate much of, the provisions for processing all asbestos health claims. In addition, certain individual distributor-codefendants have in fact negotiated separate agreements with the Trust that altered the procedures with respect to their claims.

2. *Power Under Bankruptcy Code to Issue Injunctions*

Section 105 defines the scope and forms of relief the courts may grant under the Bankruptcy Code. *In re American Hardwoods*, 885 F.2d 621, 624 (9th Cir.

1989); *In re Rustic Mfg.*, 55 B.R. 25, 30–31 (Bankr.W.D.Wis.1985). Section 105(a) provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (1988). Section 105 empowers the courts to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and administration of the bankruptcy estate. *See, e.g., In re A.H. Robins Co.*, 88 B.R. 742, 752–55 (E.D.Va.1988) (permanently enjoining proceedings in other forums and enjoining parties from commencing or continuing litigation except consistent with reorganization plan), *aff'd*, 880 F.2d 694, 700–02 (4th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *In re Burstein–Applebee Co.*, 63 B.R. 1011, 1020–21 (Bankr. W.D.Mo.1986) (permanent injunction prohibiting principles of debtor from continuing state court action against creditors committee); *In re Askew*, 61 B.R. 87, 89 (Bankr.S.D.Ohio 1986) (creditor permanently enjoined from prosecuting state court action regarding discharged debt). *But see American Hardwoods*, 885 F.2d at 625 (no power to permanently enjoin post confirmation creditor from enforcing state court judgment against nondebtor guarantor of contract liability).

The bankruptcy code authorizes the courts "to use their equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985). *See also In re Chanticleer Assoc., Ltd.*, 592 F.2d 70, 74 (2d Cir.1979) ("[t]he court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt's estate is fundamental to the scheme of the bankruptcy Act"). Earlier in the Manville reorganization proceedings, the Second Circuit emphasized that "the bankruptcy court may exercise its legitimate injunctive powers to control the future course of rehabilitation pursuant to appropriate legal standards and evidentiary showings." *Manville Corp. v. Equity Sec. Holders Comm.*, 801 F.2d 60, 69 (2d Cir.1986). *See generally* Leal, *The*

*Power of the Bankruptcy Court: Section 105,* 29 S.Tex.L.Rev. 487 (1988).

■ Section 105 supports the courts' authority to grant the relief sought in the instant class action. This provision has been construed to afford bankruptcy courts necessary flexibility to facilitate reorganizations. Wide equitable powers are available to meet extraordinary problems consistent with the statutory goals of chapter 11. *See, e.g., In re Johns–Manville Corp.,* 36 B.R. 743, 757 (Bankr.S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y.1985); *In re Briggs Transp. Co.,* 780 F.2d 1339, 1343 (8th Cir.1985). Courts have also relied upon section 105 post-confirmation to issue injunctive relief to protect debtors and effectuate the plan of reorganization. *See, e.g., In re Askew,* 61 B.R. 87, 89 (Bankr. S.D.Ohio 1986).

■ Section 105, as well as the inherent power of a court of equity, provides ample authority to enjoin litigation which may constitute a threat to the assets of the debtor's estate. *See In re Chateaugay Corp.,* 109 B.R. 613, 622 (S.D.N.Y.1990), *appeal dismissed and remanded,* 924 F.2d 480 (2d Cir.1991) (remand to bankruptcy court for determination of scope of injunction in light of restoration of pension plan); *National Labor Relations Board v. Superior Forwarding Inc.,* 762 F.2d 695, 698 (8th Cir.1985); *In re Management Technology Corp.,* 56 B.R. 337, 339 (Bankr. D.N.J.1985) (power to issue writs to protect estate from interference and to ensure orderly administration); *In re Electronic Theatre Restaurants Corp.,* 53 B.R. 458, 462 (D.C. Ohio 1985) (it is interests of debtor, and not interests of nondebtors, which extraordinary powers of bankruptcy court under section 105(a) are designed to protect).

This bankruptcy court has previously set forth the authority in support of the permanent injunctions issued at the time of the Plan's confirmation. *In re Johns–Manville Corp.,* 97 B.R. 174, 180–82 (Bankr. S.D.N.Y.1989); *In re Johns–Manville Corp.,* 91 B.R. 225, 228–30 (Bankr. S.D.N.Y.1988); *In re Johns–Manville Corp.,* 68 B.R. 618, 625 (Bankr.

S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988). The present reaffirmation of the injunction protecting the Manville Corporation from asbestos-related litigation falls squarely within the analysis contained in the earlier cases. The Corporation has entered into a new agreement that will afford the Trust desperately needed cash. *See* Part II.L.3, *supra.* That funding is conditional upon a reaffirmation of the injunction. No one can seriously dispute that the availability of additional money will further the goals of the reorganization. The channeling of all litigation to the Trust preserves the viability of the Corporation thereby enhancing the value of the Trust's assets. As this bankruptcy court previously explained:

> The success of these reorganizations will be measured by the ability of the Trust to compensate the future asbestos-health claimants. The Trust's ability to function is contingent upon compliance with the Injunction and the Claims Resolution Procedures. Thus, any violation of these provisions of the Plan will irreparably harm not only the newly reorganized Debtors, but also future claimants.

*In re Johns–Manville Corp.,* 97 B.R. at 181.

The injunctions issued to protect the Trust are necessary for its very survival. The bar on all tort litigation except consistent with the Settlement will ensure that scarce resources are conserved for compensation rather than litigation defense costs, and that the goal of the class action and reorganization Plan—equitable treatment of all beneficiaries over time—may be accomplished at least with respect to the future course of the Trust.

**B. New York Law Governing Trusts**

■ New York Trust law permits modification of a trust in three situations. First, when the creator of a trust reserves the right to modify or revoke the trust. *See* Fratcher, *Scott on Trusts* § 331 (4th ed. 1989) ("If the settlor does not by the terms of the trust reserve a power to alter

or amend or modify it, he has no power to do so. But if he reserves such a power, he can modify the trust to the extent to which he has reserved a power to do so."). Second, under New York Estate Powers & Trusts Law § 7–1.9, even absent modification clause in the Trust instrument itself, a trust may be modified if all the beneficiaries agree to the modification. Finally, a court may permit a deviation from the terms of a Trust when unanticipated emergencies arise that necessitate modification in order to effectuate the purpose of the Trust. *See Restatement (Second) of Trusts* § 167(1) (1935).

▮▮▮ Under New York law, creators of trusts can reserve the right to modify trusts in any way they deem fit. *See In re Dodge's Trust,* 25 N.Y.2d 273, 303 N.Y.S.2d 847, 250 N.E.2d 849 (1969). In *Dodge* the New York Court of Appeals held that the modification or revocation of a Trust is governed by the terms of the Trust instrument. *See* 25 N.Y.2d at 286, 303 N.Y.S.2d at 857, 250 N.E.2d at 858; *see also In re Kresse's Trust,* 16 Misc.2d 878, 182 N.Y.S.2d 125 (N.Y.Sup.Ct.1958); *In re Morgan's Will,* 13 Misc.2d 214, 177 N.Y.S.2d 821 (N.Y.Sup.Ct.1958); *In re Harmon's Trust,* 5 Misc.2d 308, 164 N.Y.S.2d 468 (N.Y.Sup.Ct.1956). In *In re Herzog,* 301 N.Y. 127, 93 N.E.2d 336 (1950), the New York Court of Appeals held that when constructing a trust,

> primary attention must be given to the manifest purpose sought to be accomplished. When this is ascertained it will take precedence over all other canons of construction.

301 N.Y. at 135, 93 N.E.2d at 339. Thus, a New York court will attempt to interpret a trust instrument, including its modification clauses, in a way that promotes the primary purpose of the trust.

In this case, the purpose of the Trust is abundantly clear. As articulated in the Plan, the Trust was established in order "to deliver fair, adequate and equitable compensation to bona fide Beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims...." Trust Agreement § 2.02(i), at

C–80. Thus, any attempt to construe the language of the Trust must do so with this overriding purpose in mind.

▮▮▮ Both the Plan and Trust Agreement describe the procedures for modification. The Plan states that the

> authority of the Company, the Trustees, the PD Trustees and Holders of Claims to agree to modifications, supplements or amendments of or to the agreements and instruments attached as Exhibits hereto or as Annexes to any such Exhibit shall be as provided in such agreements and instruments.

Plan § 11.6, at C–86. The Trust Agreement states that Manville and the Trustees after consultation with the Select Counsel for the Beneficiaries may "modify, supplement or amend" the Trust Agreement "in any respect" with certain limited exceptions that are not affected by the revisions encompassed in the Settlement. Trust Agreement § 6.03(a), at C–86. Exercise of this broad amendment power does not require approval of, but merely consultation with, the Select Counsel, beneficiaries, or the Bankruptcy Court.

▮▮▮ The co-defendants argue, however, that section 6.03(a) does not extend to the Co–Defendant Procedures. The Co–Defendant Procedures are one of five Annexes to the Trust Agreement. Three out of these five Annexes contain their own modification clauses. The Co–Defendant Procedures have no amendment clause. Thus, the Co–Defendants argue that under ordinary rules of construction, the Co–Defendant Procedures may not be modified.

The co-defendants' position lacks merit. It ignores the fact that New York law holds the purpose of a trust paramount in construing the trust's terms. *See Matter of Herzog,* 301 N.Y. at 135, 93 N.E.2d at 339. Here, the purpose of the Trust will be thwarted if the Co-defendant Procedures are not modified. Thus, the absence of an amendment clause in the Co–Defendant Procedures is not controlling. This is especially so where, as here, there is no indication in the document that the clause was omitted purposefully to deny any chance of modification. The Plan, as accepted by its

beneficiaries, allows for its own amendment even absent the consent obtained through the Settlement.

 Henderson & Goldberg assert that New York Estates, Powers & Trusts Law Section 7–1.9, which requires that all beneficiaries consent to an amendment or revocation of a trust, prevents approval of the Settlement. Their reliance on this section is misplaced. The statute was enacted to establish a mechanism by which trusts which appear irrevocable on their face could be amended or revoked. "The statutory history [of section 7–1.9] indicates an intent to make seemingly irrevocable trusts, revocable upon consent of all beneficial interests." *In re Mordecai's Trust,* 24 Misc.2d 668, 670, 201 N.Y.S.2d 899, 902 (N.Y.Sup.Ct.), *aff'd,* 12 A.D.2d 449, 210 N.Y.S.2d 478 (1st Dep't 1960). The statute only applies where the creator failed to include a modification clause in the trust instrument. When, as here, the trust document contains such a provision, the Court of Appeals has held that the modification should be governed by that provision. *See In re Dodge's Trust,* 25 N.Y.2d 273, 303 N.Y.S.2d 847, 250 N.E.2d 849 (1969). The limitations of Estates, Powers & Trust Law section 7–1.9 are inapplicable in the present case.

 Even where the trust instrument does not reserve the power to amend, and all the beneficiaries do not consent to an amendment, courts are empowered to amend the terms of a trust in order to effectuate the purpose of the trust. Under New York trust law, as in most jurisdictions, courts are permitted to direct trustees to deviate from the terms of the trust when unanticipated emergencies arise which threaten to frustrate the purpose of the trust. *See In re Pulitzer's Estate,* 139 Misc. 575, 249 N.Y.S. 87 (N.Y.Sur.Ct.1931). The *Restatement (Second) of Trusts* accurately states current law:

> The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes

of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust.

*Restatement (Second) of Trusts* § 167(1) (1935).

In *Pulitzer's Estate,* 139 Misc. 575, 249 N.Y.S. 87 (N.Y.Sur.Ct.1931), the court permitted the trustees of shares of a company to sell the assets of the company despite provisions in the trust forbidding such a sale. The court authorized the sale because the company was experiencing severe economic losses. According to the court, in times of emergencies its equitable powers permit it to authorize deviations from the trust in order "to protect the beneficiaries of a trust from serious loss, or a total destruction of a substantial asset of the corpus." 139 Misc. at 579, 249 N.Y.S. at 93.

 Even were we to assume what is not the case—that the amendment clauses do not extend to the Co–Defendant Procedures appended to the Trust Agreement—the court may still order a deviation from the trust terms in order to effectuate the purpose of the trust. Since the primary and overriding purpose of the trust is to compensate all beneficiaries equitably over time, and this goal is seriously threatened by the insolvency of the trust, action to meet the emergency must be taken. It is also clear that the number of claimants and ultimate cost of compensation were not anticipated by the creators of the trust. Thus, under New York Trust law, it is within the court's equitable powers to permit the trustees to deviate from the trust terms in order to promote fair compensation for all victims. This power exists independent of a settlement or the class action.

It is an open question in some jurisdictions whether a court may permit a deviation from the terms of a trust agreement to effectuate the purpose of the trust which will have the effect of benefitting some of the beneficiaries at the expense of others. *See Scott on Trusts* § 167 (4th ed. 1989) (concluding courts cannot modify in man-

ner that advances interests of some beneficiaries at expense of others). New York appears to give its courts wide powers to effectuate the trust's underlying purposes. In *Oppenheimer's Estate*, 52 N.Y.S.2d 441, 443–44 (N.Y.Sur.Ct.1945), the court permitted the trustee to disregard trust terms directing him to pay and discharge all liens on a certain parcel of property. If the trustee discharged the mortgage, there would have been insufficient funds left to support the decedent's brother. The brother's support was the primary purpose of the trust. Justifying its decision to deviate from the trust terms, the court pointed out that the decedent had "not [been] attempting to confer a benefit upon the mortgagee" but rather "was simply defining the duty and directing the conduct of his executors with respect to an investment." *Id.* at 444. The facts did not present the issue whether the court could have modified the terms of the trust had the mortgagee been a co-beneficiary and his benefit abridged by the modification.

■ Under some circumstances, New York trust law explicitly permits modification of trust terms that benefit some beneficiaries at the expense of others. *See* N.Y. Est. Powers & Trusts L. § 7–1.6. This provision enables a court to invade a trust with income beneficiaries and principal beneficiaries in a manner that will increase the income generated for income beneficiaries even though it may diminish the value of the corpus earmarked for principal beneficiaries. *See In re Albert*, 111 Misc.2d 884, 445 N.Y.S.2d 355 (N.Y.Sup.Ct. 1981) (power to invade trust principal and apply it for benefit of an income beneficiary is in limited circumstances authorized by this section). This provision furthers the public policy of ensuring that New York trusts fulfill their primary purpose.

■ In the present matter, the proposed modifications generally will have the effect of benefiting most current claimants, later-filing claimants and future beneficiaries at the expense of a relatively few present claimants and their lawyers. In some states the Settlement may benefit a few plaintiff beneficiaries to the detriment

of some co-defendant beneficiaries. Nevertheless, each beneficiary will, under section H of the Settlement, receive an equal pro rata percentage of the value of a claim. This represents the most equitable effectuation of the Trust's purpose. Arguably, to the extent some of the loss emanating from the Trust's limited funds may be shifted to the co-defendants by operation of section H, there is presented a question under section 167(1). The equities are so clearly in favor of the modification and so clearly required by the Trust's modus vivendi, its reason for being, that the Settlement must be held to conform to the principle of section 167(1) of the Restatement of Trusts and New York's statutory and case law.

■ Were only New York involved, section H could be enforced despite the fact that it is somewhat at odds with the statutory and case substantive law controlling asbestos litigation. We need, however, to give weight to New York's law of conflicts, particularly its center of gravity concepts requiring that the substantive law of other states be considered. *See generally* Korn, *The Choice of Law Revolution: A Critique*, 83 Colum.L.Rev. 772 (1983) (definitive analysis of New York conflicts law). The center of gravity with respect to an interpretation of the Trust instrument is in New York. Applying, as the New York courts would, the New York law of trusts, there is ample authority in trust law to approve the variations incorporated in the Settlement.

## VII. FAIRNESS OF SETTLEMENT

■ Class action settlements, because they result in a judgment binding on absent members, must be approved by the court. Fed.R.Civ.P. 23(e); *see* Note, *Abuse in Plaintiff Class Action Settlements: The Need for a Guardian During Pretrial Settlement Negotiations*, 84 Mich.L.Rev. 308, 320–25 (1985) (discussing court supervision of settlements). In practice, the vast majority of class actions settle before trial. *See Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1225 (9th Cir.1989), *cert. denied*, — U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). The pressures and uncertainty of

litigation often lead plaintiffs to accept a sum certain at an early date rather than risk recovering nothing after bearing the costs and burdens associated with trial. For defendants settlement offers the opportunity to avoid the gamble of a large adverse verdict and minimize costs. By settling at a deliberate rate in asbestos litigation defendants may better control their cash flow and avoid the risk of immediate public recognition of their total probable liability through disclosures which might lead to claims of insolvency. For a substantial number of defendants a sensible settlement policy is also necessary to preserve insurance assets and remain viable. Still, the settlement of complex, multiparty class actions is difficult to accomplish. *Id.* at 1225.

As a general rule, settlements before trial are encouraged. The Federal Rules incorporate this policy preference: "Since it obviously eases crowded court dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible." Fed.R.Civ.P. 16(c) advisory committee note; *see* Fed.R.Evid. 408 (protecting confidentiality of settlements and settlement discussions as a matter of public policy). As the Ninth Circuit has emphasized,

> [i]t hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation. This is particularly true in class action suits
> . . . .

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir.1976) (footnote omitted).

A. Law and Criteria under Rule 23(e)

The Second Circuit has identified a number of factors to guide a determination whether the compromise of a class action satisfies Rule 23(e). These factors, whose importance and applicability will vary from case to case, include: (1) the complexity, expense and possible duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages, or in this instance the requested injunctive and declaratory relief; (6) the risks of maintaining the class action at trial; (7) the ability of the defendant to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the reasonableness of the settlement fund in the light of the attendant risks of litigation. *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323–24 (2d Cir.1990); *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974); *Burka v. New York City Transit Authority*, 129 F.R.D. 80, 83 (S.D.N.Y.1990).

 Generally courts should approve a class settlement if it falls within a "range of reasonableness" which recognizes "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The courts in the instant case are confronted with a Settlement that may affect hundreds of thousands of injured persons many of whom have cases pending in federal and state courts. In addition to the parties, this litigation will have an impact on major manufacturers and distributors that form a significant portion of a sector of American industry. The courts are bound to consider the effect of the Settlement on discernable public interests affected by the outcome of the case. *Long Island Lighting Co.*, 710 F.Supp. at 1436; *In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 758–59 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); *see Carson v. American Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981).

 In deciding whether to permit the termination of a class action pursuant to a settlement, a court acts in part as a fiduciary to absent class members and must be satisfied that the settlement does

not unfairly compromise their rights. *Long Island Lighting Co.*, 710 F.Supp. at 1439; *see also In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986) ("In approving the proposed settlement of a class action, a district court has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately."). The Fourth Circuit recently noted: "[t]he primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158, 161 (4th Cir.1991). If the settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented and protected. *See id.; Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 2184 n. 2, 104 L.Ed.2d 835 (1989); *Manual for Complex Litigation* § 23.14, at 166 (2d ed. 1985).

 Reasonableness and adequacy of any settlement must be judged in light of the totality of the circumstances of the litigation. *In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. at 761. The nature and goals of the action will delineate the possible consequences of proceeding in absence of settlement. Thus, the courts will not review the proposed compromise in a vacuum, but rather against the realistic alternatives that the courts perceive or have been presented by the parties. *See Thompson v. Midwest Found. Indep. Physicians Ass'n*, 124 F.R.D. 154, 159 (S.D. Ohio 1988) (in considering opposition to settlement, court must view agreement in its entirety, rather than isolating individual components for analysis).

 Finally, the courts must review the Settlement according to its terms without substituting their own judgment for that of the attorneys and class members who have negotiated in good faith. *In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986); *see also Evans v. Jeff D.*, 475 U.S. 717, 726-27, 106 S.Ct. 1531, 1536-37, 89 L.Ed.2d 747 (1986); *Foe*

*v. Cuomo*, 700 F.Supp. 107, 109-10 (E.D.N.Y.1988), *aff'd*, 892 F.2d 196 (2d Cir. 1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 441, 112 L.Ed.2d 424 (1991).

 Despite this restriction, in some instances a provision of a settlement agreement may leave questions unaddressed or so ambiguous that it threatens to undermine the feasibility of the entire agreement. Such a provision must be construed by the court before the adequacy and reasonableness of the Settlement as a whole can be evaluated. For example, where a settlement agreement failed to specify the legal rule to govern contribution claims pursuant to Section 11 of the Securities Act of 1933 and Sections 10(b) and 10b-5 of the Securities Exchange Act of 1934, the Fourth Circuit directed that the case be "remanded in order that the district court may amend Clause 9 to specify the setoff method to be used." *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 162 (4th Cir.1991).

### B. Factual Basis for the Settlement

The Plaintiff Class Representatives in their Reply Brief outline the broad areas of agreement that exist amid a welter of disputes concerning the fairness of the Settlement. They include:

1. The need to eliminate the Trust's transactions costs;

2. The need to make more cash available for distribution to Trust beneficiaries in the earlier years, while providing a healthy corporate environment for Manville Corporation [the Trust's chief asset];

3. The need for a new broad-based and evenhanded distribution system tuned to the anticipated availability of cash that will pay claimants equitably in a way that protects the interests of future claimants;

4. The need to preserve the relationships and balance of interests that now exists among beneficiaries ...; and

5. The need to reduce the beneficiaries' transaction costs in order to maximize their net recoveries.

Reply Brief in Further Support of Proposed Class Action Settlement, *Findley v. Blinken*, No. 90–3973, at 2 (E.D.N.Y. Feb. 12, 1991). General agreement among varying groups on these basic issues represents a substantial consensus that should not be ignored in the more extensive treatment of objections to individual provisions of the Settlement.

 As a predicate to evaluating the fairness of a settlement, a court must develop sufficient understanding of the relevant factual and legal issues to assess the litigation's prospects. *See Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983). An appreciation of the strength of the parties' positions is essential. In this instance, the courts are intimately familiar with the factual and legal aspects of this case. Its complexity has required thorough comprehension of the history and nature of the dispute. In view of the fully-developed record, this case is ripe for resolution, through Settlement or otherwise. Appropriate consideration can be given to the strengths of the parties' arguments, the possible alternatives to the Settlement and the risks of continued litigation.

The parties have also had ample opportunity to educate themselves about the litigation. To facilitate and expedite obtaining this knowledge, every reasonable request for discovery materials was granted. *See* 2 H. Newberg, *Newberg on Class Actions* § 11.56, at 476–77 (2d ed. 1985) (objector to settlement has no absolute right to discovery). *See also Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir.1987) (court has discretion to control discovery in class action settlements); *Glicken v. Bradford*, 35 F.R.D. 144, 148 (S.D.N.Y.1964) (same). The exhaustive record of negotiations and settlement discussions developed by the proponents of the Settlement—in which the chief minority plaintiffs' attorneys who object participated—further increased the large amount of materials already available to those interested in the settlement.

### 1. *Arms' Length Negotiations*

 The record reveals that the extensive meetings and discussions which preceded and ultimately led to the Settlement were arms-length negotiations. Counsel for the Trust, Manville and class members conducted extensive and difficult discussions over a period of several months. The experienced and skilled attorneys responsible for the Settlement vigorously pursued their clients' interests and produced a final agreement that reflects the compromises made by all parties in order to reach a consensual resolution.

Presence of judicially-appointed advisors throughout the negotiations, who reported back to the courts on several occasions, reinforces the contention that the compromise resulted from honest and difficult bargaining without any fraud or similar wrongful conduct. *See Williams v. Burlington N., Inc.*, 832 F.2d 100, 104 (7th Cir.1987), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). There is less danger of collusion where the court has appointed neutral advisors, special masters or experts who participate in the negotiations and keep the court informed of the progress of negotiations. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1436 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990); *In re Agent Orange*, 597 F.Supp. 740, 762 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). The courts were fortunate to have had the skilled services of Leon Silverman, adviser to the bankruptcy court, and his partner Matthew Gluck, who provided extraordinary assistance to the parties during settlement negotiations.

The hearings before highly skilled and experienced Special Master Frankel, a former federal district judge, in which the parties were afforded an opportunity to establish a factual record in support of their divergent positions provide the courts with ample evidence of the nature of the parties' positions and the challenges presented by the negotiations. *See* Special Master's Report, 120 B.R. 648, 662–63 (E. & S.D.N.Y.1990). This was no hurried negotiation in a smoke-filled room leading to sweetheart agreements.

### 2. Good Faith Negotiations Without Collusion

The district court, based upon the reports it received on the progress of discussions among the parties, described during the fairness hearings its perception of the negotiations: "It's obvious that the plan ... was a negotiated plan—if ever there was a negotiated settlement, it is this one.... [As] appears from the tool marks on the settlement, [it] was hammered away over a long and strenuous period of negotiations." Tr. 1/4/91 at 38. No party has presented evidence to support a contrary view.

Extensive notice of the Settlement to absent class members enabled those who with an interest in the proceedings to voice their support or opposition to the terms of the agreement. This process helps to smoke out collusive arrangements that unfairly compromise the interests of class members. A public hearing

> assures each member of the class that his or her integrity and right to express views and be heard on matters of vital personal interest has not been violated by others who have arrogated to themselves the power to speak and bind without consultation and consent.

*In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 758 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Notice affords class members the opportunity to inform the courts of relevant facts that bear on the fairness of the Settlement.

### 3. Probability of Success on Merits

In an action for damages, the most significant consideration is the strength of the plaintiffs' case on the merits weighed against the benefits of settlement. *Cf.* 7B C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 1797.1, at 395 (2d ed. 1986). In an action seeking declaratory and injunctive relief, the courts' evaluation of the limits of their authority to intervene and direct relief on behalf of class members delineates the potential additional benefits that might have resulted from continued litigation.

The Special Master's Report makes clear that the enormous gap between the Trust's assets and liabilities, while subject to dispute with respect to their precise numerical values, "leave[s] undisputed the essential conclusion that unless the present course is altered in significant respects, the Trust will fail in its purpose to compensate fairly all of its present and prospective beneficiaries." Special Master's Report, 120 B.R. 648, 662–63 (E. & S.D.N.Y.1990). The plaintiffs' have adduced strong evidence in support of their class allegations. Plaintiffs have amassed ample proof of pervasive injury and liability directly caused by Manville's mining, manufacture and distribution of asbestos.

There is no question that the fiscal resources of the Trust constitute a limited fund; that a restructuring is necessary to provide fair and equitable compensation to all beneficiaries; that, at the present level, transaction costs consume an unacceptably large amount of available funds; and that the longer litigation continues, the greater will be the prejudice suffered by all parties involved. The expense and complexity of continued litigation carries grave risks of substantial detriment to injured persons awaiting compensation, the Trust with its depleted resources, other asbestos manufacturers who bear a disproportionate burden while the Trust cannot pay Manville's share of liability and federal and state courts facing dockets inundated with asbestos cases.

The virtual insolvency of the Trust comes at a time when there is growing realization that, on a national scale, the total assets of former manufacturers and distributors of asbestos do not possess, and most likely are incapable of generating, adequate resources to compensate persons presently suffering from asbestos-associated illnesses, not to mention the anticipated tens of thousands of future victims. *See* Appendix C, attached.

Mindful that this is an action to revise distribution of assets into and from a trust with finite resources, the courts must consider the extent of relief that can be afford-

ed. It is far preferable for the parties, rather than the court, to construct the mechanisms by which difficult choices will be made. While imperfect, the Settlement does in good faith attempt to resolve such questions.

The asbestos tragedy has produced many victims. The present Settlement cannot eradicate the harsh and inequitable consequences resulting from the present failure of the Trust, the past delicts of Manville or the limits on available resources to compensate. It can only begin to provide more sensible and economically-feasible recovery for those suffering from asbestos-related injuries. The Settlement moves modestly toward those goals.

### 4. Settlement Prior to Certification of Class

The Second Circuit has cautioned that courts must carefully scrutinize compromises that were negotiated prior to class certification and where absent class members only receive notification at the time of settlement. See Plummer v. Chemical Bank, 668 F.2d 654, 658 (2d Cir.1982); Handschu v. Special Servs. Div., 605 F.Supp. 1384, 1394 (S.D.N.Y.1985), aff'd, 787 F.2d 828 (2d Cir.1986). To avoid possible collusion among, or undue influence by, the defendants on potential class representatives, there must be a "clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it ..." Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

Pre-certification settlements are discouraged if the record necessary to assess the fairness of the proposed compromise has not been developed at that early stage in the litigation. See, e.g., Plummer v. Chemical Bank, 668 F.2d 654, 658–60 (2d Cir.1982) (facts insufficiently developed to enable the court to appraise settlement intelligently). In contrast, settlements of well-developed claims in cases which have either been pending for several years or in which substantial and completed discovery enables the court to independently review

the benefits of settlement to absent class members present less concern. See, e.g., In re Beef Indus. Antitrust Litig., 607 F.2d 167, 176 (5th Cir.1979) ("settlement achieved after several years of pending litigation"), cert. denied, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); City of Detroit v. Grinnell Corp., 495 F.2d 448, 465 (2d Cir.1974) (settlement after almost four years of litigation, extensive discovery and pretrial practice).

Courts have differed in their view of the propriety of certification of classes for settlement purposes. Compare In re Bendectin Prods. Liab. Litig., 749 F.2d 300, 305 (6th Cir.1984) (vacating certification of a settlement class) with In re School Asbestos Litig., 789 F.2d 996, 1009 (3d Cir.) (recognition that most tort cases settle often resulting in savings for all concerned), cert. denied, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); In re Beef Indus. Antitrust Litig., 607 F.2d 167, 175–76 (5th Cir. 1979) (certified temporary settlement class), cert. denied, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); see also Weinberger v. Kendrick, 698 F.2d 61, 72–73 (2d Cir.1982) (temporary settlement classes useful in resolving major class action disputes), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); In re First Commodity Corp. of Boston Customer Accounts Litig., 119 F.R.D. 301, 306–08 (D.Mass.1987) (same); In re Mid–Atlantic Toyota Antitrust Litig., 564 F.Supp. 1379, 1388–90 (D.Md.1983) (same). Most recently, the Fourth Circuit concluded "[i]f not a ground for certification per se, certainly settlement should be a factor, and an important factor, to be considered when determining certification." In re A.H. Robins Co., 880 F.2d 709, 740 (4th Cir.), cert. denied, — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989).

Some commentators have similarly supported use of Rule 23 to foster settlement, even in mass tort cases. See Nielson, Was the 1966 Advisory Committee Right? Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation, 25 Harv.J.Legis. 461, 480 (1988) (noting increasing recognition that certification influences settlement

and permitting such recognition to affect decision to certify class). Professor Trangsrud who generally opposes class certification in mass tort litigation concluded:

A judicially supervised and approved class action settlement, like a judicially supervised trial, is a means of hearing and determining judicially, in other words, "adjudicating," the value of claims arising from a mass tort. As a result, if conditional certification of the case as a common question class action for settlement purposes would enhance the prospects for a group settlement, then Rule 23 authorizes certification.

Trangsrud, *Joinder Alternatives in Mass Tort Litigation,* 70 Corn.L.Rev. 779, 835 (1985).

■■■■ While the Settlement in this matter was accomplished before certification of the class, the record developed prior to and during the proceedings is voluminous and supports the settlement. Here the strength of the limited fund claim was clear at least from the time the Special Master's Report was filed making precertification settlement negotiations appropriate. *Cf. County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1422, 1424 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295, 1323–26 (2d Cir.1990); *Plummer v. Chemical Bank,* 668 F.2d 654, 656–58 (2d Cir.1982); *Weinberger v. Kendrick,* 698 F.2d 61, 72–73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re Beef Ind. Antitrust Litig.,* 607 F.2d 167, 173–78 (5th Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

■■■■ The Second Circuit has approved, under appropriate circumstances, simultaneous notice to members of the pendency of the class action and the terms of the proposed settlement. *Weinberger v. Kendrick,* 698 F.2d 61, 70–73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In addition, the proposed settlement may include a provision conditioning settlement of the suit on class certification by the court. *Long Island Lighting Co.,* 710 F.Supp. at 1425; *Weinberg v. Lear Fan Corp.,* 627 F.Supp. 719, 722–24 (S.D.N.Y.1986).

In the instant case, ample protection to the class was provided. Detailed notice was furnished to all known class members by mail and wide publicizing within the industry, unions and White Lung Associations. Mindful of the responsibility to conduct searching inquiry of a precertification settlement, the courts scheduled exhaustive fairness hearings. The courts have evaluated all information obtained during those hearings and thoroughly familiarized themselves with the extensive written submissions received in the course of the proceedings.

5. *Alternatives to Settlement*

■■■■ A significant factor that the courts must consider in evaluating the fairness of the settlement is its alternatives. Benefits of the Settlement must be weighed against realistic alternatives in the circumstances of the case bearing in mind the desirability of a consensual resolution to the problems leading to the litigation. Judge Friendly in *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), put the matter this way:

[T]he central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate.... The primary concern is with the substantive terms of the settlement: "Basic to this ... is the need to compare the terms of the compromise with the likely rewards of litigation."

*Id.* (quoting *Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968)).

■■■■ Unfortunately, here there are no satisfactory, feasible alternatives to the proposed revisions. The Trust cannot continue under the current payment procedures. Its assets will be depleted long before all claims are known, much less paid. *See* Special Master's Report, 120 B.R. 648, 668 (E. & S.D.N.Y.1990). The Trust will terminate without having compensated the majority of beneficiaries. This result is plainly unacceptable.

Some of the Settlement's detractors have proposed that a new settlement agreement should be attempted. The likelihood that further negotiation will result in a more palatable settlement is remote in view of the divergent interests propelling this litigation and its hard-fought compromises. The Settlement was the product of difficult negotiations over many months with all of the parties relinquishing some demands after realizing the extent of the Trust's limited funds. Henderson & Goldberg, with Angelos' support, developed an alternative proposal. *See* Part II, *supra*. It received neither the support of the majority of beneficiaries, the Trust or a noticeable number of other interested parties who participated in the proceedings. This lack of widespread support for an alternative plan reinforces the conclusion that renegotiation is unlikely to produce more satisfactory results.

In view of the Trust's tremendous responsibility to tens of thousands of injured beneficiaries, the courts must seek to avoid the additional delays and expense that would accompany renegotiation of the terms of the Settlement, especially in light of the dim prospect that such negotiations would be successful or would constitute a substantial improvement. The courts must also weigh pressures from other federal and state courts faced with difficult questions posed by asbestos litigation pending on their dockets. Until the Manville problem is settled most of these cases cannot be finally closed. The public interest strongly favors reaching an expeditious as well as equitable result.

These pressures to settle caution against litigating the class action through trial, appeal, and final adjudication. The transaction costs of such litigation would be detrimental to all beneficiaries. Renegotiation and continued litigation would leave the parties in the same situation in which they find themselves today, except with fewer resources to spread among the many deserving claimants, leading to yet greater shortfalls for other, perhaps less responsible, tortfeasors to bear.

Bankruptcy does not offer a more satisfactory outcome. In the first place, there is some question about whether the Trust can seek the protection of the bankruptcy court. Only "business trusts" can be debtors in bankruptcies. *See* 11 U.S.C. § 101(8)(A)(v) (1988). A business trust is an unincorporated business organization managed by trustees for the benefit and profit of persons who hold beneficial interests in the trust's corpus or income. *See In re Woodsville Realty Trust*, 120 B.R. 2, 4 (Bankr.D.N.H.1990); *In re Westchester Cty. Civil Serv. Employees Assoc., Inc.*, 111 B.R. 451, 456 (Bankr.S.D.N.Y.1990); *In re Armstead & Margaret Wayson Trust*, 29 B.R. 58, 59 (Bankr.D.Md.1982).

The Trust may not fall within the definition of a business trust. The purpose of the Trust is set forth in the Trust Agreement. It was created "to deliver fair, adequate and equitable compensation to Bona Fide beneficiaries." Plans and Related Documents, at C–80. Since it was established to compensate persons injured by Manville's asbestos rather than as a business enterprise or to hold assets, it may not qualify for relief under the Bankruptcy Code. *See In re Independent Clearing House Co.*, 41 B.R. 985, 991 (Bankr.D.Utah 1984) ("unlike an ordinary trust, the object of the ... business trust is not to hold and conserve particular property, but to provide a medium for the conduct of business and the sharing of gains"), *aff'd in relevant part*, 62 B.R. 118 (D.Utah 1986).

Second, a bankruptcy would add years to final resolution. The legal fees and consultants' fees would be compounded.

Third, since the Trust is not able to meet its obligations under the Plan, Manville, which is currently protected from liability by an injunction, might again become the target of asbestos litigation forcing it to refile for bankruptcy. It is not clear, however, that Manville would be permitted to file a new petition for reorganization. Instead, Manville might face liquidation under Chapter 7 of the Bankruptcy Code. *See In re Northampton Corp.*, 37 B.R. 110 (Bankr.E.D.Pa.1984) (subsequent filing for reorganization is modification of reorgani-

zation plan and warrants liquidation). *But see In re Jartran,* 71 B.R. 938 (Bankr. N.D.Ill.1987), *aff'd,* 87 B.R. 525 (N.D.Ill. 1988), *aff'd,* 886 F.2d 859 (7th Cir.1989) (subsequent filing of reorganization petition permissible if in good faith). Notwithstanding the grave inequities that would result from a liquidation, it is a possibility were the Settlement to fall. *Cf.* 11 U.S.C. § 1112(b) (1988) (bankruptcy court could also convert reorganization petition into liquidation proceeding if it were in best interests of creditors).

The proceeds of a liquidation would be far less than the anticipated income stream from the corporation if it continues as a going concern. The Trust has assets of value primarily because Manville is a viable, profitable business. Manville stock, the Trust's major asset, would be sold at fire-sale prices under a court-ordered liquidation. If Manville were to cease to do business, the future claimants would receive almost no funds to compensate them for their injuries. As a result, this solution represents a last resort.

Even if Manville were to file a second reorganization petition, the parties would still face the same intractable problems. A new or modified reorganization plan, if successfully developed, would only yield fewer assets from which to compensate those injured by exposure to asbestos. Transaction costs, notoriously high in bankruptcy proceedings, would again unconscionably consume and delay receipt of funds by persons suffering with asbestos-related diseases.

### 6. *Class Members' Reaction to Settlement*

This matter of the class members' views has already been touched upon in considering the problem of voting rights in Part V.E., *supra.* The positions of representatives of members of the class are described in Part III, *supra.*

 The reaction of class members to a proposed settlement offers some guidance to the courts about the perceived alternatives and fairness of the agreement. Both the extent and nature of the opposi-

tion are relevant to this inquiry. *In re Agent Orange Prod. Liab. Litig.,* 597 F.Supp. 740, 762–63 (E.D.N.Y.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Nevertheless, settlements may be approved in the face of substantial objections from class members. In *TBK Partners Ltd. v. Western Union Corp.,* 675 F.2d 456 (2d Cir.1982), the Second Circuit stated "majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable." *Id.* at 462. *See Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir.1987) (court approved settlement of Title VII action despite fact that among forty-five responding members of a total class of 126, all forty-five opposed settlement); *Parker v. Anderson,* 667 F.2d 1204, 1207 (5th Cir.) (consent decree in class action upheld despite objections by all but one of eleven named plaintiffs and numerous class members), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 720 F.Supp. 1379, 1394 (D.Ariz.1989) ("a settlement is not to be deemed unfair or unreasonable simply because a large number of class members oppose it").

Class member opposition may reflect a lack of full appreciation of the legal and factual complexities present in mass tort litigation. A truly democratic vote by informed members of the class would be virtually impossible. *See* Part IV.E, *supra.* The cost of educating the tens of thousands of claimants on issues bearing on the fairness of the Settlement and conducting the vote would be prohibitive.

In this case, the sentiments of class members appear to be widely divergent. Certain victims' associations, notably White Lung Associations, prefer liquidation of Manville to the proposed Settlement. The few independent class members to participate in the proceedings also disapproved of the terms of the agreement which provided for less than full payment of the value of

victims' claims. One plaintiff's firm, Henderson & Goldberg, which opposed the aspects of the Settlement which permit early payment to those suffering from more severe asbestos injuries, submitted a court exhibit indicating that attorneys who collectively represent 29,997 claimants oppose the proposed Settlement.

At the same time, the substance of the Settlement was submitted to a vote of plaintiffs' counsel on two separate occasions. *See* Part II.K, *supra.* In both instances, the majority of plaintiffs' attorneys present favored the proposal. *Id.* The five class counsel who voted to support the Settlement purportedly represent a roughly equal number of claimants to those who signed Henderson & Goldberg's affidavit of objection. Additionally, counsel for Asbestos Victims of America, a victims' organization based in California, testified that a random sampling of their members indicated that they supported complete payment to those most seriously injured even if that required total deferral of any payment to claimants with less impairment.

 These extremely rough tabulations wholly exclude the voice of future claimants. Assuming that they would vote in accordance with their self-interests, a natural and appropriate position, they stand to benefit the most from the changes accomplished through the Settlement. On balance, this large constituency combined with a sizable number, if not a majority, of present claimants appear to support the Settlement. This factor weighs in favor of court approval.

### 7. *Workability*

In the wake of the admitted failure of the distribution scheme established pursuant to the reorganization, particular attention must be paid to evaluating the feasibility of the Settlement's newly designed distribution process. The district court appointed Mark A. Peterson because of his experience in mass torts and alternative dispute resolution, in particular his familiarity with asbestos litigation. With his expertise the parties devised the proposed

Trust Distribution Process, Appendix A to the Stipulation of Settlement. Part II, *supra*, sets forth its main components.

#### a. Master Agreement Between Manville and the Trust

 Henderson & Goldberg challenged both the ability of Manville to make the payments to the Trust provided for in the Master Agreement and the wisdom of the special dividends. Tr. 1/23/91 at 164. They contend that the additional upfront financing will adversely affect the long-term health of Manville which in turn reduces the ultimate value of the Trust's most significant asset. Members of White Lung Associations also objected to the "windfall" benefit that the dividends create for the company's twenty percent non-Trust ownership.

Manville has indicated that it believes it will be able to meet its obligations under the Master Agreement. It is confident that it will be able to obtain financing necessary to issue the requisite dividends after the first year. *See* Supplemental Stephens Affidavit ¶¶ 2–4 (Dec. 28, 1990). Goldman Sachs advised Special Advisor Leon Silverman in the course of the negotiations between the Trust and Manville; it concluded that arranging necessary financing provided for in the Master Agreement should be feasible. *See* Tr. 1/23/91 at 254–56. Experts expressed the opinion that the Corporation would be able to handle the additional debt without sacrificing competitiveness or future business prospects. *Id.*

The manifest need for immediate cash was demonstrated before Special Master Frankel, who found that the Trust does not possess enough current assets to pay even an inconsequential amount of what it currently owes in past settlements and judgments. Special Master's Report, 120 B.R. 648, 668 (E. & S.D.N.Y.1990). Many current claimants have waited years for compensation from the Trust. To ask them to delay receipt of any funds for several additional years until the Trust monetizes its assets as the Henderson & Goldberg proposal suggests, would impose an extraordinary hardship on these claimants and their

families. Many would not live to see even a nominal portion of compensation if no cash infusion occurred in the near future. The combined insult of years of prolonged bankruptcy proceedings barring any recovery for Manville's tortious conduct and the stay on payments now in force makes further delay particularly undesirable. Moreover, in absence of additional financing, the present Settlement could not have been accomplished. Without some assurance that enough money would be available to make at least partial payments over time, plaintiffs would prefer to continue to litigate in the tort system and attempt to enforce their judgments to the extent permissible under state law against joint tortfeasors.

Testimony of Mark Lederer, Chief Financial Officer of the Trust indicated that the payments that form the centerpiece of the Agreement between the Corporation and the Trust have been subject to extensive examination by investment bankers for the Trust and other parties as well as Manville. *See* Applications for Reimbursement (referred to Magistrate Judge John Caden). Manville's Board of Directors which owes a fiduciary duty to maximize the value of the company in the interests of all its stockholders exercised its business judgment and voted to approve the special dividends. The courts should not lightly reject the opinions of these numerous experts and business executives.

The doubt about whether Manville can satisfy the additional cash dividends outlined in the Master Agreement with the Trust indicates to the courts that Manville could not withstand a substantially larger burden than that negotiated by the parties. In view of the unique circumstances of the case, the assumption of too much debt would only decrease the value of the company and the proceeds that could be realized when the Trust sells its shares of Manville stock. The courts find that the Master Agreement is reasonably feasible and fair.

### b. Distribution Process

The Distribution Process creates a system for the liquidation of claims against the Trust and their payment. *See* Part II.L.2, *supra.* The cornerstone of the scheme is its procedure to pay each claimant an equal percentage of the value of his or her claim over time. The drafters candidly acknowledged that a precise projection of amount of payment for types of claims cannot be guaranteed. Trust Distribution Process, § A, 120 B.R. 648, 670 (E. & S.D.N.Y.1990); Tr. 1/2/91 at 191.

The proposed Distribution Process in certain ways represents a marked departure from the litigation-torn compensation pattern of the Trust following the reorganization. Yet at the same time it draws from features of traditional tort compensation. As a technical matter, the Trust is removed from tort litigation except under very restricted circumstances. Negotiated settlement of claims is clearly favored under the Settlement. *See* Trust Distribution Process, § D, 120 B.R. 648, 673 (E. & S.D.N.Y.1990) (excess tort recoveries beyond maximum level for disease to be paid out of Pool B which will receive any revenues available after all outstanding Pool A claims have been satisfied in full). To minimize disagreements and narrowly focus the negotiation process between the Trust and claimants, mid-point and maximum values have been set for each asbestos-related disease. *Id.* §§ B & D, Attachment A, 120 B.R. 648, 672–73, 680 (E. & S.D.N.Y.1990). The parties have delineated relevant criteria that affect valuation of claims within those ranges mirroring factors that most significantly affect tort recovery.

Further analysis of Trust records using modern scientific methods should refine the limited criteria which should be used in fixing fair values on claims. The studies of the Sentencing Commission resulted in statistics underlying the Sentencing Guidelines; they suggest available techniques. Precise payment schedules will simplify and speed liquidation of claims at much lower costs than heretofore.

The Trust's explicit requirement to pay only a portion of each claim based on available cash should avoid a recurrence of its present insolvency. The Trust may only pay the percentage of then-present and liq-

uidated claims that can be covered out of available income from bond payments, profit-sharing payments and dividends in the particular year. *Cf. In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1396, 1417–22 (E.D.N.Y.1985) (installment payment plan will maximize recovery from fund; amounts of payments may be modified to keep claims and available assets in balance), *aff'd in relevant part*, 818 F.2d 179, 183–84 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

Proceeds from the sale of Marketable Debentures may be deposited into the "principle account" for distribution to the present claimants or the "distribution may be limited to conserve Trust resources for future claimants." Trust Distribution Process, § E, 120 B.R. 648, 674 (E. & S.D.N.Y.1990). Similarly, funding of the principal account for future claimants may be increased or decreased "in a manner which will equalize, as best as can be done, payment among all claimants." *Id.* The Trust must evaluate whether making such payments to present claimants will alter the balance sought to ensure equal payment to all claimants over time.

An additional safeguard designed to equalize payments is the provision that claimants who enter the pool after the first year will receive a first payment equivalent to what they would have received had they entered the pool during its first year. Trust Distribution Process, § F, 120 B.R. 648, 674 (E. & S.D.N.Y.1990). Similarly, the forty-five percent temporary cap seeks to reduce the risk of overpaying present claimants to the detriment of later claimants and Level Two claimants who only begin to receive compensation after the second year of operations under the revised procedures. Under the temporary cap, no Level One claimant will receive more than forty-five percent of the liquidated value of his or her claim until all other claimants in the pool, including Level Two claimants, have also reached that level.

The most significant benefit of the revised payment procedures is that a portion of actual as well as expected funds must be set aside to compensate future claimants.

At the time the Trust monetizes its primary asset through the sale of Manville stock, proceeds will be deposited into a separate account for the benefit of future claimants. This projected pattern differs markedly from past practice of paying claims in full as they became liquidated without regard to the effect such payments would have on the Trust's ability to meet its future obligations.

The flexibility built into the revised Distribution Process reinforces the court's judgment that it is workable. The provisions governing distribution of assets, anticipating total claims, authorizing deferral payments to Level Two claimants and temporarily capping payments at forty-five percent are all subject to revision if circumstances warrant. *See id.* § L, 120 B.R. 648, 679 (E. & S.D.N.Y.1990); Tr. 1/2/91 at 190–92. In fact, all aspects of the distribution process are variable depending on the most recent, available projections of assets and liabilities. The Trustees must constantly reassess critical projections and take such action as is necessary with the concurrence of the Select Counsel for the Beneficiaries after consultation with the Special Advisor to the Trust.

The continued involvement of Mark A. Peterson as Special Advisor will help to ensure that necessary adjustments are made based on the most current and reliable evidence and epidemiological studies. As one of the primary architects of the Distribution Process, Mr. Peterson possesses the requisite knowledge, skill and facility to help oversee its implementation.

As the parties and the courts fully appreciate, there are few certainties in the area of asbestos litigation. The utter failure of the reorganization claims resolution procedures in the past necessitates critical examination of the feasibility of the new procedures. The combination of factors outlined above convinces the courts that the Settlement is workable.

C. Response to Objections and Disagreements

We now turn to the substantive objections raised by various parties. The diffi-

culties presented by section H which demand more exhaustive analysis will be treated separately in Part VII.D, *infra.*

Before considering the various positions of the attorneys, it is well to remind ourselves again that they have economic differences which explain in part their divergent positions. As Appendix D and D–1, attached, and general knowledge of the field indicates, there is a wide variation among lawyers in the concentration of cases, the ratio of Level One to Level Two cases and of settled to non-settled claims.

Those lawyers who have larger ratios of non-settled claims or unpaid claims or a greater ratio of pleural to mesothelioma cases will tend to support the minority approach. Those who have received large payments from the Trust, who have large numbers of unpaid settled claims or judgments or a greater proportion of unsettled Level One than Level Two claims will tend to support the Settlement. The second group, and some members of the first, stand to gain by avoiding any challenge to the large fees and paid-up settlements they have negotiated arguably at the expense of other claimants; they will receive full payment for claims settled before the Settlement date, over $450,000,000, instead of the much smaller percentage of the total value as will other claimants—usually with no fee percentage restrictions; and they will benefit from quicker and fuller payment in the future of Level One claims.

The figures in Appendix D and D–1, attached do not fully reveal the concentration of cases. Some firms tend to list cases they are processing under the firm name. Others tend to list them under the name of local attorneys; the effect is to show a lower than actual amount of pending unsettled cases, settled cases, payments and fees for such a law firm.

1. *Distinction Between Level One and Two Claimants*

In the face of a scarcity of funds, difficult choices must be made in the apportionment of compensation from the Trust. When reviewing the settlement of a limited fund class action, the Second Circuit has emphasized the flexibility of the court's equitable jurisdiction and responsibilities in assessing whether to approve the compromise. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 182 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

"[T]he allocation of an inadequate fund among competing complainants is a traditional equitable function, using 'equity' to denote not a particular type of remedy, procedure, or jurisdiction but a mode of judgment based on broad ethical principles rather than narrow rules."

*Id.* at 182 (quoting *Curtiss–Wright Corp. v. Helfand*, 687 F.2d 171, 174 (7th Cir. 1982)).

Henderson & Goldberg assert that the distinction between Level One and Level Two claimants in the Settlement constitutes an unfair and unlawful discrimination among a single class of creditors. In fact, the Settlement makes other distinctions among claimants as well. Those suffering from more serious asbestos-related diseases are entitled to greater compensation. Payment maximums for mesothelioma exceed those for pleural plaques. While payment maximums suggested in the Distribution Process are subject to modification as necessary upon the concurrence of the Trust and Select Counsel for the Beneficiaries with the advice of the Special Advisor, Mark Peterson, no one has indicated that this classification violates fundamental principles of bankruptcy or equal protection. If a Level Two claimant develops a more serious injury that warrants reclassification as Level One, the Settlement enables the individual to refile for further compensation. Distribution Process, § A, 120 B.R. 648, 670 (E. & S.D.N.Y.1990). The Distribution Process also provides that in special circumstances, payments to Level Two claimants may exceed specified limits, such as if the person qualifies for economic hardship or Manville Only status. *See id.*

Since compensation, whether varied according to amount paid or timing of payment, can all be reduced to monetary values, if distinctions in amount of payment are defensible, then the Trust has authority

to structure the timing of payment in ways that vary among groups of claimants. *See* Tr. 1/23/91 at 244–45 (testimony of Glenn Dalhart, Henderson & Goldberg's expert, that delay in payment is simply equivalent in economic terms to reduced payments). Similarly, the risk that Level Two claimants will not receive an equal percentage of the liquidated amount of their claims can be translated into reduced monetary recovery for those with less serious injuries if the assets of the Trust do not generate a certain level income.

 Where the parties have produced a compromise which makes a distinction between those suffering from more serious, life-threatening injuries and those with less debilitating illnesses, the courts will defer to the sensible preference embodied in their Settlement. The compensation process in part operates in the shadows of the tort system. Tort litigation typically affords those with more serious claims an opportunity to expedite their cases and juries generally award larger verdicts in such circumstances. That the parties chose to retain those distinctions does not render the Settlement discriminatory.

 Henderson & Goldberg rely upon section 1123(a)(4) of the Bankruptcy Code to support their position. That provision states that a reorganization plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4) (1988).

The class representatives include persons who would qualify as Level Two claimants under the Settlement, and each of the class counsel has clients who suffer from injuries which similarly fall within the definition of a Level Two asbestos-related disease. *See* Tr. 1/2/91 at 99. These class members have voluntarily compromised their interests, or agreed to wait for their compensation, in order to enable the Trust to first pay those severely ill, dying and representatives of those who are deceased. These claimants' interests were vigorously prosecuted throughout the negotiation process and resulted in the Settlement before the courts. *See* Tr. 1/23/91 at 242. These claimants have, therefore, in effect, agreed "to a less favorable treatment of such particular claim" consistent with section 1123(a).

Moreover, section 1123(a)(4) leaves parties in bankruptcy and the courts some flexibility, in particular when faced with a complex reorganization. The District of Columbia Court of Appeals has stated:

> We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others.

*In re AOV Indus.*, 792 F.2d 1140, 1154 (D.C.Cir.1986). Similarly, in *In re Monroe Well Serv., Inc.* 80 B.R. 324, 335 (Bankr. E.D.1987), the court explained "[e]quality of treatment thus becomes a matter of degree, not one of mathematical exactitude." *Id. See In re Furlow*, 70 B.R. 973, 978 (Bankr.E.D.Pa.1987) (different treatment permissible "if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan"); *see also In re 222 Liberty Assoc.*, 108 B.R. 971, 991–93 (Bankr.E.D.Pa.1990) (applying *Furlow* test); *In re Lawson*, 93 B.R. 979, 984–85 (Bankr.N.D.Ill.1988) (same); *In re B & G Farms, Inc.*, 82 B.R. 549, 551 (Bankr.D.Mont.1988).

 Ultimately, the distinction between claimants reflects underlying differences in the nature and strength of the claims. The loss suffered is more severe when someone's life has been taken or when cancer or severe asbestosis causes great incapacity than when an individual suffers minor disability; the trauma experienced by the victim and by the families varies accordingly; the cost of necessary medical treatment differs; and the physical and mental anguish demands greater consideration and attention. The incorporation of a preference in the Settlement in extent of compensation and timing of payments to those who have suffered the most appears

justifiable and wholly appropriate. This does not mean that alternative compensation structures could not have accomplished equally laudatory goals, but only that this one certainly does not offend principles of equity, fairness and due process.

■ Henderson & Goldberg also assert an equal protection challenge to the Settlement's distinction among claimants. Even were we to assume that approval of the Settlement constitutes government action, unless that action implicates a fundamental constitutional right or discriminates on the basis of a suspect classification that merits strict judicial scrutiny, courts will tolerate distinctions among groups where created on a rational basis. *See, e.g. Regan v. Taxation with Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983). The rational basis test permits the unequal treatment of groups, "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes" that the court concluded that such classification is "irrational." *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988).

■ Even were the Settlement imposed by the government, it does not implicate fundamental constitutional rights or distinguish between Level One and Two claimants on the basis of suspect classifications; the courts need only review this aspect of the Settlement to determine whether it rests upon a rational foundation. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The categorization of claimants in the Settlement can be easily justified. Level One claimants have greater need for immediate compensation. Those suffering with mesothelioma, lung cancer and severe asbestosis typically cannot work, yet as a consequence of their illness incur extraordinary medical expenses. At their death, those bills are passed on along with funeral and burial costs to their families and estates. Their need for immediate payment is more urgent.

While the Settlement aims over time to treat all claimants alike by paying them an equal share of their claims' values, it does place the risk in the event that funds are inadequate on those afflicted with less severe injuries. In addition, other provisions in the Settlement are designed to balance this risk shouldered by Level Two claimants. First, those suffering with a Level Two illness who qualify under the Trust's extreme hardship and exigent health criteria may receive expedited payment. *See* Trust Distribution Process, § A, 120 B.R. 648, 671 (E. & S.D.N.Y.1990). Second, Level Two claimants who subsequently develop a Level One illness are entitled to reenter the distribution process and to benefit from the same preferences that other Level One claimants receive under the Settlement. *Id.* at 672. Third, the Trust will not deduct from the liquidated value of the claims of those who reapply as a result of contracting an asbestos-associated malignancy amounts they were paid as a Level Two claimant. There are ample justifications supporting the distinction between Level One and Two claimants. Level Two claimants receive adequate protection.

Henderson & Goldberg vigorously pressed their alternative proposal—not negotiated with any adversary or persuasive among a majority of the plaintiffs' bar—that purported to eliminate the distinction between Level One and Two claimants. Under their alternative distribution scheme no beneficiary would receive compensation until the Trust monetized its assets and consequently could calculate with precision the universe of funds available for payments. At that time, they suggest, the Trust should make one pro rata distribution, with a single exception for early payment to hardship claimants. In broadly defining hardship, however, Henderson & Goldberg in fact create their own distinctions that could be characterized as discriminatory. No greater rationalization exists from an equal protection standpoint to prefer claimants based upon economic needs rather than injuries suffered. A de-

lay of five or six years before receiving any compensation from the Trust would mean that virtually no Level One claimant would live to see the payment. Viewed from the perspective of the fundamental goals of the tort system, those who have suffered more severe injury deserve more immediate attention and higher amounts of payments. The proposed Settlement in fact reflects a compromise between the position of claimants represented by Henderson & Goldberg and that of Asbestos Victims of America which contends that Level One claimants should receive full payment of their claims before any funds are distributed to Level Two claimants. *See* Tr. 1/11/91 at 161–62 (remarks of Steven Kazan on behalf of Asbestos Victims of America). This compromise is fair and reasonable.

Distinctions based on severity of injury have received support from academic commentators. The American Law Institute researchers stated "[o]bviously more severe harm should be dealt with earlier and more comprehensively than less severe harm." Proposed Final Report Council Draft No. 1, *Compensation and Liability for Product and Process Injuries*, vol. 2 at 478 (American Law Institute Nov. 5, 1990). Creation of two levels embodies a recognition of varying levels of human suffering as the basis for distinctions that must be made in the face of financial limitations. The courts may not lightly disregard the self-imposed distribution of hardship visited upon asbestos health claimants as a result of the Trust's insolvency.

### 2. *Prior Settlements with Insurers During Reorganization*

Representatives of a number of victims' associations vigorously pressed the courts to reopen the bankruptcy proceedings in order to void the settlement agreement reached between Manville and its insurers during the reorganization, Tr. 1/2/91 at 254, or liquidate the company in order to yield greater compensation for those suffering from asbestos-associated injuries. *See* Tr. 1/2/91 at 245; Tr. 1/9/91 at 93. Some sought additional money from Manville above the amounts set forth in the Master Agreement, with proceeds exclu-

sively for Trust claimants and none for non-Trust stock owners. Tr. 1/11/91 at 170.

It is well-established that settlement agreements are favored under the law especially in bankruptcy matters. *See In re A & C Properties*, 784 F.2d 1377, 1383–84 (9th Cir.1986); *In re North Broadway Funding Corp.*, 34 B.R. 620, 622 (Bankr.E.D.N.Y.1983) ("Stipulations of settlement are favored by the courts, and they will rarely be set aside absent fraud, collusion, mistake or other such factors as would undo a contract."). Once approved by the bankruptcy court, a compromise takes the form of an order of the court and has the effect of a final judgment. Bankr.R. 9019(a); *see In re North Broadway Funding Corp.*, 34 B.R. at 621; *In re Furniture-in-the-Raw Inc.*, 462 F.Supp. 958, 961 (S.D.N.Y.1979). Bankruptcy courts play a special role in facilitating and approving settlements that enable debtors to reorganize and gain a fresh start. *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir.1986).

Once approved, a settlement agreement is interpreted as a contract. *See Mars Steel v. Continental Illinois Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir.1987); *In re American Plastics Corp.*, 102 B.R. 609, 611 (Bankr.W.D.Mich.1989). Such a compromise may only be set aside for fraud, mutual mistake of fact or unconscionable advantage. *In re North Broadway Funding Corp.*, 34 B.R. at 622. Absent circumstances to support voiding those agreements, the courts have "not only the power but the duty to enforce a settlement agreement which it has approved." *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974); *Vari–O–Matic Machine Corp. v. New York Sewing Machine Attachment Corp.*, 629 F.Supp. 257, 258 (S.D.N.Y.1986).

Apart from the legal barriers to revisiting the negotiations and compromises that produced the reorganization, the practical reality is that the money received by the Trust in exchange for releasing the insurance companies from future liability

has been dissipated. On the basis of the expert testimony and evidence submitted, continuation of Manville as a going concern offers the most benefit to asbestos health claimants. If Manville thrives, its annual payments of 20% of profits to the Trust will increase. The testimony of an investment banker in the course of the limited fund hearings confirmed that sale of Manville's assets at the present time or as part of a liquidation would yield a distress price whereas a later, more strategically planned sale of Manville stock by the Trust would yield a "control" premium for the stock. Tr. 10/22/90 at 544, 566–69 (testimony of Mark L. Shapiro).

The ability of the Trust to wait for favorable economic conditions to sell the stock will have a significant effect on the total amount generated to compensate both present and future claimants. The sale of Manville stock represents the single most significant business decision for the Trust. According to Mark Peterson's calculations, assuming a total of 250,000 claims, a modest projection, if the stock sells at $23.42 per share each claimant will receive 45% of the projected liquidated value of his or her claim. Hearing Ex. 13. If the stock sells for $13 per share, the Trust will likely pay roughly 36% of the liquidated value of Level One claims and 24% of Level Two claims. See Appendix A at 4. Recently the stock has traded between $4 and $5 per share. Clearly, the timing of the sale of the Trust's controlling 80% interest in Manville stock must be carefully calibrated to favorable economic conditions to maximize recovery for claimants.

According to calculations made nearly a year ago in reliance upon Manville's June 30, 1990 financial statements, Wertheim Schroder, the Trust's investment bankers, calculated a segment or "break-up" value of Manville at $2,137,714, or roughly $17.81 per share, only some of which would flow to the Trust. Shapiro Affidavit, Exh. 3 at Schedule C–2, Defendants' Exhibit 4 at Limited Fund Hearings. These figures were calculated amid a more optimistic economic climate by estimating the value of twenty roughly comparable companies' merger and acquisition transactions. A mandatory break-up resulting from a forced liquidation, however, would likely command substantially lower prices. Adding the lost income stream, the liquidation alternative appears significantly less favorable for claimants seeking to maximize overall funds available for compensation, not to mention the deleterious effect of liquidation on the company, its shareholders and employees and the industrial sector of the economy.

### 3. Treatment of Settlements and Judgments

Objections were also raised with respect to the immediate payment of settlements and judgments concluded prior to the date the class action was commenced. These objections are well taken. In effect, some plaintiffs and their counsel will receive a huge windfall of $450 million after hundreds of millions of dollars in disproportionately high fees and recoveries have already been obtained. Yet the single answer is that without this payment, some of the attorneys involved in the negotiations would have had no strong incentive to settle. There is, nevertheless, some justification warranting approval of this portion of the settlement.

Paragraph 9 of the Stipulation of Settlement provides that those claims that were previously reduced to judgment or settlement contract shall be paid according to their terms unless the claimant elects to proceed pursuant to the Distribution Process. These payments have been stayed since the district court's July 9, 1990 Order, 1990 WL 115761, and remain enjoined until the Settlement becomes final (following exhaustion of any appeals). If the Settlement is approved, the Stipulation authorizes the payment of these judgments and settlements by their terms beginning within ten days after the receipt of the First Dividend due under the Master Agreement, without acceleration or accrual of interest. Stipulation, ¶ 9, 120 B.R. 648, 668 (E. & S.D.N.Y.1990).

In view of the greatly reduced payments that class members must accept

to help preserve the Trust's limited funds for the entire class, some claimants have forcefully argued that it is manifestly unfair to pay in full certain claimants who, knowing the Trust's impending fiscal crisis, managed to obtain favorable last minute settlements or judgments. Those claimants, it is argued, should not receive full payment at the expense of all other class members. While sympathetic to the objection, the courts do not find that paragraph 9 is sufficient to warrant disapproval.

■ The provision incorporates legal realities. Judgments properly rendered in state and federal courts, entered prior to the imposition of the courts' orders enjoining all proceedings, should be afforded full faith and credit. U.S. Const. art. IV, § 1; 28 U.S.C. § 1738 (1988). As a matter of comity, res judicata and constitutional proscription, the courts must give the same effect to the judgment of another court as would the courts of the jurisdiction rendering the judgments. *See McDonald v. City of West Branch*, 466 U.S. 284, 287–88, 104 S.Ct. 1799, 1801–02, 80 L.Ed.2d 302 (1984); *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Stoll v. Gottlieb*, 305 U.S. 165, 170–71, 59 S.Ct. 134, 136–37, 83 L.Ed. 104 (1938); *Davis v. Davis*, 305 U.S. 32, 40, 59 S.Ct. 3, 6, 83 L.Ed. 26 (1938).

■ As a matter of contract law, the courts will respect freely-negotiated, binding agreements between the Trust and claimants. *See Restatement (Second) of Contracts* §§ 178–185 (2d ed. 1979). Absent allegations of fraud, grounds for recision or incompetency of parties, the courts do not generally disturb properly executed, bargained-for agreements. *See, e.g., National Petrochemical v. The M/T Stolt Sheaf,* 930 F.2d 240 (2d Cir.1991) (otherwise enforceable contract rendered unenforceable due to connection with illegal transaction); *Sheffield Commercial Corp v. Clemente,* 792 F.2d 282, 285 (2d Cir. 1986) (well settled that recession of contract allowed where there is material fraud). The parties to those contracts seek

to enforce them. The record does not contain sufficient grounds for the courts to void the agreements.

The courts recognize that certain claimants pursuant to those judgments and settlement agreements will receive a disproportionately large share of the Trust's remaining scarce funds. The parties have agreed to this Settlement provision and the courts find no persuasive basis for questioning its wisdom. As a result, the courts find that while the result may be harsh, Paragraph 9 does not render the agreement unreasonable or unfair.

### 4. *Attorneys Fees*

■ The Stipulation of Settlement limits attorneys' fees payable in connection with liquidated claims to the fee provided in the contract between claimant and counsel or 25%, whichever is less. *In re Joint Eastern and Southern Dists. Asbestos Litig. (Johns–Manville),* 120 B.R. 648, 677 (E. & S.D.N.Y.1990). The courts believe these fees and fees already received by plaintiffs' attorneys with large numbers of cases, *see* Appendices D and D1, attached are grossly excessive. Yet without approval of this figure, the plaintiffs' attorneys would not have agreed to settle. Given the real world of law as a business, it cannot be said that the Settlement should be disapproved on this ground. There are too many urgent reasons to conclude this litigation to allow the Settlement to founder on this point.

Codefendants and counsel for the future claimants argue that the 25% cap on attorneys' fees should be further reduced or set aside in favor of an hourly rate limited to 10% of total recovery. They argue that removing Manville from the tort system greatly diminishes the risk of claimant nonrecovery and consequently reduces the attorney effort required to liquidate claims. Where the effort on the part of the attorney is routine and there is almost no risk of nonrecovery, they argue, a fee of 25% is excessive and unreasonable. It amounts to a windfall for plaintiffs' attorneys. Professor Lester Brickman submitted written testimony during the fairness hearings in which he calculated that the 25% cap would

lead to excessive hourly rates. Such high fees, objectors claim, will deplete the limited fund to the particular disadvantage of the future claimants and codefendants.

■ The district court's power to review attorney fee provisions stems both from Rule 23 and from the court's supervisory power over members of the bar. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 222 (2d Cir.1987) (giving guidance to courts reviewing fee agreements), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); *Dunn v. H.K. Porter Co.*, 602 F.2d 1105, 1109 (3d Cir.1979); *In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1396, 1431 (E.D.N.Y.1985), *aff'd in relevant part*, 818 F.2d 179 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

■ The requirement embodied in Rule 23(e) that the court review the settlement in a class action to ensure that it is fair, reasonable and in the best interests of all who will be affected includes broad discretion to review fee provisions. *Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884 (2d Cir.1983), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). In *Jones*, a housing discrimination case, the court reduced fees awarded under 42 U.S.C. § 1988, noting that "in any class action [the role of the court is] to make sure that a class is taken care of fairly, especially in a settlement where no one is likely to complain." *Id.* at 884. *See also Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3d Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973).

■ Wherever a common fund is created, the fee provisions merit particularly close judicial scrutiny; *Magana v. Platzer Shipyard Inc.*, 74 F.R.D. 61, 74 (S.D.Tex.1977); *Kiser v. Miller*, 364 F.Supp. 1311, 1319 (D.D.C.1973), *aff'd in relevant part*, 517 F.2d 1237 (D.C.Cir. 1974). This is true even in the case of private contingent fee contracts entered into before the class is certified. In both *Kiser*, an action by mine workers to recover pension and welfare benefits, and *Magana*, an employment discrimination suit under Title VII, the district courts considered private contingent fee agreements between attorneys and named plaintiffs presumptively void. *Kiser*, 364 F.Supp. at 1319; *Magana*, 74 F.R.D. at 79. Courts should only uphold such agreements where judicial scrutiny indicates that the fee is reasonable. *Magana*, 74 F.R.D. at 79.

■ Because of the special fiduciary relationship between attorney and client, courts must examine fee contracts more closely than they would examine ordinary commercial contracts. *Id.* at 78 n. 9. The concern is that the extent of an attorney's own financial interest in the outcome of the litigation might influence his or her position on settlement and seriously conflict with the client's interest. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166 (2d Cir.1987) ("[O]nce a significant amount of money is on the table, the class attorneys will have an incentive to settle. They may well anticipate that the percentage of this money likely to be awarded as counsel fees will decline after a certain point."), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 304 (6th Cir.1984) (refusal to certify mandatory class for settlement purposes in part because of conflicts of interest between class counsel representing two subclasses).

■ A court must be particularly vigilant where contingent fees are satisfied out of a settlement fund approved pursuant to Rule 23(e). As the Court in *Dunn* notes:

> In such circumstances, the role of the attorneys is drastically altered; they then stand in essentially an adversarial relation to their clients who face a reduced award to the extent that counsel fees are maximized.

*Dunn v. H.K. Porter Co.*, 602 F.2d 1105, 1109 (3d Cir.1979). Contingent fee clients are often unsophisticated and infrequent consumers of legal services who may not be in a financial position to pursue an alternative arrangement. *Restatement (Third) of Law Governing Lawyers* § 46, at 2 (Tent. Draft No. 4, April 10, 1991).

Contingency fees are less justifiable when the lawyer bears no real risk of nonrecovery. *See Redevelopment Comm'n v. Hyder*, 20 N.C.App. 241, 201 S.E.2d 236 (1973); *In re Hanna*, 294 S.C. 56, 362 S.E.2d 632 (1987); *Committee on Legal Ethics v. Tatterson*, 352 S.E.2d 107 (W.Va.1986).

Professor Brickman, who has published extensively on the subject of attorney fees, argues that contingent fee contracts are invalid unless there is a real risk of nonrecovery justifying the contingency level rates:

From an historical perspective, as well as through consideration of equity, fiduciary law and ethical obligations, it has been demonstrated that a contingent fee retainer agreement is invalid unless there is a realistic possibility that there will be no recovery.

Brickman, *Contingent Fees without Contingencies: Hamlet Without the Prince of Denmark?*, 37 U.C.L.A. L.Rev. 29, 127 (1989). *See generally* Jay, *The Dilemmas of Attorney Contingent Fees*, 2 Georgetown J. Leg. Eth. 813 (1989); Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981).

■ Additionally, excessive fees violate the attorneys' obligations under disciplinary rules and codes of professional responsibility. Rule 1.5 of the American Bar Association Model Rules states that:

A Lawyer's fee shall be reasonable. Factors to be considered in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services and (Whether the fee is fixed or. contingent).

Model Rules of Professional Conduct Rule 1.5.

■ Contingent fee agreements must be warranted by the circumstances of the case and desired by the client who has been fully informed of his fee options. *See In re Reisdorf,* 80 N.J. 319, 403 A.2d 873 (1979) (contingent fee less justifiable where client not offered alternative fee arrangements); *Jenkins v. District Court,* 676 P.2d 1201 (Colo.1984) (lawyer must show client advised of all pertinent facts). The New York Code of Professional Responsibility states in relevant part:

[I]t is not necessarily improper for a lawyer, where justified by the particular circumstances of a case, to enter into a contingent fee contract in a civil case with any client, who, after being fully informed of all relevant factors, desires that arrangement.

New York Code of Professional Responsibility EC 2–20.

The most recent draft of the Restatement of the Law Governing Lawyers promulgated by the American Law Institute provides that a "lawyer may not charge a fee that is greater than is reasonable in the circumstances or that is unlawful." *Restatement (Third) of the Law Governing Lawyers* § 46 (Tent. Draft No. 4 April 10, 1991). Reasonableness will turn on whether the client was fully informed of available alternatives, whether the fee falls within amounts commonly charged by other lawyers in similar representations and whether there was a subsequent change in circumstances making the fee unreasonable. *Id.* at 209–10.

■ In reviewing a contingent fee provision, courts should inquire whether the claim is meritorious, but difficult, unusual or challenging. Claims that cannot easily attract competent representation, in part because the client lacks the means to pay

an hourly rate, might also be appropriate for contingency fee arrangements. *See McGuire v. Sullivan*, 873 F.2d 974, 980 (7th Cir.1989). At the same time, in preserving the integrity of both Rule 23 and the legal profession, courts must avoid awarding, or even appearing to award " 'windfall fees.' " *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469 (2d Cir. 1974) (quoting Graham, *Guest Opinion on Legal Fees: Fluffing the Golden Fleece*, Juris Doctor, 10, 11 (Feb. 1973)).

Supreme Court decisions in civil rights cases have aggressively limited fees that must be paid by an unconsenting defendant when the plaintiff prevails in the litigation. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (court refused enhancement of fees awarded under § 1988 where there was only slight chance of plaintiff nonrecovery); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (rejects novelty and complexity of case as factors justifying enhancement of basic hourly rate).

While the Supreme Court strictly controls fees awardable under fee shifting statutes, it is nevertheless reluctant to intrude into a plaintiff's private contractual rights with his or her attorney. The Court recently held that a privately contracted contingent fee in an individual civil rights case is not invalid even where it provides that a plaintiff pay more than the statutory award against the defendant pursuant to 42 U.S.C. § 1988. *See Venegas v. Mitchell*, 495 U.S. 82, 110 S.Ct. 1679, 1682–84, 109 L.Ed.2d 74 (1990). In *Venegas*, the plaintiff entered into a 40% contingent fee agreement with his attorney in a civil rights action brought under 42 U.S.C. § 1983. The plaintiff prevailed; however, the statutory fee award against defendants was vastly smaller than the contingent fee. Nevertheless, the Court upheld the contingent fee contract noting that, "§ 1988 controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id.* 110 S.Ct. at 1684.

Court-imposed fees under section 1988 serve the double purpose of deterrence with respect to defendants' conduct and incentive for the plaintiffs' bar to prosecute meritorious claims, even where money damage awards may be small, by assuring payment to the prevailing plaintiffs' attorneys. Contingent fee compensation must shock the court's conscience to warrant interference. The *Venegas* decision did not address the authority of the district courts to supervise contingent fees. Since both the trial court and the Court of Appeals in that case refused to find the 40% fee unreasonable, the Supreme Court did not reach the question. *Id.*

Several factors distinguish the fees collected by attorneys representing claimants seeking compensation from the Trust and the situation in *Venegas*. *Venegas* involved one individual plaintiff whereas the Trust has tens of thousands of persons claiming against its limited funds. In *Venegas*, the court sought to maximize plaintiffs' recovery, but also provide enough incentive for attorneys to prosecute difficult and important claims. In contrast, the factors leading to recovery from the Trust are obvious and clearly delineated in the Settlement's distribution process. Relatively few attorneys representing large numbers of clients have accumulated earnings in the millions and tens of millions of dollars from asbestos cases. Since many plaintiffs' firms nationwide specialize exclusively in asbestos cases, there is little fear of absence of representation. Moreover, claimants may process a proof of claim pro se without disadvantage. Scaring off attorneys by cutting fees in mass asbestos cases is hardly a realistic fear.

 In analyzing the propriety of the 25% limit, it is important to distinguish between private fee agreements between individual claimants and their attorneys (where claimants are nevertheless part of a class having claims against a limited fund), and fees paid under the equitable fund doctrine to class counsel. In the latter case, the purpose of the award is "to compensate the attorney for the reasonable value of services benefiting the *unrepresented* claimant." *Lindy Bros. Builders, Inc. v. American Radiator & Standard*

*Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973) (emphasis added). The time spent, by whom and in what manner is a first step in determining the fee. But the calculation must also consider the value of the attorney's services to the unrepresented claimants, the contingent nature of success as a class action, whether the attorney will receive compensation through private agreements with clients, the complexity and novelty of the issues presented, the quality of the work and the actual degree of success. *Id.* at 167–68. Here almost all members of the class are or will be represented by counsel, so the court may, for these purposes, assume that those relatively few claimants appearing pro se have not derived any substantial benefits from class representation.

 Where attorneys and clients make private agreements not to exceed 25% of the plaintiff's recovery, the equities favor enforcement of the privately-negotiated compensation arrangement. *Dunn v. H.K. Porter*, 602 F.2d 1105, 1111 (3d Cir. 1979). The client has entered voluntarily and knowingly into the agreement and the courts tend to show deference to such agreements:

> Unduly close review of the allocation of risks in a contract entered into before the outcome of the litigation was known or knowable might also discourage the prosecution of risky but meritorious lawsuits. We therefore believe that the courts should be loathe to intrude into a contractual relationship between an attorney and client, and that a comparison between the contractual fee and the *Lindy* fee, whose method of calculation is designed to meet very different needs, is an inappropriate ground for invalidation of a contingent fee arrangement.

*Id.* at 1111–12. The district court may set aside contingent fee agreements but not solely on the grounds that they greatly exceed the fees that would be calculated under the *Lindy* guidelines or some other method based on reasonable hourly rate. *See also Hayes v. Secretary of Health and Human Services*, 923 F.2d 418 (6th Cir. 1990) (25% limit on attorney fees in social security cases is presumptively reasonable even if it exceeds hypothetical hourly rate), *reh'g granted*, 1990 WL 258395, 1991 U.S.App. LEXIS 1020 (6th Cir.1991).

The courts would prefer a much lower fee cap than 25%, but it is not possible to reject the Settlement on this ground. Fees are paid out of the claimants' award, not out of the fund so they do not deplete the res. The attorney fee will be paid over time in proportion to the amount paid on the claim so that the value of future fees is much less than it has been in the past.

The 25% cap represents a significant reduction in the prevailing 33–45% fee obtainable in many asbestos cases nationwide. The standard one-third rate is typical in personal injury suits in New York. Despite critical commentary, courts continue to uphold the standard one-third percentage even where the probability of success is almost certain and the damage awards enormous. *See* Brickman, *A Massachusetts Debacle, Gagnon v. Shoblom,* 12 Cardozo L.Rev. 1417 (1990). A recent Massachusetts case illustrates the point. *See Gagnon v. Shoblom,* No. 88–2105 (Super.Ct. Hampden County, Feb. 20, 1990), *rev'd,* 409 Mass. 63, 565 N.E.2d 775 (1991). In *Gagnon,* the trial judge held that a one-third percentage in a case with a damage award of nearly three million dollars was outrageous and unconscionable. *Gagnon,* 565 N.E.2d at 776. The Massachusetts Supreme Court unanimously reversed that decision holding that in view of the client's consent, the court did not have the power to evaluate the fairness of the fee. Given this general reluctance to interfere with private fee contracts, the 25% cap represents a significant reduction in plaintiffs' attorney fees.

Second, some flexibility in the fee provision will provide incentive for competent counsel to bring difficult cases on behalf of claimants who may not have the resources to pay an hourly or flat rate. Removing claims against Manville from the tort system should in most cases drastically simplify the procedure for recovery and reduce the skill and effort required on the part of plaintiffs' attorneys who pursue claims

against the Trust. Still, the variety of cases claiming injury from exposure to asbestos and often complex surrounding circumstances justify maintaining flexibility while not precluding review of attorney conduct by state and local disciplinary bodies.

As we have already noted, the pervasive and insidious use of asbestos products and the long latency period ranging up to forty years for some asbestos-related diseases complicates asbestos litigation. *See generally* T. Willging, *Trends in Asbestos Litigation* 6 (Federal Judicial Center 1987). While general causation is relatively undisputed—inhalation of asbestos dust clearly causes certain diseases—causation in fact, whether a particular asbestos exposure caused this person's disease, is much more uncertain. *Id.* at 11; *see* Part II.A, *supra*. But *cf. In re Joint Eastern & Southern Dists. Asbestos Litig.*, Civ. No. 87-3459 (E. & S.D.N.Y.1991) (evidence supports defense verdict), *reprinted in* 6 Mealey's *Litigation Reports: Asbestos*, No. 7, May 3, 1991, at B-1. Some diseases, such as lung cancer, have multiple causes. Others, including asbestosis, are sometimes difficult to diagnose.

Proof of exposure, while relatively easy for navy yard workers during World War II, may be much more difficult for other claimants. Recently, a whole new group of victims has begun to manifest asbestos-associated injuries and to seek compensation from the Trust: children of asbestos workers who were exposed to fibers brought home on their parents' clothing. *See, e.g.,* Letter from Denise Abrams dated Jan. 30, 1991 (application on behalf of thirty-four year old mother of five children diagnosed with mesothelioma caused by exposure to asbestos dust on her father's clothes) (filed and docketed).

The fact that the Trust has reserved the right to contest the type and seriousness of a claimant's injuries, a claimant's exposure to Manville asbestos products and other causation in fact issues, Trust Distribution Process, § C, 120 B.R. 648, 673 (E. & S.D.N.Y.1990), means that attorneys must investigate, gather and present evidence that may be difficult to obtain. Proof of exposure may not merely be a matter of producing an employment record; it may require scouring of employment records of dead relatives and friends and checking out old residences or schools. New diseases may emerge that would require establishing general as well as causation-in-fact proof. The attorneys must keep abreast of a highly developed area of law and follow current scientific and other research.

Finally, clients are free to negotiate lower fees or proceed pro se. The Settlement does not contemplate that all fees will be 25% contingent fees. It states simply that "where calculated as a percentage of recovery, [fees] will be the lower of the fee provided in the contract between claimant and counsel or 25%." Trust Distribution Process, § I, 120 B.R. 648, 677 (E. & S.D.N.Y.1990). This language offers the attorney and client three alternatives: a 25% contingent fee, a contingent fee of a lower percentage, or an hourly or flat fee with a 25% cap. Attorney and client should work out the fee that best reflects the lawyer's effort considering the circumstances of the case and the claimant's financial ability to pay. The discussion and choice must be guided by the canons of ethics and codes of professional responsibility requiring that an attorney's fee be reasonable. Since many attorneys have received their cases as a result of union favor, the unions are in a position to intervene on behalf of their members in insisting on lower fees.

The court's conclusion that the fee provision meets the criteria set forth under Rule 23(e) is further supported by the fact that Congress enacted a similar provision to govern Social Security cases which present circumstances not wholly different (except that they cannot be handled en mass) from processing claims against the Trust. Attorney fees in social security cases are limited by statute to the smaller of

(A) 25 per centum of the total amount of such past due benefits, (B) the amount of the attorneys's fee so fixed or (C) the amount agreed upon between the claim-

ant and such attorney as the fee for such attorneys' services,

in proceedings before the secretary and to a reasonable fee for such representation, not in excess of 25% of the total of the past due benefits to which the claimant is entitled by reason of such judgment where a court renders a judgment.

42 U.S.C. § 406 (1988). As with the Trust, these are individual fee arrangements between plaintiffs and attorneys. The fee provision contemplates a choice by the parties to the fee contract. Many social security cases are routine administrative matters resolved relatively easily; others require complex factual development. The Social Security fee provision is designed to accommodate a variety of types of claims over a long period of time.

Three recent cases have defined the limits of the Social Security fee provision. In *McGuire v. Sullivan*, 873 F.2d 974 (7th Cir.1989), the court examined four cases according to the factors articulated in *Blankenship v. Schweiker*, 676 F.2d 116, 118 (4th Cir.1982). These factors include: "time and labor required; skill required; contingency of fee; amount involved and result attained; experience, reputation, and ability of attorney; and awards in similar cases." *Blankenship*, 676 F.2d at 118. In *McGuire*, the most critical factor to merit the entire 25% was risk: "A finding of riskiness is an essential one in granting a full twenty-five percent contingent fee award in a social security case." *McGuire*, 873 F.2d at 985.

In *Rodriquez v. Bowen*, 865 F.2d 739 (6th Cir.1989), the Court of Appeals for the Sixth Circuit held that the 25% fee was presumed reasonable, but might be reduced where inordinately large benefit award or minimal effort would result in a windfall to the attorney. *Id.* at 747. The court then limited fees to the customary hourly rate in the local area.

More recently, the Sixth Circuit has clarified the relation between the hourly rate and the 25% contingent fee. *Hayes v. Secretary of Health and Human Services*, 916 F.2d 351 (6th Cir.1990), *reh'g granted*, 1991 U.S.App. LEXIS 1020 (6th Cir.1991).

In *Hayes*, the court held that a contingent fee does not constitute a windfall if the amount of the fee is less than twice the hypothetical hourly rate. When the amount paid rises above this floor, "the court may consider arguments designed to rebut the presumed reasonableness of the attorney's fee." *Id.* at 355.

The fee provisions of the Social Security Act were passed in 1939. In the more than fifty years since the provision was enacted it has served as both an incentive to counsel to pursue difficult claims and a limit on excessive fees. *But see generally* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, Title IX § 9021(b), 101 Stat. 1330–295; 53 Fed.Reg. 9818 (1988) (Congress ordered study of entire fee authorization and payment process under Social Security Act). Recently, where circumstances have warranted limiting the use of the full 25% contingent fee, courts have done so within the contours of the statutory scheme.

The fee provision in the Settlement is designed to provide the same incentive and limits. It affords counsel ample reimbursement so that pursuing claims on behalf of those suffering from asbestos-related injuries should continue. It compels all to share in the necessary adjustments to account for the Trust's limited resources. Most importantly, it ensures that the bulk of money dispersed by the Trust goes to benefit claimants. The flexibility of the provision should assure that it supplies guidance for the conduct of plaintiffs counsel with respect to the Trust well into the next century.

### D. Conflict of Laws and Interpretation of Section H of the Settlement

The conflict of law question presented by this class litigation arises in a highly unusual context. The parties have negotiated a settlement of a class action that adopts a uniform substantive rule to govern certain issues in pending and prospective asbestos personal injury litigation among the parties in state and federal courts across the country. Many policy reasons lend support to the application of a uniform rule. Never-

theless, a federal court hearing an action predicated in part on diversity jurisdiction must recognize constraints in ignoring the applicability of the substantive law of the various states involved. Were claimants suing the Trust, there is little doubt that the tort law of each of fifty states would be applicable to the widely-dispersed claims on the Trust under generally accepted choice of law principles. This has been conceded by the Trust and other litigants in cases previously brought against the Trust.

It is the position of the codefendants that they are entitled to enforce their rights to contribution and to various forms of set off under applicable state laws without regard to the Settlement. Plaintiffs claim that the provisions of section H suitably provide for a sharing of the reduced recovery from the Trust between codefendants and claimants by, in effect, shifting the shortfall in total value of claims from the Trust to codefendants. During the years when Manville was in bankruptcy the codefendants were in most states responsible for Manville's share of damages. Cf. Tr. 1/2/91 at 68 (testimony of Roger Podesta).

As a matter of court power and equity there is much to be said for both positions. The dispute could be readily resolved by recognizing that the real recovery of claimants from the Trust will be reduced and then providing for a sharing of that loss between plaintiffs and codefendants.

Leon Silverman did, at the courts' request, engage in extensive negotiations following the fairness hearings in an attempt to settle this dispute between plaintiffs and codefendants. One way to do so would be to assign a fixed percentage to each disease as Manville's projected share of settlements and judgments to apply nationwide. It is true that the value would vary from state to state depending upon state law and the method of allocating settlements among defendants and plaintiffs. See Part VII.D.3.b.ii, infra (discussion of various state laws and effect on the Settlement). Such fine distinctions are beyond the capacity of the courts given the byzantine nature of some of the state statutes and the lack of ruling case law on many provisions.

The parties could, however, negotiate such a detailed settlement state-by-state.

By letter dated May 7, 1991, Mr. Silverman informed the courts that the plaintiffs and codefendants could not, at this time, reach a settlement on section H. The courts have provided what they believe is a fair resolution to assist other courts and the parties in interpreting section H. See Part VII.D.4.a., infra. The parties are urged to continue their attempt to settle this dispute during the course of any appeals. In the absence of some such consensual resolution, the courts are compelled to interpret section H in the light of the conflicting positions of the parties and the law.

A settlement agreement, even in a class action, is essentially a contract that courts will interpret in accordance with rules of construction of contracts. See, e.g., Jenkins v. Raymark Indus., 831 F.2d 550, 553 (5th Cir.1987); Air Line Stewards & Stewardesses Assoc. Local 550 v. Trans World Airlines, 713 F.2d 319, 321 (7th Cir.1983). Under settled canons of contract construction, if language in the agreement has two possible interpretations, one creating a valid contract and the other rendering it void or illegal, the court should adopt the former construction. See 2 E. Farnsworth, Farnsworth on Contracts § 5.1, at 7 (1990). This rule presumes "that the parties intend their agreement to be valid rather than invalid, lawful rather than unlawful, and honest and effective rather than fraudulent and voidable." Id.

When reviewing a settlement agreement for approval, courts will not reject the settlement unless its provisions appear to be clearly illegal on their face. Robertson v. National Basketball Ass'n, 556 F.2d 682, 686 (2d Cir.1977); see Bennett v. Behring Corp., 737 F.2d 982, 987 (11th Cir.1984); Armstrong v. Board of School Directors, 616 F.2d 305, 319 (7th Cir.1980); Grunin v. International House of Pancakes, 513 F.2d 114, 123–34 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

A similar rule of construction governs review of statutes that are challenged on constitutional grounds. A court

will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid. *See Communications Workers of America v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932). If a statute can be construed to avoid serious doubts about its constitutionality, without pressing the language "to the point of disingenuous evasion," *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985), that construction should be adopted by the court.

Codefendants argue that the substance of section H which prohibits them from impleading the Trust or presenting evidence to demonstrate Manville's responsibility for a plaintiff's injury will effectively repeal state tort reform statutes that abolish joint and several liability. While many states have enacted statutory modifications of joint and several liability, few have abolished it altogether. The specific state provisions relating to joint and several liability vary markedly from jurisdiction to jurisdiction in scope and applicability. Because of the considerable differences among state statutes, the courts must carefully analyze section H in terms of the law of conflicts and the types and policies of the numerous state tort reform laws.

It is not necessary to decide conclusively whether in fact the mandate of section H would violate state tort law statutes or constitutional rights of parties to read the provision in a manner that eliminates or minimizes such difficulties. *Cf. United States v. Security Indus. Bank*, 459 U.S. 70, 74, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982) ("substantial ... constitutional doubts ... warrant the employment of [this] canon of statutory construction"); *NLRB v. Catholic Bishop*, 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (court makes "narrow inquiry whether [provision] presents a significant risk" of unconstitutionality).

There is little doubt that section H, at a minimum, presents substantial risk of altering constitutional and state law rights of certain parties if read literally and expansively. Therefore, the courts will inquire whether an alternative interpretation of the language exists that can fairly be ascribed to the provision that would avoid serious abrogation of independent state law rights. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *cf. Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality").

In view of the conflict created by the substantive laws of several states in areas implicated by section H, the courts must address the question of which law should govern and whether the parties can choose a uniform law under the circumstances of this unusual case. If federal common law controls resolution of this issue, the courts could adopt a uniform rule.

### 1. Should a Single Federal Common Law Govern?

As the previous and subsequent discussion show, there are direction signs pointing both toward a single rule governing substantive relations between co-defendants and plaintiffs and toward fifty state rules. The atmosphere is foggy. In general, as we shall demonstrate, the safer and broader road in the special circumstances of this case is one that recognizes the predominant interest of the states in application of state substantive law to resolve the issue. The current state of our federalism points us in the direction of *Erie*.

The logic of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the holding in *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), direct a court sitting in diversity actions to utilize the conflict of law rules of the state in which it is located to ascertain what substantive law should

apply. *See In re Air Disaster at Locker-bie, Scotland,* 928 F.2d 1267 (2d Cir.1991). In *Erie,* the Court held that federal courts, vested with limited jurisdiction, are not empowered with general law-making authority exercised by state courts. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Despite this constraint, the Supreme Court has recognized "a responsibility in the absence of legislation, to fashion federal common law in cases raising issues of uniquely federal concern." *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). These situations arise only infrequently. *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963). The Court later elaborated:

> [A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases. In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.

*Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

#### a. Standard

Whether a substantive federal rule should apply in diversity actions depends on three factors culled from *Miree v. De-Kalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), and *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966):

(1) the existence of a substantial federal interest in the outcome of the litigation;

(2) the effect on this federal interest should state law be applied; and

(3) the effect on state interests should state law be displaced by federal common law.

*See In re Agent Orange Prod. Liab. Litig.,* 635 F.2d 987, 990 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Owens v. Haas,* 601 F.2d 1242 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

The Fifth Circuit Court of Appeals, sitting en banc, addressed the question whether federal common law should govern punitive damage awards in asbestos personal injury cases. *See Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1324 (5th Cir.1985) (en banc). The Fifth Circuit's analysis of the uniquely federal interests that might warrant supplanting state law bear on the circumstances present here. The majority rejected the claim that federal law should govern; the dissent would have certified the question to the Supreme Court of the United States pursuant to 28 U.S.C. § 1254(2) (1988).

The first federal interest posited in support of applying federal common law to punitive damage claims in asbestos cases analogized the potential conflict among plaintiffs for the limited resources of the former manufacturers and distributors of asbestos products to the interstate conflicts over water rights and pollution. Those interests have been viewed as uniquely federal. *See Hinderlider v. La Plata River & Cherry Creek Ditch Co.,* 304 U.S. 92, 110, 58 S.Ct. 803, 810–11, 82 L.Ed. 1202 (1938); *see also Illinois v. City of Milwaukee,* 406 U.S. 91, 105 & n. 6, 92 S.Ct. 1385, 1393 & n. 6, 31 L.Ed.2d 712 (1972). The Fifth Circuit described the position as follows:

> [J]ust as one state cannot divert the waters of a river flowing partially within its borders without regard for those downstream, one group of states should not be able by allowing recovery of noncompensatory damages to divert and deplete scarce corporate resources at the expense of injured plaintiffs in other states.

*Jackson,* 750 F.2d at 1324.

The majority found that the situation in which states resolve a dispute concerning

the appropriate use of shared natural resources differs significantly from the conflict among plaintiffs seeking recovery for asbestos injuries out of finite financial sources. Punitive damage claims not only present a conflict among plaintiffs from different states, but also plaintiffs within each state, and between present and future plaintiffs. That fact, a majority of the Fifth Circuit asserted, greatly minimized the interstate aspect of the conflict. In addition, a state when faced with disputes involving natural resources acts as quasi-sovereign on behalf of its citizenry whereas the court perceived asbestos litigation as exclusively among private litigants.

A second interest asserted as uniquely federal was preserving the viability of government suppliers of essential items. Either the failure to compensate tens of thousands of injured persons or the bankruptcy of a major sector of the economy has consequences for the entire country. The Fifth Circuit majority, however, disputed the conception that merely national interests with great significance constitute "uniquely federal interests." *Jackson,* 750 F.2d at 1324–25. Instead,

> to be "uniquely federal" and thus a sufficient predicate for the imposition of a federal substantive rule, an interest must relate to an articulated congressional policy or directly implicate the authority and duties of the United States as sovereign.

*Id.* at 1325; *see, e.g., Texas Indus. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (authority and duties of United States must be "intimately involved"); *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981) ("definition of rights and duties of the United States" constitutes uniquely federal concern); *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (federal law governs rights of United States arising under nationwide federal program); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943) (questions arising from issuance of commercial paper used by United States resolved by federal common law).

The majority found that in the absence of Congressional action in the area of asbestos, the federal courts remain circumscribed by state law. The effect of judgments in asbestos cases on the government's ability to procure supplies is too attenuated to qualify as the type of unique federal interest necessitating displacement of state law. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 2517–18, 101 L.Ed.2d 442 (1988) (federal common law defense for military contractors only displaces duties imposed by state tort law in carefully circumscribed instances); *In re Joint Eastern and Southern Dists. Asbestos Litig. (Grispo),* 897 F.2d 626, 630–32 (2d Cir.1990) (applying *Boyle* standard to asbestos failure to warn cases); *cf. Miree v. DeKalb County,* 433 U.S. 25, 29–32, 97 S.Ct. 2490, 2493–95, 53 L.Ed.2d 557 (1977) (federal interest in air travel insufficient basis for creation of federal law in action between private parties where no direct affect on United States or its treasury); *Bank of America Nat'l Trust & Sav. Ass'n v. Parnell,* 352 U.S. 29, 33–34, 77 S.Ct. 119, 121–22, 1 L.Ed.2d 93 (1956) (governmental interest too speculative and remote in action between private parties that does not touch rights and duties of United States).

Moreover, the majority of the Fifth Circuit found that in view of the traditionally strong state interests underlying tort law, only clear legislative action could justify application of a federal rule of decision to the tens of thousands of cases pending in state and federal courts. *Id.; see also Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) ("Punitive damages have long been a part of traditional principles of state law.... Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted.").

A third interest offered as a justification for reliance on federal common law is the federal judicial interest in ensuring fair and equitable resolution of the asbestos mass

tort cases. The majority rejected this as too all-encompassing and abstract an interest to form the basis for displacing state law. The court declared "implicit in *Erie* [is] the idea that in diversity actions federal court concerns in a just judicial system cannot be used as a reason for supplanting substantive state policies." *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1326 (5th Cir.1985) (en banc). To so hold would eviscerate the meaning of *Erie* and ignore its constitutional underpinnings. *Id.* The Fifth Circuit found that the Supreme Court's holding in *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), which rejected the argument that the federal court's equitable powers constituted an exception to the *Erie* doctrine, controlled the result with respect to a claim based on a court's sense of justice. In *Guaranty Trust* the Supreme Court stated:

> [S]ince a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.

*Id.* at 108–09, 65 S.Ct. at 1469. To permit an exception where a federal court thought justice so warranted would expand unrecognizably the "few and restricted" instances governed by federal common law. *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963).

In accord with the majority on the controlling precedents, the dissent strongly contested the formulation of the interests at stake:

> We do not deal here with a question of limited scope and impact such as the application of a state statute of limitations governing breach of trust actions as did *Guaranty Trust* on which the majority relies. As Justice Frankfurter pointed out, even before *Erie* such statutes generally governed diversity suits. Rather, we confront a sequence of massive tort claims that has unparalleled geographic and financial dimensions.
> We confront cases where the application of divergent governing principles can destroy the rights of similarly situated claimants. We confront no less than a challenge to our purpose as courts.

*Jackson,* 750 F.2d at 1330 (Clark, C.J., joined by Gee, Garza, Politz and Jolly, JJ., dissenting) (footnote omitted). The dissent viewed the interstate nature of the controversy engendered by the nationwide flood of asbestos litigation as predominant and ample justification for imposition of federal common law.

In particular they emphasized the unique circumstances never witnessed by the courts before asbestos litigation that warranted an unusual but justified result:

> Unless the dependent rights of all present and future claimants are considered by the only forum capable of devising a single appropriate response to basic issues that affect the economic vitality of the compensation fund, disparate awards to early claimants can destroy the courts' ability to do justice. The asbestos litigation presents one of the few and restricted instances where formulation of federal common law is justified under the strictures defined by existing precedent.

*Id.* at 1335 (Clark, C.J., dissenting). Experience has certainly borne out that ominous prediction concerning the consequences of the asbestos litigation for plaintiffs who develop injury now and in the future.

The dissent found indistinguishable the equitable division of scarce resources between citizens of different states where conflicting state interests make the use of the other state's law inappropriate, regardless of whether riparian rights or meaningful compensation for personal injuries are at stake. *Id.* at 1331–32 (Clark, C.J., dissenting) (citing *Hinderlider v. La Plata River and Cherry Creek Ditch Co.,* 304 U.S. 92, 110, 58 S.Ct. 803, 811, 82 L.Ed. 1202 (1938)). The dissent explained:

> An equitable resolution of this nationwide competition for scarce assets is surely as important to the basic interests of federalism as the equities invoked to

justify the formulation of a common law of nuisance to resolve the dispute between the several bordering states over the pollution of Lake Michigan.

*Id.* (citing *Illinois v. City of Milwaukee,* 406 U.S. 91, 92, 92 S.Ct. 1385, 1387, 31 L.Ed.2d 712 (1972)).

The Fifth Circuit also considered practical difficulties that would result from applying federal common law to claims for punitive damages. In *Jackson,* the authority of the court to reach only Mississippi plaintiffs undermined the benefit sought from imposition of federal common law. Instead,

> any federal substantive rules fashioned by us would only exacerbate the alleged inequities among claimants, with punitive and certain types of compensatory damages being available outside the circuit but not within.

*Jackson,* 750 F.2d at 1326. Such a result would only encourage forum shopping and disadvantage plaintiffs within the jurisdiction.

Another practical obstacle was an inability "to discern any governing principle of easy application for the imposition of federal common law in the asbestos context." *Id.* Relying simply on the need to limit plaintiffs' recoveries in an effort to ensure ample funds for future claimants does not yield a discrete number of legal issues that might be subject to federal common law; many other disputes would satisfy the criteria. This raised the prospect that the federal courts would become increasingly responsible for establishing a general federal tort law in contravention of *Erie. Id.* at 1327.

Finally, the Fifth Circuit as a matter of policy rejected applying federal common law at the point in time when most of the legal issues raised by asbestos litigation had been resolved according to state law. To do otherwise would hinder the progress of adjudicating the cases many of which have lingered for years. *Id.* The Fifth Circuit concluded:

> [U]nder our federal system Congress is generally the body responsible for balancing competing interests and setting national policy. There is no doubt that a desperate need exists for federal legislation in the field of asbestos litigation. Congress' silence on the matter, however, hardly authorizes the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions.

*Id.* The dissent agreed that congressional action would be preferable, but also noted that a decision by the federal court would not preclude a legislative solution and in fact might inspire one.

While it did not act as a court, it seems of passing significance that the United States Judicial Conference has unanimously requested Congress to pass necessary national legislation for the resolution of asbestos litigation. There is at least the implication that the members of that body chaired by the Chief Justice of the United States with a representative from the Court of Appeals and the district courts of each circuit had serious doubts about the possibility of a federal common law solution.

### b. Application of Standard

With that background in mind, we turn to the uniquely federal interests that underlie this class action to determine whether federal common law should control contribution and set-off rights under the Settlement. The posture of the *Findley* class action provides strong practical reasons that favor adopting a uniform national rule, although the courts will not go so far as to impose one. The class comprises all present and prospective beneficiaries; imposition of the uniform substantive rule would further similar treatment for all claims. The close nexus between distribution of funds from the Trust and the treatment of those payments in asbestos litigation means that the modification of one without the other may hamper successful rehabilitation of the Trust.

The first uniquely federal interest implicated in this class action is fortifying and preserving a bankruptcy reorganization involving a major corporation. Drawing on the courts' continuing bankruptcy

jurisdiction, a uniform rule might be imposed such as the one embodied in the Settlement. *Cf. Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943) (courts of bankruptcy in applying United States statutes follow federal common law). Federal courts have exclusive jurisdiction over bankruptcy cases under Article I and Article III and thus are not required to abide by and enforce state law where to do so would frustrate the bankruptcy court's effort to successfully rehabilitate distressed debtors. *See* U.S. Const. art. 1, § 8, cl. 4; *see also In re Taddeo,* 685 F.2d 24, 28–29 (2d Cir.1982) (bankruptcy court ruling to permit debtor to cure default rather than pay entire mortgage as dictated by state law did not vitiate state created rights but determined their enforceability); *In re Beck Indus.,* 725 F.2d 880, 891 (2d Cir. 1984) (adopting most stringent standard, rather than state law standard, in claim for punitive damages against trustee as necessary to protect estate).

In *Heiser v. Woodruff,* 327 U.S. 726, 732, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946), the Supreme Court discussed the inherent power of a bankruptcy court to determine whether to enforce state claims:

> In passing upon and rejecting or allowing the proof of claim in this case the court of bankruptcy proceeds—not without appropriate regard for rights acquired under state law—under federal statutes which govern the proof and allowance of claims based on judgments. In determining what judgments are provable and what objections may be made to their proof, and in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy, requires its rejection or its subordination to other claims which, in other respects are of the same class, the bankruptcy court is defining and applying federal, not state, law.

*Id.*

Addressing this issue, this bankruptcy court in the Manville proceedings explained:

> [T]here is great justification for a bankruptcy court to authorize a uniform standard specifying some form of disease manifestation as the point of health claim allowability. This will avoid the unfairly inconsistent results which would otherwise eventuate in applying multitudinous statutes of limitations to like claims.

*In re Johns–Manville Corp.,* 36 B.R. 743, 750–51 n. 4 (Bankr.S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y.1985). The court then imposed, as the nationwide standard for allowability of claims against Manville, that an action accrues at the point of discovery or manifestation. *Id.*

In another context somewhat analogous to the case at bar, courts have approved complex securities class action settlements that selected a uniform rule for contribution and set-off rights as a matter of federal common law. The settlements eliminated contribution rights of non-settling defendants and adopted a set-off rule to govern in the event that the plaintiff prevails against a non-settling defendant. *See, e.g., Franklin v. Kaypro Corp.,* 884 F.2d 1222 (9th Cir.1989) (proportionate share of fault method adopted); *Singer v. Olympia Brewing Co.,* 878 F.2d 596 (2d Cir.1989) (pro tanto method adopted), *cert. denied,* —— U.S. ——, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990).

Most recently, the Fourth Circuit remanded a securities class action because the district court did not decide what set-off method would uniformly apply after a partial settlement of the case had been reached. *See In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 161 (4th Cir.1991). In the absence of a statutory provision determining the applicable rule to govern explicitly-created contribution rights, the Fourth Circuit surveyed the varying rules adopted by other circuits. Failure to determine the appropriate set-off rule as part of the class action settlement fatally undermined its fairness, leading the court to remand the case for the determination of the proper rule. *Id.*

Similar circumstances are present in this class action. Nevertheless, the nature of the negotiations and substantive rights at

stake dictate a more restrained outcome. The impleader and evidence bar contained in section H have been included in an attempt to minimize the effect of the Settlement on pending asbestos litigation in other courts and to facilitate smooth functioning of the Trust. At the heart of the Settlement is its effort to extricate the Trust from litigation. This must be accomplished in an equitable fashion that does not place unnecessary transaction costs on the Trust. The courts as part of their scrutiny of the Settlement could determine whether the particular substantive provision selected is fair and should be adopted as a matter of federal common law.

Here, to the extent that the Bankruptcy Code permits contribution and indemnification claims, no provision dictates how to calculate the set off if a reorganized entity settles claims for which a codefendant may also be partially liable. *See* 11 U.S.C. § 502(e) (1988) (court may disallow claims for contribution of entity liable with debtor on claim of creditor to extent that such claim for contribution is contingent). To leave the question open affects the litigation posture of the parties and prevents them from assessing the desirability of the Settlement. *See In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 159–161 (4th Cir.1991). To leave the issue completely unresolved would engender further litigation. In view of this delicate situation, the Settlement preserves contribution rights and adopts the *pro tanto method to govern set-off* rights.

▮ With responsibility to oversee effectuation of the Plan, the courts find that the unique federal bankruptcy context offers some support for the adoption of the uniform rule contained in the Settlement. As part of the original bankruptcy reorganization the parties could have adopted the present *contribution and set-off rules* without any jurisprudential problem. Before us, however, is a class action, based primarily on diversity jurisdiction, rather than a pure bankruptcy proceeding. In its class action aspect, the Settlement does not modify the Plan, but merely affects the administration of the Trust. The existence of the uniquely federal bankruptcy interest does not alone justify application of federal common law where it would displace the tort law of the several states in cases pending in state courts. The last factor of the test enunciated in *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), the effect on state interests should state law be displaced, cautions against blithely rejecting state law in an area dominated by local interests. While we might characterize the proceeding as one under New York law administering a trust or one under the bankruptcy law—both leading to justification for a single substantive rule— the multistate tort genes of this hybrid litigation show clearly in its visage.

This case does present compelling support in favor of a uniform rule in addition to the fact that it emanates from a complex bankruptcy reorganization that subsequently faltered. It also entails a difficult settlement of a class action affecting some 160,000 claimants geographically dispersed across the country seeking compensation from a limited fund. It raises some of the most intractable problems in attempting to delineate a satisfactory means by which to handle the tidal wave of asbestos cases that has hit the nations' federal and state courts. *See, e.g., Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 415–17 (5th Cir.) (en banc) (Clark, C.J., joined by Gee, Garza, Politz, and Jolly, JJ., dissenting) ("national [asbestos litigation] problem has been adjudicated as though it were a state problem.... The problems we face in this litigation are ones of national public policy.... Such policy cannot be subject to the whims of individual states because matters of national public policy have nationwide application."), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).

▮ These national interests, while unique, do not transform this class action into one that leads straight to the conclusion that it ought to be resolved according to federal common law for the reasons set forth by the majority in *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1324–26 (5th Cir.1985) (en banc). The fundamental state interests that constitute the bed-

rock of the tort system caution against the imposition of a single uniform rule by a federal district court in absence of explicit congressional authority.

We cannot ignore the strong federalism context of the issue. States have given great attention to tort law reform in recent years. Many of them, after strongly fought legislative battles have modified in complex ways the substantive relations between plaintiffs, defendants and codefendants. All this has occurred during a period when Congress has repeatedly failed to enact national tort legislation even if it were restricted to mass torts. Many cases have already been brought in venues based on these state reforms. We are loath to cut the Gordian Knot presented by state tort law diversity using the sword of federal common law without Congressional warrant.

As we have already pointed out, the United States Judicial Conference has recently taken the highly unusual step of specifically recommending legislation designed to handle asbestos litigation on a national level. Beyond the strong state interests served by tort law, large interstate and national interests of comparable dimensions are being sacrificed by the now endemic problems of asbestos. Despite the multitude of federal interests intertwined in this litigation, the noticeable silence of Congress on the subject precludes the courts from acting on the basis of federal common law to override all state tort law as it affects the relations between plaintiffs and codefendants.

This situation differs markedly from that presented by Agent Orange. *See In re Agent Orange Prod. Liab. Litig.*, 580 F.Supp. 690, 711–13 (E.D.N.Y.1984). In that class action, the circumstances supported a finding that national consensus law should govern the question of liability in cases consolidated by the Multidistrict Judicial Panel. State tort law addressing questions of injuries caused by toxic exposure while serving in the armed services in Vietnam did not vary significantly from state to state leading the court to conclude that states faced with claims against government military contractors would refer to national consensus law. Here, the states have recently adopted statutes focusing on the precise issue covered by section H. The law in the several jurisdictions is in flux and ought to be defined in the first instance by the state courts.

This is not to say that other state and federal courts ought not follow the rule adopted in the Settlement in the interests of consistent and equitable treatment of all Trust beneficiaries to the extent that it does not violate a state's public policy. Emphatically, they should do so. But, when state public policy and the dictates of *Erie* prevent this sensible result, they cannot be compelled by the federal courts to do so.

We turn to the choice of law and conflicts of law rules to see whether they offer any escape from the need to look to the substantive law of the fifty states. As the following discussion demonstrates, there is no nirvana in this direction.

2. *Choice of Law Generally*
 a. Constitutional Limitations

Before analyzing the provision according to conflict of law jurisprudence, we briefly address the constitutional limitations, founded in the due process clause and the full faith and credit clause, that constrain a forum's choice of substantive law to govern in diversity cases. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 814–823, 105 S.Ct. 2965, 2975–80, 86 L.Ed.2d 628 (1985); *see Travelers Indemnity Co. v. Sarkisian*, 794 F.2d 754, 762 (2d Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986). Due process prohibits the selection of the law of a state which is only slightly related to the litigation while full faith and credit requires that a forum respect the laws and judgments of other states unless to do so would violate the public policy of the forum jurisdiction. *Shutts*, 472 U.S. at 818–19, 105 S.Ct. at 2977–78. Constitutional considerations might support the application of more than one jurisdiction's law to a particular multistate dispute. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101

S.Ct. 633, 639–40, 66 L.Ed.2d 521 (1981) (plurality opinion). The Court has cautioned, however, that

> for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that the choice of its law is neither arbitrary nor fundamentally unfair.

*Id.* at 312–13, 101 S.Ct. at 640; *see Home Ins. Co. v. Dick,* 281 U.S. 397, 410, 50 S.Ct. 338, 342, 74 L.Ed. 926 (1930).

A recent Supreme Court case raising choice of law questions confirmed that the same principles apply in class actions. In *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), a class action was brought by gas company investors, who resided in many states, to recover interest on suspended royalties pending final administrative approval of a rate increase. The Kansas Supreme Court had held that in adjudicating a nationwide class action the state trial court had great latitude to apply its own law unless compelling reasons existed to require the court to look to the law of other jurisdictions. Review of the relevant contacts with the forum led the Kansas Supreme Court to conclude that the cumulative weight of connection between the parties, the forum and the litigation warranted application of Kansas law to the entire litigation. The contacts included petitioners' conducting substantial business in Kansas, oil and gas extraction being an important business in the state, the Kansas courts' having experience resolving the type of dispute at issue, the plaintiff members desiring that Kansas law apply and the case resembling a suit against a "common fund" located in Kansas. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818–19, 105 S.Ct. 2965, 2977–78, 86 L.Ed.2d 628 (1985).

The Supreme Court reversed and remanded the case on the basis of the Kansas courts' choice of law analysis. The Court reiterated that the standard articulated in *Allstate* applied with equal force in a nationwide class action. The Court expressly stated that the presence of a "common fund" within a state might require or support the application of that state's law to claims against the fund from parties in all other states. *Id.* at 819, 105 S.Ct. at 2978 (citing as an example *Hartford Life Ins. Co. v. Ibs,* 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915)). Review of the facts in *Shutts,* however, revealed "no specific identifiable res in Kansas, nor is there any limited amount which may be depleted before every plaintiff is compensated." *Id.*

Reviewing the other contacts offered in support of Kansas law, the Court discredited the notion that because plaintiffs failed to opt out of the class action that they favored the application of Kansas law. Plaintiffs' desire for forum law rarely influences the conflicts analysis; to hold otherwise would merely encourage forum shopping. *Shutts,* 472 U.S. at 820–21, 105 S.Ct. at 2978–79. With respect to the authority conferred on the court with jurisdiction to adjudicate a nationwide class action, the Court held that the state court

> may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law.... The issue of personal jurisdiction over plaintiffs in a class action is entirely distinct from the question of the constitutional limitations on choice of law; the latter calculus is not altered by the fact that it may be more difficult or more burdensome to comply with constitutional limitations because of the large number of transactions which the State proposes to adjudicate and which have little connection with the forum.

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821, 105 S.Ct. 2965, 2979, 86 L.Ed.2d 628 (1985). To apply its own law the state must have significant contacts or aggregation of contacts to the claims asserted by each member of the class " 'creating state interests' in order to ensure that" application of a state's law "is not arbitrary or unfair." *Id.* at 821–22, 105 S.Ct. at 2979–80 (quoting *Allstate,* 449 U.S. at 312–13, 101 S.Ct. at 639–40). In view of Kansas' lack of interest in claims unrelated to that state, the Court found that the application

of its law exceeded constitutional limits. *Id.* 472 U.S. at 822, 105 S.Ct. at 2979–80.

The Court emphasized that the expectations of the parties constitute a significant factor in determining the fairness of choosing the governing substantive law. Similarly, a state " 'may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them' " without offending the full faith and credit owed to the laws of other states. *Id.* (quoting *Home Ins. Co. v. Dick,* 281 U.S. 397, 410, 50 S.Ct. 338, 342, 74 L.Ed. 926 (1930)).

### b. Modern Choice of Law

Rather than working from a background of lucid and precise rules, modern choice of law regimes "have produced fruits so diverse that pragmatic appraisal is impossible." Cavers, *A Critique of the Choice of Law Problem,* in J. Martin, *Perspectives on Conflict of Laws: Choice of Law* 25, 26 (1980). Apparently concurring in this assessment, the Supreme Court stated that each of the fifty states "applies its own set of malleable choice-of-law rules." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 252 n. 18, 102 S.Ct. 252, 264 n. 18, 70 L.Ed.2d 419 (1981). The varying approaches to choice of law range from the traditional "vested rights" approach of the *Restatement (First) of Laws* or the "most significant relationship" regime adopted in the *Restatement (Second) of Laws* to the "center of gravity," "governmental interest," "comparative impairment," "better law," "principles of preference," "functional," or "lex fori" approaches. L. Brilmayer, *An Introduction to Jurisdiction in the American Federal System* 218 (1986); *see* Kay, *Theory into Practice: Choice of Law in the Courts,* 34 Mercer L.Rev. 521, 585 (1983).

Traditional choice of law theory in the United States has struggled to resolve the tension between the doctrine of comity, most clearly articulated by Justice Story, and the notion of vested rights developed in large part by Joseph Beale during the early 1900's. *Compare* J. Story, *Commentaries on the Conflicts of Laws,* §§ 33, 36, 38 (4th ed. 1852) *with Restatement (First) of Conflicts of Laws* (1934). *See also* Note, *Choice of Law: A Fond Farewell to Comity and Public Policy,* 74 Cal.L.Rev. 1447, 1448–49 (1986). According to these theories, the rule of *lex loci delicti* —the law of the place where the act in question occurred or where the right was created— would govern. In tort suits, the right vests at the place of injury; in contract suits, it is the place where the legal relationship is established.

The underpinnings of the vested rights approach, with its vision of law as a set of constant rules or norms to govern future events, rests upon a territorial theory of jurisdiction. *See generally* Korn, *The Choice-of-Law Revolution: A Critique,* 83 Colum.L.Rev. 772, 778–79 (1983). This doctrine posits that each state sovereign has the exclusive right to regulate the conduct of persons and the status of things within its geographical limits. In an effort to bring certainty to the law of conflicts, the First Restatement created a body of comprehensive conflicts rules that reflect these principles. *E.g., Restatement of Conflict of Laws* § 379 (1934). But these easily stated principles could not accommodate the complicated reality that the industrial world and multistate disputes produced. In practice the rules proved susceptible of varying applications and inconsistent results.

With rapid industrialization, advances in transportation and communication, the interstate and international boundaries became less significant and conflicts more prevalent. Frequently more than one sovereignty might have an interest in a dispute and ascertaining the location of the defining event could be quite difficult or subject to manipulation to produce a particular result. *See, e.g., Grant v. McAuliffe,* 41 Cal.2d 859, 264 P.2d 944 (1953); *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 162, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946). The location of the critical event might be little more than fortuitous. *See, e.g., Kilberg v. Northeast Airlines,* 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961); *Haumschild v. Continental Cas. Co.,* 7 Wis.2d 130, 95

N.W.2d 814 (1959); *see generally* Cavers, *A Critique of the Choice of Law Problem*, 47 Harv.L.Rev. 173, 178 (1933). The changed world was not well served by the theoretical basis and practical application of the rigid rules of the first Restatement. As one commentator remarked of the prolific criticism of the vested rights approach: "They condemned the choice-of-law rules as metaphysical in concept, mechanistic in operation, and myopic as to consequences." Rosenberg, *The Comeback of Choice–of–Law Rules*, 81 Colum.L.Rev. 946, 948 (1981).

To afford some flexibility to the rigid rules of the First Restatement, courts developed an exception which permitted one state to refuse to apply the law of another state if to do so would violate a fundamental public policy of the forum jurisdiction. *See, e.g., Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895); *see generally Feldman v. Acapulco Princess Hotel*, 137 Misc.2d 878, 881, 520 N.Y.S.2d 477, 480 (N.Y.Sup.Ct.1987). This escape from the rigid dictates of *lex loci*, however, lacked a firm analytical foundation and generated its own criticism.

New York, under the leadership of Chief Judge Stanley H. Fuld, established the departure from traditional choice of law concepts among the state courts. The New York Court of Appeals sought to devise a new approach to conflicts that was more resonant with modern life and the increased significance of the domicile of the parties. With its landmark decision of *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), New York rejected mechanistic application of the place of injury rule in personal injury cases and instead considered the policies underlying state statutes implicated in a particular dispute. The Court of Appeals later explained that *Babcock* demonstrated its willingness

> to sacrifice the certainty provided by the old rule for the more just, fair and practical result that may best be achieved by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.

*Neumeier v. Kuehner*, 31 N.Y.2d 121, 130, 335 N.Y.S.2d 64, 74, 286 N.E.2d 454, 457 (1972).

Numerous other theories arose in the aftermath of *Babcock* that signaled the demise of rigid adherence to the vested rights approach. *See generally* Kay, *Theory into Practice, supra* (discussion of each theory with breakdown of which states have adopted which analysis). The modern methodologies offered varying, flexible criteria for courts to balance in selecting the governing law. The scope of relevant factors in the conflicts analysis greatly expanded as did the inquiry into the purposes underlying the local competing rules and the extent to which application of a law to the particular dispute would serve those purposes.

Prominent among the scholars advocating the new approach was Professor Brainerd Currie. He forcefully championed a regime guided by "governmental interest analysis." *See* B. Currie, *Selected Essays on the Conflict of Laws* (1963). This choice of law technique does not focus on the location of where the right attaches but rather examines, on a case by case basis, the policies behind the differing laws implicated in a multi-jurisdictional dispute. Each court must then consider whether the public policy of a particular state would be furthered, frustrated or irrelevant to the controversy at issue. *See generally* Currie, *Notes on Methods and Objectives in Choice of Laws*, 1959 Duke L.J. 171; *see also* Sedler, *The Governmental Interest Approach to Choice of Law, An Analysis and Reformulation*, 25 U.C.L.A. L.Rev. 181 (1977). The court would only displace the law of the forum if the policy of the legislature of another jurisdiction had a stronger interest in the dispute. *See* Sedler, *Professor Juenger's Challenge to the Interest Analysis Approach to Choice–of–Law: An Appreciation and a Response*, 23 U.C. Davis L.Rev. 865, 878 (1990).

Professor Willis Reese, Reporter of the Second Restatement, in an attempt to reinject structure and predictability produced a comprehensive analysis predicated on

grouping of contacts to determine the state with the "most significant relationship" to the controversy. *See, e.g., Restatement (Second) of Conflict of Laws* §§ 145, 188 (1971); *see also* Leflar, *Choice of Law: State's Rights*, 10 Hofstra L.Rev. 203 (1981). His core conceptualization of choice of law emerged in § 6 of the Restatement:

> (2) When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international systems,
>>
>> (b) the relevant policies of the forum,
>>
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>>
>> (d) the protection of justified expectations,
>>
>> (e) the basic policies underlying the particular field of law,
>>
>> (f) certainty, predictability and uniformity of result, and
>>
>> (g) ease in the determination and application of the law to be applied.

*Restatement (Second) of Laws* § 6 (2d ed. 1971). These principles, with respect to the particular issue, should illuminate the significance of the relationship to the potentially interested states, the relevant events and parties. Rather than a simple calculation of number of contacts, the factors reflect concern for the purposes and objectives of each of the competing state's laws, the strength of those interests and the extent to which they are implicated in the dispute. *Id.* (comments). The final factors recognize the importance of the justified expectations of the parties and judicial needs in ascertaining and applying the proper law. *See* Hill, *The Judicial Function in Choice of Law*, 85 Colum.L.Rev. 1585 (1985) (appraisal of virtues of rules to guide the courts).

Professor Robert Leflar propounded a doctrine emphasizing "choice-influencing considerations" in order to select the law that will best serve justice in the individual case. He specified five considerations that should guide the choice of law determination where a true conflict exists: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of governmental interests; and, (5) application of the better rule of law. R. Leflar, *American Conflicts Law* 195 (3d ed. 1977); *see also* W. Reese & M. Rosenberg, *Cases and Materials on the Conflict of Laws* 479–80 (8th ed. 1984). New Hampshire appears to have embraced Leflar's concept of better law. *See Clark v. Clark*, 107 N.H. 351, 222 A.2d 205 (1966). The court explained:

> We prefer to apply the better rule of law in conflicts cases just as is done in nonconflicts cases, when the choice is open to us. If the law of some other state is outmoded, an unrepealed remnant of a bygone age, "a drag on the coattails of civilization," ... we will try to see our way clear to apply our own law instead. If it is our own law that is obsolete or senseless (and it could be) we will try to apply the other state's law.

107 N.H. at 355; 222 A.2d at 209. *See also* Kay, *Theory into Practice, supra*, at 571 (citing other courts that have adopted Leflar's approach). Leflar candidly incorporated into his conflicts analysis the relative substantive merit of competing laws. Korn, *Choice–of–Law Revolution, supra*, at 819.

Other scholars have further refined modern conflicts doctrines and suggested alternative regimes. *See, e.g.,* Juenger, *Governmental Interests and Multistate Justice: A Reply to Professor Sedler*, 24 U.C. Davis L.Rev. 227 (1990); von Mehren, *Choice of Law and the Problem of Justice*, 41 Law & Contem.Prob. 34 (Spring 1977). Professor Juenger has been the leader in stressing the need for a national solution to the conflicts issues presented by mass torts.

While the scholars offer valuable critique and insight into the choice of law process, discussion of each of the various methodologies is not necessary for the purposes of this opinion. The hallmark of the modern conflicts regimes is their flexibility. At the same time they have given rise to a new

generation of difficulties resulting from the lack of consistent application and thorough understanding of the sophisticated choice of law analysis.

In response to the numerous approaches to conflicts followed in varying forms by state courts, some commentators have urged adoption of a federal rule of conflicts for complex multistate class actions. The American Law Institute's Complex Litigation Project has undertaken the difficult task of drafting such model rules for mass torts. *See* American Law Institute, *Complex Litigation Project: Prelim. Draft No. 3* ch. 6, at 3 (Sept. 19, 1990) (choice of law). "It states that the purpose of federal choice of law rules for complex litigation is not to make [substantive policy] determinations, but to resolve conflicts among the states." *Id.* at 5. The Draft recommends retaining the conflicts principles of those states with the most significant interests in a particular issue. The principal goal in such cases must be to select a choice of law rule that produces one law for each issue by the most evenhanded and fair approach without so complicating the process as to render it beyond practical resolution. The courts would derive substantial benefits from simplicity and ease of application with a federal rule, but to date it has been impossible to reach any consensus on its substance among the advisors and others interested in the project. *See* American Law Institute, *Complex Litigation Project: Reporters' Memorandum to the Council* ch. 6 (Jan. 25, 1991) (choice of law).

Other commentators have also urged adoption of a simplified conflicts analysis in mass tort litigation drawing on the various modern conceptions of choice of law. Professor Juenger has proposed the following model:

In selecting the rule applicable to any issue in a mass disaster case, the court will take into account the laws of the following jurisdictions:

(a) the place of the tortfeasors conduct,

(b) the place of injury,

(c) the home state of each party,

As to each issue, the court shall select from the laws of these jurisdictions the most suitable rule of decision.

Juenger, *Mass Disasters and the Conflict of Laws,* 1989 U.Ill.L.Rev. 105, 126. *See also* Weintraub, *Methods for Resolving Conflict-of-Law Problems in Mass Tort Litigation,* 1989 U.Ill.L.Rev. 129, 141, 156 (unified law for mass torts would eliminate complications in process and enhance equal treatment of all victims regardless of their residence); Rubin, *Mass Torts and Litigation Disasters,* 20 Ga.L.Rev. 429, 445 (1986).

A multiparty, multiforum action almost by definition involves conflicting interests of many states. That is certainly the case in the instant class action. This necessitates selection of the proper substantive rule of law. The need to review the law of fifty states as part of the conflicts analysis in national class actions as a practical matter greatly restricts the use of Rule 23 in mass tort cases. Here the courts are faced with a Settlement that incorporates the substantive tort rule currently applicable in the majority of jurisdictions. The question this federal court must answer in this diversity case is whether New York courts would approve the Settlement with its choice of a uniform law, particularly when New York has instituted wide "reforms" by statute and case law inconsistent with national law.

### 3. *New York Conflicts Rules*

The Trust was created in New York. Its assets are in New York. Many of those injured are New York residents. Many work sites where injury occurred are located in New York. Some of the key codefendant manufacturers either were incorporated in New York or have their principle place of business in New York. New York has had a preeminent role in resolving the conflicts problem.

In view of the numerous approaches to choice of law, and the expansive number of jurisdictions with an interest in the present litigation, we turn to what a New York state court would do faced with the present controversy. *See Klaxon Co. v. Stentor*

*Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). New York courts have recognized the concept of *depecage* which permits the applicable law to vary from issue to issue in the litigation depending on the nature of the dispute. *See, e.g., Application of Electronic & Missile Facilities, Inc.*, 38 Misc.2d 423, 236 N.Y.S.2d 594 (N.Y.Sup.Ct. 1962); *Shannon v. Irving Trust Co.*, 275 N.Y. 95, 105, 9 N.E.2d 792, 795 (1937) (court gave effect to provision in inter vivos trust that local law of New York should determine trustee commissions while other issues were governed by local law of New Jersey).

In this nationwide class action, the law that ought to apply to the claims of class members who may reside, work and have suffered injury in different jurisdictions must be addressed. This presents the courts with a dilemma. Even if the courts undertook to consider the fundamental policies underlying each of the recently adopted tort reforms, the scope of many of the provisions and their applicability to asbestos cases is still in the process of being defined in many states. The uncertainties in scope and meaning of many of the state substantive statutes leaves this court in the position of anticipating how the New York courts would rule as to the contours of tort reform laws of the various jurisdictions. *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 & n. 10 (2d Cir.1989). As Judge Friendly described it, the task is "to determine what the New York courts would think the California courts would think on an issue about which neither had thought." *Nolan v. Transocean Air Lines*, 276 F.2d 280, 281 (2d Cir.1960), *vacated and remanded*, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961), *on remand*, 290 F.2d 904 (2d Cir.), *cert. denied*, 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 96 (1961). *But cf. Metz v. United Technologies Corp.*, 754 F.2d 63, 66–67 (2d Cir.1985) (conflated into one step process).

Theoretically, here the second step of the analysis would have to be conducted separately for each of the fifty states. With respect to unsettled questions of common law, the Second Circuit has concluded:

> We believe that New York courts would, as a matter of substantive interpretation, presume that the unsettled common law of another state would resemble New York's but that they would examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's law.

*Id.* *See also Grimaldi*, 875 F.2d at 1003 (ambiguity in New York cases whether, encountering issues of unsettled foreign state law, courts will apply presumption of similarity with New York common law).

Mindful of *Erie* and comity considerations, the courts cannot disregard the contents of the recently enacted tort reform statutes in many states. These statutory modifications represent the most recent pronouncements by the legislatures of many states in response to strong pressures and conflicting interests of plaintiffs and defendants. Variations in laws respecting joint and several liability, contribution and indemnification rights, and set offs must be considered. This exercise convinces the courts that the ultimate resolution of the applicable law in pending state and federal asbestos cases must be determined by the court hearing the case at the time the issue is presented.

Given the tremendous complexities and web of issues generated by section H, this Settlement provision must first be analyzed as a contractual choice of law provision that selects a particular substantive rule of decision. The Settlement amounts to a contract among all Trust beneficiaries. Section H must also be viewed from the perspective of incorporating a uniform tort rule to govern the effect of settlements between beneficiaries and the Trust in state and federal asbestos disputes. The courts adopt the standard contained in section H, except where it violates either a fundamental public policy of New York or any other state. We include recommendations on how it should be applied by other jurisdictions based on the most accurate estimates of the value of the

Trust's future payment available at this time.

### a. Choice of Law: Contracts

The traditional approach to contract choice of law turned on the distinction between matters relating to the execution, interpretation or validity of the contract and matters of performance, the former construed according to the laws of the state where the contract was created and the latter according to the laws of where the contract was to be performed. *See, e.g., Swift & Co. v. Bankers Trust Co.*, 280 N.Y. 135, 141, 19 N.E.2d 992, 995 (1939); *Union Nat. Bank v. Chapman*, 169 N.Y. 538, 543, 62 N.E. 672, 673 (1902).

In the seminal case of *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 101–02 (1954), the New York Court of Appeals embraced a new choice of law perspective described as:

> a method—first employed to rationalize the results achieved by the courts in decided cases—which has come to be called the "center of gravity" or the "grouping of contacts" theory of the conflict of laws. Under this theory, the courts, instead of regarding as conclusive the parties; intention or the place of making or performance, lay emphasis rather upon the law of the place "which has the most significant contacts with the matter in dispute."

308 N.Y. at 160, 124 N.E.2d at 101–02. While this approach relinquished the certainty and predictability of the former approach, it enabled the forum court

> not only to reflect the relative interests of the several jurisdictions involved ... but also to give effect to the probable intention of the parties and consideration to "whether one rule or the other produces the best practical result."

*Auten*, 308 N.Y. at 161, 124 N.E.2d at 102.

Following *Auten*, New York courts generally enforce choice of law clauses in a contract if the chosen law has some meaningful contact with the contract and the fundamental policy of the otherwise applicable law is not vitiated. *See, e.g., Corporacion Venezolana de Fomento v. Vintero*

*Sales Corp.*, 629 F.2d 786, 793 (2d Cir. 1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Bank Itec N.V. v. J. Henry Schroder Bank & Trust*, 612 F.Supp. 134, 140–41 (S.D.N.Y.1985); *Hawes Office Sys., Inc. v. Wang Laboratories, Inc.*, 537 F.Supp. 939, 942 (E.D.N.Y.1982). In other instances, courts seem to determine the applicable law by weighing the forum-related contacts without regard to the parties choice. *Keystone Leasing Corp. v. People's Protective Life Insurance Co.*, 514 F.Supp. 841, 847 (E.D.N.Y.1981); *Haag v. Barnes*, 9 N.Y.2d 554, 216 N.Y.S.2d 65, 68–69, 175 N.E.2d 441, 443 (1961) ("The more modern view is that 'the courts ... lay emphasis ... upon the law of the place which has the most significant contacts with the matter in dispute.' ").

New York courts will not enforce a foreign jurisdiction's law if to do so would violate its public policy. This continues the traditional exception of not enforcing statutes that are particularly anachronistic or offensive to the forum. *See, e.g., Haag v. Barnes*, 9 N.Y.2d 554, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961); *Kilberg v. Northeast Airlines, Inc.*, 9 N.Y.2d 34, 39, 211 N.Y.S.2d 133, 135, 172 N.E.2d 526, 527–28 (1961) ("Our courts should if possible provide protection for our own State's people against unfair and anachronistic treatment of the lawsuits which result from these disasters."); *see generally* Paulsen & Sovern, *"Public Policy" in the Conflict of Laws*, 56 Colum.L.Rev. 969 (1956) (criticizing use of public policy exception as a substitute for meaningful choice of law analysis).

The Second Restatement largely adopted the concept embodied in *Auten* with slightly greater respect for the parties choice of a state's law if the particular issue is one which the parties could have resolved by an explicit provision in their agreement. *Restatement (Second) of Law: Conflict of Laws 2d* § 187 (2d ed. 1971). This rule enables the parties to effectuate their expectations and furthers predictability. If the provision is one the parties had the authority to resolve explicitly in the con-

tract, the selection of substantive law will govern unless

> (a) the chosen state has no substantial relationship to the parties or transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental public policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.*

This conflicts rule applied to contracts questions may not govern if the provision was not truly negotiated and agreed to among the parties. Thus, if facts raise a question as to whether consent was obtained by improper means, or whether the provision is contained in an adhesion contract drafted unilaterally by the dominant party, the forum court will carefully scrutinize the provision to determine its validity. *Id.* (comment b). In particular, courts will not give effect to a provision, not freely negotiated, which would result in substantial injustice to the opposing party. *Id.; see also Restatement (Second) of Conflict of Laws* § 187 comment e (1971) (rule designed to respect justified expectations of parties).

 New York courts give substantial deference to parties' choice of law provisions. *See* N.Y.Gen.Oblig.L. § 5–1401(1); *Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir. 1984). The designated law will govern if the state selected has sufficient contacts with the transaction. *Id.; Hawes Office Systems, Inc. v. Wang Laboratories, Inc.,* 537 F.Supp. 939, 942 (E.D.N.Y.1982); *cf. Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821, 105 S.Ct. 2965, 2979, 86 L.Ed.2d 628 (1985). Courts then analyze the nature of the relationship among the disputants, predicate factual circumstances and the law chosen.

Whether a New York court would enforce the Settlement provision which adopts a uniform substantive set-off rule is unclear from the cases and commentary. Many courts follow the general proposition, not easily applied to the facts of this case, that the parties' choice of law, where reasonable under the circumstances of the case, should be respected.

While in many ways analogous to a contractual provision, in some material respects the presence of the codefendant provision in the Settlement raises different questions. Typically, contracts bind those who sign them who are thereby put on notice that it contains a choice-of-law provision. In signing a contract, each party expresses his or her assent to each of its provisions. *Zerman,* 735 F.2d at 20.

 The reality of the Settlement's circumstances precludes treating it as a contract between plaintiffs and codefendants. The codefendants did not draft it, they did not consent to it and they are emphatic in their insistence that it is anathema to them. It would twist the facts beyond recognition to say that the codefendants contracted to apply the tort rule embodied in section H of the settlement.

Whether section H can be supported by New York's tort choice of law principles is the question we now address.

### b. Choice of Law: Torts

New York choice of law in cases involving torts has generated much scholarly commentary and discussion. *See, e.g.,* Korn, *The Choice–of–Law Revolution: A Critique,* 83 Colum.L.Rev. 772, 789 (1983); *Comments on Babcock v. Jackson: A Recent Development in Conflict of Laws,* 63 Colum.L.Rev. 1212 (1963).

Beginning with the rejection of the virtually universal rule of *lex loci delicti* in *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the New York Court of Appeals developed a modern choice of law methodology for tort disputes. *See Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972); *Tooker v. Lopez,* 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969); *Macey v. Rozbicki,* 18 N.Y.2d 289, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966); *Dym*

*v. Gordon,* 16 N.Y.2d 120, 262 N.Y.S.2d 463, 209 N.E.2d 792 (1965).

Rather than invariably applying the law of the place of injury, these cases dictate that "controlling effect" must be given

to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation.

*Babcock,* 12 N.Y.2d at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283. The virtue of such an approach is that it gives the state with the greatest interest in a particular dispute

paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation.

*Id.* (quoting *Auten v. Auten,* 308 N.Y. at 161, 124 N.E.2d at 102).

This analysis led New York courts to compare relevant contacts and interests to ascertain which jurisdiction had the closer and stronger nexus with the dispute. *See, e.g., Macey v. Rozbicki,* 18 N.Y.2d 289, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966); *Dym v. Gordon,* 16 N.Y.2d 120, 262 N.Y.S.2d 463, 209 N.E.2d 792 (1965). Continuing to address the conflict of laws question in the context of guest statutes similar to the one at issue in *Babcock,* the courts demonstrated some variations in interpretations of the meaning and proper application of the new methodology. *See Feldman v. Acapulco Princess Hotel,* 137 Misc.2d 878, 520 N.Y.S.2d 477, 480 (N.Y.Sup.Ct.1987).

The second Restatement of Conflict of Laws employing similar principles, cited favorably in New York Court of Appeals decisions, outlined the following criteria as relevant in tort choice of law questions:

(1) The rights and liabilities of parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Restatement (Second) of Conflicts of Laws* § 145 (2d ed. 1971).

The Restatement distinguishes between a forum with no interest in the litigation but for its presence on the docket and one that has a substantive connection with the case. *Id.* at § 6 comment e. In the former instances, the forum state's policies are not relevant. Where the parties or litigation have significant contact with the forum jurisdiction, the policies behind its substantive laws must be considered.

The inconsistencies and apparent ad hoc nature of the outcome of New York conflict cases created some dissatisfaction with the vagaries of open-ended interest analysis. In response, Chief Judge Fuld proposed the formulation of "a few rules of general applicability promising a fair level of predictability" which incorporated the governmental interest analysis developed in the Court of Appeals' prior decisions. These systematic rules were offered as guidance to courts in the context of guest statutes. *Neumeier v. Kuehner,* 31 N.Y.2d 121, 130, 335 N.Y.S.2d 64, 74, 286 N.E.2d 454, 457–58 (1972). The rules generally provide that in common domicil "false conflict" cases, the law of the domicil should govern. In the split domicil "true conflicts" cases, ordinarily the place of the tort should apply if it is also the domicil of one of the parties. In the other split domicil situations, the law of the place of the tort should control unless interest analysis yields a different result. *See Feldman v. Acapulco Princess Hotel,* 137

Misc.2d 878, 520 N.Y.S.2d 477, 480 (N.Y.Sup.Ct.1987).

The Court of Appeals recognized that while New York has a strong state interest in protecting its citizens injured in another state from antiquated or unfair statutes, no similar interest can be asserted with respect to citizens of that foreign state injured within their own borders. The Court of Appeals explained:

> While New York may be a proper forum for actions involving its own domiciliaries, regardless of where the accident happened, it does not follow that we should apply New York law simply because some may think it is a better rule, where doing so does not advance any New York State interest, nor the interest of any New York State domiciliary.

*Neumeier,* 31 N.Y.2d at 125, 335 N.Y.S.2d at 68, 286 N.E.2d at 457.

The Court of Appeals has extended the general principles underlying the *Neumeier* rules to apply outside the guest statute context. Seeking a balance between the need for predictability and uniformity of result and the desire to reach just, fair and practical results, Chief Judge Fuld noted:

> The single all-encompassing rule which called, inexorably, for selection of the law of the place of injury was discarded, and wisely, because it was too broad to prove satisfactory in application. There is, however, no reason why choice-of-law rules, more narrow than those previously devised, should not be successfully developed, in order to assure a greater degree of predictability and uniformity, on the basis of our present knowledge and experience.

*Neumeier,* 31 N.Y.2d at 127, 335 N.Y.S.2d at 69, 286 N.E.2d at 457. Discerning the larger message to be recognized in the *Neumeier* rules, Professor Korn concluded in his comprehensive and perceptive discussion:

> These messages are of transcendent importance to a sound transition of the modern approaches from the simple *Babcock* situation to the more problematic split-domicile conflict patterns: that the dispositive force of *Babcock's* insight

into the importance of the docimicle contact would prove much diminished in the context of split-domicile conflicts; that the latter would require reconsideration of the necessity for resort to the much maligned locus contact; and that this in turn might often require New York plaintiffs and ... laws to yield to the contrary laws of other states.

Korn, *The Choice–of–Law Revolution: A Critique,* 83 Colum.L.Rev. 772, 917 (1983).

New York courts ascertain the state with the stronger interest in applying its law based on the type of statute at issue. In *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985), the Court of Appeals stated that "the relative interests of the domicile and locus jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case." 65 N.Y.2d at 198, 491 N.Y.S.2d at 95, 480 N.E.2d at 684. Where the conflict rules involve standards of conduct, the court considers the law of the place of injury to possess the predominant, if not exclusive, interest

> because the locus jurisdiction's interest in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct ... assumes[s] critical importance and outweigh[s] any interests of the common domicile jurisdiction.

*Id.* (citing *Restatement (Second) of Conflict of Laws* § 145 comment d, at 417–18 (1971)).

Conversely, in the broader area of loss allocation for admittedly tortious conduct, rules such as those limiting damages,

> considerations of the State's admonitory interest and party reliance are less important. Under those circumstances, the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy in an action by a foreign domiciliary for injuries resulting from the conduct of a codomiciliary that was tortious under the laws of both jurisdictions ... Analysis then favors the jurisdiction of common domicile because of its interest in enforcing the decisions of both parties to accept

both the benefits and the burdens of identifying with that jurisdiction and to submit themselves to its authority.

*Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d at 685. The statutes at issue in this class action fall into this latter category. They define the allocation of loss among the many tortfeasors responsible for asbestos-associated injuries. Every state has recognized a cause of action in tort predicated on exposure to asbestos.

We will attempt to apply the above rules to this case recognizing, however, that *Neumeier* and its progeny assume that New York is the forum-jurisdiction of the dispute. In many of the cases affected by section H, New York will not be the forum of the litigation. The teaching of these rules must be adapted to account for the unusual posture of the instant case.

Of the 157,000 pending claims against the Trust, at least some likely fall into each of the paradigm situations outlined in *Neumeier.* The majority of cases probably involve injured claimants who live, worked and suffered injury in the state in which they sue. Typically the plaintiffs and defendants, however, have different domiciles. Under *Neumeier,* normally the law of the state where the injury occurred should govern, except in those cases where applying a different rule "will advance the relevant substitute rule law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." *Neumeier,* 31 N.Y.2d at 128, 335 N.Y.S.2d at 70, 286 N.E.2d at 458.

Given the mass of cases raising virtually infinite conflict situations, the larger policy questions addressed by state tort reform statutes must be considered to apply New York conflicts rules. This requires evaluation of which states have the most significant interest in the conflict created by section H, whether the policies sought to be affected by those statutes are implicated by a change in the rule controlling how a settlement by the Trust will effect a subsequent judgment, and the extent to which the purposes of those state tort statutes are furthered or frustrated by

the selection of a uniform rule. Faced with the need to perform this task with respect to the laws of all fifty states, New York courts would likely group the states according to the types of rules they appear to follow.

The courts here inquire generally into the purposes underlying relevant tort laws of the several states. New York courts have eschewed merely referring to forum law out of desperation or inability to ascertain foreign law. New York courts might, however, faced with a national class action that implicated the law of every jurisdiction, select the overwhelming majority rule—if one existed and it was not too divergent from the New York rule. Given the confused national tort law scene, it requires abandonment of every shred of skepticism to believe that New York would project a single rule of tort law on all the states. We cannot say with confidence that New York's rule of conflicts can be interpreted as leading to the result reached in section H of the Settlement.

### i. *Joint and Several Liability*

A thorough evaluation of section H demands that we briefly analyze the applicable substantive state tort laws it attempts to displace. Two types of statutes are particularly relevant to this case: (1) the recent "tort reform" statutes enacted in many states that modify the common law doctrine of joint and several liability, and (2) the statutes governing contribution and set-off where there is a partial settlement in a multidefendant case.

Despite its ancient roots, modern tort law is one of the most dynamic and controversial areas of law. Once the interest of a specialized bar, insurance companies and academics, recent developments have catapulted questions concerning how persons who have suffered personal injuries should be compensated into the public discourse. P. Schuck, *Tort Law and the Public Interest* 17–18 (ed.1991). The proposed Settlement interfaces with many tort concepts still at the center of fervent debate among legislators, courts, corporate executives, the injured and legal and academic experts. A brief summary of significant changes in

tort jurisprudence provides a background against which to evaluate section H and helps illuminate the courts' concern with this provision of the Settlement.

The early common law recognized joint torts only where the wrongdoers acted "in concert" or breached a joint duty. 3 E. Harper, E. James & O. Gray, *The Law of Torts*, § 10.1 at 1 (1986). Acting in concert required that tortfeasors act together with a common design or plan. Breach of common duty occurred when tortfeasors were linked by relationships—master-servant, principal-agent—which created a joint duty under a theory of vicarious liability even though no joint action occurred. *Id.* at 3. A third species of joint tort was recognized where an indivisible injury (death or complete destruction of a building) resulted from the independent but successive or concurrent actions of multiple tortfeasors. *Id.* Where joint torts were recognized, the act of one tortfeasor became the act of all. *Heydon's Case*, 11 Co. Rep. 5, 77 Eng. Rep. 1150 (1613).

At common law, joint tortfeasors were held jointly and severally liable to the tort victim. *The Law of Torts, supra*, § 10.1 at 1. Under this rule, a successful plaintiff could satisfy a judgment against all tortfeasors entirely from any one of them. Conversely, the release of one joint tortfeasor from liability released the others as well. *Cocke v. Jenner*, Y.B. 10 Hen. VI, f.41b. Co. Litt. 232, 80 Eng. Rep. 214 (c. 1432). The equities favored placing the burden of any error in loss allocation on the wrongdoer rather than the innocent plaintiff.

Joint and several liability furthers the compensation goal of tort law by shifting the risk of partial recovery from the injured party to the tortfeasor. The doctrine seeks to place the injured person in the position he or she would have been but for the tortious conduct and compels the defendant to bear the risk of paying more than its culpable share of plaintiffs' compensation. Am. Bar Ass'n, *Special Comm. on Tort Liability System, Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law*, at 4–29 (1984).

The original common law rule of joint and several liability developed during a time of limited liability. The doctrines of contributory negligence and assumption of risk eliminated many plaintiffs' claims. These theories completely barred a plaintiff from recovering if he or she was found in any way responsible for the injury. In contrast, under the principle of comparative negligence common in many jurisdictions today, a plaintiff's own conduct may reduce but will not completely abolish recovery. In addition, the English common law rules of joinder permitted a single action to proceed only against parties who acted in concert. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keaton on the Law of Torts*, § 46 (5th ed. 1984). After the introduction of the codes of procedure such as the Field Code in New York in 1848, the strict English rule evolved in American jurisdictions to permit joinder of tortfeasors who acted independently to produce an indivisible result. *Id.*

The early common law similarly precluded actions by joint tortfeasors for contribution. *Id.* § 50 at 337. Contribution permits a tortfeasor who has satisfied an entire judgment to sue other wrongdoers to pay a share of the damages awarded. *Heizer Corp. v. Ross*, 601 F.2d 330, 331 (7th Cir.1979). The common law prohibition was founded on the principal that "no man can be permitted to found a cause of action on his own intentional tort." *Restatement (Second) of Torts* § 886(A)(3) (1977); *see Merriweather v. Nixon*, 101 Eng. Rep. 1337 (1799). The early rule applied only to intentional torts. When American jurisdictions began to allow joinder of persons who had negligently caused the same damage, the bar on contribution was extended to cases of negligence. *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1226 (9th Cir.1989), *cert. denied*, — U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990).

The rule proscribing contribution engendered extensive criticism on two principal grounds: it was unfair to defendants, especially those whose responsibility for tor-

tious conduct was minimal, and it promoted collusion between plaintiffs and certain wrongdoers rather than apportioning damages equitably. *Id.* at 1227. Gradually, states began to modify the rule. By 1981, thirty-nine states permitted some form of contribution. Twenty-nine states enacted the change through statute, while ten relied on judicial action. *Northwest Airlines v. Transport Workers Union*, 451 U.S. 77, 87 n. 17, 101 S.Ct. 1571, 1578 n. 17, 67 L.Ed.2d 750 (1981).

### ii. *Tort Reform Statutes and Policies Relevant to Settlement*

During last several decades the United States has witnessed an explosion in tort litigation in part facilitated by greatly relaxed rules governing liability. *See generally* P. Schuck, "The New Judicial Ideology of Tort Law" in *New Directions in Liability Law* (Olson ed. 1988). First, comparative negligence replaced contributory negligence increasing the number of plaintiffs who could maintain a cause of action despite some misconduct on their part. Second, virtually all jurisdictions abolished the privity requirement, expanding the number of defendants a plaintiff could sue directly, often to include the principal wrongdoer who might have the most substantial assets. Third, strict liability rules relieved plaintiffs of the difficult burden of proving negligence in product liability cases. Fourth, expanded notions of causation enabled plaintiffs to recover even where they could not prove whose product injured them, *see, e.g., Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980) (indeterminate defendant), or that a particular defective product caused their injury rather than an injury to another, *see In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 172–73 (2d Cir. 1987) (indeterminate plaintiff), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Fifth, many states eliminated or restricted traditional governmental and charitable immunities. Sixth, the notion of duty expanded to include responsibility for injuries discovered long after the responsible conduct occurred. Together these tort principles have greatly augmented the scope and extent of liability. *See generally* P. Schuck, *Tort Law and the Public Interest: Competition, Innovation and Consumer Welfare* 19–20 (ed. 1991).

The dramatic expansion in liability helped fuel a litigation explosion. The sudden shift of balance toward plaintiffs in the case of personal injuries generated vociferous and diverse calls for relief and limitations on allegedly excessive jury awards. This in turn created a climate for "tort reform." A major impetus for change were the cries of distress from the insurance industry during the mid–1980's when premiums soared. *See* Priest *Modern Tort Law and Its Reform*, 22 Valparaiso L.Rev. 1 (1987).

In response, statutory tort restrictions were widely adopted. Congress came close to enacting a federal tort reform statute in 1985 and 1986. *Id.* at 3. Between 1985 and 1987, every state legislature considered some variety of tort litigation limitation and forty-two states enacted statutes. *Id.; see also Selected State Legislative Action Re: Affordability and Availability of Liability Insurance* (National Conference of State Legislatures Aug. 4, 1986). Widely divergent views and powerful special interests produced statutory compromises in most states. The results are varied and lack clearly articulated theoretical underpinnings. *See* Priest, *The Current Insurance Crisis and Modern Tort Law*, 96 Yale L.J. 1521 (1987). Instead, tort reform statutes amount to a patchwork of provisions some of which favor defendants and other of which favor plaintiffs in varying and complex ways: modifications of joint and several liability, rules of set-off governing the effect of settlement on joint tortfeasors' responsibility for verdicts, limits on damages and attorneys' fees and complex new procedural rules.

The motivation behind revision of joint and several liability stems in part from a perception that the rule was unfair to solvent defendants. Where a major defendant is insolvent, minor defendants are often left responsible for amounts substantially greater than their share of culpability. The harshness of the rule was exacerbated by expansions in liability. While

plaintiffs who were slightly at fault could recover, defendants who were slightly at fault might have to satisfy an entire judgment. Some states moved to remedy this situation by structuring a system where defendants would only bear responsibility for their share of certain or all damages.

Though nearly four-fifths of the states had enacted some type of tort reform by 1989, the specific provisions contain significant qualifications and exceptions yielding highly varied statutory frameworks. Some states have abolished joint and several liability for all damages both economic and non-economic. *See, e.g.,* Ky.Rev.Stat. § 411.182; Ariz.Rev.Stat. § 12–2506; Colo. Rev.Stat. § 13–21–111.5; Kan.Stat. § 60– 258a(d). Even those states retain joint and several liability, however, when there is genuine concert of action among tortfeasors.

Some states have only limited joint and several liability. Georgia, for example, abolishes joint and several liability where there is some degree of fault on the part of the plaintiff. Ga.Code. § 51–12–33 (1986). This is a modified return to contributory negligence: an innocent plaintiff may benefit from joint and several liability while the plaintiff who is partially at fault must bear the risk of recovering less than his or her full judgment. Other states exempt torts prosecuted on a theory of strict liability from the rule abolishing joint and several liability. *See, e.g.,* N.M.Stat. § 41–3A–1; Haw.Rev.Stat. § 663–10.9 (specific exemption for asbestos cases); Wash.Rev.Code § 4.22.070(3) (joint and several liability retained for injury resulting from exposure to hazardous substances).

New Jersey has a complicated formula limiting joint and several liability to parties with sixty percent or greater responsibility. N.J.Stat. § 2A:15–5.3. Parties twenty to sixty percent responsible are jointly and severally liable for economic damages and liable only for their percentage share of non-economic damages. Parties less than twenty percent responsible are only liable for their share of all damages. *Id.* In 1987, the statute was amended to exempt actions brought under a number of environ-

mental protection statutes N.J.Stat. § 2A:15–5.4. Two courts have concluded that asbestos cases qualify as an environmental tort so that joint and several liability would still apply to all defendants for all damages. *See Wundrak v. Armstrong World Industries Inc.,* No. 89–1912, slip op., 1991 WL 172956 (D.N.J. May 28, 1991) (reversing prior finding that asbestos cases do not fall within environmental exception); *Stevenson v. Porter–Hayden,* No. W– 010848–89 (N.J.Super. Feb. 19, 1991). This issue is currently on appeal before a New Jersey appellate court.

California and Florida have abolished joint and several liability for non-economic damages. Cal.Civ.Code § 1431.2; Fla.Stat. § 768.81. Other states such as New York have abolished joint and several liability with respect to non-economic damages for defendants who are less than 50% at fault. N.Y.C.P.L.R. 1601; *see also* Iowa Code § 668.4. Still other states, such as Mississippi and Louisiana, limit joint and several liability to the first 50% of a plaintiff's recovery. Miss.Code § 85–5–7(2); La.Civ. Code art. 2324. *See also* Ill.Code of Civil Procedure § 2–1117 (any defendant whose fault "is less than 25% of the total fault attributable to the plaintiff ..."); Walsh and Doherty, *Section 2–1117: Several Liability's Effect on Settlement and Contribution,* 79 Ill.Bar J. 125 (1991). Many of these "reform" statutes are so new and convoluted that no federal court can safely say what they mean. Their interpretation must be left to the states and the forums' federal courts.

If the modifications to the rule of joint and several liability were intended to favor defendants, the resulting provisions do not uniformly do so. The New York statute demonstrates the variability. The statute provides that where a defendant's total liability is 50% or less, liability for noneconomic loss shall not exceed his or her equitable share "determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss." N.Y.C.P.L.R. 1601 (1990). *See also* N.Y.Gen.Oblig.L. § 15– 108(a). The statute exempts motor vehicle, release of hazardous substances and cer-

tain products liability cases from its reach. It also excludes parties from the determination of equitable shares where the claimant "proves that with due diligence he was unable to obtain jurisdiction over such [party]...." N.Y.C.P.L.R. 1601.1. Courts applying this provision have reached varying conclusions on how to categorize bankrupt entities. *See, e.g., In re New York City Asbestos Litig.*, —— N.Y.2d ——, 572 N.Y.S.2d 1006 (N.Y.Sup.Ct.1991) (Freedman, J.) (discussion of difficulties in recomputation of verdicts to account for bankrupt and settling defendants). There is a similar divergence of views with respect to whether the provision encompasses those not present in an action in order to preserve diversity jurisdiction. As one district judge concluded, the statute "represents a negotiated compromise between plaintiffs and defendants interests. Some provisions do indeed favor defendants, others do not." *In re Joint Eastern & Southern Dists. Asbestos Litig. (Dutcher)*, No. 88 Civ. 1286, 1990 WL 124330 at 7 (S.D.N.Y.1990).

Particularly relevant to the effect of section H of the Settlement are state rules governing contribution and set-off. In forty-two states a settlement between a plaintiff and a joint tortfeasor extinguishes the settling tortfeasor's right to seek contribution from non-settling defendants, and in turn, releases the settling tortfeasor from liability for contribution. Fifteen states have adopted this rule in the form of the Uniform Contribution Among Joint Tortfeasors Act which provides:

> (d) A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement or in respect to any amount paid in a settlement which is in excess of what was reasonable.
>
> ....
>
> (5) Release or covenant not to sue. When a release or a covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> ....

> (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

Uniform Contribution Among Joint Tortfeasors Act, §§ 1, 4, 9 U.L.A. 98 (1975); *see, e.g.,* Fla.Stat. § 768.31; Mass.Gen.L. ch. 231B § 1. Other states have enacted similar but not identical statutes. *See, e.g.,* N.Y.Gen.Obl.L. § 15–108; Cal.Code Civ. Proc. § 877. Under these provisions when plaintiffs settle with the Trust, contribution rights between the Trust and the non-settling defendants are extinguished and setoff rules become operative.

In exchange for the discharge of contribution rights, non-settling tortfeasors in forty-three states are entitled to a set-off of the verdict to reflect settlements with joint tortfeasors. The notion of set-offs emerged from the one satisfaction rule which entitles a plaintiff to only one recovery for a particular injury. *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *see also Restatement (Second) of Torts* § 885(3) (1979). Set-off rules fall principally into three categories: "Pro tanto", "pro rata" and "equitable share."

More than half of the states employ the "pro tanto" rule. *See, e.g.,* Cal.Code Civ. Proc. § 877; Ill.Rev.Stat. ch. 70, par. 302. This practice subtracts from a judgment against a non-settling defendant the actual amount received by the plaintiff in settlement. The Second Circuit recently adopted this rule as a matter of federal common law to govern contribution in federal securities actions. *See Singer*, 878 F.2d at 600. The advantage of this approach is that plaintiff does not risk receiving less than the full verdict. It also recognizes that plaintiffs often settle for an amount less than the settling defendant's actual liability. This is particularly true when the settling defendant is insolvent. It is the method adopted in section H.

In a small number of states, non-settling defendants are entitled to a set-off equal to the settling defendants' pro rata share of liability. The pro rata share is calculated

by dividing the total judgment by the total number of defendants (settling and non-settling). For example, if there are four defendants, and one settles before a judgment of $100,000 is reached, the judgment will be reduced by one-fourth, or $25,000. *See, e.g.,* Idaho Code § 6–806. The major advantage of this rule is convenience; shares are easy to calculate.

The pro rata approach poses significant risks for plaintiffs. The plaintiff who settles with one tortfeasor for less than the pro rata share will receive less than a full recovery. This is likely when a plaintiff settles with an insolvent defendant. The attendant risks discourage plaintiffs bound by this rule from settling cases prior to trial. This rule also discourages joining defendants who may be responsible for a small percentage of damages because the verdict will be reduced according to the number rather than extent of liability. This factor is significant in asbestos cases which often involve dozens of defendants, many of whom account for small shares of responsibility.

Approximately one-fifth of the states follow the rule which provides that a non-settling defendant is entitled to a set-off equal to the settling defendant's "equitable share" of liability. *See, e.g.,* Iowa Code § 668.7; *cf.* N.Y.Gen.Oblig.L. § 15–108 (set-off is arguably the greater of equitable share or amount of settlement). Like the pro rata rule, this set off also inhibits plaintiffs' desire to settle by potentially reducing a verdict by more than the amount of money actually received. With an insolvent defendant, this outcome is nearly certain. Thus in states employing the equitable share of liability set-off method, plaintiffs settling with insolvent defendants have no hope of receiving a full recovery. While the pro tanto rule is most common, the equitable share apportionment has significant support. The Court of Appeals for the Ninth Circuit determining set-off rules in federal security cases recently adopted this approach. *Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1231–32 (9th Cir.1989) (non-settling defendants limited to their actual percentage of liability), *cert. denied,* — U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192

(1990); *see also Smith v. Mulvaney,* 827 F.2d 558, 561 (9th Cir.1987).

### 4. *Application of Law to Case; Interpretation of Provision*

For reasons indicated below, the courts interpret the Settlement as permitting states to exercise their evidence and substantive law policies to regulate the relationship between plaintiffs and codefendants so long as the method of recovery from the Trust is not affected and the Trust is not required to participate in any way in any litigation.

#### a. Value of Level One and Level Two Claims

After the Settlement was reached, at the courts' request, Leon Silverman engaged in extensive settlement negotiations with representatives of the plaintiffs and codefendants to attempt to devise a consensual uniform national approach or some other form of settlement of their differences. It would be reasonable to expect the negotiators to accept in principle that their agreement should take the form of a set-off equal to a realistic percentage assigned to the Trust's share. This would be based at least in part on what the Trust would probably pay injured claimants. It is apparent that in any good faith negotiation both sides would have to concede that the Trust's share would have to be much lower than the 40% that the codefendants claim was Manville's traditional share. There was apparently disagreement about the appropriate percentages to be used.

Based upon available data and computations from Mr. Peterson, *see* Appendix A, attached, the courts conclude for the present that the fairest percentage in light of what claimants will most likely receive from the Trust in all jurisdictions and the past listing of Manville's share would be 15% for Level One claims and 7.5% for Level Two claims for current trial and settlement purposes. This issue is further adverted to in Part VII.D.4.b.i, *infra.* Mr. Peterson's, and the plaintiffs', analyses would support a finding that claimants will

actually receive in the order of 5% of the actual value of their claims for Level Two injuries and 10% for Level One injuries from the Trust in pro tanto jurisdictions. Codefendants have furnished a comprehensive critique of Mr. Peterson's calculations in Appendix A, attached. *See* Letter from Roger E. Podesta, John D. Aldock and Andrew T. Berry dated May 7, 1991. They calculate the Trust's share for Level Two cases at between 10% and 16% and for Level One cases at between 9% and 17% for other cancer and serious asbestosis or mesothelioma respectively, when both the Trust's and codefendants' shares are reduced to present value. *Id.* at 15; *see also id.* at 26 (Level One between 6%–11%, and Level Two between 9%–18%); Letter from Anne E. Cohen dated May 8, 1991. The codefendants' calculations reduce payments by other manufacturers to present value which only seems appropriate in instances where payments will be made over time; solvent defendants, typically settle cases on terms that call for relatively prompt payment. The codefendants also suggest that different allowances for states whose laws divide responsibility differently would be appropriate. *Id.* at 26–27.

Based on the courts' analysis of all the current data and projections as well as some knowledge of the present state of litigation and settlement practice in asbestos cases nationwide, we conclude that the intermediate figures of 7.5% and 15% would be reasonable for the time being as compromise estimated values in all jurisdictions. The parties may, of course, and are encouraged to, agree on these or any other figures nationally or on a state-by-state basis. National and statewide agreements to simplify issues and settle cases are needed. Too much money has already been spent litigating issues that are no longer debatable.

After completion of appeals and availability of estimates from Professor Margaret Berger's 706 Panel, *see* Appendix B, attached, Mark Peterson, the Trust and others, the courts will hold a hearing to provide an updated estimate. The present calculations are not binding on the parties or any court. The parties may agree to use them globally or in individual states or cases or to use such other percentages as they agree upon. Other courts are free to rely upon these estimates as guides or not as they find helpful under state policy and procedure.

Mr. Silverman's authority continues. The parties are urged to continue settlement discussions and to take advantage of his good offices.

b. Contribution and Set Offs

 Having analyzed the terms of the Settlement, the relevant choice of law principles, and the substantive law provisions and policies implicated in this aspect of the Settlement, the courts find that as construed below section H meets Rule 23(e)'s fairness standard. Much of section H is precatory; its precise contours will be defined by the courts and parties in asbestos litigation beyond the scope of this class action. The courts conclude that its inclusion in the Settlement does not warrant abandonment of an otherwise laudable compromise.

i. *Codefendants*

The clear goal of the class action is to remove the Trust wholly from the litigation that threatens to devour it and deprive all beneficiaries of any meaningful compensation. We cannot strike a perfect balance in removing the Trust from the tort system while preserving the rights of beneficiaries in other asbestos litigation. The courts' primary concern must be with the efficient management of the Trust and an equitable sharing among beneficiaries of benefits and hardships.

The courts must bear in mind that the task is to review the Settlement as a whole in face of the available alternatives. As the courts' envision those alternatives, they are unappealing. Hence every effort must be made to understand how section H operates and whether it so prejudices the rights of certain parties that it warrants rejection of the Settlement in its entirety. *See Robertson v. National Basketball Ass'n,* 556 F.2d 682, 686 (2d Cir.1977). At the same time, the absence of an opt-out right

weighs heavily in the courts' analysis of the propriety of the parties adopting a national rule of law that affects the substantive rights of the parties in other pending litigation.

■ This case presents the paradigm "common fund" case that the Supreme Court in *Shutts* indicated might justify the uniform application of the law of the jurisdiction in which the fund is located. In fact, the Plan provides that New York law will govern disputes arising out of the bankruptcy and reorganization. Plan § 11.7 at C–37 ("the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York"). New York has substantial contacts and aggregation of contacts to make that choice constitutionally sound with respect to issues relating to the Trust. The bankruptcy proceedings occurred in New York and the assets of the Trust are located in New York.

The problem is enhanced in its difficulty because here the Settlement selected a particular substantive rule, not followed in New York, to apply in asbestos cases litigated in state and federal forums throughout the country. While contribution and set-off rights resulting from a settlement with the Trust affect the fund, other fundamental tort issues in those cases may dominate which would incline a New York court to apply the law of plaintiff's residence, the place of injury or the defendant corporation's principle place of business. *See* discussion in Part VII.D.3, *supra.* The Supreme Court has recently reaffirmed the historical significance of state determinations in tort cases. *See Pacific Mutual Life Insurance Co. v. Haslip,* — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (refusal to disturb award of punitive damages because of reluctance to interfere with historic state interests protected by tort law).

The fluid state of tort law especially in states with recently enacted "tort reform" schemes seems to reinforce the wisdom of leaving such issues of first impression with the state courts. As some members of the Fifth Circuit put it:

> Each of many states touched by this litigation has a strong interest in ensuring that its citizens receive full compensation, regardless of when their claims accrue. Uncompensated claimants can directly or indirectly burden the state itself.

*Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1330 (5th Cir.1985) (en banc) (Clark, C.J., dissenting).

■ Accepting the basic premise that application of one state's law in a complex action is justified if the choice of law criteria utilized are neutral and fair and applied in light of the nature of the litigation, as already noted a New York court might approve a settlement that incorporated a uniform rule currently utilized by the majority of state jurisdictions under the circumstances of this case. *Cf.* American Law Institute, *Complex Litigation Project: Prelim. Draft No. 3* ch. 6, at 3 (Sept. 19, 1990); *In re Agent Orange Prod. Liab. Litig.,* 580 F.Supp. 690, 709–10, 711–13 (E.D.N.Y.) (national consensus law appropriate in nationwide class action seeking recovery for injuries incurred during military service in Vietnam), *mandamus denied sub nom. In re United States,* 733 F.2d 10 (2d Cir.1984). Where, as here, states have recently enacted numerous, varying statutes many of which have not been construed by the courts of the states, however, it would require stretching, to the point of reformulation, New York conflicts rules to arrive definitively at a single uniform rule.

In the original Manville reorganization proceedings this bankruptcy court affected relationships between nondebtors, such as MacArthur and Manville's insurers, with whom MacArthur claimed they had a separate contractual relationship. *See In re Johns–Manville Corp.,* 33 B.R. 254, 267 (Bankr.S.D.N.Y.1983). Affirmation of the settlement between Manville and its insurers was upheld by the district court and the Second Circuit Court of Appeals. *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 94 (2d Cir.1988), *cert. denied,* 488

U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). The Court of Appeals found that MacArthur's interest in the policies was adequately protected by the fact that Mac-Arthur "may proceed in the bankruptcy court against the $770 million settlement fund." *Id.* at 94. Similarly, the *Breland* class action Settlement in effect resolved the claims of plaintiffs against all code-fendants including Aetna, A.H. Robins' in-surer. *See In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). The Fourth Circuit upheld the confirmed plan and settlement of the class action.

■■■ As the above cases demonstrate, public policy strongly favors not simply rejecting the proposed Settlement in its en-tirety because of the ambiguity and poten-tial harsh operation of section H when it may in practice only affect an insignificant number of cases. The undisputed evidence in the record is that the vast majority of asbestos cases nationwide settle, and that between 95–99% of the claims against the Trust reach consensual resolution. This proclivity to settle greatly reduces the sig-nificance of section H's incorporation of the doctrine of joint and several liability which only becomes operative when a case is tried to judgment.

Furthermore, section H set-off rights are only triggered when a plaintiff settles with the Trust. Plaintiffs in states with eq-uitable share or other types of set-off stat-utes might decide not to settle because settling with the Trust would actually re-duce their total compensation. *See, e.g., In re Joint Eastern and Southern Dists. As-bestos Litig. (Gallin),* 760 F.Supp. 33, 34–35 (E.D.N.Y.1991) (plaintiff's verdict re-duced by entire numerical value of settle-ment with Manville Trust; nonsettling de-fendant left with no judgment to satisfy despite finding of liability and share of responsibility; plaintiff would have re-ceived more in absence of settlement with Trust). Since plaintiffs control the decision to settle, it is foolish to think they will do so when it results in their detriment.

If the Settlement failed to provide for a uniform pro tanto rule, plaintiffs in juris-dictions with other set-off methods would simply refuse to compromise their claims against the Trust until they had resolved their claims against all codefendants. The Distribution Process, however, operates on the premise that plaintiffs want to settle and will immediately enter negotiations with the Trust in an effort to reach a quick and fair compromise. Without this incen-tive on the part of the plaintiffs, the entire process may lose momentum. A plaintiff's interest in settlement with the Trust in such states would be tied to the vagaries of the tort system and his or her success in compromising claims against codefendants. Such delay tactics by the plaintiffs, while understandable, would impede the smooth and efficient operation of the Trust. While these difficulties could be surmounted, they raise a specter of problems that the Trust does not welcome. Thus, the Trust as well as the plaintiffs benefits from the uniform pro tanto rule.

Many of the statutes which modify the majority rule embodied in the Settlement were passed within the last five years and did not immediately take effect. Even in states with tort law that conflicts with the rule contained in section H, many of the cases will be governed by pre-reform law. Moreover, some states that altered the tra-ditional rule of joint and several liability carved out statutory exceptions which may or may not apply to asbestos cases. *Cf. Wundrak v. Armstrong World Indus., Inc.,* No. 89–1912 (D.N.J. May 28, 1991) (reversing prior decision and finding asbes-tos cases within exception to tort reform provisions).

■■■ Assuming—contrary to our con-clusion—that New York courts would adopt a uniform rule as part of the Settle-ment, we now analyze the fairness of the rule of decision selected according to princi-ples of fairness. *See* Fed.R.Civ.P. 23(e). The set-off provision contained in section H represents a reasonable compromise among competing interests.

First, it serves the most fundamental goal of the tort system—complete compen-sation of those injured. *See Edmonds v. Compagnie Generale Transatlantique,*

443 U.S. 256, 258 n. 2, 99 S.Ct. 2753, 2755 n. 2, 61 L.Ed.2d 521 (1979). Many states have concluded that the inability to sue one joint tortfeasor should not enable other joint tortfeasors to limit their liability. *See Cimino v. Raymark Indus.*, 751 F.Supp. 649, 657 (E.D.Tex.1990). Codefendants will be permitted to reduce any judgment by the amount of actual compensation received—or more accurately, to be received—by the plaintiff from the Trust. This will shift the risk of only partial recovery from the plaintiffs to the codefendants in accordance with principles underlying joint and several liability. In view of the relatively small dollar payments that plaintiffs will have to accept from the Trust compared to what they received in the past from the Trust, such an off-set comports with Rule 23(e)'s reasonableness requirement.

Second, the Settlement incorporates the set-off rule employed in the majority of jurisdictions. This not only reflects the substantive reasonableness of the method of calculating a reduction to account for settlements, but minimizes *Erie* and comity constraints. Moreover, this set off is consistent with the fact that the Trust was created primarily as an entity to compensate plaintiffs. If a uniform rule should be employed, in view of the unique circumstances of this case there is little doubt that it should be a pro tanto rule.

Third, the pro tanto rule reduces the transaction costs associated with computing set offs. Whereas apportionment of fault rules require litigation to determine shares of responsibility, the pro tanto method simply relies upon a calculated dollar-for-dollar a percentage reduction. Pro tanto reductions also avoid the arbitrariness of the pro rata schemes whereby a simple split among all defendants can be manipulated by whom the plaintiff sues or whom a defendant impleads. While the pro rata division is also relatively easy to administer (assuming predictability of the amount the plaintiff will actually receive from the Trust), it fails to account for the wide variations in responsibility among former asbestos distributors and manufacturers.

Fourth, the existence of careful and thorough analyses of the effect of the Trust's Distribution Process should enable state and federal courts to anticipate what the consequences of the pro tanto set off will be in pending and prospective asbestos cases and to alter it according to the public policy of the state as necessary. The courts suggest, as noted above, a 7.5% allowance for Level Two claims and a 15% allowance for Level One claims. Use of such a fixed percentage would allow related litigation against codefendants to be terminated and shares computed without waiting for final payments from the Trust to fix the Trust's actual share.

▮▮▮ These calculations represent a fair national percentage that would roughly average the amounts that codefendants should receive as set-offs in non pro tanto states. *See* part VII.D.4.a, *supra*. In considering the probable percentage of liability to be attributable to Manville where other defendants share responsibility, the stipulation in *Cimino v. Raymark Indus.*, 751 F.Supp. 649 (E.D.Tex.1990) is significant. The non-settling defendants agreed on "13% causation for settling defendant Johns–Manville Corporation." *Id.* at 654. In the 79 Brooklyn Navy Yard cases recently tried to jury verdicts, the percentage of responsibility attributed to Johns–Manville in a mix of cancer, asbestosis and pleural plaque cases ranged from 7% to 10%. The fact that the Trust may have generally settled claims on the basis of a 30% or more share of liability in some cases in the past is not decisive.

Rather than impose a determination at this stage to govern in state and federal personal injury cases in all courts of the country well into the next century, the courts merely append the most current calculations. *See* Appendix A, attached. They offer this application of section H based on the figures and epidemiological data currently available. Other courts are encouraged, to the extent feasible and consistent with public policy, to assume that these projections reflect a fair apportion-

ment and apply them where possible. *See* discussion in Part VII.D.4.a, *supra.*

Thus, according to current calculations, subject to modification when additional data becomes available, it appears reasonable to assume for purposes of settlements and trials that the Trust's share of total asbestos liability averaging pro tanto payments and equitable share allocations equals roughly 15% for Level One claimants and 7.5% for Level Two claimants. *See* Part VII.D.4.a., *supra.* It is hoped that these figures will enable states trying asbestos cases to anticipate what the parties can expect from the Trust and apply the set-off rules accordingly.

Following a decision on appeal of this judgment, the courts will hold an evidentiary hearing on this question. At that time, the courts will update these projections with the benefit of Dean Berger's work projecting the extent of future asbestos-related injuries. *Cf. In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir.) (district court retains authority to modify protective order integral to settlement), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987); *Beecher v. Able,* 575 F.2d 1010, 1016 (2d Cir.1978) (district court has discretion to modify settlement agreement with respect to allocation of settlement proceeds when use of formula for allocation under agreement would lead to inequitable results); *Zients v. La Morte,* 459 F.2d 628, 629–30 (2d Cir.1972) (district court overseeing settlement distribution has inherent power to accept late claims despite contrary terms of agreement).

Consistent with their fiduciary duties to absent class members, the courts have attempted to ensure that the operation of the Settlement will fulfill the purposes behind the limited fund class action without unduly burdening any beneficiaries. In view of the interpretation outlined above, the courts find that the Settlement as a whole, and section H in particular, meets the standard for fairness under Rule 23(e).

▬ If the interpretations of the Settlement in this memorandum are considered revisions—which should not be the

case—they are made pursuant to the district court's equitable powers to supervise trusts under New York law and pursuant to the bankruptcy and district courts' powers under the Bankruptcy Code and the Second Amended and Restated Plan of Reorganization.

In sum, a state may apply state policy and law to control set-off and contribution in contravention of the terms of section H. No such application of individual state law may affect the Trust's payment obligations or its need to appear in court. As noted below, this conclusion also applies to distribution and shipowners.

### ii. *Distributors and Shipowners*

We turn next to the objections of various distributors. Those distributors, who have negotiated arrangements with the Trust and filed conditional objections, retain the rights created by those agreements.

The distributors and the shipowners are essentially in the same position as the codefendants. The Settlement places a shield around the Trust protecting its corpus against direct and indirect suits relating to claims of impaired persons injured by exposure to asbestos. No actions are permitted that will allow the Trust to be drawn into a litigating posture. The Trust's assets cannot be frittered away paying for litigation costs. Any special legal relationships of a distributor approved by the Bankruptcy Court in the course of the Manville reorganization or in a contract between the Trust and a distributor remain in effect. Liability among claimants, codefendants, distributors and shipowners are controlled by applicable state or federal substantive law. To the extent that any distributor, shipowner or codefendant compensates a claimant and seeks reimbursement from the Trust, the amount and timing of reimbursement is the same as it would have been for the claimant. Beyond such general principles, there is no point in trying to foresee all possible legal and factual issues that may arise in the future. They can be decided if and when they arise.

The objections of the Pacor Trust are contingent on a finding that its rights pur-

suant to the Pacor/Manville Stipulation are modified by the Settlement. The Trust has asserted that in fact the Pacor Trust's rights remain unaffected by the current Settlement. The plaintiffs have adopted the same position. The Pacor/Manville Stipulation provides that pass-through claims shall be processed in all respects as a proof of claim filed directly with the Trust,

> including, without limitation, being bound by all of the provisions and restrictions set forth herein, established by the Manville Trust and applicable to personal injury asbestos health claims filed with the Manville Trust, or set forth by a court having competent jurisdiction over the Manville Trust and applicable to personal injury asbestos health claims filed with the Manville Trust pursuant to the Manville Plan.

Pacor/Manville Stipulation ¶¶ 2(b)(i), 2(e)(i).

Having agreed to this provision, Pacor took the risk that the procedures, provisions and restrictions that existed at the time of the Stipulation might change. The Distribution Process approved by the courts "set forth" the procedures, provisions and restrictions applicable to asbestos health claims as envisioned by this agreement. Thus, any changes in existing procedures by virtue of the Settlement would be consistent with the Pacor/Manville Stipulation.

■ Regardless of the Trust's authority under court directive to alter its distribution system, the current Settlement does not disturb the arrangement embodied in the Pacor/Manville Stipulation. Claims filed with the Pacor Trust may be passed through to the Manville Trust without processing them. If the Trust rejects the claims they will be subject to arbitration. Hence the courts will treat Pacor's objections as mooted by the continued viability of the Pacor/Manville Stipulation, with the caveat that the Trust's revised method for distributing funds will govern all compensation by the Trust.

■ MacArthur Company and certain of its affiliates were also distributors of Manville asbestos-containing products. On October 30, 1989, this bankruptcy court approved a stipulation among MacArthur, Manville and the Trust (the "MacArthur Stipulation") which provided that MacArthur's pre-August 1, 1988 claims against Manville for indemnity and contribution, as well as its claims to Manville insurance proceeds under vendor endorsements of those policies, were compromised for an aggregate amount of $8,000,000. That amount has allegedly been paid. The MacArthur Stipulation also outlined procedures whereby MacArthur would be able to assert indemnity and contribution claims with respect to asbestos health claims that were unpaid on August 1, 1988. The MacArthur Stipulation did not liquidate and settle those claims nor did it establish the procedure for payment of those claims.

MacArthur objects that the Settlement impairs their rights under the MacArthur Stipulation both because they lose the ability to implead the Trust in pending litigation and to effectuate the unique provisions of their arrangement for claims processing with the Trust. To the extent that MacArthur's rights are altered by the Settlement, they like all codefendants, must accommodate the Trust's limited fund status.

Paragraph 10 of the MacArthur Stipulation provides that MacArthur retains the right to seek indemnity and contribution from the Trust for claims not compromised by the agreement "in accordance with the Plan and this Stipulation and Order." For claims that MacArthur pays, it may file a Co–Defendant Proof of Claim with the Trust. If the claim is not settled, they may seek relief. These same rights are afforded all codefendants. *See* Trust Agreement, Annex F ¶¶ III.D.2; III.D.3. Alternatively, the MacArthur Stipulation enables MacArthur to assert contribution and indemnification claims against the Trust in court "in the manner described in Section IV of the Co–Defendant Procedures" that shortens the waiting period if the underlying tort health claimant has the ability to obtain a priority in claims processing with the Trust. These rights do not differ from those of other codefendants and do not entitle MacArthur to special dispensation

or relief from the Settlement. MacArthur cannot drag the Trust into tort litigation by injured persons in which MacArthur is a defendant, codefendant or third party defendant. The Trust is immune from such litigation.

The aspects of the MacArthur Stipulation which differ from procedures applicable to other codefendants are unaffected by the class action Settlement so long as they do not result in the Trust being involved in litigation. MacArthur vigorously asserts that its potential rights to recovery from Manville's insurers entitles it to more favorable treatment. In fact, MacArthur compromised its entitlement to a portion of the Manville insurance proceeds with its receipt of the $8,000,000 for the payment of its pre-August 1, 1988 claims. Other parties including plaintiffs and future claimants may have reason to complain about the favorable treatment of MacArthur. MacArthur is not in an equitable position to use its windfall to gain future advantages to the detriment of all other parties.

To the extent MacArthur objects to the newly-adopted payment procedures of the Trust, they stand in the same shoes as all other parties seeking contribution or indemnification from the Trust. The existence of the court-approved MacArthur Stipulation does not fundamentally alter the extent to which MacArthur can be bound by the class action Settlement. MacArthur continues to have the right to assert contribution and indemnification claims outside of court and follow the procedures it negotiated; however, the claims will be paid in accordance with the terms of the Settlement in order to ensure equitable distribution of the Trust's limited assets. MacArthur will not be permitted to drag the Trust into litigation. It is absolutely essential that the Trust avoid the expenses of collateral litigation.

In reality, MacArthur seeks to insulate itself entirely from any asbestos-related liability through the vehicle of the class action Settlement. It requested that the courts include a provision by which plaintiffs would release any and all claims against MacArthur for any and all derivative liability attributable to the distribution of Manville's asbestos-containing products, along with suitable provisions for indemnification and credits.

MacArthur Objection at 15. MacArthur is not entitled to such protection as a result of the agreement it negotiated with Manville and the Trust, nor could it receive such relief except upon consent of the plaintiffs. The application to amend the Settlement to include such a provision must be rejected.

Several other distributors argue that because their liability in many states is exclusively derivative of that of the manufacturer, the class action Settlement unduly prejudices them. See, e.g., Wash.Rev.Code § 4.22.010 (distributors have indemnity claims against manufacturers of defective products for all of plaintiffs' damages). To the extent that the Trust does not fully satisfy its obligations to injured plaintiffs, the distributors may be compelled to pay the shortfall; that is a matter regulated by state substantive law. Unfortunately, the Trust does not have the resources to pay the full extent of any of its asbestos-related liability. Plaintiffs in certain states may suffer disproportionately because the state legislatures have enacted statutes that limited joint and several liability. Similarly, in states which have adopted provisions which hold distributors secondarily liable, the distributors may face obligations resulting from their distribution of Manville products.

In most states the extent to which distributors are protected by doctrines, such as partial or comparative indemnity which seek to shift the distributors' liability to the manufacturer, is contested by the parties. In California, for example, plaintiffs maintain that distributors are independently liable. See Tr. 1/11/91 at 159. In contrast, distributors argue that their liability is vicarious and secondary to that of the manufacturer. See Objections of E.J. Bartells. Compare Angelus Associates Corp. v. Neonex Leisure Prods., Inc., 167 Cal.App.3d 532, 213 Cal.Rptr. 403 (1985) (recognizing doctrine of comparative indemnity holding

manufacturer primarily liable and distributor secondarily liable) *with Far West Financial Corp. v. D & S Co.*, 46 Cal.3d 796, 251 Cal.Rptr. 202, 760 P.2d 399 (1988).

■■■ The applicability of such doctrines seems unresolved as of the present date. For example, Oregon amended its product liability statute of limitations for asbestos cases in 1983 to provide for a rule based on discovery of injury. *See* Or.Rev.Stat. § 30.907. Under the statute, a distributor is subject to the same strict tort liability as a manufacturer, provided the distributor sold a product that was in a "defective condition unreasonably dangerous to the user or consumer." Or.Rev.Stat. §§ 30.-900, 30.920(1). For a distributor who does not create defects in a product, however, its liability is secondary to that of the manufacturer. A distributor has a common law right of indemnity against the actor who created the dangerous condition in the product. *Dale's Sand & Gravel Co. v. Westwood Constr. Co.*, 62 Or.App. 570, 661 P.2d 1378 (1983); *Davison v. Parker*, 50 Or.App. 129, 137, 622 P.2d 1113 (1981). In addition, joint tortfeasors have statutory rights to contribution under the Oregon law. Or.Rev.Stat. § 18.430. Bartells is litigating in Oregon state court the scope of its common law indemnity and statutory contribution rights. *See Hughes, Pers. Rep. v. Celotex Corp.*, Civ. No. 87–1078–PA (D. Oregon). It alleges that the portion of liability attributable to the actor who is primarily liable must be automatically shifted to the manufacturer.

■■■ In this respect, the distributors' objections do not differ significantly from that of the codefendants who challenge the Settlement on the basis of its effect on various tort reform statutes. The scope, meaning and applicability of state statutes will not be determined as part of this class action. The Settlement provides mechanisms which remove the Trust from the tort system without dramatically altering the landscape of asbestos litigation in other courts. The Settlement provides a uniform method of treatment for all parties seeking contribution and indemnification from the Trust. Those rights are not extinguished; instead the other companies stand in the same shoes that the underlying plaintiff would have occupied. This provision meets the standard for fairness under Rule 23(e).

To the extent that these objections raise questions concerning the protections distributors might be entitled to under recently enacted tort reform statutes or court decisions, they are beyond the scope of the instant case. Such unsettled areas of the law ought to be resolved by the state courts or federal courts with appropriate venue which will be more familiar with the statutory provisions and their legal history as well as the facts of the particular case.

The Shipowners are in an even less favorable position than the distributors to seek special privileges. Their liability is to be measured by applicable state or federal law. They have the same rights as the codefendants. They cannot be permitted to embroil the Trust in expensive litigation.

### c. *Evidence Bar*

■■■ The exclusion of evidence concerning Manville or the Trust's status as a tortfeasor was included in the Settlement to effectuate the Trust's complete removal from the tort system. Without such a limitation, it is argued, plaintiffs and defendants alike will attempt to exploit the absence of Manville for tactical gain. It may also embroil the Trust in ongoing litigation, frustrating the Settlement's efforts to conserve funds for compensation.

Plaintiffs typically rely on Manville-related evidence to establish punitive damage claims. Introduction of such damaging evidence as the Sumner Simpson papers indicating Manville's alleged intentional suppression of information concerning the harmful effects of exposure to asbestos dust serves to buttress contentions that the asbestos manufacturers acted in concert and with careless and reckless disregard for the health of workers. Without evidence concerning Manville, arguably the most significant player in the asbestos industry, "[t]he plaintiffs will not be able to tar the co-defendants with the abundant proof of Manville's pre–1982 wrongdoing." Tr. 1/4/91 at 24.

Codefendants rely on Manville-related evidence to prove that it was Manville's products rather than their own that caused a particular plaintiff's injury. *See* Tr. 1/2/91 at 72–73. Codefendants seek to establish their own lack of culpability based on the amounts and time periods in which Manville supplied products to the places that the plaintiffs were employed or exposed. The typical latency for the injury suffered by a particular plaintiff may correlate more or less with the time when that defendant's or Manville's products were present. If relevant, codefendants exploit any differences among the products that might tend to increase the likelihood that the illness resulted from one rather than the other's products. *See* Tr. 1/2/91 at 73–75. The codefendants similarly rely upon Manville-related evidence to argue that their share of responsibility for the injuries, if any, is minimal because of the quantity of other companies' harmful products present during the plaintiff's exposure.

Plaintiffs have conceded that the evidence bar does not in fact exclude evidence relevant to dispute causation. The plaintiffs in the first instance must prove that each defendant's products substantially contributed to the plaintiff's injury; codefendants may rebut that proof as necessary to defend their clients. For example, codefendants can introduce evidence to demonstrate that asbestos products did not contain crocidolite, but that products of other manufacturers present at the worksite utilized this arguably more dangerous type of fiber. Who produced those other products does not necessarily form an essential element of a codefendant's proof.

To the extent that codefendants rely on Manville evidence to prove percentages of liability, their expert who testified at the fairness hearings provided calculations of market shares without reference to anything but one company's own records and those collected for the entire market. *See* Tr. 1/11/91 at 42–45. The Asbestos Information Act of 1988 requires that any person who manufactured or processed asbestos or asbestos-containing material that was prepared for sale for use as surfacing material, thermal system insulation, or miscellaneous material in buildings (or whose corporate predecessor manufactured or processed such asbestos or material),

> shall submit to the Administrator of the Environmental Protection Agency the years of manufacture, the types of classes of product, and, to the extent available, other identifying characteristics reasonably necessary to identify or distinguish the asbestos or asbestos-containing material.

Pub.L. 100–577, 102 Stat. 2901 (Oct. 31, 1988). As a practical matter the availability of this information as well as other marketwide statistics greatly reduces the need to establish who were the other parties manufacturing asbestos-containing material as long as the party-defendant can show what a small percentage of total sales it contributed.

Plaintiffs have similarly conceded that the bar does not prevent the codefendants from introducing evidence to impeach a witness who has changed his or her testimony. If a plaintiff or co-worker initially offered certain product identifications and, by the time of trial, the products that the plaintiff recalls at his or her worksite have changed, the parties are free to utilize prior testimony to challenge the credibility of the witness. Thus, cross-examination of witnesses with respect to product identification does not run afoul of the meaning of section H.

The consequences of litigating with the "empty Manville chair" are difficult to gauge. In view of the central need to effect a total removal of the Trust from the tort system, the evidence ban seeks to accomplish this in as evenhanded a manner as possible. Plaintiffs have conceded that the bar does not preclude defendants from litigating their case. This comports with well-established canons of construction favoring interpretations of an agreement that tend to make it fair and reasonable. *See* 4 W. Jaeger, *Williston on Contracts* § 620, at 747–49 (3d ed. 1961). In light of the plaintiffs' interpretation of the reach of the provision, arguments concerning its unfairness are greatly diminished.

Without the Trust present to defend itself, whatever evidence is introduced will not be tested by that litigator for its accuracy either through review, explanation, cross-examination or argument. To expect the plaintiffs to defend Manville, or to rebut the evidence introduced against Manville, is unrealistic. Only the Trust possesses the information to attempt to counter incriminating Manville evidence.

As a practical matter attempts to try the empty chair will likely skew results by increasing the share attributed to Manville, as it does with any defendants not present to defend themselves in multidefendant asbestos cases. In the Brooklyn Navy Yard, for example, the jury attributed larger than expected percentage-responsibility to certain smaller manufacturers who were not present at the first phase (64 cases) of the trials. Some of those defendants were unable to settle during the second phase of the trials as a result of the earlier jury findings of fault that they felt were inaccurate. After participating in the Phase Two trial (15 cases) before the same jury as tried Phase I, at least one of these defendants was able to totally exonerate itself.

Plaintiffs, too, have proven adept at shifting larger than expected shares to those present. In the Brooklyn Navy Yard cases after a defendant settled and withdrew, plaintiffs shifted position to suggest that those defendants present were the chief culprits.

Mindful of federalism and comity concerns, the courts recognize the limited effect of the evidence bar in section H. Evidentiary determinations are based on the facts and contentions of specific cases. Trial courts faced with pending and future asbestos cases should have latitude to ascertain what evidence they consider relevant to the issues being litigated. The courts prefer that direct and indirect disputes about Manville remain out of the tort system, but they can not interpret section H as providing a blanket, abstract ban on all evidence that alludes to Manville. The actions of Manville, as well as of other manufacturers of asbestos-containing products, are part of the vivid history of asbestos litigation in this country. The extent to which that evidence remains relevant in pending cases must be left to the trial judges to determine based on the particular circumstances of the dispute.

This interpretation does not burden the Trust. There is no reason for it to participate in any trial or in any discovery. All relevant information is available from other sources. Trial courts should exempt the Trust from any appearances or participation in any aspect of future asbestos litigation. The orders of the courts mandate such a bar. The courts have already used their contempt power against an attorney who ignored this injunction.

In sum, a state or federal court may admit or exclude evidence in contravention of the terms of section H. No ruling on evidence or discovery may affect the Trust's payment obligations or its need to appear in court.

#### d. *Impleader Bar*

Just as the courts have the authority to remove the Trust from direct suits by plaintiffs in the tort system to save it from self-destruction, the courts have the power to preclude the codefendants, distributors or shipowners from impleading the Trust in litigation. To permit one without the other would undermine present efforts to equitably restructure the Trust and create manifest unfairness. Only the total elimination of all costs associated with litigation defense will conserve the limited funds that remain in the Trust's coffers for the purpose for which they were channeled to the Trust.

All parties may pay some price for the sacrifice. The prevailing understanding at the time the Plan was adopted allowing the parties to continue litigating against the Trust was that ample funds existed to compensate fully all those injured by Manville asbestos. The conceded reality at the time of this class action is that the Trust is "deeply insolvent" and drastic measures must be employed to salvage existing and anticipated funds for fair and equitable compensation of all beneficiaries. Plaintiffs must give up their right to try their claims against Manville to a jury; distribu-

tors and shipowners relinquish their right to implead the trust and codefendants lose their right to bring third-party actions to resolve their contribution claims against the Trust.

The courts doubt that a perfect solution could be crafted to accomplish these results and maintain the delicate balance among Trust beneficiaries in pending litigation in other fora. The impleader ban is amply justified by the circumstances of the case, the existence of a set off where applicable, and a right to pursue contribution and indemnification claims against the Trust outside the courts in the new Distribution Process. Prejudice to the parties other than the Trust is minimized by the absence of the Trust in court. *See* Trust Distribution Process, § H, 120 B.R. 648, 676 (E. & S.D.N.Y.1990). Those other than the Trust are not appreciably inhibited in enforcement of their legal rights against each other.

The codefendants, distributors and shipowners argue that they will bear a disproportionate share of the liability as a result of the impleader bar protecting the Trust from litigation. That issue relates to the credit codefendants receive for the Trust's settlement with a plaintiff. On a substantive level, the courts do not believe the impleader bar or set-off provisions are unfair. As already noted the courts suggest an application the set-off rule contained in section H that reflects the best available estimates at this time. *See* Parts VII.D.4.a and b.i, *supra*. The issue will be revisited at a later date.

In sum, neither a state nor a federal court may allow any party to bring the Trust in as a party or in discovery. Litigants who attempt to circumvent this bar will be subject to contempt.

## VIII. NEED TO OPERATE TRUST WITH MINIMAL COSTS IN MANNER THAT WILL ENSURE SUCCESS OF RESTRUCTURING

Upon being informed by the Trust that its budget for internal costs would be 25 million dollars for 1991, even though no substantial payments would be made for more than a year, the courts met with the Trustee's Chairman and Executive Director of the Trust. The courts emphasized once again the need to save every possible dollar for claimants. The Trust was requested to cut its internal expenditures drastically. Insurance costs are being closely reviewed.

The courts had previously, on February 5, 1991, instructed the Trust to cease all litigation defense in an effort to conserve funds. With the exception of a few motions to sever and stay litigation against the Trust and completion of minimal post-trial and appellate litigation, all other litigation defense by outside counsel was eliminated. This has resulted in considerable savings for the benefit of Trust beneficiaries. Litigation expenses for the first quarter of 1991 were over six million dollars, in part because of the reluctance of some parties and some courts to honor the courts' stays or because of trials actually under way; this money could have been better held for claimants.

For the Settlement to succeed the scarce resources of the Trust must be conserved and maximized. In response to the courts' instructions to reduce operational expenses to the greatest extent possible, the Trust has virtually ceased use of outside counsel, has instituted changes in its Garden City data facility resulting in a cost reduction of nearly 85% and virtually stopped legal activities at its Denver Research Center, decreasing expenses by 87% from the projected 1991 budget. *See* Letter from John C. Sawhill, Managing Trustee, dated May 6, 1991. As a result, the Trust has reduced its overall expenses for the first quarter of 1991 from $13,133,337 spent during the first quarter of 1990 to $6,535,798. This also represents a savings of over a million dollars from what was budgeted for the first quarter of 1991. *Id.* Further reductions are expected.

The Settlement gives the Trust the opportunity to continue to reduce expenditures because it provides for a cheaper semi-administrative compensation process rather than the previous tort-litigation method of liquidating claims. The courts anticipate that every effort will be made to

increase the present tendency toward frugality. Every dollar must be saved for those who have been injured by asbestos.

## IX. RELATION OF SETTLEMENT TO OTHER ASPECTS OF ASBESTOS PROBLEM

### A. Need For Overall Solution

This Settlement is one major step in an attempt to solve the asbestos problem. *See* discussion in Part II.D, *supra*, of how increasing tempo of litigation is compounding stresses and how courts and others are dealing with the tensions. *See also* discussion in Part V.B, *supra*, of the unique nature of asbestos litigation.

Cooperative efforts to handle asbestos litigation in a more uniform fashion nationwide are increasing among groups of federal and state trial judges. This unprecedented communication and collaboration reflects the level of frustration among the judges saddled with burgeoning dockets clogged by asbestos litigation. It has enabled courts with extensive experience to share their more successful methods for efficiently resolving the mass of asbestos cases. *See* Part V.B, *supra*.

On August 10, 1990, a group of federal judges met in Washington at the Federal Judicial Center to call for a national solution. A document containing their tentative conclusions was signed by Chief Judge Thomas D. Lambros of the Northern District of Ohio and Chief Judge Robert M. Parker of the Eastern District of Texas. *In re National Asbestos Litigation* (1990). The following United States District Judges in conference reviewed and approved the terms of this Order: Walter J. Gex, III, Southern District of Mississippi; Alan H. Nevas, District of Connecticut; Richard A. Schell, Eastern District of Texas; Charles Schwartz, Jr., Eastern District of Louisiana; Charles P. Sifton, Eastern District of New York; Jack B. Weinstein, Eastern District of New York; Charles R. Wolle, Southern District of Iowa; and Rya W. Zobel, District of Massachusetts. Judge Charles R. Weiner, Southern District of Pennsylvania, later took a leading role in this groups' discussions and Judge Wolle

acted as chief liaison with state judges. While the specifics of the August Order were not executed, this initiative led to further steps on the national and state levels, including national meetings of state trial judges. This intense level of informal trial-judge cooperation on a statewide and national level is not typical of the American judicial systems.

The Judicial Panel on Multidistrict Litigation recently heard arguments on whether to consolidate all federal asbestos cases for pretrial purposes (MDL action); this similarly reflects dissatisfaction with efforts to handle asbestos cases on an individual basis. *See In re Asbestos Prods. Liab. Litig.*, (No. VI) (Docket No. 875, Jan. 17, 1991) (Jud.Pan. on MDL). Transfer through the Multidistrict Panel of all asbestos cases for pretrial purposes was denied five times between 1977 and 1987. *See* Judicial Conference Asbestos Report at 22. At this stage of mature asbestos mass tort litigation there is a danger that MDL action might serve only to delay further ultimate resolution of many cases. Especially in states with efficient pretrial and trial management schemes in place, the disruption and sheer number of cases would generate initial confusion and a period of adjustment, slowing the flow of funds to the injured. This is so because the MDL panel may in theory only consolidate the cases for pretrial and settlement, not for trial. *See* 28 U.S.C. § 1407. Since most cases are pending in state courts and the MDL Panel has no power to move these cases, at best, it could only ameliorate, not solve, the national problem. Some new form of partial MDL action, however, could be structured to avoid disruption.

MDL action could become a catalyst for a national solution. MDL treatment could serve to streamline procedures and ensure more uniform timing and trial-readiness for similarly-situated parties nationwide. Most significantly, it would create a forum with all parties to federal cases before it. There are now unprecedented opportunities in the asbestos litigation for nationwide action and settlement of these claims with the hope that *all* resources and assets would

be before a single tribunal or group of judges. The newer defendants could consistently and effectively be brought in and contribute their fair share. Integration of the scattered asbestos cases and funds is essential for efficient disposition.

As Appendix C, attached, suggests, there is strong reason to believe that unless changes are made in the treatment of asbestos litigation, many if not most current defendants will be in a limited fund situation. They do not have, and they probably will not have, assets to pay for their current and contingent asbestos liabilities given the present mode of disposing of asbestos claims. Only a Rule 23(b)(1)(B) solution provides an alternative to bankruptcy for many corporations unless Congress enacts new legislation or the Rules of Civil Procedure are radically restructured with respect to mass torts. Rule 23(b)(1)(B) could provide the basis for a global settlement with or without MDL action. The Rule would permit—as MDL action would not—coordination of both state and federal cases in one court.

There is little question that the factual predicate necessary for a national Rule 23(b)(1)(B) class action could be established on the basis of a limited fund theory. To approximate what might be asbestos defendants' total costs for future as well as pending claims, one can multiply the results on Table Eighteen of Appendix C, attached, based on the 136,250 pending claims. Most analyses of expected payments by the Trust have assumed, somewhat arbitrarily in the absence of more precise estimates, a range of future plus present claims between 250,000 and 366,-000. *See* Appendix A, attached. The latter figure assumes about twice as many future claims as the former.

The simplest estimate that includes future claims can be made by doubling the estimates on Table Eighteen, to illustrate possible costs for a total of 272,500 claims, an amount at the lower end of the range. This would mean minimum costs of $19.6 billion and costs of $26 to $28 billion under the more plausible assumptions. *See* Appendix C, attached.

Estimates for the range 250,000 to 366,-000 can be obtained by multiplying the Table Eighteen results by 250,000/136,325 = 1.83 and by 366,000/136,250 = 2.69. The simple table below shows the results of these calculations.

ILLUSTRATION OF POSSIBLE RANGES OF DEFENDANTS
COSTS FOR PENDING AND FUTURE CLAIMS (in billions)

| | Pending (136,325) | Pending & Future (250,000) | (366,000) |
|---|---|---|---|
| Minimum Estimate | 9.7 | 17.8 | 26.0 |
| Empirically Supported | 14.2 | 26.1 | 38.2 |
| Maximum Estimate | 19.1 | 35.0 | 51.4 |

Punitive damages could further increase these figures greatly.

Of course, estimates of how much money asbestos defendants might spend on both future and pending claims are more speculative than estimates solely for pending claims contained in Appendix C, attached. First, we have no proven basis for concluding that there will be 250,000 or 366,000 claims or some number greater or less. Although a plausible range, these numbers were chosen only to illustrate what could

happen in the future on the basis of estimates and information now available to the courts.

Second, when we multiply the results of Appendix C, we extend the probability of error in the fundamental assumption of those analyses. We assume that the valuation of cases and defense expenditures that applied in the past will apply not only to pending claims, but also to claims yet to be filed. This seems unlikely; for example, courts will probably be increasingly in-

clined to control fees and other litigation expenses.

The calculations cannot give us a firm estimate of what will be the overall costs to defendants. Rather, it illustrates what would be defendants' overall costs over a plausible range of pending and future claims if future litigation remains unchanged from the past. It does suggest strongly that key defendants cannot remain solvent unless changes in handling asbestos cases are made.

To sum up: If all defendants' costs to indemnify and defend against present unpaid claims is approximately $15 billion, *see* Appendix C, Table Eighteen midpoint, attached, and the number of prospective claims more than doubles the number of past claims, *see* Part VII.D.4.a, *supra* and Appendices A and C, attached, as we believe it will, the total cost to indemnify and defend against all unpaid claims is no less than 30 billion dollars, assuming that the litigation continues as it has in the past. As much as 20 billion dollars of this sum would be eaten up in transaction costs. Any increase in efficiencies of compensation through national consolidation of claims and an administrative damages system for valuing claims somewhat like that projected for the Settlement or UNR rather than a negotiated or trial tort system of variable compensation will, we estimate, offer savings of well over 10 billion dollars. This money can be used to increase compensation to claimants or reduce the drain on industry, or be shared between the two. We believe these savings estimates to be conservative.

*Most of the defendants cannot bear the costs of the present system. Congress, the courts and all others affected can no longer ignore the problem. We should not continue to tolerate this huge waste indefinitely. If Congress will not act, the courts and parties must.*

Efforts continue seeking Congressional intervention and help to alleviate the burden created by the hundreds of thousands of claimants suffering or about to suffer from asbestos-associated injuries. As the Judicial Conference Ad Hoc Asbestos Committee recounted:

[t]he most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

Judicial Conference Asbestos Report at 3. In the face of asbestos problems afflicting state and federal courts throughout the country the Conference concluded that the only satisfactory solution rests with Congress:

The committee firmly believes that the ultimate solution should be legislation recognizing the national proportions of the problem in both federal and state courts and creating a national asbestos dispute resolution scheme that permits consolidation of all asbestos claims in a single forum—whether judicial or administrative—with jurisdiction over all defendants and appropriate assets.

*Id.* at 3; *see* recommendations of others on need for national solution in Part V.B, *supra; Cf.* H.R. 2450, 102nd Cong., 2d sess. (1991) (bill to create limited jurisdiction in federal courts to allow consolidation where at least 25 persons were injured that resulted in damages over $50,000 per person). Unfortunately, Congress has neglected to, and appears unlikely to act. This means that the courts, the attorneys and their clients, and perhaps state legislatures must fill the breach.

The reach of the instant Settlement is impressive. It attempts to address one difficult facet of the asbestos debacle. It offers some positive benefit for everyone in exchange for revisions in the manner claims are processed and the amount of money paid by the Trust. It serves, however, only as a modest beginning. A total national consolidation and integrated solution to the asbestos problem is needed if we are to adequately compensate the injured without destroying the effectiveness of

much of our industry and some of our courts.

### B. Flexibility of Plan to Permit Integration; First Step to Integrate Bankruptcy Facilities and Rule 23(b)(1)(B) Class Action Funds

At the present time, each of the companies that formerly produced or distributed asbestos products and sought protection of the Bankruptcy Code has proceeded on its own or with closely affiliated entities in its attempts to reorganize. Each of the debtors or reorganized entities responsible for a portion of the total asbestos liability has embarked on separate paths to cope with the complex process. Ample evidence exists to document the needless duplication in time, effort, attorneys fees and other transaction costs that devour scarce resources as a result of the maintenance of separate claims facilities for each bankrupt. Each keeps separate records of the same claimants and each claimant must make multiple applications with multiple forms and supporting documents. The inefficiencies that attend this balkanized effort seem particularly unjustifiable in the context of companies and trusts that admit they have only limited resources.

The various facilities that handle asbestos claims differ in the extent to which they resemble tort litigation. *See generally* Peterson, *Giving Away Money*, 54 Law & Contem.Prob. 1201, 1203–10 (Winter 1991). For example, claims facilities incorporate varying provisions to govern the extent of discovery permitted, the extent of individualization in claims evaluation, the preservation of defenses to liability, the extent of compensation available and the payment terms. *Id.* The greater the sensitivity built into the process, the more costly the valuation of each claim. *Id.* The more easily a claimant can resort to litigation the more expensive tort values will dominate the claims valuation process. *Id.*

A bankruptcy court has the power to consolidate separate corporate debtors pursuant to its general equitable powers. *See In re Augie/Restivo Baking Co.*, 860 F.2d 515, 519 (2d Cir.1988); *In re Do-*

*nut Queen, Ltd.*, 41 B.R. 706, 708–09 (Bankr.E.D.N.Y.1984); *In re Richton Int'l Corp.*, 12 B.R. 555, 557 (Bankr. S.D.N.Y.1981); *see also In re F.A. Potts & Co.*, 23 B.R. 569 (Bankr.E.D.Pa.1982). Consolidation results in pooling of the companies assets, combining the claims, eliminating inter-company claims and having creditors vote on both plans of reorganization. *See In re Augie/Restivo*, 860 F.2d at 518. Under appropriate circumstances, consolidation ensures the equitable treatment of all creditors. *Id.* Without further legislation it is doubtful if there is authority to consolidate these bankruptcies across district lines. It might, in any event, be too complicated to integrate all the disparate reorganizations.

While consolidation of these various bankruptcies is not practicable, it would be perfectly sound and proper to restructure the procedures of the trusts and other entities set up as a result of the various bankruptcies. A single integrated payment and administrative facility could act on behalf of all the funds. The existence of multiple facilities greatly complicates the claimants' efforts to obtain compensation and reduces the total recovery because an attorney will invariably take a percentage of each award. Having separate trusts impedes settlement because each claim is processed in a different fashion on a different time schedule after independent review and analysis.

Lack of coordination becomes more critical each year. Evidence is accumulating that almost all former manufacturers of asbestos will encounter the same fundamental financial difficulties. *See* Appendix C, attached; Part IX.A, *supra.* Recently, Glenn A. Dalhart, a certified public accountant retained by certain plaintiffs, submitted an affidavit in connection with the national limited fund class action pending in the Eastern District of Texas, *See Linscomb v. Pittsburgh Corning Corp.*, No. 1:86–MC–456 (E.D.Tex.1990), indicating that Owens–Corning Fiberglas—a major player in asbestos litigation—properly constitutes a limited fund defendant for Rule 23(b)(1)(B) purposes. Without passing on

its accuracy, it is significant that he has stated:

> The focus of this Exhibit is to calculate three different coverage ratios which relate to the magnitude of the book value or the market value of the corporation, to the magnitude of the estimated book value or market value of asbestos personal injury liability net of any accessible insurance coverage. Each of these calculations suggest that the asset or market values of Owens–Corning Fiberglas Corporation are insufficient to cover the estimated market value of asbestos personal injury liability. This preliminary analysis, based upon publicly available data, suggests that Owens–Corning Fiberglas Corporation would be considered a limited fund Defendant as to its asbestos personal injury liability.

Affidavit of Glenn A. Dalhart, dated March 28, 1991 at 5, reprinted in Mealey's, *Litigation Reports: Asbestos* H–5–6 (Apr. 19, 1991).

Eagle–Picher has filed a request for a one year extension of the period in which it has the exclusive right to file a reorganization plan. *See In re Eagle–Picher Indus.*, No. 1–91–00100 (Bankr.W.D.Ohio Apr. 10, 1991). This company is clearly a limited fund. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Eagle–Picher)*, 132 F.R.D. 332 (E. & S.D.N.Y.1990). While substantial work on valuation of the company, its asbestos liability and its other financial commitments was performed in connection with its motion for treatment as a limited fund before the district court, the inherent intricacies and multiple constituencies in bankruptcy proceedings have retarded the reorganization.

Despite the experience gained from company after company filing for bankruptcy, huge transaction costs continue to be incurred in establishing independent claims facilities that yield relatively small compensation after years of delay. Little progress has been accomplished in the handling of the cases. Economies of scale are possible and should be pursued.

The experience of UNR Industries reinforces the need for maximum efficiency. Having filed a chapter 11 petition in 1982, it has yet to pay its first claim. Recently, it revealed the three options available for claimants when they begin to liquidate claims. Option One offers a small immediate cash payment in full satisfaction of the claim. For a mesothelioma case, the facility will pay $1,500; for other cancer, $1000; for all other asbestos disease, $400. The Manville Trust has enough assets to provide considerably more generous awards than UNR.

What has happened with Manville, UNR, Eagle–Picher and others will recur again and again as each of the companies in bankruptcy attempts to reorganize. The Settlement permits the Trust to participate in joint administrations and other bankruptcy and Rule 23(b)(1)(B) funds. It has also allowed the Trust to cooperate in a more global settlement of all asbestos litigations.

It is of more than passing interest that the Reporters' Five Year Study, *Enterprise Responsibility for Personal Injury, Approaches to Legal and Institutional Changes* to the American Law Institute, Volume 2, dated April 15, 1991, recommends a solution similar to that approved by the courts for the Manville Trust:

> [Our model] is proposed on the basis of our reflections on the tort lessons taught by the litigation crises of DES, Asbestos, Dalkon Shield and Agent Orange. It provides augmented collective procedures designed to address large scale mass disaster cases that cannot be resolved in a fair and efficient manner by the standard process. Specifically, in addition to mandatory class actions, [this model] treats risk as accrued injury, authorizes insurance fund judgments to cover future loss from disease or traumatic harm and schedules average damages for defined subclasses.
>
> . . . .
>
> [These model] procedures should be presumptively applied when the sheer number or the litigation cost of separate actions threatens to undermine the defendants' financial capacity to satisfy all judgments. [The model] should be invoked whenever there is substantial risk

that expenditures on some fraction of claims stemming from a mass disaster will prevent the balance of claimants from receiving equal treatment.

*Id.* at 420–21. This report, it should be emphasized, has not been adopted by the American Law Institute and there is good reason to believe that there will be powerful opposition to the Reporters' suggestions. Nevertheless, the congruence of views of the Reporters, the parties to the Settlement and the courts suggest that the instant case is sensibly decided. Whether the Reporters' models are useful generally is an open question. They are properly applied here in the Manville Trust phase of the mega mass tort of asbestos.

## X. CONCLUSION

The Settlement is approved. *See* terms set out in *In re Joint Eastern & Southern Dists. Asbestos Litig. (Johns–Manville),* 120 B.R. 648 (E. & S.D.N.Y.1990). The class action is certified pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. The class consists of

all Beneficiaries of the Trust, including, but not limited to, all persons who presently have or may in the future have (a) any unliquidated claim for death or personal injury arising from exposure to asbestos and arising or allegedly arising, directly or indirectly from acts or omissions of the Manville Corporation or any of its predecessors, subsidiaries or affiliates; (b) any warranty, guarantee, indemnification or contribution claims against the Trust arising directly or indirectly from exposure to asbestos by any member of the Class; and (c) settlements or judgments arising from any of the foregoing claims previously asserted against the Trust.

Stipulation ¶ 2, 120 B.R. at 669.

The Settlement does not prevent a court from interpreting section H of the Settlement to permit application of rules of substantive law and evidence mandated by applicable state or federal public policy. Such interpretations may not interfere with provisions of the Settlement and injunctions protecting the Trust and the Manville Corporation.

In interpreting section H of the Settlement, a reasonable allocation of percentages of total liability to the Trust is 7.5% for Level Two claims and 15% for Level One claims, subject to recomputation by the courts after appeals are completed, further data is available, and an evidentiary hearing is held.

Leslie Gordon Fagen is appointed to represent future claimants during the appeal and thereafter until and unless his authority is revoked or transferred to another representative.

Previous stays are continued permanently and no proceedings may be commenced or prosecuted against the Trust in any state or federal court arising from claimed exposure to asbestos. Previous injunctions are continued permanently and no proceedings may be commenced or prosecuted against the Manville Corporation arising from claimed exposure to asbestos. These injunctions are not subject to modification except on appeal. The courts are simultaneously with entry of this final judgment signing permanent stays and injunctions on behalf of the Trust and the Manville Corporation. These orders are subject to approval of the Settlement on appeal.

So ordered.

## APPENDICES

A. Manville Trust's Share of Total Payments by All Defendants

B. Feasibility of Projections

C. Total Value of Asbestos Claims

D. Claims Settled with Trust By Law Firm

D1. Unsettled Claims Pending Against Trust by Law Firms With More Than 100 Claims

E. Injunction Protecting Trust

F. Injunction Protecting Manville Corporation

APPENDIX A

April 11, 1991

TO: Jack B. Weinstein

FROM: Mark A. Peterson

SUBJECT: MANVILLE TRUST'S SHARE OF TOTAL PAYMENTS BY ALL ASBESTOS DEFENDANTS

This memo (1) examines the Manville portion of past settlements, (2) estimates what proportion of settlements will be paid by Manville under the reorganized plan set out in the Findley v. Blinken settlement and (3) calculates the present value of income streams that will be paid by Manville to claimants.

MANVILLE TRUST'S SHARE OF PAST SETTLEMENTS

We cannot make a definitive, current calculation of the Manville share because codefendants maintain the confidentiality of their settlements. However, both the Manville Trust and Peterson Consulting (a Center for Claims Resolution consultant, no relationship to me) estimated the Manville share by comparing Trust and codefendant payments to 6,000 "pre-bankruptcy" claimants who filed claims before the date of the Manville bankruptcy. These analyses suggest that Manville's share of payments averaged about 30 percent in cases where both it and codefendants made payments.

The Trust's information about codefendants' payments was obtained from lawyers representing each claimant. For each pre-bankruptcy claim plaintiffs' lawyers had to complete a form that identified any codefendants who had not yet settled and the total amount of paid by codefendants who had already settled. The Trust compared the amount of its payment with the total paid by all codefendants for 6,207 pre-bankruptcy claims where all codefendants were reported to have settled. Table One shows the distribution of the Manville share for these cases.

TABLE ONE

DISTRIBUTION OF THE ESTIMATED MANVILLE TRUST PAYMENT
SHARE FOR SETTLED PRE-BANKRUPTCY CLAIMS

| Manville Share | Percent of claims in each range |
|---|---|
| Less than 20% | 9% |
| 20-25% | 13 |
| 25-30% | 14 |
| 30-35% | 15 |
| 35-40% | 11 |
| 40-45% | 5 |
| 45-50% | 4 |
| 50...-...75% | 11 |
| 75...-...99% | 5 |
| 100% | 11 |

SOURCE: Based on analyses of Manville Trust data of payments by the Trust and by codefendants as reported by claimants' lawyers for 6,207 cases that were filed before the Manville Corporation filed for bankruptcy. For each case the plaintiffs' lawyer reported no other remaining defendant.

Note that in eleven percent of these claims, the Manville Trust made the only payment (i.e. a lawyer indicated that no money had been paid by codefendants and that no claims were pending against any codefendant). These "Manville-only" cases must be excluded in comparing payments by Manville and codefendants: there is no issue of credit or contribution in these cases. Table Two compares payments by the Trust and codefendants when Manville only cases were excluded.

### TABLE TWO

**MANVILLE PERCENT FOR PRE-BANKRUPTCY CLAIMS, EXCLUDING "MANVILLE-ONLY CLAIMS"**

| | Full Settlement ($1,000) | Manville Payment ($1,000) | Manville Share |
|---|---|---|---|
| Pleural | $56 | $17 | 31% |
| Asbestosis | 95 | 28 | 30 |
| Other cancer | 106 | 35 | 33 |
| Lung cancer | 203 | 64 | 31 |
| Mesothelioma | 352 | 100 | 28 |
| All claims | $118 | $36 | 30% |

SOURCE: Based on analyses of Manville Trust of amount they paid in settlements and amount of settlements by codefendants that were reported by claimants' lawyers for 5,357 cases that were filed before the Manville Corporation filed for bankruptcy. For each case the plaintiffs' lawyer reported no other remaining defendant. Excludes 850 cases where Manville had virtually all liability, i.e. where at least 85 percent of payments were made by Manville.

Table Two uses the Manville Trust's working definition of "Manville only", which excludes the 3 percent of cases where the Manville share was between 85 and 100 percent, as well as the 11 percent of cases where no payments were made by codefendants. The cases with Manville shares between 85 and 100 percent were excluded for two reasons. Generally, the cases involved nominal payments by codefendants, such as the flat payments that some defendants offer for virtually all claims. These cases would be unlikely to raise a contribution issue in the future. Rather than pay the balance of the Manville share on top of such nominal settlements of their own liability exposure, codefendants who made such payments would likely pay nothing. Second, because these few cases are so atypical, with Manville percentages that do not represent most cases, their inclusion somewhat skews the overall average.

Page 3

Nevertheless, Table Three shows the Manville share under the two alternative definitions of "Manville only". That table also shows the effects of one further analytic refinement, by adding to reported settlements $26 million in judgments entered against codefendants in these cases. Since most (but not all) of these settlements would likely have been paid, codefendants' share of payments will be understated if these judgments are excluded.

TABLE THREE

MANVILLE PERCENT FOR PRE-BANKRUPTCY CLAIMS,
UNDER ALTERNATIVE ASSUMPTIONS

| | Definition of "Manville Only" * | |
|---|---|---|
| | 85% to 100% | 100% |
| Judgments Included ** | 28.9 | 30.6 |
| Judgments Excluded ** | 30.1 | 31.8 |

* "85-100%" excludes all cases where Manville paid at least 85 percent of total reported settlements, as defined in Table Two. "100%" excludes only cases where there was no report of a settlement by a codefendant and no outstanding claims against a codefendant (includes 5,509 claims).

** "Judgments Excluded" counts only reported settlements by codefendants, as in Table Two. "Judgments Included" counts both settlements by codefendants and reported judgments against codefendants.

Peterson Consulting also compared payments made by the Manville Trust and members of the Asbestos Claims Facility (ACF) for some 6,000 pre-bankruptcy claims (these were not necessarily identical to the 6,207 claims examined by the Manville Trust). They found that the Manville Trust paid 38 percent of the total amount paid by the Manville Trust and ACF codefendants. This analysis is not very helpful, since it does not include payments by codefendants who were not members of the ACF. But at least it shows that the Manville Trust would have paid something less than 38 percent of these claims if payments by all defendants had been included.

An analysis by the Manville Trust provides information to supplement the Peterson Consulting analysis. Looking at a subset of 2,437 pre-bankruptcy cases that had been fully settled by all codefendants the Trust found that defendants other than Manville and those in the ACF paid 21 percent of total settlements, the ACF paid 49 percent and Manville paid 30 percent. The ratio of Manville to ACF payment found by the Trust was the same as that found by Peterson Consulting (30% divided by 49% equals 38% divided by 62%).

Page 4

Under all of these alternative analyses, the Manville share stayed near 30 percent. Indeed, it is likely that the Manville Trust actually averaged less than 30 percent of payments for these pre-bankruptcy claims. First, "Full Settlement" reported here probably understates actual payments by codefendants, because in some cases lawyers may have failed to report either a codefendant's settlement or the fact that a codefendant had not yet settled. Second, Manville payments occurred after (sometimes years after) codefendants' settlements and would have been increased because of inflation (both general and in settlement values) and disease progression. On the other hand, codefendants argue that they paid more in these pre-bankruptcy cases then they are now paying, because they paid part of Manville's obligations while Manville was in bankruptcy.

The analyses below all assume that the Manville share is 30 percent. But as I consider at the end of this memorandum, conclusions about the Manville Trust's share of payments are affected little if this percentage is decreased or increased by reasonable amounts.

EXPECTED MANVILLE TRUST SHARE OF FUTURE SETTLEMENTS

The Manville Trust's share of future settlements will depend upon several parameters that are not now certain: the number and types of future claims, the sale price of Manville Corporation stock, the Trust's operating expenses, the values that the Manville Trust places on claims and the amount that codefendants pay in settlement. The number of claims and the sale price of Manville stock will jointly determine how much the Trust can pay for each claim, as shown on Table Four.

Under the provisions of the reorganized plan, the Manville Trust will agree to a settlement value for each claim (i.e. the liquidated value). The Trust will be able to pay more or less of this liquidated value, depending upon the number of claims that it faces and its resources, primarily from selling the Manville Corporation stock. Table Four shows the level of payment that the Trust might be able to make under alternative estimates of these key parameters. The first pair of columns on Table Four indicates how much of the liquidated value placed on a claim by the Manville Trust might be paid by the Manville Trust. This payment level might be greater or less than the examples shown here, depending upon the number of claims and sale price of the Manville stock. ' The estimates shown on Table Four are for purposes of illustration--there are no bases for asserting that these or other alternative estimates will obtain. The analyses below assume a total of 250,000 total claims and a sale price of $13 per share, which would yield a payment level of 36 percent for level one claims and 24 percent for level two. Analyses that use alternative estimates of these parameters yield different projections about the level of payment that the Manville Trust might accomplish, but do not change the overall conclusions of this memorandum. Some of these alternative analyses are reported at the end of this memorandum.

Page 5

TABLE FOUR

PAYMENTS BY MANVILLE TRUST WILL DEPEND UPON THE
TOTAL NUMBER OF CLAIMS AND SALE PRICE OF MANVILLE CORPORATION STOCK

| | Manville payments as % of Manville value | | Manville payments as % of total value * | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 1 | Level 2 |
| **366,000 Claims \*\*** | | | | |
| $13/share | 25% | 14% | 7.5% | 4.2% |
| $18/share | 29 | 19 | 8.7 | 5.7 |
| **250,000 Claims \*\*** | | | | |
| $13/share | 36% | 24% | 10.8% | 7.2% |
| $18/share | 42 | 32 | 12.6 | 9.6 |

* This is payment by the Manville Trust as a percent of total settlements by all defendants including Manville. The calculation assumes that in the past, payments by Manville averaged 30 percent of total payments by all defendants and that in the future, the liquidated value of settlements by Manville under the reorganized plan will continue to be 30% of the total settlement value by all defendants.

** The number of unsettled claims now pending against the Manville Trust plus future claims. Currently the Trust faces around 136,000 pending claims. A total of 366,000 claims assumes approximately 230,000 future claims. A total of 250,000 assumes approximately 114,000 future claims. Both numbers assume that the distribution of types of diseases for future claims will be similar to those filed during 1990.

The number of claims against Manville and sale price of the Manville stock will also determine what share of the total obligation among all defendants can be borne by the Trust. This is indicated in the second set of columns. Given that Manville has on average been responsible for about 30 percent of total payments by all defendants, we can start with the assumption that the Trust will continue to agree to settlements that average around 30 percent of the total liability among all defendants. But since it can now pay, for example, only 36 and 24 percent of its past amounts to levels one and two respectively, the Trust will pay only 10.8 percent of the overall burden for level one claimants and 7.2 percent for level two claimants (36% of 30%= 10.8%; 24% of 30% = 7.2%).

Page 6

However, it is not certain that the settlement (liquidated) values agreed to by the Trust will continue to average 30 percent of the total settlements by all defendants. The Trust's settlement (liquidated) values under the reorganized plan will almost certainly differ from the Trust's calculations of its past average settlements. Attachment One of the Settlement Plan states the anticipated midpoint value for each disease, which is the value that the Manville Trust is expected to place on average on each disease. The midpoints specified in this attachment differ from past calculated averages for four of the six diseases. For pleural disease and other cancer, midpoint values are substantially less than past calculated averages, while midpoints are slightly greater than past calculated averages for asbestosis and lung cancer.

These differences do not necessarily mean that the Trust will change how it calculates the settlement values of claims. The parties to the Findley v. Blinken settlement felt that the Attachment One midpoints more accurately reflected actual values that the Trust had placed on particular diseases than the Trust's calculations for its somewhat imprecise disease categories. The disease categories for which the Trust calculated averages were based on claimants' allegations of disease. These allegations were often indefinite or erroneous. For example, about half of the claims that the Trust categorized as "Other Cancer" turned out to be lung cancer claims. Because settlement values are appreciably greater for lung cancer than for other cancers (excluding mesothelioma), the inclusion of so many lung cancer claims artificially increased the value of the Trust's category for "Other Cancer".

Nevertheless, the values that the Manville Trust places on the various diseases will likely change under the reorganized distribution plan, because of changes in its procedures, as well as any changes in the nature of claims and in the overall environment of asbestos litigation. The Trust's settlement values will continue to be 30 percent of the total only if the codefendants match any changes that the Trust will make in valuing cases.

Tables Five and Six show the amount of money that might be paid by the Trust and codefendants under two different assumptions about how codefendants will value claims. Table Five assumes that the Trust and codefendants will make identical adjustments in their valuation, so that the Trust's settlement values will continue to be 30 percent of total settlements.

Page 7

TABLE FIVE

MANVILLE PAYMENTS IF 250,000 CLAIMS AND $13/SHARE
(Assuming equivalent adjustments in values by
the Manville Trust and codefendants)

| | Total * | | Manville ** | | Codefend's | |
| | Past | Future | Past | Future | Past | Future |
|---|---|---|---|---|---|---|
| Pleural | 77 | 40 | 23 | 3 | 54 | 37 |
| Asbestosis | 110 | 117 | 33 | 8 | 77 | 109 |
| | | | | | | |
| Serious asbest | 267 | 267 | 80 | 29 | 187 | 238 |
| Other cancer | 153 | 67 | 46 | 7 | 107 | 60 |
| Lung cancer | 237 | 275 | 71 | 30 | 166 | 245 |
| Mesothelioma | 487 | 487 | 146 | 53 | 341 | 434 |

Payments ($1,000)

| | Manville | | Codefend's | |
| | Past | Future | Past | Future |
|---|---|---|---|---|
| Pleural | 30 | 7.2 | 70 | 92.8 |
| Asbestosis | 30 | 7.2 | 70 | 92.8 |
| | | | | |
| Serious asbestos | 30 | 10.8 | 70 | 89.2 |
| Other cancer | 30 | 10.8 | 70 | 89.2 |
| Lung cancer | 30 | 10.8 | 70 | 89.2 |
| Mesothelioma | 30 | 10.8 | 70 | 89.2 |

Percent of Payments

* Total payments are estimated assuming that settlement values
by the Manville Trust have been and will be 30 percent of the
total settlement agreed to by all defendants. For four
diseases future "Total Payments" differ from the calculation
of past averages. Attachment One of the Stipulated Settlement
states the anticipated midpoint value for each disease, which
is the value that the Manville Trust is expected to place on
average on each disease. The midpoint values are less than
the calculation of past averages for pleural and other cancer
and greater for asbestosis and lung cancer.

** Past Manville averages are from calculations of payments by
the Manville Trust. Futures were calculated by multiplying
the anticipated midpoints in Attachment A of the Stipulated
Settlement by 36 percent for level one diseases and 24 percent
for level two. For lung cancer an anticipated midpoint of
$82,500 was used, which was an average for nonsmokers ($120,000
anticipated midpoint in Attachment A) and smokers ($70,000
midpoint) weighted for the past relative frequency of both
types of claims with the Manville Trust.

Note that if they follow the Trust in adjusting the values of pleural disease and other cancer cases, codefendants might pay less for such claims than they have in the past even after assuming part of the Manville obligation.

Table Six assumes that the Trust adjusts its valuation of settlements consistent with the midpoint values, but that the codefendants do not adjust their valuations. This means that the Trust's settlement values for pleural disease and other cancer cases (which will be less than the Trust's calculation of past averages) will be less than 30 percent of the total settlement value, but that its values for asbestosis and lung cancer (which are more than the Trust's calculation of past averages) will be greater than 30 percent. Because Table Six assumes that codefendants do not change their evaluation of claims, total settlement value for future cases will differ from past levels only in the amount that the Trust's valuations change.

### TABLE SIX

#### PAYMENTS IF 250,000 CLAIMS AND $13/SHARE
(Assuming adjustments in values by the Manville Trust but no adjustments by codefendants)

| | Payments ($1,000) | | | | | |
| | Total * | | Manville | | Codefend's | |
| | Past | Future | Past | Future | Past | Future |
|---|---|---|---|---|---|---|
| Pleural | 77 | 66 | 23 | 3 | 54 | 63 |
| Asbestosis | 110 | 112 | 33 | 8 | 77 | 104 |
| Serious asbest | 267 | 267 | 80 | 29 | 187 | 238 |
| Other cancer | 153 | 127 | 46 | 7 | 107 | 120 |
| Lung cancer | 237 | 249 | 71 | 30 | 166 | 219 |
| Mesothelioma | 487 | 487 | 146 | 53 | 341 | 434 |

| | Percent of Payments | | | |
| | Manville | | Codefend's | |
| | Past | Future | Past | Future |
|---|---|---|---|---|
| Pleural | 30 | 4.5 | 70 | 95.5 |
| Asbestosis | 30 | 7.1 | 70 | 92.9 |
| Serious asbest | 30 | 10.8 | 70 | 89.2 |
| Other cancer | 30 | 5.5 | 70 | 94.5 |
| Lung cancer | 30 | 12.0 | 70 | 88.0 |
| Mesothelioma | 30 | 10.8 | 70 | 89.2 |

\* Assumes that settlement values agreed to by the Manville Trust will change to meet the midpoint values in Attachment One, but that settlement values agreed to by codefendants will not change.

**920**

As Table Six shows, the percent of total payments by all defendants that will be borne by the Manville Trust will vary among diseases depending upon how the Trust changes its settlement values. The Manville share ranges between 4.5 and 7.1 percent for level two claims and between 5.5 and 12.0 for level one claims.

This discussion emphasizes that the impact of the Findley v. Blinken settlement on codefendants' payments will depend upon how the Manville Trust and codefendants settle individual cases. It will depend upon the values placed on each claim by the Manville Trust and by codefendants. More important, it will depend upon codefendants' willingness to bear any of the Manville share of liability. A settling codefendant will not have to pay a part of the Manville obligation unless it agrees to do so. Plaintiffs' only leverage for arguing that a codefendant should bear part of the Manville obligation is a threat that such burden could be imposed if the case were tried. This is relatively weak leverage. In any event, the percent of burden that will be shifted to a codefendant will be a function of the negotiating skills and strength of each party. Of course the provisions of the Findley v. Blinken settlement will have an impact on credits for trial judgments, but these represent only a small fraction of cases and of the overall value of claims. The Trust's analysis of pre-bankruptcy claims found that judgments represented only 5.5 percent of codefendants' payments in those cases and 3.8 percent of all payments including those by Manville (even less if some of the $26 million in judgments was not actually paid).

THE VALUE OF PAYMENTS TO CLAIMANTS

It is important to recognize that the value of Manville Trust payments to claimants is less than the Manville Trust's future percent of payments shown on Tables Five and Six. Because Manville will pay claimants over time, the present value of such payments is reduced. Table Seven shows the present value of payments to claimants, assuming a 9 percent annual interest rate.

The discounted present value does not impact contribution and indemnification issues under the provisions of the Stipulation and Settlement in Findley v. Blinken. If a codefendant pays a judgment that absolves the Manville Trust from liability to a claimant, the codefendant receives a credit for payments already made by the Trust to the claimant and succeeds to the claimants rights to further Trust payments. But the discount would be significant if contribution/indemnification were handled differently: If instead of the provisions of the Stipulation of Settlement, codefendants who satisfied judgments were to receive specific percent credits for the Trust's payments to claimants. Presumably these credits would be available to codefendants as soon as the Findley v. Blinken settlement becomes effective. The credit could be taken at the time when a codefendant settles, even if Manville had not yet settled with and begun

making payments to the claimant. While codefendants would have this credit available in the first year that the Findley v. Blinken settlement becomes effective, it would be years before claimants would receive payments that generate the credit, with timing determined by the class action settlement plan. Pending, level one claimants would begin to receive money in the first or second year of reorganized operations; most pleural claimants would not receive any money for six or more years. Of course the longer that a claimant must wait to receive some or any of his payment from the Manville Trust, the less valuable such payment would be.

TABLE SEVEN

THE VALUE OF MANVILLE PAYMENTS TO CLAIMANTS AS PERCENT OF TOTAL VALUE *
ACCOUNTING FOR THE TIME VALUE OF PAYMENTS

| | Adjusted to Present Value ** | | | | | | | Not *** |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Claimant 2 | Receives 3 | First 4 | Payment 5 | 6 | Average | Adjusted |
| Pleural | | | | | 3.0 | 2.9 | 2.9 | 4.5 |
| Asbestosis | | | 5.3 | 4.9 | 4.7 | | 5.0 | 7.1 |
| Serious asbest | 9.0 | 8.6 | | | | | 8.9 | 10.8 |
| Other cancer | 4.6 | 4.4 | | | | | 4.5 | 5.5 |
| Lung cancer | 10.0 | 9.5 | | | | | 9.8 | 12.0 |
| Mesothelioma | 9.0 | 8.6 | | | | | 8.9 | 10.8 |

* The value of payments by the Manville Trust may be more or less than shown depending upon the number of future claims, income to the Manville Trust, the amount of the Trust's expenses, the timing of the sale of the Manville Corporation stock and the value of settlements by codefendants.

** The value in the first year of the reorganized plan of projected payments to those claimants who have claims pending when the reorganized plan becomes effective. Adjusted values are based on Manville Trust Future Percent of Payments from Table Five, assuming a 9 percent annual interest rate and sale of Manville Corporation stock and final payment by Manville Trust in sixth year after plan becomes effective. Table shows the years when first payments will be made under the reorganized plan for each asbestos-related disease.

*** Manville Trust Future Percent of Payments from Table Five without adjustment for payment over time.

Table Seven calculates the "present" value (i.e. present in the first year of operation of the reorganized plan) of projected income streams to claimants who have claims at the time the plan begins operation. The table shows how the value decreases as claimants have to wait longer for payment. The table also shows the adjusted value in each injury group averaged across all claims pending at the time the plan begins. As the table shows, claimants on average lose another one to two percent of the total value of their claims because of the projected delays in paying claimants under the plan. Level one claimants will receive payments from the Manville Trust that have an adjusted value between 4.5 and 9.8 percent of the total values of their claims. Level two claimants will receive payments that have an adjusted value between 2.9 and 5.0 percent of the total value of their claims.

THE SENSITIVITY OF THESE ANALYSES TO ASSUMPTIONS

The calculations in this memorandum are based on many assumptions and examine only some of the many factors that will ultimately determine the amount of money that the Manville Trust will be able to pay to claimants and the share of overall settlements that these payments will represent. Consequently, these calculations cannot produce certain projections of the amount and share of the Trust's future payments. A range of reasonable projections can be made.

To explore how wide this range is, Tables Eight and Nine examine the effects of using assumptions that differ from those made for the calculations in this memorandum. The Tables compare the value of Manville payments to claimants (i.e. Table Seven, Value of Manville Payments to Claimants, the average for claimants claiming each asbestos disease, adjusted for present value) with calculations based on different assumptions about: (1) Manville's appropriate share of liability, (2) the total number of pending and future claims, (3) the sale price of Manville Corporation stock, (4) codefendants' evaluations of claims in the future and (5) the discounting interest rate.

Table Ten looks at an additional payment provision of the distribution plan in the proposed Findley v. Blinken settlement, the offer of "deferral payments" of up to $2,000 to claimants who will accept this lump-sum payment for their present injury claim. Claimants who accept deferral payments can file a new claim if they later suffer a level one disease. Because deferral payments are for a fixed amount, they are unaffected by the sale price of Manville Corporation stock or the eventual number of claims. However, the relative value of these payments depends upon the assumed Manville share. And because deferral

payments will be made in the second and subsequent years, the value of deferral payments also depends upon the interest rate. The value of deferral payments is critical to success of the distribution plan, since the plan projects that as many as 37,500 level two claimants will accept such payments, reducing the Trust's transaction costs and making more money available to other claimants. If the value of deferral payments is too low, few will accept such payments.

TABLE EIGHT

THE VALUE OF MANVILLE PAYMENTS TO CLAIMANTS AS PERCENT OF TOTAL VALUE
PROJECTED UNDER ALTERNATIVE ASSUMPTIONS *

| | Table 7 Results | Alternative Assumptions | | | | | |
|---|---|---|---|---|---|---|---|
| | | Manville Share 27% | 33% | 366,000 Claims | Manville Stock @ $18 | Equivalent Adjustment in Values | Interest Rate 7% |
| Pleural | 2.9 | 2.6 | 3.3 | 1.7 | 3.9 | 4.6 | 3.2 |
| Asbestosis | 5.0 | 4.6 | 5.5 | 2.9 | 6.7 | 5.1 | 5.4 |
| Serious asbest | 8.9 | 8.1 | 9.9 | 6.2 | 10.4 | 8.9 | 9.3 |
| Other cancer | 4.5 | 4.0 | 5.1 | 3.1 | 5.3 | 8.9 | 4.7 |
| Lung cancer | 9.8 | 8.9 | 10.8 | 6.8 | 11.4 | 8.9 | 10.3 |
| Mesothelioma | 8.9 | 8.1 | 9.9 | 6.2 | 10.4 | 8.9 | 9.3 |

* The results from Table 7 include the following assumptions:
 Manville share of 30 percent
 250,000 pending and future claims
 Manville Corporation stock sells at $13 per share
 Manville adjusts evaluations of claims, codefendants do not
 Annual interest rate of 9 percent.
 Each of the analyses under alternative assumptions varies only
one of the assumptions underlying the results from Table 7:
 Manville share of 27 percent
 Manville share of 33 percent
 366,000 pending and future claims
 Manville Corporation stock sells at $18 per share
 Manville and codefendants adjust evaluations equivalently
 Annual interest rate of 7 percent.

■■■■■■■■■

■■■■■■

Page 13

TABLE NINE

THE VALUE OF MANVILLE PAYMENTS TO CLAIMANTS AS PERCENT OF TOTAL VALUE
PROJECTED UNDER ALTERNATIVE ASSUMPTIONS *

| | Listed Assumptions | | Alternative Assumptions | | | | | | | |
| | | | Manville Share | | | | Sale of Manville Stock | | | |
| | | | 27% | | 33% | | @ $13 | | @ $23 | |
| PRORATA POOL: | 250K | 360k | 250K | 360k | 250K | 360k | 250K | 360k | 250K | 360k |
|---|---|---|---|---|---|---|---|---|---|---|
| Pleural | 4.1 | 2.4 | 3.6 | 2.2 | 4.6 | 2.8 | 2.9 | 1.7 | 5.3 | 2.9 |
| Asbestosis | 7.0 | 4.2 | 6.4 | 3.9 | 7.7 | 4.6 | 5.0 | 2.9 | 9.2 | 5.0 |
| | | | | | | | | | | |
| Serious asbst | 10.8 | 7.4 | 9.9 | 6.7 | 12.0 | 8.2 | 8.9 | 6.2 | 11.1 | 8.2 |
| Other cancer | 5.5 | 3.7 | 4.9 | 3.3 | 6.2 | 4.2 | 4.5 | 3.1 | 5.6 | 4.2 |
| Lung cancer | 11.9 | 8.2 | 10.8 | 7.4 | 13.7 | 9.4 | 9.8 | 6.8 | 12.3 | 9.7 |
| Mesothelioma | 10.8 | 7.4 | 9.9 | 6.7 | 12.0 | 8.2 | 8.9 | 6.2 | 11.1 | 8.2 |

| | Alternative Assumptions | | | |
| | Equiv Adjust in Values | | Interest Rate 7% | |
| PRORATA POOL: | 250K | 360k | 250K | 360k |
|---|---|---|---|---|
| Pleural | 6.4 | 3.9 | 4.5 | 2.7 |
| Asbestosis | 7.1 | 4.2 | 7.6 | 4.6 |
| | | | | |
| Serious asbst | 10.8 | 7.4 | 11.3 | 7.7 |
| Other cancer | 10.8 | 7.4 | 5.7 | 3.9 |
| Lung cancer | 10.8 | 7.4 | 12.5 | 8.6 |
| Mesothelioma | 10.8 | 7.4 | 11.3 | 7.7 |

* The listed assumptions are as follows:
 Manville share of 30 percent
 Manville Corporation stock sells at $19.13 per share
 Manville adjusts evaluations of claims, codefendants do not
 Annual interest rate of 9 percent.
The value of Manville payments is calculated for two estimates
 of the eventual number of persent and future claims:
 250,000 and 366,000.
Each of the analyses under alternative assumptions varies only
one of the listed assumptions:
 Manville share of 27 percent
 Manville share of 33 percent
 Manville Corporation stock sells at $13 per share
 Manville Corporation stock sells at $23 per share
 Manville and codefendants adjust evaluations equivalently
 Annual interest rate of 7 percent.

TABLE TEN

THE VALUE OF MANVILLE DEFERRAL PAYMENTS AS PERCENT OF TOTAL VALUE
PROJECTED UNDER ALTERNATIVE ASSUMPTIONS *

| | Listed Assumptions | | Alternative Assumptions | | | | | | | |
| | | | Manville Share | | | | Sale of Manville Stock | | | |
| | | | 27% | | 33% | | @ $13 | | @ $23 | |
| | 250K | 360k | 250K | 360k | 250K | 360k | 250K | 360k | 250K | 360k |
|---|---|---|---|---|---|---|---|---|---|---|
| **DEFERRALS ** | | | | | | | | | | |
| Pleural | 2.5 | 2.5 | 2.2 | 2.2 | 2.8 | 2.8 | 2.5 | 2.5 | 2.5 | 2.5 |
| Asbestosis | 1.0 | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.0 | 1.0 | 1.0 | 1.0 |

| | Alternative Assumptions | | | |
| | Equiv Adjust in Values | | Interest Rate 7% | |
| | 250K | 360k | 250K | 360k |
|---|---|---|---|---|
| **DEFERRALS ** | | | | |
| Pleural | 4.1 | 4.1 | 2.6 | 2.6 |
| Asbestosis | 1.1 | 1 1 | 1.2 | 1.2 |

* The listed assumptions are as follows:
 Manville share of 30 percent
 Manville Corporation stock sells at $19.13 per share
 Manville adjusts evaluations of claims, codefendants do not
 Annual interest rate of 9 percent.
The value of Manville payments is calculated for two estimates
 of the eventual number of persent and future claims:
 250,000 and 366,000.
Each of the analyses under alternative assumptions varies only
 one of the listed assumptions:
 Manville share of 27 percent
 Manville share of 33 percent
 Manville Corporation stock sells at $13 per share
 Manville Corporation stock sells at $23 per share
 Manville and codefendants adjust evaluations equivalently
 Annual interest rate of 7 percent.

** Lump sum $2,000 payments made during the second, third or fourth
 year of the plan. Deferral payments can be requested by any
 claimant, but most would be expected to be requested by
 claimants with pleural or asbestosis claims.

To reiterate, the analyses reported in this memorandum were made to illustrate generally the effect of the Manville Distribution process. They should not be taken as providing precise predictions that claim to have a scientific basis. The analyses are based on assumptions that are within the ranges that are suggested by persons who have some knowledge of each issue. Assumptions about the Manville share of total payments to asbestos victims are supported by the limited empirical information that is available. But while they are apparently reasonable, it is unlikely that all of these assumptions will bear out. Nevertheless, even under the alternative assumptions considered in Table Eight, there can be no doubt about the conclusions that the Manville Trust will be able to pay only a small portion of the total value of asbestos claims and that in terms of present value the Trust's payments represent even less to claimants.

## APPENDIX B

## INTERIM RULE 706 REPORT

### Projected Disease and Claims

#### Margaret A. Berger

This Report is submitted to the courts in connection with my appointment on December 7, 1991 by the district court, as an expert pursuant to Rule 706 of the Federal Rules of Evidence. I was at that time charged with reporting to the courts "upon the feasibility of providing accurate estimates of future claims upon the Trust," and "empowered to aid the court in selecting an appropriate panel of knowledgeable and neutral experts pursuant to Rule 706 of the Federal Rules of Evidence."

As I testified at the Fairness Hearing on January 22, 1991, projecting the number of future claimants with any degree of confidence is a difficult, complex task because of numerous unknowns that surround the incidence of disease and the incidence of claims. (Tr. 1/22/91, pp. 3–16). This Report considers first the feasibility of making future projections and concludes that such projections are feasible, then considers the desirability of having court-appointed experts undertake the task of making projections and concludes that such a project directed by court-appointed experts is in the best interests of the Manville Personal Injury Settlement Trust (hereinafter "Trust"), of present and future claimants and of the courts. Finally, it proposes a workplan consisting of several stages, and recommends that the first stage be implemented immediately.

1. *The Feasibility of Making Projections.* a) *The nature of the problem.* In order to project the number of future persons who will make claims for asbestos related disease, two separate calculations must be made: 1) as to the incidence of various diseases that are attributable to asbestos exposure, and 2) as to the number of victims of each of these diseases who will make a claim for damages against the Trust.

*Incidence of disease.* At this time, it is generally accepted that exposure to asbestos can cause mesothelioma and lung cancer. In addition, a lesser but statistically significant association has been found between asbestos exposure and other forms of cancer, such as cancer of the colon, stomach, rectum, larynx and kidney. A causal relationship has also been established between exposure to asbestos and asbestosis and a number of pleural diseases.

Despite the numerous epidemiological studies that amply demonstrate the role of asbestos as the causative agent in these diseases, calculating the future incidence of asbestos disease is a task filled with uncertainties. In the first place, analysis is hampered by an incomplete understanding of the diseases. Although there is a consensus that a dose-response relationship exists between exposure and development of disease (except perhaps in the case of mesothelioma), data is sparse about the exact contours of this relationship. While it is agreed that intensity of exposure, duration of exposure and period subsequent to expo-

sure (the latency period) all play a part, so that an extended exposure or a less intense exposure may result in eventual disease if sufficient time elapses, a formula for calculating and applying a dose-response ratio does not exist at this time.

The lack of exact knowledge about the role of exposure also hampers projecting the future incidence of the so called "new wave" of asbestos disease. Available epidemiological data relate almost exclusively to groups of workers who were exposed prior to the halt in asbestos installation that occurred circa 1973–75 as a result of governmental regulation, other developments in determining liability and increased epidemiological evidence.

By 1975 essentially no new asbestos products were entering the American marketplace. Potential new groups of claimants do exist, however, because 1) exposure persists for persons engaged in asbestos removal or subjected to crumbling asbestos *in situ* and 2) the latency period has not expired for those exposed prior to 1975. Next to nothing is known as yet with regard to the potential claims based on removal and *in situ* exposures. The long latency period for asbestos related diseases means that few injuries will manifest themselves earlier than fifteen to twenty-five years after initial exposure and some will continue to develop for more than 40 years.

Secondly, even if there were greater scientific certainty about the consequences of exposure, problems would exist because of the scarcity of data about actual exposure. By the time a person becomes ill, memories of the long distant exposure may be dim, and records may be non-existent. Furthermore, even in those industries in which asbestos exposure was overall the most severe—such as insulation installation and shipbuilding—exposure obviously varied depending on the employer, the type of task the employee performed, and the years in which the work was done. Assessing exposure as a basis for calculating future disease raises serious problems.

Third, most of the projections made to date have attempted to estimate cases of mesothelioma and have then attempted to extrapolate to other diseases. Whether the other diseases can be calculated as a constant percentage of mesothelioma cases has not, however, clearly been demonstrated.

Fourth, one cannot calculate the incidence of future disease on the basis of present disease without adjusting for a large number of uncertainties in addition to changing exposure rates. Although epidemiological studies reach conclusions about the incidence of particular diseases in the particular population studied, the diagnosis on which the characterization of the disease rests may often be based on inadequate data. The diagnosis is often derived from a death certificate because better evidence, such as an autopsy or a pathologist's report, is not available. Asbestosis, in particular, is difficult to diagnose. Mesothelioma is alleged to have been under-diagnosed until recently because physicians had no experience with the disease, but there is disagreement about the rate of error. The research of Dr. Seliokoff, for example, show that death certificates seriously misestimate morbidity as determined from detailed case-by-case evaluations of medical data and pathology.

Confounding factors further increase the difficulty of projecting the future incidence of disease. Smoking is known to act synergistically with asbestos exposure in causing lung cancer and asbestosis. Other hazardous substances prevalent in some industries may also play a role in causing disease. On the other hand, the decrease in smoking rates and general increase in life expectancy means that a projection must adjust for the fact that in the future fewer persons will have died of something else before they have a chance to develop an asbestos caused disease. Relatively minor exposures may, for example, result in long latency periods of fifty years or more affecting people in their seventies or eighties.

Finally, yet another issue that has to be resolved is the degree to which different types of asbestos fibers affect disease rates. A controversy exists in the scientific community about this matter.

*Incidence of claimants.* Estimating the incidence of claimants requires taking into account numerous factors that impact on the likelihood that a person suffering from an asbestos caused disease—or his or her survivors—will file a claim. Among the factors that may have an effect are: publicity about the availability of a claims mechanism; the amount of money available to pay claims; the value ascribed to particular diseases; the economic climate; the degree of proof required, and the persistence with which lawyers or unions encourage and pursue claims.

Obviously many of these factors will be affected by the functioning of the Trust. This, of course, leads to circularity. The answers to many of these questions may be affected by projections about the number of future claimants, and the effect they may have on the value of particular claims.

b. *Are projections feasible?* Is it worth undertaking a projection of future claims against the Trust in light of the numerous uncertainties that must be taken into account in ascertaining the incidence of disease and the incidence of claims? After speaking to numerous experts in a variety of disciplines, and reading reports of projections made at the time of the Manville bankruptcy, I am persuaded that such an inquiry is practical because a useful product would result.

In the months since my appointment I have spoken to epidemiologists, mathematicians, biostatisticians, physicians specializing in industrial health, pulmonologists, and economists. Most of them had direct experience with asbestos. Some of them, such as Drs. Philip Enterline and William Nicholson, have made projections about asbestos disease. Others, such as Dr. Joel E. Cohen and Dr. Kenneth G. Manton, have written reports critiquing the various models of projections. In addition, I have read a number of projections and assessments of projections made at the time of the Manville bankruptcy by Alexander Walker (on behalf of Johns–Manville); by Paul MacAvoy (on behalf of the Commercial Union Insurance Company); by Joel E. Cohen (at the request of Milbank Tweed Hadley & McCloy which represented unsecured creditors in the Johns–Manville bankruptcy); and by Kenneth G. Manton (for the Congressional Research Service). I have also reviewed an actuarial study prepared in 1985 by the Tillinghurst Group for presentation in the UNR Industries bankruptcy.

The group of experts agreed that while it is impossible to arrive at *the* correct number of future claims, it is possible to develop models for projecting plausible ranges of disease incidence and for estimating the incidence of claims. A number of experts suggested that one could start with the projections that had been made at the time of the bankruptcy almost a decade ago. One could then compare projected mesothelioma deaths with actual deaths from the Surveillance, Epidemiology and End Results Program Sponsored by the National Cancer Institute (SEER registry), add data from recent epidemiological studies (of which there are many) and make appropriate adjustments to the old models that would reflect this new data. The data available in the records of the Trust provide a useful sampling source.

The experts theorized that a more accurate model could be constructed now than in 1982 because of the additional new data. They were intrigued with the possibility of utilizing data from the Trust which has a rich store of information about actual cases: 27,000 cases that were settled and more than 130,000 pending claims. Although not all of the data relating to these claims are complete or computer accessible, a good deal of information exists in the files that could be sampled, particularly with regard to the mesotheliomas and other cancers that constitute the bulk of the Level I claims. Furthermore, the new models for projecting claims could be tested in the interim before Manville stock is sold to see whether the range of uncertainty for various projections could be reduced, or whether further adjustments in the models are warranted.

2. *The desirability of having projections made by court-appointed experts.* a) *The need for projections.* Making pro-

jections about the future incidence of claims against the Trust is in the best interest of the Trust and the asbestos disease victims. It is also desirable to provide the courts with information necessary to avoid future unexpected shortfalls. The projections would assist the Trust both in estimating the total reserves it needs to set aside for future claims and in providing information about the timing of new claims, a factor which affects the funds that have to be retained at any particular time. The projections would, therefore, greatly increase the planning capability of the Trust, claimants and their attorneys. The projections would also promote the parity provisions in the Settlement Agreement that propose *pro rata* treatment for present and future beneficiaries.

Although the discussion above considers the wide range of uncertainty and variability attributable to projections as a whole, disaggregating the projections for various groups of workers and particular diseases may make projections easier. Considerable epidemiological work has been done with respect to some trades that worked extensively with asbestos prior to 1975. Department of Labor statistics exist with regard to the number of workers in these fields. Combining these data with the information derived from actual claims made against the Trust may lead to estimates with an acceptable degree of plausibility about the maximum number of future claims that may be expected from these groups. Obviously, projections about "new wave" cases will have a much lesser degree of certainty. But even with these groups of potential claimants some limits may exist if experts conclude that the incidence of claims will be lower than for the traditional unionized asbestos worker claimants.

b) *The need for projections by court-appointed experts.* The history of the Johns–Manville bankruptcy demonstrates the need for projections made by persons unassociated with the litigants. An independent study is not susceptible to attack on the basis of bias, a charge leveled against some of the projections previously made. These charges were undoubtedly fueled when it almost immediately became evident that the projections of future claims made on behalf of the Johns–Manville Corporation were much too low. The Johns–Manville litigation also demonstrates that not all projections undertaken by parties see the light of day at the time when they would be most useful. A study made at the direction of the courts will become part of the public record. Its assumptions and conclusions will be publicly aired and subject to peer review by the scientific community. The consequence of asbestos use is an issue about which the public and our policy-makers need to be informed, bearing in mind the courts' position that the Trust is a quasi-public entity.

3. *Recommendations for a workplan.* a) *Possible strategies.* I also solicited advice about methods of proceeding with the task of making projections. Dr. Joel E. Cohen of Rockefeller University, whose curriculum vitae is attached as Appendix A, suggested three possible strategies for arriving at a range of plausible numbers: 1) Contact persons who had previously done comprehensive projections about future asbestos claims to inquire whether they would be willing to update their work. Dr. Cohen was particularly impressed by the projection produced by Dr. Kenneth G. Manton, Research Professor of Demographic Studies at Duke University, who had in 1983 prepared a projection for the Congressional Research Service. 2) Farm out the project to a consulting organization such as the one that had prepared the study for Manville at the time of the bankruptcy. 3) Make one person primarily responsible for making the projection, and appoint in addition an advisory panel of experts to advise the principal expert.

The suggestion of selecting an expert to update prior work had considerable appeal as a strategy that might ensure considerable savings in cost and time. When I contacted Dr. Manton about his willingness to update his prior projections, he expressed enthusiasm for undertaking such a project. He observed that a scientist rarely has an opportunity to revisit past work in order to evaluate its correctness and to make fur-

ther adjustments. At my request, he drafted a proposal as to how he would proceed. (See attached Appendix B which also contains Dr. Manton's curriculum vitae.)

The suggestion of appointing a panel of experts to advise the expert with prime responsibility also has considerable merit. If eminent scientists in a variety of fields would furnish suggestions and data to the principal expert and critique his work, the final product would undoubtedly gain in breadth and authority. Dr. Manton advised me that he would welcome the opportunity to work with an advisory group of experts.

At first I thought that the principal expert and advisory panel should be appointed at the same time. Accordingly, I have spent considerable time looking for well-respected, neutrally-perceived experts in the following fields: epidemiology, biostatistics, environmental medicine, pulmonology and economics. Suggestions were also made that a pathologist and an expert on fibers might be useful. While I have identified candidates for the panel in many of these fields, I soon realized that selecting an epidemiologist who was truly knowledgeable about asbestos but who would not be perceived as plaintiff or defendant oriented was a task that would take considerable time.

I now think that to defer all work on the projections until the panel is in place would be a mistake. Dr. Manton is prepared to start immediately; the panel can be assembled while he is working without losing valuable time. Furthermore, Dr. Manton's proposal contemplates that he will make monthly reports to Dr. Joel E. Cohen who will act as a consultant with regard to the study. Consequently, Dr. Manton would from the outset have the advantage of outside comment on his work. It seems both useful and cost effective to have Dr. Manton produce a draft projection of incidence of disease and claims to which the panel can react.

b. *Recommendations about the workplan.* I, therefore, at this time make the following recommendations:

1. Dr. Kenneth G. Manton should be appointed by the district court pursuant to Rule 706 of the Federal Rules of Evidence to prepare a projection of the future incidence of asbestos disease and the claims that will be asserted against the Manville Personal Injury Settlement Trust. I further suggest that this appointment be made immediately. Dr. Manton is an excellent choice for this task for many reasons. He has excellent credentials, and has been highly recommended by Dr. Cohen and others. In addition, Mark Peterson advised me that Dr. Manton is extremely well-regarded by Mark Peterson's colleagues at the Rand Institute.

Dr. Manton has previously made projections about asbestos and will not need to start from scratch. He still has available all the programs he used before. He will also have the assistance of a staff of persons with whom he has worked before such as programmers, statisticians, and secretaries. Use of the Duke University facilities and support staff will save a great deal of money. Dr. Manton has proposed that he be paid through Duke University rather than as an hourly consultant so that the cost of this project should be considerably lower than if the work were done by a private consulting organization.

Dr. Manton has not allied himself with plaintiffs or defendants in the past. Although he has worked on numerous governmental projects, and has at times testified in connection with this work, Dr. Manton advised me that he has never accepted payment from a litigant, or an industry, because he has not wanted to compromise his integrity or usefulness.

2. I also suggest the immediate appointment of Dr. Joel E. Cohen, pursuant to rule 706 of the Federal Rules of Evidence, as the senior consultant to oversee Dr. Manton's work. Dr. Cohen has assisted me with various issues pertaining to this project and I have found his advice invaluable. Dr. Cohen has met Mark Peterson on a number of occasions, as well as associates of Leslie Gordon Fagen, Esq. at Paul, Weiss, Rifkind, Wharton & Garrison, members of the Selected Counsel for the Benefi-

ciaries, and staff of the Trust. All of them seem to have been favorably impressed with his expertise.

3. I also recommend that the Manville Personal Injury Settlement Trust be directed to make available to Drs. Manton and Cohen such data as they need in order to carry out the task of projecting the future incidence of asbestos related disease and the future incidence of claims against the Manville Personal Injury Settlement Trust. In case of any dispute about which materials should be made available by the Trust and in what form, I recommend that I be authorized to decide, subject to appeal to the district court in writing within five days.

Dated: Brooklyn, New York
April 2, 1991

Respectfully submitted,

/s/ <u>Margaret A. Berger</u>

Margaret A. Berger
Associate Dean and
Professor of Law
Brooklyn Law School
250 Joralemon Street
Brooklyn, NY 11201

APPENDIX C

May 7, 1991

TO: Jack B. Weinstein

FROM Mark A. Peterson

SUBJECT: Estimating total expected costs among all defendants
 for indemnity and defense of pending asbestos claims

This report estimates the total costs that asbestos defendants might be expected to pay for presently pending personal injury claims. The estimates are based primarily on data about past claims settled by the Manville Trust. The report addresses most of the limitations of the data and methods of estimation by using assumptions that provide ranges around the uncertainties created by these limitations. Based on these assumptions, the analyses suggest what defendants' expected costs might be, if asbestos litigation were to continue as it has in the past.

However, asbestos litigation is changing so significantly that the present analyses are unlikely to provide a realistic estimate of what asbestos defendants' future expenses will actually be. In particular, the analyses lack data about apparent changes in the characteristics of claims and in the values placed on claims as major defendants run out of money and new defendants enter. The uncertainties that are created by this lack of data cannot be finessed through use of alternative assumptions. As the conclusion to this report discusses, these uncertainties can only be reduced by further analyses based on additional data.

In principle, the total value of pending claims--what all asbestos defendants including Manville might expect to have to pay to defend and compensate only those claims now pending against them--can be estimated from information available about past and pending claims against the Manville Trust. The analysis begins with the number and types of claims pending against the Trust. For each asbestos-related disease, the number of pending claims is multiplied by the expected average payment by all defendants for that disease. The expected average payment by all defendants is estimated as the average past payments by the Manville Trust for that disease, divided by historic share of full payments that has been made by the Trust, because the following equations are equivalent:

 Total payments x Manville share = Manville payment
 Total payments = Manville payment / Manville share.

The expected payments for each disease are totaled and an estimate of expected defense costs is also added.

Although simple in principle, this calculation is limited in the following ways:

Page two

First, some of the past and pending Manville claims involve no other defendants. These "Manville-only" claims received larger payments from the Manville Trust, but do not create liability on the part of other defendants.

Second, some of the claims pending against Manville have already been resolved by codefendants. The total value of all pending asbestos claims includes Manville's liability for these claims, but not liability for the codefendants who have already resolved a claim.

Third, assumptions must be made about the Manville share of liability in order to estimate the total payments for all defendants. The Manville Trust's data for prebankruptcy claims provide an empirical basis for estimating the Manville share for the various types of diseases, but some plaintiffs and codefendants make different assumptions about this share.

Fourth, the argument is widely made that the seriousness or "quality" of claims has declined in recent years. If this is so, either the number or expected value of pending claims must be discounted to reflect that pending cases have less value than claims already settled.

Fifth, alternative estimates can be made of the costs that asbestos defendants must pay to resolve pending claims.

Sixth, significant changes in the litigation environment have apparently changed the settlement values for claims. Values for resolved claims might not apply to settlements that will be made for pending claims.

This report considers the effects of each of these factors in estimating the total expected costs to all defendants, including Manville, for pending asbestos claims. Most of the limitations do not present insuperable problems in estimating the expected costs of asbestos claimants. Where possible, the report presents a range of estimates based on various assumptions about the factors. But the sixth limitation may be so fundamental that it prevents the analyses from providing a realistic estimate of defendants' likely costs for pending claims. Because we have no systematic information about recent or likely future changes in the character or valuation of asbestos claims, we can only infer the characteristics and values of present cases from information about the past. In effect, the analyses in this report estimate expected costs to asbestos defendants if past litigation practices continue to apply in the future. But as we know, asbestos litigation is currently so unstable that the present estimates may be inapplicable to the changing litigation.

The estimates in this report suggest why asbestos litigation is changing--why the future is unlikely to be like the past. Estimates that are based on empirically supportable assumptions suggest that defendants would face costs that range between $13 and $16 billion to indemnify and defend pending asbestos claims if the litigation

were to continue unchanged from the past. The report presents other estimates that fell outside of this range, based on alternative assumptions that do not have empirical support. Nevertheless, even the lowest of these alternative estimates suggests that if the litigation were to continue like the past, defendants would face expenses ranging between $9.7 and $10.4 billion to indemnify and defend asbestos claims that are already pending. But because the asbestos litigation is changing, defendants' actual expenses might be less than these estimated costs and the costs may be shared with defendants who are new to the litigation.

CLAIMS PENDING AGAINST THE MANVILLE TRUST AND CEFENDANTS

As of mid-April, 1991, there were 136,250 claims pending against the Manville Trust. To project the diseases that are likely to be proven, the Trust adjusted the diseases claimed by claimants on the basis of its experience about what diseases were actually proven by claimants who claimed each asbestos-related disease. Table One shows the estimates of the number of claimants who are likely to prove each asbestos disease.

### TABLE ONE

### CLAIMS PENDING AGAINST MANVILLE TRUST

| | All Manville Claims | |
|---|---|---|
| | Number * | % by Disease |
| Pleural | 74,176 | 54.4 |
| Asbestosis | 41,883 | 30.7 |
| Other cancer | 3,590 | 2.6 |
| Lung cancer | 10,926 | 8.0 |
| Mesothelioma | 5,675 | 4.2 |
| All claims | 136,250 | |

\* Number of claims reported as of April 10, 1991, by claimed disease. The number for each disease category is an estimate of the number of claimants that will actually have each disease. These estimates are based on the diseases alleged by claimants, with adjustments to reflect the Trust's experience in finding what types of injuries were proven for claimants alleging a particular disease.

The 136,250 includes 990 claims that Manville Trust settled in a class action total for $44 million. The total settlement has not been allocated across claims nor for disease types. The average settlement for these 990 claims is similar to that for all Manville Trust settlements, so their treatment as pending claims does not materially change any present estimates.

Page four

Some of these 136 thousand claimants filed claims only against Manville. The number of Manville-only claims must be estimated, so that estimates of the global asbestos liability do not include projected payments by codefendants for claims that are only against Manville. In addition, the Manville liability for these claims is greater because Manville must pay for claimants' entire injuries.

The portion of pending claims against Manville that are Manville-only can be estimated by looking at the portion of such claims among claims already resolved by the Trust. In order to identify Manville-only claims, we must have data on codefendants' payments. These data are available only for a sample of 6,000 claims filed before the Manville Corporation emerged from bankruptcy, data reviewed in my report of April 11, 1991. Table Two-A estimates the number of pending Manville-only claims based on the percent of Manville-only claims for each type of disease among these prebankruptcy claims.

TABLE TWO-A

ESTIMATE OF NUMBER OF MANVILLE-ONLY AND JOINT CLAIMS

| | All Manville Claims | | Manville-Only | | Manville & Codef | |
|---|---|---|---|---|---|---|
| | Number | % by Disease | % JM * Only | Number | Number | % by Disease |
| Pleural | 74,176 | 54.4 | 15 | 11,118 | 63,058 | 53.3 |
| Asbestosis | 41,883 | 30.7 | 9 | 3,769 | 38,114 | 32.2 |
| Other cancer | 3,590 | 2.6 | 11 | 395 | 3,195 | 2.7 |
| Lung cancer | 10,926 | 8.0 | 12 | 1,311 | 9,615 | 8.1 |
| Mesothelioma | 5,675 | 4.2 | 22 | 1,248 | 4,427 | 3.7 |
| All claims | 136,250 | | 13 | 17,841 | 118,409 | |

* Estimate of the percent of each disease type that is a Manville-only claimed, based on the Manville Trust's experience with prebankruptcy claims. See, Peterson report of April 11, 1991.

As Table Two-A shows, this analysis estimates that approximately 13 percent of claims against Manville are Manville-only. This may be an overestimate. Historically for prebankruptcy claims, Manville-only were greatest among pleural and mesothelioma claims. In turn, pleural claims are more frequent now among pending claims than for prebankruptcy claims. As a result, Table Two-A estimates more Manville-only claims overall among pending claims (13 percent) than the 11 percent among prebankruptcy claims. Contrary to this, claims supervisors for the Manville Trust find fewer rather than more Manville-only claims among recent and presumably future claims. Many prebankruptcy claims involved Manville plant workers who could file only against Manville. A far smaller proportion of recent and pending claims are from Manville plant workers.

Page five

Table Two-B attempts to reflect this recent experience, estimating that the proportion of Manville-only claims among pending claimants will be half that for prebankruptcy claims. This assumption yields an estimate of about 6.6 percent Manville-only claims, which is consistent with the expectations of the Trust's claims supervisors.

TABLE TWO-B

ALTERNATIVE ESTIMATE OF NUMBER OF MANVILLE-ONLY AND JOINT CLAIMS

| | All Manville Claims | | Manville-Only | | Joint Manv & Codef | |
|---|---|---|---|---|---|---|
| | Number | % by Disease | % JM * Only | Number | Number | % by Disease |
| Pleural | 74,176 | 54.4 | 7.5 | 5,563 | 68,613 | 53.9 |
| Asbestosis | 41,883 | 30.7 | 4.5 | 1,885 | 39,998 | 31.4 |
| Other cancer | 3,590 | 2.6 | 5.5 | 197 | 3,393 | 2.7 |
| Lung cancer | 10,926 | 8.0 | 6.0 | 656 | 10,270 | 8.1 |
| Mesothelioma | 5,675 | 4.2 | 11.0 | 624 | 5,051 | 4.0 |
| All claims | 136,250 | | 6.6 | 8,925 | 127,325 | |

 * Estimate of the percent of each disease type that is a
 Manville-only claimed, based on an assumption that this
 rate for pending claims will be half the rate found among
 prebankruptcy claims.

Most codefendants have resolved more claims than the Manville Trust, because of the two extended periods when no Manville claims have been resolved. Estimates of the global liability for pending asbestos claims should not include projected liability for codefendants for cases that they have already settled. However, because codefendants will not provide information about their settlements, it is impossible to determine precisely how many claims have been resolved by each codefendant and the proportion of liability in each case that has been resolved. Table Three compares available information about the number of resolved and pending claims reported by the Manville Trust, Owens Corning Fiberglass and the two defense consortia, the Asbestos Claims Facility and the Center for Claims Resolution. When Manville-only claims are subtracted from the total number of claims against Manville, there is close similarity in the number of claims represented by each.

Page six

TABLE THREE

RESOLVED AND PENDING CLAIMS AGAINST MANVILLE AND CODEFENDANTS

| | Resolved | Pending | Total |
|---|---|---|---|
| Manville * | | | |
| All | 26,669 | 136,250 | 162,919 |
| Exclude 6.6% JM only | 24,636 | 127,325 | 151,961 |
| Exclude 13% JM only | 23,326 | 118,409 | 141,735 |
| CCR and ACF ** | 63,000 | 77,000 | 140,000 |
| OCF *** | 60,500 | 88,000 | 148,500 |

* Number of settled, Manville-only claims was estimated as 11% for 6207 prebankruptcy claims and respectively 13% and 6.6% of the remaining 20,462 settled claims.

** Data provided by Larry Fitzpatrick of the Center for Claims Resolution, February 1991. 18,000 cases were settled by ACF, the rest by CCR.

*** Data from the 1990 financial statement for Owens Corning Fiberglass. OCF reported 56,400 resolved and 84,500 pending claims as of December 31, 1990. These were adjusted to April 1991 on the basis of OCF's report of annual rates of new claims and dispositions.

Table Three suggests a range that can be used to estimate the remaining liability among defendants for claims now pending. There are 77,000 claims which have not yet been resolved by the Center for Claims Resolution, an entity that represents a substantial proportion of liability among defendants. The 77,000 claims are a minimum estimate of the number of pending claims that remain unsettled by most or all defendants. But this is only a minimum estimate. Although Table Three suggests that the CCR and the defunct ACF might have together resolved around forty thousand claims that are still pending against Manville, not all of these claims will have been resolved by other significant defendants. Owens Corning Fiberglass, which still faces 88,000 claims, presumably faces liability in ten thousand cases that have been resolved by the CCR. The number of claims pending against OCF--88,000--seems a defensible, if conservative estimate of the maximum number of claims that remain unsettled by most or all defendants.

938 

Page seven

The pattern of claims against and settlements by the various asbestos defendants is complex: Even though CCR has resolved more claims, OCF will have resolved some claims not yet resolved by CCR; CCR will have resolved some of the 88,000 claims pending against OCF; across all defendants there are undoubtedly more than 88,000 claims that are pending against at least one defendant other than Manville; some claims have been filed only against codefendants and not Manville; and other claims have been filed against only a single defendant (i.e. they are like Manville-only claims). This complex pattern of facts could be clarified by research that obtains information about all settlements for a sample of claims pending against the Manville Trust.

However, since such data are not now available, the present assumptions simplify this complexity (1) by treating every claim as having been settled either by all or by no codefendant and (2) by setting a range of 77,000 to 88,000 claims that have been settled by no defendant. Under these assumptions, the Manville Trust would be the only potentially liable defendant for as many as 58,889 claims (136,250 minus 77,000) and it would be solely liable for at least 47,889 claims (136,250 minus 77,000). Note that the 47,889 to 58,889 claims for which the Manville Trust is assumed to be solely liable include both claims where all other defendants settled and others where a claim was made only against the Manville Trust.

ESTIMATE OF INDEMNITY PAYMENTS FOR CLAIMS SOLELY AGAINST MANVILLE

Manville's exposure differs between Manville-only claims and joint claims against both Manville and a codefendant. As Table Four shows, the Manville Trust has historically paid more in Manville-only claims than joint claims. The table displays the actual payments among prebankruptcy claims and calculates the ratios of average payments in Manville-only claims to average payments in joint claims.

Unfortunately, there are no available data that would allow us to determine directly the average payments for Manville-only and joint claims among all settled claims. We can identify Manville-only claims only among the six thousand prebankruptcy claims, and we cannot simply assume that the average payments for the two types of claims among prebankruptcy cases also apply to other settled claims. Manville Trust data show that prebankruptcy claims averaged lower settlements than the twenty thousand other claims settled by the Trust.

However, we can estimate the average settlements for Manville-only and joint claims by assuming that the ratios of the averages observed for prebankruptcy claims were maintained for all settled claims. To estimate the averages, we also have to assume what proportion of all claims settled by the Manville Trust were Manville-only. Table Four provides estimates of the average payments to Manville-only and joint claims under the two assumptions of the number of Manville-only claims, 13 and 6.6 percent.

Page eight

## TABLE FOUR

### RATIO OF PAYMENTS IN MANVILLE ONLY AND JOINT CLAIMS *
(Payments in $ Thousands)

| | Prebankruptcy Claims | | | 13% Manv Only | | 6.6% Manv Only | |
| | Average Payment | | | Average Payment | | Average Payment | |
| | Joint Claim | Manville Only | Ratio | Joint Claim | Manville Only | Joint Claim | Manville Only |
|---|---|---|---|---|---|---|---|
| Pleural | 18 | 24 | 1.34 | 23 | 31 | 23 | 31 |
| Asbestosis | 29 | 43 | 1.50 | 36 | 54 | 37 | 56 |
| Other cancer | 36 | 53 | 1.45 | 41 | 59 | 42 | 61 |
| Lung cancer | 67 | 113 | 1.68 | 68 | 115 | 71 | 119 |
| Mesothelioma | 112 | 209 | 1.87 | 124 | 232 | 135 | 253 |

* Ratio of payments in Manville-only divided by payments in joint claims among 6,207 prebankruptcy claims. "13% Manv Only" and "6.6% Manv Only" estimate the average settlements for Manville-only and joint claims among all 26,669 claims settled by the Manville Trust, assuming that ratios for prebankruptcy claims apply to all settled claims and assuming respectively that 13 percent and 6.6 percent of settled claims were Manville-only.

The total expected liability of asbestos defendants includes both liability among all defendants--including Manville--for cases that remain completely unsettled (i.e. the 77,000 to 88,000 claims) and the Manville Trust's liability for pending asbestos claims where it is solely liable. Table Five estimates the latter, separating the Trust's liability for Manville-only claims and claims where all other defendants have settled. The table presents estimates of the value of Manville-only claims for each of the two alternative assumptions about the number of such claims using estimates of past settlement averages shown on Table Four. The table presents four estimates of payments expected from Manville for claims already settled by all other defendants under the two assumptions that 77,000 or 88,000 pending claims remain unsettled by other defendants and the two assumptions about the number of Manville-only claims.

Page nine

## TABLE FIVE

### ESTIMATE OF VALUE OF CLAIMS SOLELY AGAINST MANVILLE
(Total Values in $ Millions; Average Values in $ Thousands)

| | Avg Value | Where Codefendants Have Settled * | | | | Manville Only | | |
| | | 77,000 Unsettled | | 88,000 Unsettled | | | | |
| | | Number | Total Value | Number | Total Value | Number | Avg Value | Total Value |
|---|---|---|---|---|---|---|---|---|
| **13% Manv.-Only** | | | | | | | | |
| Pleural | 23 | 22,052 | 507 | 16,194 | 372 | 11,118 | 31 | 345 |
| Asbestosis | 36 | 13,329 | 480 | 9,788 | 352 | 3,769 | 54 | 204 |
| Other cancer | 41 | 1,117 | 46 | 820 | 34 | 395 | 59 | 23 |
| Lung cancer | 68 | 3,362 | 229 | 2,469 | 168 | 1,311 | 115 | 151 |
| Mesothelioma | 124 | 1,548 | 192 | 1,137 | 141 | 1,248 | 232 | 290 |
| All claims | | 41,408 | 1,454 | 30,408 | 1,067 | 17,841 | | 1,013 |
| **6.6% Manv.-Only** | | | | | | | | |
| Pleural | 23 | 27,119 | 624 | 21,191 | 487 | 5,563 | 31 | 174 |
| Asbestosis | 37 | 15,809 | 585 | 12,354 | 457 | 1,885 | 56 | 105 |
| Other cancer | 42 | 1,341 | 56 | 1,048 | 44 | 197 | 61 | 12 |
| Lung cancer | 71 | 4,059 | 288 | 3,172 | 225 | 656 | 119 | 78 |
| Mesothelioma | 135 | 1,996 | 269 | 1,560 | 211 | 624 | 253 | 158 |
| All claims | | 50,324 | 1,822 | 39,325 | 1,424 | 8,925 | | 527 |

\* Table estimates separately the values of (1) claims where all
defendants other than Manville have settled and (2) where a
claim was filed only against Manville. The expected average
payments by Manville for these two types of cases are shown in
Table Four. The Table presents estimates under two assumptions
about the number of pending Manville-only claims and under two
estimates of the number of claimants who have not yet settled
with any defendant: With 77,000 claims unsettled by any
defendant, Manville faces 41,408 claims where all other
defendants have settled if 13 percent of its claims are
Manville-only and 50,324 claims settled by all other
defendants if 6.6 percent are Manville-only; with 88,000
claims Manville faces respectively 30,408 and 39,325 claims
settled by all other defendants.

## ESTIMATE OF INDEMNITY PAYMENTS FOR CLAIMS AGAINST ALL DEFENDANTS

The next analysis estimates the total amount that all defendants,
including Manville, can be expected to pay for the 77,000 to 88,000
claims in which claimants have yet to receive substantial settlements.
This analysis requires assumptions about the average payments that all
defendants can be expected to make for pending claims. These
assumptions about payments for pending claims are the most troublesome

element of the analysis. Assumptions about average payments that will be made for pending claims can only be made by extrapolating from payments that have been made in previously resolved claims. The extrapolations are problematic, if the bases for settling claims have or will change. The extrapolations would then provide little information about what defendants will actually pay, but would at most indicate what defendants' expected payments would have been if past practices had continued into the future. Because the environment of asbestos litigation is changing significantly in ways that likely effect how claims are evaluated, this criticism is pertinent and fundamental for the present analyses. The last section of this report looks more closely at this issue and at ways to carry out estimations in light of changes in the asbestos litigation.

The next sections put aside this criticism in order to evaluate pending claims by extrapolating from settlement values for past claims. These sections present analyses based on alternative assumptions (1) about how to estimate the unknown total amount of payments by all defendants from the known amount of payments by the Manville Trust and (2) about the comparability between previously resolved and pending claims.

Table Six presents estimates of full value of pending claims, i.e. the total amount that all defendants might be expected to pay on average for claims for each disease. The estimates have been calculated by dividing the average past payments by the Manville Trust for each disease by the historic share of full payments made by the Trust for the disease. The Manville Trust's share of payments was derived from the Trust's data for prebankruptcy claims. Those data indicate that when Manville-only claims are excluded, the Manville Trust paid between 28 percent and 33 percent of the total payments by all defendants, depending upon the type of disease (see, Peterson Memorandum of April 11, 1991). The estimates on Table Six assume that the Manville shares found for prebankruptcy claims apply to payments for pending claims, an assumption that is controversial (Table 14, below presents estimates of the expected payments by defendants based on alternative assumptions about the Manville share). The estimates on Table Six are provided for both of the assumptions that 13 or 6.6 percent of pending claims are Manville-only. Note that the analyses do not assume that the Manville Trust will continue to pay between 28 and 33 percent of all payments by defendants, nor do they assume any other share of payments by the Trust. The historic Manville shares are used simply to estimate the total expected payment by all defendants from data on historic payments by the Manville Trust.

Page eleven

TABLE SIX

EXPECTED AVERAGE PAYMENTS BY ALL DEFENDANTS *
(Average Values in $ Thousands)

| | 13% Manv Only | | | 6.6% Manv Only | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Manville | | Full | Manville | | Full |
| | Avg Value | Share | Avg Value | Avg Value | Share | Avg Value |
| Pleural | 23 | .31 | 74 | 23 | .31 | 74 |
| Asbestosis | 36 | .30 | 120 | 37 | .30 | 123 |
| Other cancer | 41 | .33 | 124 | 42 | .33 | 127 |
| Lung cancer | 68 | .31 | 219 | 71 | .31 | 229 |
| Mesothelioma | 124 | .28 | 442 | 135 | .28 | 482 |

* The Table estimates payments by all defendants, including
 Manville. The Manville shares for disease types are based on
 empirical evidence of the share of Manville Trust payments for
 prebankruptcy claims (see, Peterson Memorandum of April 11,
 1991). Manville Average Values are from Table Four.
 Full Average Value is calculated as follows:

(Manville Avg. Value) / (Manville Share)

Table Seven estimates the total amount that all defendants, including
Manville, can be expected to pay for the 77,000 to 88,000 claims where
claimants have received no settlements, assuming that claimants will
receive on average the amounts shown on Table Six.

As Table Seven shows, estimates of the full value of pending claims
range between $8.9 and $10.2 billion, assuming that 13 percent of
claims against the Manville Trust are Manville-only. The full value
ranges from $9.2 to $10.5 billion, asssuming 6.6 percent Manville-only
claims. All estimates are based on the assumption that claims now
pending will be valued in the same manner as were resolved claims. The
estimation of defendants' payments for these claims would vary if the
average payments shown on Table Six were calculated using different
assumptions about the Manville share. Estimations of the full value of
pending claims using different assumptions about the Manville share are
presented in Tables Fifteen and Sixteen below.

Page twelve

TABLE SEVEN

ESTIMATED VALUE OF CLAIMS PENDING AGAINST ALL DEFENDANTS *
(Total Values in $ Millions; Average Values in $ Thousands)

| | Full Average Value | 77,000 Claims Number of Claims | 77,000 Claims Total Value | 88,000 Claims Number of Claims | 88,000 Claims Total Value |
|---|---|---|---|---|---|
| **13% Manville Only** | | | | | |
| Pleural | 74 | 41,006 | 3,034 | 46,864 | 3,468 |
| Asbestosis | 120 | 24,785 | 2,974 | 28,326 | 3,399 |
| Other cancer | 124 | 2,078 | 258 | 2,374 | 294 |
| Lung cancer | 219 | 6,253 | 1,369 | 7,146 | 1,564 |
| Mesothelioma | 442 | 2,879 | 1,273 | 3,290 | 1,454 |
| All claims | | 77,001 | 8,908 | 88,000 | 10,179 |
| **6.6% Manv. Only** | | | | | |
| Pleural | 74 | 41,494 | 3,070 | 47,422 | 3,509 |
| Asbestosis | 123 | 24,189 | 2,975 | 27,644 | 3,400 |
| Other cancer | 127 | 2,052 | 261 | 2,345 | 298 |
| Lung cancer | 229 | 6,211 | 1,422 | 7,098 | 1,625 |
| Mesothelioma | 482 | 3,055 | 1,473 | 3,491 | 1,683 |
| All claims | | 77,001 | 9,201 | 88,000 | 10,515 |

* The Table estimates the total amount that will be paid by all
defendants, including Manville, for 77,000 and 88,000 claims,
respectively, that have not been settled by any defendant.
Full Average Value from Table Six. Number of claims is shown
for low and high estimates of number of pending claims that
remain unsettled (see, text accompanying Table Three). The
number of claims for each disease is the same as for
"Manville & Codef" on Tables Two-A and Two-B.

TOTAL INDEMNITY PAYMENTS FOR ALL PENDING CLAIMS, BASED ON HISTORIC VALUES

Table Eight calculates the total expected payments by asbestos defendants
for indemnity of pending claims by adding the Manville Trust's expected
payments for claims where it is solely liable to the expected payments by
all defendants, including Manville, for cases that remain completely
unsettled. Estimates of the total indemnity payments are presented for
the two assumptions of the number of Manville-only claims and for the
alternatives of 77,000 and 88,000 claims that are assumed to have been
settled with no defendant. All of the estimates on Table Eight are based

on assumptions that the payments by all defendants, including Manville, will average 3.33 times payments by the Manville Trust and that the values placed on past claims should continue to apply to pending claims. Under these assumptions, the total expected indemnity payments by all asbestos defendants ranges between $11.4 and $12.5 billion, if those claims are to be valued as they had been in the past. These estimates represent only the expected payments to claimants and do not include the anticipated costs for defense or other resolution of these claims.

TABLE EIGHT

ESTIMATED VALUE OF PENDING CLAIMS ACROSS ALL DEFENDANTS
BASED ON FULL HISTORIC VALUE
(Total Values in $ Millions)

| | Claims w/o Settlement | |
|---|---|---|
| | 77,000 | 88,000 |
| **13% of Claims Are Manville Only** | | |
| Claims Against All Defendants | 8,908 | 10,179 |
| Claims Solely Against Manville | | |
| Settled by Other Defendants | 1,454 | 1,067 |
| Manville-only Claims | 1,013 | 1,013 |
| Total Expected Liability | 11,375 | 12,259 |
| | | |
| **6.6% of Claims Are Manville Only** | | |
| Claims Against All Defendants | 9,201 | 10,515 |
| Claims Solely Against Manville | | |
| Settled by Other Defendants | 1,822 | 1,424 |
| Manville-only Claims | 527 | 527 |
| Total Expected Liability | 11,550 | 12,466 |

Of course, even setting aside the fundamental criticism that historic values might not continue to apply, the estimates summarized on Table Eight cannot be regarded as matters of certainty. The assumptions that underlie these analyses are simply reasonable projections about the types, numbers and values of claims. Estimates of the total indemnity payments for pending cases will vary under different assumptions. Indeed there is a widely held perception that many pending cases are not as serious as those cases already resolved, which argues that the analyses in Table Eight overstate the total indemnity payments. Similarly, opposing parties to the litigation argue that the Manville share is greater or less than the average 30 percent assumed for the present analyses.

Page fourteen

The analyses below examine the total indemnity payments under assumptions (1) that pending claims present less serious injuries than those already resolved and (2) that the Manville share is respectively 25 percent and 40 percent of full payments by all defendants. The analyses then estimate the total cost of both indemnity and defense of pending claims, under two assumptions about defense costs.

## ADJUSTMENT FOR THE APPARENT DECLINE IN THE SERIOUSNESS OF CLAIMS

Many participants in asbestos litigation--judges, defendants and plaintiffs' lawyers--observe that taken as a whole, claims pending against asbestos defendants are less serious than those already resolved. If this is the case, then total indemnity payments by asbestos defendants would be overestimated by simply using past average payments to project future claims. Again, data could be collected on the characteristics of a sample of resolved and pending claims to see if and how claims have changed. But in the absence of such data, the present analyses can only make assumptions about the comparability of resolved and pending claims.

The analyses described above in Tables Six through Eight assume that resolved and pending claims are comparable and that historic values could be directly applied to pending claims. The analyses in this section are based on the assumption that as a whole pending claims are less serious than resolved claims. These analyses use an adjustment to reflect a decline in seriousness of claims that is consistent with the projections that estimated the future performance of the Manville Trust.

Negotiations over the restructuring of the Manville Trust revealed a broadly-held perception that many asbestosis claimants would be unable to prove an asbestos-related disease. Projections of the expected payments to claimants under the reorganized trust assumed that as many as 20,000 claims pending against the Manville Trust (approximately 15 percent of such claims) might be subject to dismissal for failure to state a cause of action. Table Nine shows how 20,000 such nonclaims might be distributed across claims pending against the Manville Trust. The Table assumes relatively few nonclaims among claimants alleging an asbestos-related cancer, based on the Trust's experience showing that few cancer claims failed to involve some type of asbestos-related disease. The remainder of the projected 20,000 nonclaims are distributed between pleural and asbestosis claims so that the assumed rate of nonclaims is four times greater for pleural than asbestosis claims.

Page fifteen

TABLE NINE

CLAIMS AGAINST THE MANVILLE TRUST, ADJUSTING FOR CLAIMS
THAT MIGHT BE UNABLE TO PROVE AN ASBESTOS RELATED INJURY

| | +− Reported<br>Number<br>Pending | +− Assumed<br>Nonclaims | −+−Estimated−+<br>Number<br>Compensible |
|---|---|---|---|
| Pleural | 74,176 | 17,472 | 56,704 |
| Asbestosis | 41,883 | 2,466 | 39,417 |
| Other cancer | 3,590 | 18 | 3,572 |
| Lung cancer | 10,926 | 33 | 10,893 |
| Mesothelioma | 5,675 | 11 | 5,664 |
| All claims | 136,250 | 20,000 | 116,250 |

* This adjustment represents an assumption that as many as
 20,000 or approximately 15 percent of claims pending against
 the Manville Trust might fail to provide evidence of an
 asbestos-related disease. The number of nonclaims for cancer
 claims represent historical experience of the Manville Trust
 of the proportion of such claims that do not provide evidence
 of an injury. The numbers for pleural and asbestosis claims
 assume that the frequency of nonclaims will be four times
 greater for pleural disease than for asbestosis.

Of course, there is no reason to believe that this assumption of 20,000
nonclaims is precisely correct. Rather, the assumption provides a means
of representing the argument that, taken as a whole, present claims
involve less serious injuries. The analyses in this section exclude
these 20,000 claims and then use the average payments for past claims to
estimate the value of the remaining 116,250 claims pending against the
Manville Trust. The adjustment is admittedly arbitrary: it may either
overadjust or underadjust for any changes in the seriousness of claims.
Unfortunately, without empirical information about the changing
characteristics of claims, any adjustments will be arbitrary.

Table Ten shows the number of Manville-only and joint claims expected
for the pending 116,250 claims that remain. Because the percent of
Manville-only claims has little impact on estimated global liability, all
remaining analyses assume that 13 percent of claims are Manville-only.

'Page sixteen

TABLE TEN

ESTIMATE OF NUMBER OF MANVILLE-ONLY AND JOINT CLAIMS
AFTER ELIMINATION OF 20,000 ASSUMED NONCLAIMS

| | +---- Estimated ------+ | | -Manville Only - | | -Joint Manv & Codef+ | |
|---|---|---|---|---|---|---|
| | Number<br>Compensible | % by<br>Disease | % JM<br>Only | Number | Number | % by<br>Disease |
| Pleural | 56,704 | 48.8 | 15 | 8,506 | 48,198 | 47.6 |
| Asbestosis | 39,417 | 33.9 | 9 | 3,548 | 35,869 | 35.4 |
| Other cancer | 3,572 | 3.1 | 11 | 393 | 3,179 | 3.1 |
| Lung cancer | 10,893 | 9.4 | 12 | 1,307 | 9,586 | 9.5 |
| Mesothelioma | 5,664 | 4.9 | 22 | 1,246 | 4,418 | 4.4 |
| All claims | 116,250 | | 13 | 15,000 | 101,250 | |

Table Eleven estimates the Manville Trust's liability for pending claims
in which it is solely liable, after elimination of the assumed 20,000
nonclaims. Again, the table separates the Trust's Manville-only liability
from liability for claims where all other defendants have settled.

TABLE ELEVEN

ESTIMATE OF VALUE OF CLAIMS SOLELY AGAINST MANVILLE,
AFTER ELIMINATION OF 20,000 ASSUMED NONCLAIMS
(Total Values in $ Millions; Average Values in $ Thousands)

| | +--- Where Codefendants Have Settled * --+ | | | | | +---- Manville Only --+ | | |
|---|---|---|---|---|---|---|---|---|
| | | 77,000 Unsettled | | 88,000 Unsettled | | | | |
| | Avg<br>Value | Number | Total<br>Value | Number | Total<br>Value | Number | Avg<br>Value | Total<br>Value |
| Pleural | 23 | 16,855 | 388 | 12,378 | 285 | 8,506 | 31 | 264 |
| Asbestosis | 36 | 12,544 | 452 | 9,212 | 332 | 3,548 | 54 | 192 |
| Other cancer | 41 | 1,112 | 46 | 816 | 33 | 393 | 59 | 23 |
| Lung cancer | 68 | 3,352 | 228 | 2,462 | 167 | 1,307 | 115 | 150 |
| Mesothelioma | 124 | 1,545 | 192 | 1,135 | 141 | 1,246 | 232 | 289 |
| All claims | | 35,408 | 1,306 | 26,002 | 958 | 15,000 | | 918 |

Table presents analyses under two alternative estimates of the
total number of claim unsettled by all defendants; 77,000
claims which implies that the Manville Trust faces another
35,408 claims where all other defendants have settled
[101,250 (compensible Manville joint claims, Table Ten) minus
65,842 (compensible claims unsettled by defendants, Table
Twelve)]; and 88,000 claims which implies another 26,002 Trust
claims settled by all other defendants [101,250 minus 77,248].

TABLE TWELVE

ESTIMATED VALUE OF CLAIMS PENDING AGAINST ALL DEFENDANTS,
AFTER ELIMINATION OF 20,000 ASSUMED NONCLAIMS
(Total Values in $ Millions; Average Values in $ Thousands)

| | Codefs Avg Value | 77,000 Claims Number of Claims | 77,000 Claims Total Value | 88,000 Claims Number of Claims | 88,000 Claims Total Value |
|---|---|---|---|---|---|
| Pleural | 74 | 31,341 | 2,319 | 35,818 | 2,650 |
| Asbestosis | 120 | 23,308 | 2,797 | 26,638 | 3,197 |
| Other cancer | 124 | 2,041 | 253 | 2,333 | 289 |
| Lung cancer | 219 | 6,255 | 1,370 | 7,149 | 1,566 |
| Mesothelioma | 442 | 2,897 | 1,280 | 3,311 | 1,463 |
| All claims | | 65,842 | 8,019 | 75,248 | 9,165 |

\* The Table estimates the total amount that will be paid by all
defendants, including Manville, for 77,000 and 88,000 claims,
respectively, that have not been settled by any defendant.
It assumes that the proportion of claims that are compensible is
the same as for all joint Manville claims. This proportion is
the number of compensible claims (101,250 from Table Ten)
divided by the total number of joint Manville claims (118,409
from Table Two-A) i.e. 101,250 / 118,409 = .86. Among 77,000
pending claims, 86 percent or 65,842 are compensible and
11,158 are assumed to be unable to state a cause of action.
Among 88,000 claims, 75,248 are assumed to be compensible and
12,752 do not state a cause of action. The percent of
claimants with each type of disease is the same as for all
Manville joint claims (Table Ten).

Table Twelve shows the full value of pending claims after the 20,000
assumed noncompensible claims are excluded. The elimination of these
assumed noncompensible claims reduces the total of the historically
based value for pending claims about ten percent, from between $11.4 to
$12.3 billion when the cases are included (Table Eight) to between $10.2
to $11.0 billion when the cases are excluded (Table Thirteen). Note
that while the estimates on Table Thirteen provide an adjustment for
possible changes in the seriousness of pending asbestos claims, they
make no provision for possible changes in valuations of claims. The
estimates assume that the values placed on claims in the past will
continue to apply to the settlements of claims now pending.

Page eighteen

TABLE THIRTEEN

ESTIMATED VALUE OF PENDING CLAIMS ACROSS ALL DEFENDANTS
AFTER ELIMINATION OF 20,000 ASSUMED NONCLAIMS
(Total Values in $ Millions)

| | Claims w/o Settlement | |
|---|---|---|
| | 77,000 | 88,000 |
| Claims Against All Defendants | 8,019 | 9,165 |
| Claims Solely Against Manville | | |
| Settled by Other Defendants | 1,306 | 958 |
| Manville-only Claims | 918 | 918 |
| Total Expected Liability | 10,243 | 11,041 |

ALTERNATIVE ASSUMPTIONS ABOUT THE MANVILLE SHARE

The analyses of the historically-based value of pending claims have been based on the assumption that the full payments by all defendants average about three-and-one-third times the Manville payment, based on the Manville share of 30 percent of prebankruptcy payments. This assumption is supported by empirical analysis of the Manville Trust's data for prebankruptcy claims.

Others argue that the Manville share has been more or less than 30 percent, which would mean that full value of claims is less or greater than the values assumed in the analyses. The following analyses estimate the full value of claims under two alternatives: an assumption that the full value of claims is four times the Manville payments (assuming a Manville share of 25 percent) and an assumption that the full value of claims was two-and-one-half times the Manville payments (assuming a Manville share of 40 percent). These alternative assumptions have no empirical support, but they provide means for examining the upper and lower bounds of what all defendants could expect to pay for pending asbestos claims based on historic values.

Table Fourteen shows estimates of expected average payments by all defendants, including Manville, under the three alternative assumptions about the Manville share. Again, these estimates have nothing to do with the share of payments that the Manville Trust might make in cases now pending. The assumptions about the Manville share are used only to provide alternative estimates of the total payments that all defendants might be expected to make for pending claims. This report does not consider what part of these payments might be borne by the Manville Trust. As Table Fourteen shows, defendants' expected payments decline as the Manville share increases.

Page nineteen

TABLE FOURTEEN

DEFENDANTS' EXPECTED PAYMENTS UNDER ALTERNATIVE
ESTIMATES OF THE MANVILLE SHARE *
(Average Values in $ Thousands)

| | Manv Average Value | Alternative Estimates | | | | | |
|---|---|---|---|---|---|---|---|
| | | Manv Share | Full Avg Value | Manv Share | Full Avg Value | Manv Share | Full Avg Value |
| Pleural | 23 | .31 | 74 | .26 | 88 | .41 | 56 |
| Asbestosis | 36 | .30 | 120 | .25 | 144 | .40 | 90 |
| Other cancer | 41 | .33 | 124 | .28 | 146 | .44 | 93 |
| Lung cancer | 68 | .31 | 219 | .26 | 262 | .41 | 166 |
| Mesothelioma | 124 | .28 | 442 | .23 | 539 | .37 | 335 |
| All claims | | .30 | | .25 | | .40 | |

* Full Average Value estimates payments by all defendants, including
Manville. The Manville shares for disease types when Manville
share averaged 30 percent are based on empirical evidence of
the share of Manville Trust payments for prebankruptcy claims
(see, Peterson Memorandum of April 11, 1991). Manville shares
for disease types when Manville share is assumed to average 25
percent were 5/6 of the observed averages for diseases at an
average Manville share of 30 percent. Share for disease types
when the Manville share is assumed to average 40 percent are
4/3 of the observed averages at 30 percent. Defendants'
Average Value is calculated as follows:

(Manville Avg. Value) / (Manville Share)

Tables Fifteen and Sixteen estimate an upper and lower bound on the
total values of pending asbestos claims, when those claims are valued as
they have been in the past. Table Fifteen estimates a lower bound on
defendants' payments by assuming that the average payments by all
defendants will be 2.5 times the averages paid by the Manville Trust and
by eliminating 20,000 claims that are assumed to be noncompensible. In
contrast, Table Sixteen estimates an upper bound on defendants' payments
by assuming that the average payments by all defendants will be 4 times
the averages paid by the Manville Trust and by including all pending
claims, including the 20,000 claims.

Page twenty

TABLE FIFTEEN

LOWER BOUND ESTIMATE OF VALUE OF PENDING CLAIMS AGAINST DEFENDANTS
(Total Values in $ Millions; Average Values in $ Thousands)

| | Full Average Value | 77,000 Claims Number of Claims | Total Value | 88,000 Claims Number of Claims | Total Value |
|---|---|---|---|---|---|
| Pleural | 56 | 31,341 | 1,755 | 35,818 | 2,006 |
| Asbestosis | 90 | 23,308 | 2,098 | 26,638 | 2,397 |
| Other cancer | 93 | 2,041 | 190 | 2,333 | 217 |
| Lung cancer | 166 | 6,255 | 1,038 | 7,149 | 1,187 |
| Mesothelioma | 335 | 2,897 | 970 | 3,311 | 1,109 |
| All claims | | 65,842 | 6,051 | 75,248 | 6,916 |

* The Table estimates the total amount that will be paid by all
defendants, including Manville, for 77,000 and 88,000 claims,
respectively, that have not been settled by any defendants.
It assumes that full average value (i.e. average amount paid
by all defendants for each disease) will be 2.5 times Manville
payments for non-Manville-only claims, that 11,158 of 77,000
claims are noncompensible and that 12,752 of 88,000
claims are noncompensible.

TABLE SIXTEEN

UPPER BOUND ESTIMATE OF VALUE OF PENDING CLAIMS AGAINST DEFENDANTS
(Total Values in $ Millions; Average Values in $ Thousands)

| | Full Average Value | 77,000 Claims Number of Claims | Total Value | 88,000 Claims Number of Claims | Total Value |
|---|---|---|---|---|---|
| Pleural | 88 | 41,006 | 3,609 | 46,864 | 4,124 |
| Asbestosis | 144 | 24,785 | 3,569 | 28,326 | 4,079 |
| Other cancer | 146 | 2,078 | 303 | 2,374 | 347 |
| Lung cancer | 262 | 6,253 | 1,638 | 7,146 | 1,872 |
| Mesothelioma | 539 | 2,879 | 1,552 | 3,290 | 1,773 |
| All claims | | 77,001 | 10,671 | 88,000 | 12,195 |

* The Table estimates the total amount that will be paid by all
defendants, including Manville, for 77,000 and 88,000 claims,
respectively, that have not been settled by any defendants.
It assumes that full average value (i.e. average amount paid
by all defendants for each disease) will be 4 times Manville
payments for non-Manville-only claims. No claims are
eliminated as being noncompensible.

Page twenty-one

Although there are reasons to be skeptical about assumptions underlying the upper and lower bound estimates, these analyses set a range of between around $8 billion to over $14 billion when pending claims are valued as they have been in the past (Table Seventeen). This range understates what these pending claims would have cost asbestos defendants in the past environment of asbestos litigation, because the estimates do not include the significant expenses for defending cases.

TABLE SEVENTEEN

UPPER AND LOWER BOUND ESTIMATES OF VALUE OF PENDING CLAIMS
ACROSS ALL DEFENDANTS
(Total Values in $ Millions)

| | Claims w/o Settlement | |
|---|---|---|
| | 77,000 | 88,000 |
| LOWER BOUND: | | |
| Claims Against All Defendants | 6,051 | 6,916 |
| Claims Solely Against Manville | | |
| Settled by Other Defendants | 1,306 | 958 |
| Manville-only Claims | 918 | 918 |
| Total Expected Liability | 8,275 | 8,792 |
| UPPER BOUND: | | |
| Claims Against All Defendants | 10,671 | 12,195 |
| Claims Solely Against Manville | | |
| Settled by Other Defendants | 1,454 | 1,067 |
| Manville-only Claims | 1,013 | 1,013 |
| Total Expected Liability | 13,138 | 14,275 |

THE TOTAL COSTS OF INDEMNITY AND DEFENSE

A RAND Corporation study of asbestos litigation prior to the Manville bankruptcy found that 33 percent of defendants' expenditures went for defense and costs in processing claims. Only 67 percent of those payments went to claimants. So far the present analyses have estimated what defendants might have to pay to claimants for pending cases without considering defense expenses--they look only at the 67 percent.

Although the RAND research examined an earlier period of asbestos litigation, the study's findings about defense expenses seem to apply to defendants who continue an active defense. Most defendants will not reveal the precise amount of their defense expenses, but some indicate informally that defense expenses run at least 30 percent of all of their expenditures on asbestos litigation.

Page twenty-two

CONCLUSIONS

Table Eighteen adds defense costs to four alternative estimates of
the historically based values of pending claims. Although uncertain,
the best evidence is that defense costs have represented about 33
percent of all expenditures by defendants (i.e. 33 percent of the total
of indemnity payments plus defense costs). Similarly, the only
empirical evidence suggests that payments by all defendants, including
Manville, have averaged 3.33 times the Manville Trust's payments.
Analyses using these assumptions provide the most reasonable estimates
of what the defense and indemnification of pending asbestos claims would
cost defendants, including Manville, if claims continue to be defended
and settled on the same bases as they have in the past--total costs
ranging between $13.0 and $16.1 billion. Even under assumptions that
minimize these estimates--that total payments by all defendants
including Manville will be only 2.5 times payments by the Manville
Trust, that 20,000 pending claims are noncompensible, that litigation
costs will only be 30 percent of all expenditures--the analyses
suggest that asbestos defendants might have reasonably expected to
spend between $9.7 and $10.4 billion for pending claims if the
environment of asbestos litigation remained unchanged.

TABLE EIGHTEEN

DEFENDANTS' FULL COSTS OF INDEMNITY AND DEFENSE *
(Total Values in $ Billions)

| | Indemnity | | Defense Costs 30% | | Defense Costs 33% | |
|---|---|---|---|---|---|---|
| | 77,000 | 88,000 | 77,000 | 88,000 | 77,000 | 88,000 |
| **Empirically Based** | | | | | | |
| Adjust for nonclaims | 10.2 | 11.0 | 12.4 | 13.6 | 13.0 | 14.2 |
| Full historic value | 11.4 | 12.3 | 14.2 | 15.4 | 14.8 | 16.1 |
| **Lower Bound** | | | | | | |
| Adjust for nonclaims | 8.3 | 8.8 | 9.7 | 10.4 | 10.2 | 10.9 |
| **Upper Bound** | | | | | | |
| Full historic value | 13.1 | 14.3 | 16.7 | 18.3 | 17.3 | 19.1 |

* These calculations assume that defense costs for the Manville
Trust will be 10 percent and that the Trust will pay $1.6
billion in indemnification to present claimants (35 percent of
their full liability). For remaining liability, calculations
assume alternatively that indemnification represents 70 percent
or 67 percent of the total expenses of defendants.

**954**

But asbestos litigation is changing and will likely change even more significantly, in great part because the litigation is so costly. More than a dozen defendants who participated in the past litigation have gone into bankruptcy or effectively disappeared because their assets have been exhausted or compromised. To an uncertain degree, the remaining defendants may be required to pick up payments previously made by bankrupt defendants--this report makes no attempt to assess the legal requirements or effects of alternative theories of contribution. To an uncertain degree, some of the historic value of asbestos claims will be lost because there is no solvent defendant to provide payment. The litigation has been changed by the addition of new defendants, many of whom have significant assets. These new defendants might absorb appreciable portions of the costs of asbestos litigation or their costs might be limited if their liability runs to only a small portion of asbestos claimants. Defense costs may shrink as defendants adopt more efficient practices and as claims facilities assume a bigger role.

There is broad recognition that the values of claims have changed and are likely to change further in the future, even though there is no agreement on how values have changed. Some participants report that the values of claims have decreased as plaintiffs become willing to take what they can get now from financially-strapped defendants. Others report that values have increased because plaintiffs demand more when payments are made over time rather than in one lump sum. The greater use of consolidated trials, class actions and other aggregative procedures undoubtedly affect values, but in uncertain directions. These procedures could decrease the values of claims, following the general pattern of litigation that claims settled in groups receive less money than those settled individually. Or these procedures might increase the values of claims, because far more claims now appear at the courthouse steps. The values of claims and defense costs could be modified greatly if plaintiffs and defendants agree upon global resolution of claims against one or more defendants. Because the valuation of asbestos claims seems to have changed and seems likely to continue to change, the analyses of this report cannot be regarded as realistic projections of expected payments by asbestos defendants. The estimates are based on the extrapolation of past values that may well not apply to the settlement of pending claims.

Page twenty-four

But while the analyses of the present report are limited in several important ways, these limitations can be substantially addressed by further research. The analyses suffer from the absence of critical information, primarily about the nature of present claims and the patterns of payments by various defendants. These data may become available as the Manville Trust and the Selected Counsel for the Beneficiaries collect data that they need to allocate assets between present and future claimants. But more fundamentally, the present analyses are ignorant of recent and likely future changes in asbestos litigation. Realistic estimates of the likely costs of asbestos litigation require that analyses such as those in this report be done in conjunction with analyses of defendants' assets that will be called upon to pay those costs, and that both sets of analyses draw upon current information about the nature and value of claims.

APPENDIX D

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90.

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| Pro se | 3,778,125.00 | 2,391,000.00 | 1,387,125.00 |
| ABRAHAM, WATKINS, NI | 369,000.00 | 77,000.00 | 292,000.00 |
| ADAMS, THIENHAUS & K | 78,900.00 | 21,560.00 | 57,340.00 |
| ADAMSON, PHIFER, & R | 20,000.00 | 20,000.00 | |
| ADSHEAD & TAGLIAFERR | 25,000.00 | 25,000.00 | |
| ALLEN L. ROTHENBERG | 70,000.00 | 28,000.00 | 42,000.00 |
| ALLEN RODMAN, P. C. | 5,413,800.00 | 4,114,300.00 | 1,299,500.00 |
| ALLEN, ALLEN, ALLEN | .133,100.00 | 133,100.00 | |
| ANAPOL, SCHWARTZ, WE | 986,000.00 | 204,400.00 | 781,600.00 |
| ANDREW J. SMOLICH | 600,000.00 | 287,200.00 | 312,800.00 |
| ARTHUR L. PETERSEN, | 7,553,000.00 | 4,585,000.00 | 2,968,000.00 |
| ASBESTOS GROUP, P.A. | 2,211,360.00 | 552,360.00 | 1,659,000.00 |
| ASCH, SUSS & TORTORE | 2,157,070.00 | 1,315,720.00 | 841,350.00 |
| ASHCRAFT & GEREL | 5,471,250.00 | 2,972,900.00 | 2,498,350.00 |
| ATREUS M. CLAY | 50,000.00 | 50,000.00 | |
| BAGGETT, MCCALL, & B | 197,000.00 | | 197,000.00 |
| BALDWIN & BALDWIN | 15,852,000.00 | 14,012,858.00 | 1,839,142.00 |
| BANGS, CASTLE, SCHNA | 80,000.00 | 80,000.00 | |
| BARON & BUDD | 27,473,375.00 | 14,793,400.00 | 12,679,975.00 |
| BELL, FALLER, WEST & | 20,000.00 | | 20,000.00 |
| BENNIE & BENNIE, P.C | 42,000.00 | 42,000.00 | |
| BERNARD RUTTENBERG | 60,000.00 | 60,000.00 | |
| BLANK, ROME, COMISKY | 3,714,640.00 | 3,252,140.00 | 462,500.00 |
| BOCKOFF, ZAMLER, MEL | 4,166,000.00 | 697,700.00 | 3,468,300.00 |
| BOHANNON, BOHANNON & | 71,500.00 | 37,000.00 | 34,500.00 |
| BONNETT, FAIRBOURN | 40,000.00 | | 40,000.00 |
| BOUDOUSQUE' & FENAS | 240,000.00 | 240,000.00 | |
| BRAYTON & ASSOCIATES | 1,624,250.00 | 190,800.00 | 1,433,450.00 |
| BROBYN & FORCENO | 3,660,050.00 | 274,780.00 | 3,385,270.00 |
| BROOKMAN, ROSENBERG, | 14,961,500.00 | 13,395,500.00 | 1,566,000.00 |
| BROWN & FINNEY | 2,906,000.00 | 2,775,500.00 | 130,500.00 |
| BROWN, DAVENPORT & A | 183,000.00 | 183,000.00 | |
| BROWN, TERRELL, HOGA | 5,554,950.00 | 905,000.00 | 4,649,950.00 |
| BRUCE LEE AHNFELDT | 3,031,500.00 | 1,063,500.00 | 1,968,000.00 |
| BRUNO & BRUNO | 106,500.00 | | 106,500.00 |
| BRYAN, JONES, JOHNSO | 45,000.00 | 45,000.00 | |
| BURKE & BURKE, LTD. | 1,274,500.00 | 656,000.00 | 618,500.00 |
| BURNS, SCHNEIDERMAN, | 4,611,175.00 | 1,342,000.00 | 3,269,175.00 |
| BURROW & WILLIAMS | 145,170.00 | | 145,170.00 |
| BYRD, DAVIS & EISENB | 118,900.00 | | 118,900.00 |
| CAMPAGNOLI, ABELSON | 65,000.00 | 65,000.00 | |
| CARIMI LAW FIRM | 180,000.00 | 180,000.00 | |
| CARLSON, ROBINSON & | 6,541,125.00 | 4,937,125.00 | 1,604,000.00 |

PAGE. '2

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| CARNES AND DIBBLE | 54,000.00 | 54,000.00 | |
| CAROSELLI, SPAGNOLLI | 4,476,000.00 | 1,824,000.00 | 2,652,000.00 |
| CARTER, RUBENSTEIN, | 50,000.00 | 50,000.00 | |
| CARTWRIGHT, SLOBODIN | 5,423,664.00 | 3,942,324.00 | 1,481,340.00 |
| CASALINA & DISSTON | 45,000.00 | 45,000.00 | |
| CASEY, GERRY, CASEY, | 13,821,847.00 | 12,954,847.00 | 867,000.00 |
| CASTLE, SCHNAUTZ, HI | 1,027,717.00 | 789,086.00 | 238,631.00 |
| CATHERINE J. BROWN | 245,000.00 | 175,000.00 | 70,000.00 |
| CAULEY AND CONFLENTI | 140,000.00 | | 140,000.00 |
| CHAMBERLAIN, D'AMAND | 635,500.00 | 139,600.00 | 495,900.00 |
| CHAMBERS, STEINER, M | 500,000.00 | | 500,000.00 |
| CHARLES J. CASALE JR | 225,000.00 | 225,000.00 | |
| CHARLES L. CUNNINGHA | 60,000.00 | | 60,000.00 |
| CHAVES, GONZALES & R | 633,750.00 | | 633,750.00 |
| CHERRY, FERRARA, MUT | 3,090,500.00 | 2,475,000.00 | 615,500.00 |
| CHERWIN & GLICKMAN | 80,000.00 | 80,000.00 | |
| CHERYL TURNER | 44,000.00 | 17,600.00 | 26,400.00 |
| CHRISTOPHER E. GRELL | 4,740,300.00 | 1,873,000.00 | 2,867,300.00 |
| CLANCY & SLININGER | 356,112.00 | 356,112.00 | |
| COHEN AND DANIS | 50,000.00 | 50,000.00 | |
| CONNERTON, RAY & SIM | 515,500.00 | 268,000.00 | 247,500.00 |
| COONEY AND CONWAY | 40,000.00 | | 40,000.00 |
| COOPER, BECKMAN & TU | 4,251,500.00 | 3,800,000.00 | 451,500.00 |
| COVERT AND BRAUD | 529,295.00 | 191,595.00 | 337,700.00 |
| COZEN & O'CONNOR | 85,000.00 | 85,000.00 | |
| CRAFT, THOMPSON, & B | 641,800.00 | 516,800.00 | 125,000.00 |
| CRITCHLOW & WILLIAMS | 90,000.00 | 90,000.00 | |
| CUMBEST, CUMBEST, HU | 267,000.00 | 35,000.00 | 232,000.00 |
| CUNNINGHAM, LYONS & | 1,148,100.00 | 146,000.00 | 1,002,100.00 |
| CUPIT, JONES & FAIRB | 10,996,470.00 | 10,336,470.00 | 660,000.00 |
| D. BRUCE HANES | 91,000.00 | 91,000.00 | |
| DANGEL & SHERRY, P.C | 4,974,450.00 | 2,673,400.00 | 2,301,050.00 |
| DAVID H. HAYWORTH | 65,000.00 | 65,000.00 | |
| DAVID M. HAMMOND | 37,500.00 | 37,500.00 | |
| DAVID M. WEINFELD | 346,500.00 | 115,000.00 | 231,500.00 |
| DAVIDSON & O'MARA | 103,888.00 | 41,555.00 | 62,333.00 |
| DAVIS & LEWIS | 8,441,500.00 | 6,409,000.00 | 2,032,500.00 |
| DAVIS FIRM | 236,000.00 | 20,000.00 | 216,000.00 |
| DECKER, CARDON, THOM | 20,000.00 | 20,000.00 | |
| DELBELLO & COLL | 10,000.00 | | 10,000.00 |
| DEMARCO & CARRAFIELL | 78,000.00 | 78,000.00 | |
| DENNIS H. HENNINGER | 18,000.00 | | 18,000.00 |
| DERCK AMERMAN | 180,000.00 | 85,000.00 | 95,000.00 |

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| DICKSTEIN, SHAPIRO | 2,686,250.00 | 2,241,000.00 | 445,250.00 |
| DIES, DIES & HENDERS | 30,000.00 | | 30,000.00 |
| DIGARDI & CAMPBELL | 324,740.00 | 324,740.00 | |
| DODD, CONEY, BISHOP | 280,000.00 | 280,000.00 | |
| DONALD A. MARSHALL, | 1,244,000.00 | 94,000.00 | 1,150,000.00 |
| DONALD C. LONG | 16,500.00 | 16,500.00 | |
| DUNN AND MILLER | 75,000.00 | 75,000.00 | |
| DYER, MAHER & COSTIG | 24,000.00 | | 24,000.00 |
| EDMONDS, COLE, HARGR | 35,000.00 | 14,000.00 | 21,000.00 |
| EDWARD O. MOODY, P.A | 2,938,500.00 | 260,000.00 | 2,678,500.00 |
| EDWIN C. MARTIN, JR. | 30,000.00 | | 30,000.00 |
| ELLIS & MORRISON | 10,000.00 | 10,000.00 | |
| EMBRY AND NEUSNER | 3,944,671.00 | 2,608,421.00 | 1,336,250.00 |
| EMROCH & ASSOCIATES | 35,000.00 | 35,000.00 | |
| ENDRESS & ENDRESS | 86,167.00 | 86,167.00 | |
| FAIR & MAYO | 90,000.00 | 90,000.00 | |
| FARACI, GUADAGNINO, | 705,000.00 | | 705,000.00 |
| FRANCES A. GAMBO | 80,000.00 | 80,000.00 | |
| FRANK R. FRISCH | 1,267,000.00 | | 1,267,000.00 |
| FREEDMAN & AREEDA, P | 40,000.00 | 16,000.00 | 24,000.00 |
| FRONEFIELD & DEFURIA | 406,000.00 | 209,000.00 | 197,000.00 |
| GALIHER DEROBERTIS L | 5,079,000.00 | 3,010,000.00 | 2,069,000.00 |
| GALLIGAN & CONLIN, P | 847,000.00 | 243,000.00 | 604,000.00 |
| GARDNER, ROBEIN, & H | 382,000.00 | 50,000.00 | 332,000.00 |
| GARRUTO, GALEX & CAN | 28,124,780.00 | 22,244,580.00 | 5,880,200.00 |
| GAVIN & GAVIN | 6,970,250.00 | 6,409,000.00 | 561,250.00 |
| GELMAN AND GELMAN | 338,000.00 | 290,000.00 | 48,000.00 |
| GENE R. GRIFFIN | 150,000.00 | 150,000.00 | |
| GEORGE M. JONES | 260,000.00 | 260,000.00 | |
| GEORGE S. HENDERSON | 425,000.00 | 202,000.00 | 223,000.00 |
| GEORGE W. HOWARD III | 585,500.00 | 585,500.00 | |
| GEORGE W. KILBOURNE | 626,400.00 | 251,000.00 | 375,400.00 |
| GERALD H. HANRATTY | 45,000.00 | 45,000.00 | |
| GERTLER, GERTLER & | 19,869,184.00 | 14,656,784.00 | 5,212,400.00 |
| GILLENWATER, NICHOL | 10,707,000.00 | 10,337,667.00 | 369,333.00 |
| GILLICK, MURPHY, GIL | 618,000.00 | 168,000.00 | 450,000.00 |
| GLASSER & GLASSER | 57,272,780.00 | 10,161,500.00 | 47,111,280.00 |
| GLASSMAN & JETER | 332,000.00 | 125,000.00 | 207,000.00 |
| GLORIOSO & WELCKER | 300,000.00 | 300,000.00 | |
| GOODMAN, MEAGHER & E | 2,293,500.00 | 1,138,000.00 | 1,155,500.00 |
| GRAY & RITTER | 12,500.00 | | 12,500.00 |
| GREENE, KETCHUM, BAI | 1,465,900.00 | 1,465,900.00 | |
| GREENE, O'REILLY, BR | 27,227,544.00 | 27,085,985.00 | 141,559.00 |

959

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| GREENFIELD & ASSOCIA | 2,459,450.00 | | 2,459,450.00 |
| GREER, KLOSIK, & DAU | 6,500.00 | 6,500.00 | |
| GREITZER & LOCKS | 36,971,640.00 | 31,036,500.00 | 5,935,140.00 |
| HABUSH, HABUSH & DAV | 350,000.00 | | 350,000.00 |
| HAL C. PITKOW & ASSO | 930,000.00 | 212,500.00 | 717,500.00 |
| HALLEY, CORNELL & LY | 8,318,500.00 | 5,462,600.00 | 2,855,900.00 |
| HAMBURG, RUBIN, MULL | 3,290,500.00 | 1,950,000.00 | 1,340,500.00 |
| HANEMANN & BATEMAN | 225,250.00 | | 225,250.00 |
| HARPER & DRIVER | 42,500.00 | 42,500.00 | |
| HARTER, SECREST & EM | 1,542,500.00 | | 1,542,500.00 |
| HAYWOOD, DENNY, MILL | 424,600.00 | 396,600.00 | 28,000.00 |
| HEILIGENSTEIN & BADG | 225,000.00 | 225,000.00 | |
| HELM, PLETCHER, HOGA | 525,985.00 | 325,985.00 | 200,000.00 |
| HENDERSON & GOLDBERG | 20,000,675.00 | 9,991,400.00 | 10,009,275.00 |
| HERDON, HARPER & MON | 210,000.00 | 84,000.00 | 126,000.00 |
| HERRON & HERRON | 1,732,800.00 | 1,232,520.00 | 500,280.00 |
| HERTOGS, FLUEGEL, SI | 7,090,300.00 | 3,245,600.00 | 3,844,700.00 |
| HIGHSMITH, STRAUSS & | 75,000.00 | 75,000.00 | |
| HOBERG, FINGER, BROW | 245,000.00 | 245,000.00 | |
| HOFFMAN, FISCHER & B | 7,500.00 | 7,500.00 | |
| HOGAN, SMITH, ALSPAU | 160,760.00 | 160,760.00 | |
| HULLVERSON, HULLVERS | 2,305,000.00 | 2,305,000.00 | |
| HUNTER & FEDULLO | 27,500.00 | 20,000.00 | 7,500.00 |
| HYATT, CRABTREE & MO | 33,500.00 | | 33,500.00 |
| JABLINSKI, FOLINO, R | 50,000.00 | 50,000.00 | |
| JACK K. CLAPPER | 1,265,500.00 | 720,500.00 | 545,000.00 |
| JACOBS & CRUMPLAR, P | 2,894,400.00 | 1,271,500.00 | 1,622,900.00 |
| JAMES H. PORN, LTD. | 225,000.00 | 225,000.00 | |
| JAMES P. FRANTZ & AS | 60,000.00 | | 60,000.00 |
| JAMES P. HOLLORAN | 20,000.00 | 20,000.00 | |
| JAMES WALKER, LTD. | 1,511,255.00 | 1,437,255.00 | 74,000.00 |
| JAMES, GALLIGAN & CO | 1,783,603.00 | 475,803.00 | 1,307,800.00 |
| JAS. W. MEHAFFY, JR. | 558,750.00 | 117,500.00 | 441,250.00 |
| JEFFREY B. HARRISON | 824,000.00 | 216,000.00 | 608,000.00 |
| JERRY NEIL PAUL | 1,118,000.00 | 40,000.00 | 1,078,000.00 |
| JOEL P. LOEFFELHOLZ | 15,000.00 | 15,000.00 | |
| JOHN C. ROBINSON | 1,178,500.00 | 208,000.00 | 970,500.00 |
| JOHN C. SMITH, JR. | 795,000.00 | 522,500.00 | 272,500.00 |
| JOHN E. SUTTER | 129,000.00 | | 129,000.00 |
| JOHN P. ALGAR | 42,500.00 | | 42,500.00 |
| JOHN R. MITCHELL, L. | 56,000.00 | | 56,000.00 |
| JOHN W. NORMAN, INC. | 292,500.00 | | 292,500.00 |
| JOHNS & JOHNS, LTD. | 120,000.00 | 120,000.00 | |

**960**

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| JOHNSON & CHILDS | 127,750.00 | | 127,750.00 |
| JON H. ANDERSON, P.A | 8,500.00 | 8,500.00 | |
| JONES & GRANGER | 454,500.00 | 3,000.00 | 451,500.00 |
| JONES & WILSON | 8,838,600.00 | 8,493,600.00 | 345,000.00 |
| JONES, GALLIGAN, KEY | 274,500.00 | 155,000.00 | 119,500.00 |
| JONES, JONES & ALEXA | 65,000.00 | 65,000.00 | |
| JONES, MAHONEY & BRA | 115,000.00 | 46,000.00 | 69,000.00 |
| JOSEPH A. BYRNE, JR. | 10,000.00 | 10,000.00 | |
| JOSEPH D. SHEIN, P. | 17,370,000.00 | 16,657,000.00 | 713,000.00 |
| JOSEPH F. BUSACCA | 50,000.00 | 50,000.00 | |
| JOSEPH I. FINEMAN | 4,000.00 | 4,000.00 | |
| KARL ASCH, P.A. | 75,000.00 | | 75,000.00 |
| KAZAN, MCCLAIN, EDIS | 37,111,750.00 | 29,353,400.00 | 7,758,350.00 |
| KELLY, OLSON, PUSCH, | 110,000.00 | 110,000.00 | |
| KENNETH E. JOEL, ESQ | 17,100.00 | 6,840.00 | 10,260.00 |
| KENNETH L. KNAPP | 4,320,811.00 | 4,145,811.00 | 175,000.00 |
| KERN & WOOLEY | 140,000.00 | 140,000.00 | |
| KIRCHER & PHALEN | 117,000.00 | 10,400.00 | 106,600.00 |
| KLINE & GORDAN | 12,000.00 | 12,000.00 | |
| KLOVSKY, KUBY, & HAR | 3,064,155.00 | 3,045,810.00 | 18,345.00 |
| KODENSKI AND CANARAS | 18,500.00 | 18,500.00 | |
| KOONZ, MCKENNEY, & J | 697,500.00 | 550,000.00 | 147,500.00, |
| KREINDLER & KREINDLE | 1,221,800.00 | 1,171,800.00 | 50,000.00 |
| KRIST, GUNN, WELLER | 75,000.00 | 75,000.00 | |
| LAKIN & HERNDON, P. | 16,000.00 | | 16,000.00 |
| LAMPKIN, MCCAFFREY & | 147,200.00 | | 147,200.00 |
| LAMPL, SABLE, MAKORO | 175,000.00 | 175,000.00 | |
| LANDAU AND MILLER | 25,000.00 | | 25,000.00 |
| LANGERMAN, BEGAM, LE | 894,500.00 | 650,000.00 | 244,500.00 |
| LARRY CAIN | 1,036,200.00 | 1,036,200.00 | |
| LARRY D. SCHWARTZ | 113,500.00 | 113,500.00 | |
| LATTI ASSOCIATES | 11,282,000.00 | 11,122,000.00 | 160,000.00 |
| LAWRENCE K. BURLEIGH | 46,000.00 | 46,000.00 | |
| LAWTON & CATES, S.C. | 71,000.00 | | 71,000.00 |
| LEO B. DUBLER | 125,000.00 | 125,000.00 | |
| LEONARD LEE FREEDMAN | 30,000.00 | 30,000.00 | |
| LEONARD T. JERNIGAN, | 20,000.00 | | 20,000.00 |
| LERITZ, REINERT & D | 100,000.00 | 100,000.00 | |
| LEVIN, MIDDLEBROOKS, | 211,600.00 | 211,600.00 | |
| LEVINSON, AXELROD, W | 2,593,462.00 | 317,500.00 | 2,275,962.00 |
| LEVINSON, FRIEDMAN, | 8,167,422.00 | 4,018,285.00 | 4,149,137.00 |
| LEVY, PHILLIPS & KON | 9,597,150.00 | 8,694,750.00 | 902,400.00 |
| LIPMAN & WEISBERG | 1,056,250.00 | 31,000.00 | 1,025,250.00 |

PAGE. 6

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| LIPSITZ, GREEN, FAHR | 1,350,900.00 | 460,000.00 | 890,900.00 |
| LOPATIN AND MILLER, | 120,000.00 | | 120,000.00 |
| LOUTOS & LEVENTIS, L | 6,500.00 | | 6,500.00 |
| MADNICK, MILSTEIN, M | 80,000.00 | 80,000.00 | |
| MAGANA, CATHCART, MC | 1,823,000.00 | 1,445,000.00 | 378,000.00 |
| MAHER, RANDY R. | 10,000.00 | | 10,000.00 |
| MAHONEY & MAHONEY, P | 79,000.00 | 79,000.00 | |
| MANDELL & WRIGHT | 50,000.00 | | 50,000.00 |
| MANZA, MOCERI & COLL | 218,000.00 | 218,000.00 | |
| MAPLES & LOMAX, P. A | 543,750.00 | 528,750.00 | 15,000.00 |
| MARITIME ASBESTOS | 5,000.00 | 5,000.00 | |
| MARK B. ARONSON/CHAR | 50,000.00 | 50,000.00 | |
| MARK HODGEMAN | 30,000.00 | 30,000.00 | |
| MARSHALL LAW OFFICES | 40,000.00 | 16,000.00 | 24,000.00 |
| MARTIN & MARTIN, P.C | 65,000.00 | 65,000.00 | |
| MARTIN W. DIES | 808,000.00 | | 808,000.00 |
| MARTZELL,THOMAS & BI | 670,500.00 | 201,000.00 | 469,500.00 |
| MARVIN B. PETERSON | 803,000.00 | 640,000.00 | 163,000.00 |
| MASSA, PIERCE & KING | 80,000.00 | 80,000.00 | |
| MAURICE H. CONNELLY | 16,000.00 | 16,000.00 | |
| MCCARROLL, NUNLEY & | 100,000.00 | 100,000.00 | |
| MCCROSKEY, FELDMAN | 300,000.00 | 150,000.00 | 150,000.00 |
| MCCULLOUGH, WAREHEIM | 30,000.00 | 30,000.00 | |
| MCCUTCHEN, BLACK, VE | 100,000.00 | 100,000.00 | |
| MCDONOUGH, DIGBY & C | 600,000.00 | | 600,000.00 |
| MCGRADY & MCGRADY | 118,750.00 | 118,750.00 | |
| MCQUAID, BEDFORD, B | 18,664,961.00 | 2,602,520.00 | 16,062,441.00 |
| MCTEAGUE, HIGBEE, LI | 1,015,000.00 | 750,000.00 | 265,000.00 |
| MEHAFFY & MILLER | 220,500.00 | | 220,500.00 |
| MERKEL & COCKE, P. A | 120,000.00 | | 120,000.00 |
| MICHAEL B. SERLING | 7,629,500.00 | 3,109,500.00 | 4,520,000.00 |
| MICHIE, HAMLETT, LOW | 1,418,750.00 | 83,400.00 | 1,335,350.00 |
| MIDDLETON & ANDERSON | 5,244,000.00 | 5,216,000.00 | 28,000.00 |
| MILLER & PITT, P. C. | 1,396,000.00 | 737,000.00 | 659,000.00 |
| MILLER, BRODSKY & | 185,000.00 | 185,000.00 | |
| MILLER, COHEN, MARTE | 2,416,222.00 | 197,000.00 | 2,219,222.00 |
| MILLS, TIMMONS & FLO | 44,750.00 | | 44,750.00 |
| MINOR & BENTON | 6,043,500.00 | | 6,043,500.00 |
| MINTZ, LEVIN, COHN , | 97,200.00 | 97,200.00 | |
| MULLIS, MARSHALL, LI | 37,500.00 | 37,500.00 | |
| MULVEY & NOUCAS P. A | 5,133,500.00 | 3,747,500.00 | 1,386,000.00 |
| MURCHISON, TAYLOR KE | 297,200.00 | 297,200.00 | |
| MURRAY & MURRAY | 100,000.00 | | 100,000.00 |

**962**

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| NASS, WIEBELT & NASS | 280,000.00 | 280,000.00 | |
| NELSON, HOSKIN, GROV | 42,500.00 | 17,000.00 | 25,500.00 |
| NESS, MOTLEY, LOADHO | 17,701,875.00 | 11,529,450.00 | 6,172,425.00 |
| NEWMAN & BRONSON | 200,000.00 | 200,000.00 | |
| NICHOLAS ZOLLER | 25,000.00 | 25,000.00 | |
| NORDSTROM, STEELE, B | 8,447,186.00 | 7,705,936.00 | 741,250.00 |
| NUNNALLY & LUMPKIN, | 51,000.00 | | 51,000.00 |
| NURENBURGH, PLEVIN, | 350,000.00 | 350,000.00 | |
| O'BRIEN, SHAFNER, B | 7,057,544.00 | 4,229,144.00 | 2,828,400.00 |
| ODOM, ELLIOTT & MART | 3,308,250.00 | 823,300.00 | 2,484,950.00 |
| OLSON, KULKOSKI, GAL | 100,000.00 | 100,000.00 | |
| ORDAS, ORDAS & | 490,500.00 | 325,000.00 | 165,500.00 |
| PADOVA & HINMAN | 169,000.00 | 114,000.00 | 55,000.00 |
| PATTEN, WORNOM & WAT | 28,167,689.00 | 10,457,759.00 | 17,709,930.00 |
| PAUL, REICH & MYERS | 2,108,525.00 | 1,363,025.00 | 745,500.00 |
| PEARSON & GOLDBERG | 371,500.00 | 371,500.00 | |
| PENDLETON & GAMBLE | 38,500.00 | 38,500.00 | |
| PERLBERGER & HAFT, P | 2,514,800.00 | 839,700.00 | 1,675,100.00 |
| PETER G. ANGELOS | 5,461,505.00 | 1,091,755.00 | 4,369,750.00 |
| PETER HALLGREN | 275,000.00 | 110,000.00 | 165,000.00 |
| PETERS & PETERS | 25,000.00 | 25,000.00 | |
| PFEIFER & FABIAN, PA | 773,500.00 | 74,400.00 | 699,100.00 |
| PHILIP V. LAGO | 50,000.00 | | 50,000.00 |
| PHILLIPS, GARDILL, K | 100,000.00 | 100,000.00 | |
| PHILLIPS, OLORE & DU | 17,500.00 | 17,500.00 | |
| PHILLIPS, RICHARDS & | 221,000.00 | 50,000.00 | 171,000.00 |
| PIERSON & PIERSON | 25,000.00 | 25,000.00 | |
| POPHAM, CONWAY, SWEE | 827,400.00 | 219,150.00 | 608,250.00 |
| POWELL, O'SHEA, HANE | 307,500.00 | | 307,500.00 |
| POZZI, WILSON, ATCHI | 5,313,000.00 | 2,659,000.00 | 2,654,000.00 |
| PREVIANT, GOLDBERG, | 508,000.00 | | 508,000.00 |
| PROCHAZKA, MCGRATH & | 40,000.00 | 40,000.00 | |
| QUARLES & BRADY | 690,000.00 | | 690,000.00 |
| QUINN, GENT BUSECK & | 52,500.00 | 52,500.00 | |
| R. JOHN WESTBERRY | 40,000.00 | 40,000.00 | |
| RANDALL A. BONO, LTD | 980,500.00 | 160,000.00 | 820,500.00 |
| RANDY H. KAPLAN | 250,000.00 | 100,000.00 | 150,000.00 |
| RANKIN & SULTAN | 485,000.00 | 15,000.00 | 470,000.00 |
| RAUTH & CHIHAK | 75,000.00 | 75,000.00 | |
| REAUD, MORGAN & QUIN | 40,000.00 | 40,000.00 | |
| RICHARD D. GOLDBERG | 20,000.00 | 20,000.00 | |
| RICHARD F. PATE, P. | 1,526,400.00 | 1,483,900.00 | 42,500.00 |
| RICHARD LEVINE | 70,000.00 | | 70,000.00 |

963

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| RICHARD M. BADER P.A | 10,500.00 | | 10,500.00 |
| RICHARD N. BUSH | 24,000.00 | 24,000.00 | |
| ROBBINS, RUBINSTEIN | 1,423,650.00 | 327,000.00 | 1,096,650.00 |
| ROBERT C. WEISENBERG | 675,000.00 | | 675,000.00 |
| ROBERT E. SWEENEY CO | 7,106,500.00 | 6,177,500.00 | 929,000.00 |
| ROBERT J. COONEY & A | 20,129,297.00 | 18,897,497.00 | 1,231,800.00 |
| ROBERT RAMSEY | 3,502,000.00 | 3,502,000.00 | |
| ROBERT S. WALDER | 200,000.00 | 200,000.00 | |
| ROBERT T. SEIWELL | 15,500.00 | 15,500.00 | . . . |
| ROBINSON & RAYFIELD | 125,000.00 | 125,000.00 | |
| ROGER B. LANE, ATTOR | 922,500.00 | 922,500.00 | |
| ROGER N. MESSER, P.A | 120,000.00 | 120,000.00 | |
| ROSE, KLEIN & MARIAS | 54,278,220.00 | 45,479,620.00 | 8,798,600.00 |
| ROSENBLUM, GOLDENHER | 75,000.00 | 75,000.00 | |
| ROSSCUP & KRAGH | 302,500.00 | 61,000.00 | 241,500.00 |
| ROTKO & CRESKOFF | 8,500.00 | 3,400.00 | 5,100.00 |
| ROWLAND & ROWLAND P. | 5,626,500.00 | 4,161,800.00 | 1,464,700.00 |
| SACHS, NUNN, KATES, | 811,500.00 | 95,000.00 | 716,500.00 |
| SACKS & SACKS | 85,000.00 | | 85,000.00 |
| SAYRE, MORENO, PURCE | 100,000.00 | | 100,000.00 |
| SCHECHTER AND EISENM | 71,000.00 | | 71,000.00 |
| SCHNEIDER, REILLY, Z | 5,577,937.00 | 4,306,937.00 | 1,271,000.00 |
| SCHROETER, GOLDMARK | 13,832,592.00 | 8,292,296.00 | 5,540,296.00 |
| SEWARD, TALLY & PIGG | 156,000.00 | 156,000.00 | |
| SHERMOEN, LEDUC & JA | 315,000.00 | | 315,000.00 |
| SHOR, LEVIN & WEISS | 7,794,500.00 | 6,263,000.00 | 1,531,500.00 |
| SHORT, SHORT, TELSTA | 55,000.00 | | 55,000.00 |
| SILVERGATE, GERTNER | 34,500.00 | 34,500.00 | |
| SILVERMAN, SILVERMAN | 115,000.00 | 115,000.00 | |
| SIMKE, CHODOS, SILBE | 6,655,500.00 | 6,233,500.00 | 422,000.00 |
| SKLARZ & EARLY | 5,563,000.00 | 4,950,000.00 | 613,000.00 |
| SPANGENBERG, SHIBLEY | 90,000.00 | 90,000.00 | |
| SPITLER & WILLIAMS-Y | 40,000.00 | | 40,000.00 |
| STAFNE & DOYLE | 98,000.00 | 98,000.00 | |
| STANFORD & BOHANNON | 1,825,000.00 | 1,660,000.00 | 165,000.00 |
| STANLEY R. GUSTAFSON | 114,000.00 | 57,000.00 | 57,000.00 |
| STEINGOLD & STEINGOL | 30,000.00 | | 30,000.00 |
| STEMPLE & BOYAJIAN | 3,725,695.00 | 2,442,195.00 | 1,283,500.00 |
| STEPHEN & HARRIS, P. | 40,000.00 | | 40,000.00 |
| STEPHEN A. KATZ, P. | 1,244,946.00 | 92,461.00 | 1,152,485.00 |
| STEPHEN A. SHELLER & | 120,000.00 | | 120,000.00 |
| STEPHEN LAUDIG, P. C | 1,851,400.00 | 1,562,400.00 | 289,000.00 |
| STEPHEN M. FELDMAN, | 355,000.00 | 355,000.00 | |

**964**

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| STEPHENSON & THOMPSO | 7,932,500.00 | 3,233,500.00 | 4,699,000.00 |
| STEPHENSON, THOMPSON | 5,617,750.00 | 774,000.00 | 4,843,750.00 |
| STERL F. SHINABERRY | 1,279,850.00 | 583,800.00 | 696,050.00 |
| STERNS & INGRAM | 1,206,663.00 | 412,500.00 | 794,163.00 |
| STERNS & WALKER | 4,689,830.00 | 4,652,330.00 | 37,500.00 |
| STEVEN BRUCE STEIN | 290,000.00 | 150,000.00 | 140,000.00 |
| STEVEN H. WODKA, ATT | 2,009,050.00 | 255,200.00 | 1,753,850.00 |
| STUART H. BRICKNER, | 345,000.00 | 345,000.00 | |
| SULLIVAN & LIAPAKIS | 397,500.00 | | 397,500.00 |
| SUMMERS, MCCREA & WY | 2,751,000.00 | 2,100,000.00 | 651,000.00 |
| TABAK & MELLUSI | 100,000.00 | 100,000.00 | |
| TAFT, TAFT & HAIGLER | 1,858,400.00 | 1,858,400.00 | |
| TAUNIA THOMPSON ELIC | 327,500.00 | | 327,500.00 |
| TERRENCE M. JOHNSON | 260,000.00 | | 260,000.00 |
| THE DAVIS FIRM | 339,500.00 | 8,500.00 | 331,000.00 |
| THOMAS A. BAIZ, JR. | 175,000.00 | 70,000.00 | 105,000.00 |
| THOMAS ALLEN DEAS | 50,000.00 | 50,000.00 | |
| THOMAS J. YOUNG & AS | 75,000.00 | 75,000.00 | |
| THOMAS MARTIN | 1,457,500.00 | 1,457,500.00 | |
| THOMAS W. CLARKE | 120,000.00 | 120,000.00 | |
| THOMAS, ROBERT EMMET | 37,000.00 | 37,000.00 | |
| THORNTON & EARLY | 15,194,550.00 | 12,616,200.00 | 2,578,350.00 |
| TILTON, BECK & HOFFM | 406,132.00 | 406,132.00 | |
| TOM UPCHURCH, JR. & | 1,045,500.00 | | 1,045,500.00 |
| TOMAR, SIMONOFF, ADO | 5,526,000.00 | 2,570,000.00 | 2,956,000.00 |
| TOWNSLEY, BUSH, LEWI | 117,500.00 | 27,500.00 | 90,000.00 |
| TRACY AND ASSOCIATES | 108,500.00 | | 108,500.00 |
| TRENT L. SEAWELL | 130,000.00 | 130,000.00 | |
| TURREY A. KEPLER | 58,000.00 | 58,000.00 | |
| UMPHREY, SWEARINGEN | 2,188,750.00 | 77,000.00 | 2,111,750.00 |
| UMPHREY, SWEARINGEN, | 109,850,309.00 | 23,499,000.00 | 86,351,309.00 |
| UNGERMAN & IOLA | 730,000.00 | 128,000.00 | 602,000.00 |
| VENABLE AND VENABLE, | 6,658,900.00 | 3,009,000.00 | 3,649,900.00 |
| VERDERAIME & DUBOIS, | 308,000.00 | 308,000.00 | |
| VONACHEN, LAWLESS, T | 641,600.00 | 221,600.00 | 420,000.00 |
| WAGONER, STEINBERG, | 800,000.00 | | 800,000.00 |
| WALLACE AND POPE | 20,000.00 | | 20,000.00 |
| WALLACE, WHITLEY, PO | 638,100.00 | 344,200.00 | 293,900.00 |
| WALTER M. HACKETT, J | 10,000.00 | 10,000.00 | |
| WALTER P. FONTENOT | 175,000.00 | 175,000.00 | |
| WALTHEW, WARNER, COS | 1,670,481.00 | 412,731.00 | 1,257,750.00 |
| WASSERWALD & BOATNER | 1,304,000.00 | 1,294,000.00 | 10,000.00 |
| WELLBORN, HOUSTON, | 13,315,000.00 | 11,020,000.00 | 2,295,000.00 |

PAGE 10

MANVILLE PERSONAL INJURY SETTLEMENT TRUST
QUALIFIED CLAIM TOTALS BY LAW FIRM
AS OF: 12/13/90

| Law Firm | Resolution Amount | Actual Payment | Unpaid Amount |
|---|---|---|---|
| WILENTZ, GOLDMAN & | 46,481,400.00 | 31,627,500.00 | 14,853,900.00 |
| WILHELM, THOMPSON, W | 51,000.00 | 51,000.00 | |
| WILLIAM B. STREMEL | 116,000.00 | 95,000.00 | 21,000.00 |
| WILLIAM P. FEDULLO | 214,500.00 | 163,000.00 | 51,500.00 |
| WILLIAM T. KELLY | 20,000.00 | | 20,000.00 |
| WILLIAMS & BOYD | 90,000.00 | 90,000.00 | |
| WILLIAMS, KLUKOWSKI, | 800,000.00 | 800,000.00 | |
| WILLIAMS, TRINE, GRE | 2,120,000.00 | 705,000.00 | 1,415,000.00 |
| WINDHORST, GAUDRY, T | 1,118,500.00 | 858,500.00 | 260,000.00 |
| WINSTON & CASHATT | 954,500.00 | 411,800.00 | 542,700.00 |
| WINTERING LAW OFFICE | 120,000.00 | 36,000.00 | 84,000.00 |
| WISEMAN, SHAIKEWITZ, | 45,000.00 | 45,000.00 | |
| WOLF & WOLF | 660,750.00 | 240,400.00 | 420,350.00 |
| WOLL, CROWLEY, BERMA | 110,000.00 | | 110,000.00 |
| WYSOKER, GLASSNER, W | 6,160,274.00 | 2,469,848.00 | 3,690,426.00 |
| YOUNG & REVERMAN | 62,000.00 | | 62,000.00 |
| YOUNG & YOUNG | 1,281,288.00 | 1,073,538.00 | 207,750.00 |
| ZIFF, WEIERMILLER & | 132,500.00 | | 132,500.00 |
| TOTAL | 1,128,927,988.00 | 679,836,619.00 | 449,091,369.00 |

APPENDIX D-1

Manville Personal Injury Settlement Trust

AS1 - STAT48B
Date: 05/01/91

Counts of Qualified, Unsettled POC's
By Highest Count.
(Firms with 100 or less cases omitted)

| Law Firm | POC Count | |
|---|---|---|
| MARITIME ASBESTOS | 11083 | (Leonard C. Jaques) |
| PETER G. ANGELOS | 9389 | |
| GREITZER & LOCKS | 5651 | |
| HENDERSON & GOLDBERG | 5064 | |
| NESS, MOTLEY, LOADHO | 4332 | |
| BARON & BUDD | 3280 | |
| ASBESTOS GROUP, P.A. | 3138 | |
| THORNTON & EARLY | 3114 | |
| BROOKMAN, ROSENBERG, | 2906 | |
| WILENTZ, GOLDMAN & | 2418 | |
| ASHCRAFT & GEREL | 2257 | |
| HAROLD W. NIX AND AS | 2058 | |
| PERLBERGER & HAFT, P | 1779 | |
| BROBYN & FORCENO | 1760 | |
| ALLEN L. ROTHENBERG | 1749 | |
| PRO SE | 1717 | |
| ROBERT E. SWEENEY CO | 1700 | |
| ROBBINS, RUBINSTEIN | 1613 | |
| ROSE, KLEIN & MARIAS | 1468 | |
| SPANGENBERG, SHIBLEY | 1329 | |
| BROWN, TERRELL, HOGA | 1280 | |
| BURROW & WILLIAMS | 1270 | |
| WEITZ & LUXENBERG, P | 1256 | |
| STERNS & INGRAM | 1201 | |
| CAROSELLI, SPAGNOLLI | 1153 | |
| GARRUTO, GALEX & CAN | 1132 | |
| GEORGE W. HOWARD III | 1094 | |
| DAVID M. WEINFELD | 1054 | |
| MAPLES & LOMAX, P. A | 1053 | |
| DAVIS & LEWIS | 1047 | |
| CHERRY, FERRARA, MUT | 1031 | |
| ANAPOL, SCHWARTZ, WE | 1004 | |
| SIMKE, CHODOS, SILBE | 999 | |
| STEPHEN L. SHACKELFO | 962 | |
| CARTWRIGHT, SLOBODIN | 934 | |
| ROWLAND & ROWLAND P. | 902 | |
| CUPIT, JONES & FAIRB | 900 | |
| JOSEPH D. SHEIN, P. | 886 | |
| RANDALL A. BONO, LTD | 885 | |
| A. RUSSELL SMITH | 880 | |
| MICHAEL F. COLLEY | 866 | |
| CASEY, GERRY, CASEY, | 864 | |
| LEONARD C. JAQUES | 862 | |

Manville Personal Injury Settlement Trust

AS1 — STAT48B
Date: 05/01/91

Counts of Qualified, Unsettled POC's
By Highest Count.

| Law Firm | POC Count |
| --- | --- |
| ROBERT J. COONEY & A | 858 |
| HAWKINS & NORRIS | 845 |
| UMPHREY, SWEARINGEN | 767 |
| UMPHREY, BURROW, REA | 763 |
| ALLEN RODMAN, P. C. | 737 |
| LANE & GOSSETT | 711 |
| SKLARZ & EARLY | 705 |
| JACK K. CLAPPER | 702 |
| WILSON & BAILEY | 688 |
| MCQUAID, BEDFORD, B | 677 |
| CONNERTON, RAY & SIM | 673 |
| MICHAEL P. CASCINO | 668 |
| JONES & GRANGER | 614 |
| HERTOGS, FLUEGEL, SI | 602 |
| LIPSITZ, GREEN, FAHR | 598 |
| STEPHEN A. KATZ, P. | 598 |
| VENABLE AND VENABLE, | 597 |
| CUMBEST, CUMBEST, HU | 590 |
| STEMPLE & BOYAJIAN | 542 |
| SCHROETER, GOLDMARK | 533 |
| DONALD A. MARSHALL, | 529 |
| HERSCHEL L. HOBSON | 527 |
| BOCKOFF, ZAMLER, MEL | 515 |
| JACOBS & CRUMPLAR, P | 500 |
| JOHN W. NORMAN, INC. | 467 |
| KOONZ, MCKENNEY, & J | 457 |
| WYSOKER, GLASSNER, W | 457 |
| GLASSER & GLASSER | 455 |
| TOMAR, SIMONOFF, ADO | 450 |
| LEVY, PHILLIPS & KON | 437 |
| BYRD, DAVIS & EISENB | 435 |
| COONEY AND CONWAY | 434 |
| LEVINSON, FRIEDMAN, | 423 |
| ARTHUR L. PETERSEN, | 422 |
| JONES & WILSON | 417 |
| RHODEN, LACY & NELSO | 411 |
| GERTLER, GERTLER & | 410 |
| STERL F. SHINABERRY | 389 |
| GALIHER DEROBERTIS L | 388 |
| PAUL, REICH & MYERS | 368 |
| TERRENCE M. JOHNSON | 362 |
| JERRY NEIL PAUL | 358 |
| RICHARD F. PATE, P. | 356 |

ASI — STAT48B
Date: 05/01/91

Manville Personal Injury Settlement Trust

Counts of Qualified, Unsettled POC's
By Highest Count.

| Law Firm | POC Count |
|------|-------|
| KAZAN, MCCLAIN, EDIS | 333 |
| PFEIFER & FABIAN, PA | 330 |
| BAGGETT, MCCALL, & B | 328 |
| ROBLES & GONZALEZ | 317 |
| REAUD, MORGAN & QUIN | 307 |
| TAFT, TAFT & HAIGLER | 303 |
| MINOR & BENTON | 297 |
| GILLENWATER, NICHOL | 294 |
| EMBRY AND NEUSNER | 280 |
| SCHNEIDER, REILLY, Z | 278 |
| BRAYTON & ASSOCIATES | 272 |
| CLIFFORD W. CUNIFF | 261 |
| MS ASBESTOS ASSOCIAT | 260 |
| ABRAHAM, WATKINS, NI | 257 |
| KITCHENS & MCRAE | 245 |
| LEVINSON, AXELROD, W | 245 |
| MILLER, COHEN, MARTE | 245 |
| BALDWIN & BALDWIN | 240 |
| BROWN & FINNEY | 234 |
| GOODMAN, MEAGHER & E | 233 |
| LAKIN & HERNDON, P. | 232 |
| JAMES P. HOLLORAN | 230 |
| PATTEN, WORNOM & WAT | 226 |
| ODOM, ELLIOTT & MART | 224 |
| WILLIAMS, TRINE, GRE | 223 |
| JEFFREY B. HARRISON | 212 |
| VASOS, KUGLER & DICK | 206 |
| MARTIN W. DIES | 203 |
| FARACI, GUADAGNINO, | 202 |
| HAMBURG, RUBIN, MULL | 196 |
| NORDSTROM, STEELE, B | 186 |
| ASBESTOS ASSOCIATES | 184 |
| O'BRIEN, SHAFNER, B | 184 |
| GREENE, KETCHUM, BAI | 183 |
| BEVAN & ECONOMUS | 179 |
| BRUCE LEE AHNFELDT | 176 |
| LEVIN, MIDDLEBROOKS, | 173 |
| GERALD A. DICKERSON | 172 |
| LAWRENCE HANNAWAY & | 169 |
| CRAFT, THOMPSON, & B | 168 |
| MORRIS EISEN & PERRY | 167 |
| LATTI ASSOCIATES | 165 |
| WILLIAM C. FIELD & T | 163 |

AS1 — STAT48B
Manville Personal Injury Settlement Trust Date: 05/01/91

Counts of Qualified, Unsettled POC's
By Highest Count.

| Law<br>Firm | POC<br>Count |
|---|---|
| DAVID M. LIPMAN P. A | 161 |
| ASHFORD & HASTINGS | 157 |
| HALLEY, CORNELL & LY | 157 |
| BERNSTEIN, BERNSTEIN | 151 |
| ADAMS, CESARIO & ATK | 144 |
| WALLACE, WHITLEY & B | 144 |
| POPHAM, CONWAY, SWEE | 142 |
| LANDAU AND MILLER | 141 |
| HAL C. PITKOW & ASSO | 140 |
| MICHAEL B. SERLING | 140 |
| MICHIE, HAMLETT, LOW | 140 |
| RICHARD A. BOCKOFF | 140 |
| UNGERMAN & IOLA | 140 |
| MCTEAGUE, HIGBEE, LI | 139 |
| GOLDMAN & SKEEN | 138 |
| CHAMBERLAIN, D'AMAND | 137 |
| JOHN C. ROBINSON | 136 |
| CUNNINGHAM, LYONS & | 135 |
| CALWELL, MCCORMICK & | 133 |
| GARDNER, ROBEIN, & U | 130 |
| SHELBY & CARTEE | 130 |
| CARLSON, ROBINSON & | 128 |
| MORENO, PURCELL & SC | 125 |
| WELLBORN, HOUSTON, | 125 |
| GEORGE S. HENDERSON | 122 |
| POZZI, WILSON, ATCHI | 119 |
| ROBERT PEIRCE & ASSO | 116 |
| STEPHENSON, THOMPSON | 115 |
| WILLIAM C. FIELD | 114 |
| HARTER, SECREST & EM | 111 |
| LATTOF & LATTOF | 111 |
| DICKSTEIN, SHAPIRO | 108 |
| ROBERT RAMSEY | 108 |
| JAMES R. HARTZOG | 107 |
| VONACHEN, LAWLESS, T | 107 |
| GREENFIELD & ASSOCIA | 101 |

**970**

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 and
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
 :
In re JOINT EASTERN AND SOUTHERN NYAL
DISTRICTS ASBESTOS LITIGATION : Index No. 4000

------------------------------------x

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
 :
In re JOHNS-MANVILLE CORPORATION, In Proceedings For A
et al. : Reorganization Under
 Chapter 11. Case Nos.
 : 82 B 11656 (BRL)
 through 82 B 11676 (BRL),
 : Inclusive

 Debtors. :

------------------------------------x

------------------------------------x
BERNADINE K. FINDLEY, as :
Executrix of the Estate of C.A. No. 90-3973 (E.D.N.Y.)
HILLIARD FINDLEY, UMA LAIL : C.A. No. 90-7158 (S.D.N.Y.)
CALDWELL, as Executrix of the
Estate of ODELL CALDWELL, :
EDWARD LINDLEY, JOSEPH C. JONES,
and JAMES WILLIAM BARNETTE, JR., :
on behalf of themselves, and all
others similarly situated as :
beneficiaries of the Manville
Personal Injury Settlement Trust, :

 Plaintiffs, : ORDER AND
 FINAL JUDGMENT
 -against- :

DONALD M. BLINKEN, DANIEL FOGEL, :
FRANCIS H. HARE, JR., CHRISTIAN
E. MARKEY, JR. and JOHN C. :
SAWHILL, not individually but
solely in their capacities as :
Trustees of the Manville Personal
Injury Settlement Trust, :

 Defendants. :
```

It is hereby ORDERED, ADJUDGED AND DECREED that:

1. The Notice of Pendency of Class Action, Class Action Determination, Proposed Settlement of Class Action and Settlement Hearing (the "Notice") which was mailed on November 28, 1990 to all known members of the Class, and thereafter between November 28, 1990 and December 17, 1990, Exhibits A and B to the Stipulation of Settlement were mailed to all known members of the Class, and the public dissemination of the Notice through print advertising on November 30, 1990, and further public dissemination of the Notice through print advertising between December 29, 1990 and otherwise continuing through January 9, 1991 is determined to constitute the best notice practicable in the circumstances and in full compliance with the requirement of Rule 23 of the Federal Rules of Civil Procedure and the requirements of applicable law and due process of law and approved nunc pro tunc.

2. The action of the trustees (the "Trustees") of the Manville Personal Injury Settlement Trust (the "Trust") in causing the Trust to commence the Limited Fund Proceeding and the execution, delivery and performance of the Stipulation by the Trustees and the Trust are authorized and approved.

3. The terms of the settlement as set forth in the Stipulation are the product of good-faith arms' length bargaining among counsel for the parties, without collusion among the parties or their counsel, and the Class

-2-

representatives and the representative of the future claimants have thoroughly reviewed and approved such terms prior to the hearings by the Court on the fairness of such settlement.

4. The settlement as set forth in the Stipulation is fair, adequate and reasonable with respect to all Class members, and is hereby approved in all respects, and the Class representatives and defendants are directed to consummate the settlement in accordance with the terms and provisions of the Stipulation.

5. The Action is hereby dismissed with prejudice on the merits as to (i) each and every one of the named defendants in the Action (regardless of whether such defendant has been served or entered an appearance in the Action) and the Trust and all Co-Defendants, distributors, shipowners, and all others, and (ii) each and every one of the plaintiffs and all members of the Class, and each of them, whether known or unknown, and their heirs, executors, administrators, successors, assigns and guardians, without costs.

6. The plaintiffs and each and every member of the Class, whether directly or in any other capacity, whether known or unknown, and any of their respective heirs, executors, administrators, successors, assigns, and guardians, as well as their agents, other representatives and counsel, are hereby permanently barred and enjoined from instituting or prosecuting in any other action in any court of this or any other jurisdiction, whether state or federal or foreign, any claims,

rights or causes of action, whether known or unknown, that have been, could have been or in the future might be asserted, whether directly derivatively, representatively or in any other capacity, which claims, rights or causes of action are in connection with or arise now or hereafter out of, or relate to any of the facts or claims that have been or could have been alleged in the Action (the "Settled Claims").

7. Each member of the plaintiff class is permanently enjoined from commencing or maintaining any action or proceeding, or taking or refusing to take any other action, with respect to the rights of such class member against the Trust, except as provided in the Stipulation.

8. The class representatives are authorized and directed to execute, and they are deemed to have already executed, on behalf of themselves and all class members, and shall deliver to the Trustees and Manville Corporation, unconditional releases and covenants not to sue in the form of Attachment A hereto, and said releases and covenants shall be forever binding upon all members of the Class.

9. The settlement of the rights of the named representatives of the Class and all members of the Class against the Trust and Manville Corporation effected by this Order shall not be deemed to modify any provision of the Second Amended and Restated Plan of Reorganization of Johns-Manville Corp., et al. (the "Plan"), or except as expressly provided in the Stipulation, any documents entered into in connection

-4-

therewith or any order of the Bankruptcy court entered in connection with the Plan or the confirmation thereof.

10. All members of the Class, whether known or unknown, and any of their respective heirs, executors, administrators, successors, assigns, and guardians, as well as their agents, other representatives and counsel, are hereby stayed, restrained and enjoined from taking one or more of the following actions for the purposes of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Health Claim or Other Asbestos Obligation (other than actions brought to enforce any right or obligation under the Stipulation):

(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation in a state or federal or foreign judicial, arbitral, administrative or other forum) against or affecting Manville Corporation or any of its present, former or future affiliates (collectively, "Manville") or any property of any of the foregoing or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferee or successor;

(b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether

-5-

directly or indirectly, any judgment, award, decree or other order against Manville or any property of any of the foregoing or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferee or successor;

(c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind against Manville or any property or any of the foregoing, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing, or any property of any such transferee or successor;

(d) setting-off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to Manville, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing; and

(e) proceeding in any manner and any place with regard to any matter that is subject to resolution pursuant to the Stipulation, except in conformity and compliance therewith. The provisions of this decretal paragraph 10 and the subdivisions thereof shall be forever binding on all members of the Class and shall not be subject to modification or review in the future, other than by appeal from this Order.

11. Mark Peterson, Esq. (and any duly appointed successor) is hereby appointed to serve in the capacity of Special Advisor to the Trust and to perform all such duties as are contemplated by the Stipulation.

12. Robert B. Steinberg, Ronald L. Motley and a third person duly appointed pursuant to the Plan (and any duly appointed successors) are hereby authorized to continue to serve in the capacity of Selected Counsel for the Beneficiaries and to perform all such duties as are contemplated by the Stipulation.

13. Jurisdiction is hereby reserved over all matters relating to compliance with the terms and conditions of the Stipulation.

Dated: Brooklyn and New York,
 New York
 May 16, 1991

 _____
 U.S.D.J.

 _____
 U.S.D.J.

-7-

APPENDIX F

UNITED STATES DISTRICT COURT
 and
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

In the Matter of : 82 B 11656/76
 (BRL)
 :

 JOHNS-MANVILLE CORPORATION
 et al., :

 Debtors. :

- - - - - - - - - - - - - - - - - -x

### ORDER REAFFIRMING THE INJUNCTION
### CONTAINED IN THE CONFIRMATION ORDER

The Second Amended and Restated Plan of
Reorganization, as amended (the "Plan"), of Manville
Corporation and the other debtors herein (collectively
"Manville") provided, inter alia, that the Manville Personal
Injury Settlement Trust (the "Trust") would assume all of
Manville's present and future asbestos health liabilities
and that Manville itself would no longer be subject to
asbestos-related claims. After the bankruptcy court had
appointed a legal representative to protect the interests of
those who would make asbestos-related health claims in the
future ("future claimants"), after notice had been duly
given to the future claimants and all other parties in
interest, and after a full evidentiary hearing had been
held, the bankruptcy court entered an order dated
December 22, 1986 confirming the Plan (the "Confirmation Order"

978

Paragraph 29 of the Confirmation Order enjoins all future claimants, among others, from taking specified actions against Manville and certain other entities with respect to asbestos-related claims (the "Injunction"). The issuance of the Injunction was a condition precedent to the confirmation and consummation of the Plan and was essential to the Plan's implementation.

By order dated July 15, 1987 the district court affirmed the Confirmation Order in all respects. On March 30, 1988, the court of appeals affirmed the district court's order, but because no future claimants had objected to the Injunction and their legal representative had unequivocally supported it, the court of appeals did not specifically determine whether the Injunction impermissibly infringes the rights of the future claimants. The Plan was consummated on November 28, 1988.

On November 26, 1990 Manville made an application to these courts (the "Application") for an order (a) reaffirming the Injunction and (b) declaring that as a matter of law the Injunction, being an integral part of a confirmed and consummated plan of reorganization under Chapter 11 of the Bankruptcy Code, will not hereafter be subject to revocation or modification. By order to show cause dated November 26, 1990 these courts directed that a hearing be held on January 2, 1991 and thereafter to consider the Application; that notice of that hearing be

-2-

published in newspapers having nationwide circulation and mailed to all Trust beneficiaries whose names and addresses appear in the records of the Trust; and that any papers opposing or responding to the Application be served and filed on or before December 21, 1990. The courts appointed Leslie Gordon Fagen, Esq., to serve as legal representative for the future claimants (the "Legal Representative") in connection with the Application. The Legal Representative does not oppose the Application and has advised the courts that, in his opinion, Manville's "continued financial health . . . is of critical importance to the future claimants."

In the Confirmation Order the bankruptcy court made an express finding that the Injunction is essential to the viability of Manville's business operations and to the successful implementation of the Plan. On the basis of the undisputed evidence and submissions now before these courts, the finding that the Injunction is necessary and essential is reaffirmed. Payments to asbestos health claimants could not and cannot be implemented unless Manville continues to be shielded from all asbestos-related claims, including claims by future claimants.

NOW, upon the Application and all papers submitted in support thereof (no papers in opposition having been received), the stenographic record of the hearing held on January 2, 1991 to consider the Application, the Special Master's Report dated November 3, 1990 (which Report, and

-3-

the findings and recommendations contained therein, were adopted by these courts pursuant to F.R. Civ. P. 53(e)(2) by order dated January 15, 1991), the record on which that Report was based, and the entire record of these cases; and after due deliberation thereon; it is hereby

ORDERED, ADJUDGED AND DECREED, that the Application is in all respects GRANTED; and it is further

ORDERED, ADJUDGED AND DECREED, that the Injunction is hereby reaffirmed; and it is further

ORDERED, ADJUDGED AND DECREED, that as the Injunction is an integral part of a confirmed and consummated plan of reorganization under Chapter 11 of the Bankruptcy Code it is not subject to revocation or modification in the future.

Dated: New York and Brooklyn, N.Y.
 May 16, 1991

_____
Jack B. Weinstein
United States District Judge

_____
Burton R. Lifland
Chief United States Bankruptcy Judge

-4-